UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LILLIE BRANTLEY, by her guardian ad litem Chauncey McLorin; GILDA GARCIA; ALLIE JO WOODARD, by her guardian ad litem Linda Gaspard-Berry, individually and on behalf of all other similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>DAVID MAXWELL-JOLLY, Director of the Department of Health Care Services, State of California, DEPARTMENT OF HEALTH CARE SERVICES,<br><br>Defendants. | Case No:  C 09-3798 SBA<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Docket 14, 25 |

Plaintiffs are elderly persons and adults with disabilities who bring this class action suit against Defendants California Department of Health Care Services and its Director (Defendants) to stop funding cuts in the Medi-Cal Adult Day Health Care (ADHC) program. ADHC is a community-based program for low income seniors and younger disabled adults that provides health care and other services at centers located throughout California.  As a result of the state's current fiscal crisis, the state legislature enacted Assembly Bill ABX4 5 as part of the Budget Act of 2009, which will temporarily reduce ADHC services from a maximum of five to three days per week.  Plaintiffs allege that this reduction will place them along with putative Class Members at risk of hospitalization and/or institutionalization in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*

The parties are presently before the Court on Plaintiffs' motion to preliminarily enjoin Defendants from reducing, terminating or modifying ADHC program benefits to the Plaintiffs and Class Members from four or five days per week, to a maximum of three days per week, pursuant to ABX4 5, unless and until alternate Medi-Cal services are provided, including

through reasonable modifications to the program, which prevent inappropriate institutionalization in violation of their rights under the ADA and Section 504.  On September 9, 2009, the Court conducted an extensive hearing on the motion.  Having read the papers submitted and considered the arguments of counsel, the Court hereby GRANTS Plaintiffs' motion for preliminary injunction.

## I.      BACKGROUND

### A.      BACKGROUND OF THE ADHC PROGRAM

ADHC is a Medi-Cal funded community-based program for low income seniors and younger disabled adults.[1]  More specifically, ADHC is an organized day care program that includes therapeutic, social and skilled nursing health activities for the purpose of restoring or maintaining optimal capacity for self care.  Peach Decl. ¶ 3.  ADHC services are administered by non-profit and for profit providers which are licensed by the state, and operate centers throughout the state.  Individuals who live at home or in licensed residential care facilities participate from one to five days per week (for a period of four hours per day), depending on their assessed needs.  While the majority of persons served are elderly, ADHC centers also serve non-elderly adults with chronic disabling mental health, cognitive or physical conditions.

Individuals wishing to receive ADHC services must obtain their medical history and physical information from their personal physician (if they have one) and participate in a three-day assessment performed by a multi-disciplinary team of clinicians including physicians, registered nurses, social workers, physical therapists, recreational therapists and dieticians, among others.  Missaelides Decl. ¶ 22.  The multidisciplinary team designs an Individual Plan of Care (IPC) that specifies the types of services the applicant requires and the amount of time

---

[1] Medicaid is a cooperative federal-state program that authorizes the federal government to provide funds to participating states to administer medical assistance to individuals "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. The program authorizes the government to pay a percentage of the costs incurred by a participating state for patient care, provided that the state complies with certain federal requirements.  42 U.S.C. § 1396a.  California participates in Medicaid through the California Medical Assistance Program (Medi-Cal), and has designated its Department of Health Care Services as the agency responsible for its administration. Cal. Welf. & Inst.Code §§ 10720, 14000.

each week those services are necessary, which is then sent for review to the Medi-Cal field office with a Treatment Authorization Request.  Id.

The IPC includes a number of certifications.  One of those certifications, identified as Medical Necessity Criterion #5, finds that:  "The participant's condition or conditions require all of the ADHC services set forth in boxes 20-23 on each day of attendance that are individualized and designed to maintain the ability of the participant to remain in the community and avoid emergency department visits, hospitalizations, or other institutionalization."  Davis Decl., Exh. A at 5 (emphasis in original).  The IPC also certifies that the participant meets the criteria for services, including a determination that if services are not provided, "a high potential exists for the deterioration of the participant's medical, cognitive, or mental health condition or conditions in a manner likely to result in emergency department visits, hospitalization, or other institutionalization if adult day care services are not provided."  Cal. Welf. & Inst. Code § 14526.1(d)(4); Davis Decl. ¶ 18, McCloud Decl. ¶ 17, Toth Decl. ¶ 13, Puckett Decl. ¶ 12, Myers Purkey Decl. ¶ 17.  The IPC must be reapproved every six months by Medi-Cal, at which point the ADHC center reassesses the participant and revises the IPC, if necessary.  Missalaedes Decl. ¶ 23.

### B.   FACTS RELATING TO PLAINTIFFS

#### 1.   Lillie Brantley

Lillie Brantley is an 84-year old woman severely impaired by Alzheimer's disease and inflicted with hyperlipidemia, seizure disorder, atrial fibrillation, has had a stroke, and is frail. Davis Decl. ¶ 28; McLorin Decl. ¶ 3.  For the last three years, she has been receiving services through the Bayview Hunter's Point ADHC program in San Francisco, California.  McLorin Decl. ¶ 4.  She is authorized to receive Medi-Cal funded ADHC services five days a week. Davis Decl. ¶¶ 26, 30.  In accordance with her IPC, Ms. Brantley receives:  daily professional nursing services to monitor her hypertension, monitor and control her seizures and monitor her weight loss; daily personal care services to assist with her feeding, toileting, and ambulation, as well as to monitor her whereabouts; daily social services to improve her mood and behaviors, which relate to her dementia; semi-weekly physical therapy maintenance to reduce her risk for

falls and to maintain her current functioning; semi-weekly occupational therapy services to maintain her functional strength; and nutritional monitoring in connection with her hypertension and her recent weight loss.  Id. ¶ 30.

In addition to attending and receiving services at the ADHC program five days per week, she receives 283 hours of In-Home Supportive Services (IHSS), including protective care, through the Medi-Cal program, which is her limit.  Id. ¶ 10.  Ms. Brantley can never be left alone, given her cognitive and health impairments.  McLorin Decl. ¶ 6.  She lives with her great niece Chauncey McLorin and Ms. McLorin's 15-year old daughter.  Id. ¶ 3.  If Ms. Brantley is unable to receive services from the ADHC center five days a week, there are no persons or services readily available to fill that void.  Id. ¶ 8.  Ms. McLorin lacks funds to pay for private care and cannot afford to quit her full-time job.  Id. ¶ 10, 16-17.  As a result, a reduction in ADHC services will result in Ms. Brantley's institutionalization.  Steinke Decl. ¶¶ 18-22; Davis Decl. ¶ 32; McLorin Decl. ¶ 16.

### 2.    Allie Woodard

Allie Jo Woodard is a 79-year old woman who has been diagnosed with bipolar affective disorder, depression, diabetes, glaucoma, hypertension, and osteoarthritis.  Davis Decl. ¶ 21.  Like Ms. Brantley, she receives services from the Bayview Hunter's Point ADHC program, where she has gone for nine years.  Gaspard Berry Decl. ¶ 4.  She is authorized to receive Medi-Cal funded ADHC services five days a week.  Id.

Consistent with her IPC, Ms. Woodard receives:  daily professional nursing services to monitor her hypertension, fall risk and pain and mobility issues related to her arthritis; daily personal care services to monitor her exertion level to prevent cardiac compromise; daily social services in the form of group activities intended to prevent psychiatric hospitalization; weekly psychological counseling, and daily monitoring by a program social worker for reality reorientations; ongoing therapeutic activities to monitor and improve her socialization and improve her interactions with peers; and semi-weekly occupational therapy services for maintaining her functional strength.  Davis Decl. ¶ 22.  Ms. Woodard's disability has rendered her very fragile both emotionally and physically, resulting in frequent psychiatric

hospitalizations.  Gaspard-Berry Decl. ¶ 9; Davis Decl. ¶ 23.  She is also at risk of falling, and requires constant physical and verbal cueing to use her walker.  Id.

Ms. Woodard lives alone; however, she may never be left alone because her mental impairments place her at risk of wandering.  Gaspard-Berry ¶ 6.  A few years ago, she was missing for two full days.  Id.  Ms. Woodard currently receives 283 IHSS hours of service, which is the maximum available.  Id. ¶ 5.  In addition, her daughter and son rotate spending the night with her.  Id. ¶ 7.  On weekends, her daughter Linda Gaspard-Berry brings Ms. Woodard to her home in Fremont.  Id. ¶ 7.  Ms. Woodard will be institutionalized if she is unable to receive the services provided by the ADHC five days a week or receive some appropriate alternative services, as both Ms. Gaspard-Berry and her brother work full-time and cannot afford to quit their jobs to care for their mother.  Gaspard-Berry Decl. ¶ 16-17; Davis Decl. ¶ 25; Steinke Decl. ¶¶ 18-21, 24.

### 3.    Gilda Garcia

The third Plaintiff, Gilda Garcia, is a 77 year-old woman who lives alone in a one-bedroom apartment in San Francisco.  Garcia Decl. ¶ 3.  She suffers from unstable diabetes, hypertension, Bells' Palsy, and kidney problems.  McCloud Decl. ¶ 21.  Ms. Garcia was diagnosed with diabetes in 1995, and must take insulin four times a day to control her blood sugar, along with other medications for conditions such as hypertension.  Garcia Decl. ¶¶ 3, 5.  Depending on her blood sugar levels, Ms. Garcia's condition can interfere with her vision and mobility.  Id. ¶ 3.

Ms. Garcia is highly dependent on the ADHC for medical stability and preventing isolation and depression.  Since 2004, Ms. Garcia has received services from the Institute on Aging Adult Day Health Care Center (Institute on Aging) on a daily basis.  Id. ¶¶ 6-7.  In addition to participating in the activities at the center, Ms. Garcia is treated by the nurses who help her monitor her diabetes.  Id. ¶¶ 8-10.  An IHSS worker assists Ms. Garcia with activities such as laundry, shopping, housework and meal preparation.  Id. ¶ 14.  However, the worker only visits her for one hour, once per week.  Id.  The professional opinion of the nurse at the

1   program is that it is crucial for Ms. Garcia to attend the center five days per week to prevent

2   emergency room visits and hospitalization.  Perelman Decl. ¶¶ 14, 15; Garcia Decl. ¶ 18.

3        In accordance with her IPC at the Institute on Aging ADHC program, Ms. Garcia

4   receives:  daily professional nursing services to monitor her for hypoglycemic reactions and to

5   monitor her joint and back pain; daily personal care services to supervise her ambulation and

6   prevent falls attributable to her poor vision and impulse control; daily social services to

7   increase her opportunities for socialization and on an as needed basis to help her coordinate her

8   IHSS and other social services; daily therapeutic activities to increase physical activity, leisure

9   and cognitive opportunities; physical therapy maintenance program three days per week to

10  maintain her endurance and physical strength; semi-weekly occupational therapy maintenance

11  program to maintain her current levels of functioning; and registered dietician services to

12  ensure she understands the importance of maintaining a diabetic diet.  McCloud Decl. ¶ 24,

13  Exh. B.

14       Ms. Garcia lives alone, and receives limited IHSS services.  She is dependent on the

15  socialization provided by the ADHC program.  In addition, Ms. Garcia is protected from

16  isolation and depression by attending ADHC five days per week.  Ms. Garcia will face

17  destabilization of her diabetes, and the risks that this condition poses, including a heightened

18  risk of falls and vision impairments.  McCloud Decl. ¶ 24.  Without five days per week of

19  ADHC services, she is at risk for hospitalization and/or institutionalization.  McCloud Decl. ¶¶

20  25-27; Steinke Decl. ¶ 18-21, 23; Garcia Decl. ¶¶ 7, 8, 9, 16, 18; Steinke Decl. ¶¶ 18-21, 24.

21       C.   **ASSEMBLY BILL ABX4 5**

22       On July 28, 2009, the California Legislature enacted Assemby Bill ABX4 5, which

23  include amendments to Welfare and Institutions Code section 14132(p) regarding ADHC

24  services.  The new law, which will take effect on or about September 10, 2009, temporarily

25  reduces the maximum ADHC benefit to three days per week for all Medi-Cal beneficiaries.

26  Cal. Welf. & Inst. § 14132(p)(2).  In addition, the bill imposes new restrictions limiting

27  eligibility for ADHC services and will go into effect if and when the Director of California

28  Department of Health Care Services provides a written declaration that the new restrictions are

ready to be implemented.  Cal. Welf. & Inst. Code § 14521.1.  Once new eligibility criteria are developed, the maximum ADHC benefit will return to five days per week.  Bailey Decl. ¶ 3. These new restrictions will terminate or deny ADHC services to individuals based on the degree of their functional limitation and need for a certain level of care.  See Compl. ¶ 48.

For those participants who will be affected by the benefit reduction, Defendants anticipate reliance on alternative programs to fill the void created by the elimination of ADHC services.  Muchmore Decl. ¶ 13.  The burden of identifying and accessing these unspecified alternative services will be on the participant and his or her caregiver with the assistance of the ADHC center.  Id.  Each of these alternative services, whether offered through Medi-Cal or by some other source, has its own unique eligibility criteria that must be satisfied before the participant receives authorization.  Id.  Eligibility for ADHC services does not automatically confer eligibility or authorization for any of these alternative services.  Id.  In addition, at the hearing on the instant motion, the parties acknowledged that there is no mechanism to ensure that upon the reduction of ADHC benefits that the alternative services will be identified and in place to ensure that Plaintiffs and class members will not suffer any gap in the services required by their respective IPCs.

## D.   PROCEDURAL HISTORY

Plaintiffs commenced the instant action on August 18, 2009.  The Complaint alleges six claims for relief:  (1) violation of the ADA; (2) violation of Section 504 of the Rehabilitation Act; (3) violation of procedural due process under 42 U.S.C. section 1983: (4) violation of the Medicaid Act; (5) violation of Medicaid comparability requirement; and (6) violation of California Government Code sections 11135 and 11139.  Plaintiffs purport to bring this action on behalf of "all recipients of Medi-Cal in the State of California who receive Adult Day Health Care Services whose Adult Day Health Care Benefits will be limited, cut, or terminated under the provisions of ABX4 5."  Compl. ¶ 109.  Plaintiffs also allege two subclasses.  The "Limitation of Benefits Subclass" consists of Medi-Cal beneficiaries who have been authorized to receive four to five days of ADHC services, whose services will be reduced to three days under ABX4 5.  Id. ¶ 110(a).  The "Termination of Benefits Subclass" includes past and future

1   Medi-Cal recipients whose ADHC services will be terminated once the DHCS implements new

2   classification standards.  Id. ¶ 110(b).

3        On August 24, 2009, Plaintiffs filed a Motion for a Temporary Restraining Order and

4   Order to Show Cause (Motion for TRO).  Plaintiffs filed their Motion for TRO, anticipating

5   that the reduction in ADHC services would take effect on August 27, 2009.  Upon learning that

6   the change would not transpire until the week of September 7, 2009, Plaintiffs superseded their

7   Motion for TRO with a Motion for Preliminary Injunction on August 26, 2009.  In their

8   motion, Plaintiffs request an order:

9        (a) Enjoining and prohibiting Defendants Director David Maxwell-
         Jolly and the Dept. of Health Care Services, and successors, agents,
10       officers, servants, employees, attorneys and representatives and all
         persons acting in concert or participating with Defendants, from
11       implementing or enforcing ABX4 5 or engaging in the following
         actions until this Court rules on a permanent injunction:

12       Reducing, terminating or modifying Medi-Cal Adult Day Health
         Care (ADHC) program benefits to the Plaintiffs and Class Members
13       from 4 or 5 days per week, to a maximum of 3 days per week,
         pursuant to ABX4 5, in violation of their rights under the ADA,
14       Section 504, the Due Process clause of the Constitution, and the
         Medicaid Act.

15       Reducing, terminating or modifying Medi-Cal Adult Day Health
16       Care (ADHC) program benefits to the Plaintiffs and Class Members
         from 4 or 5 days per week, to a maximum of 3 days per week,
17       pursuant to ABX4 5, unless and until alternate Medi-Cal services are
         provided, including through reasonable modifications to the program,
18       which prevent inappropriate institutionalization in violation of their
         rights under the ADA and Section 504.

19       (b) Enjoining and prohibiting Defendant Director David Maxwell-
20       Jolly and his successors, agents, officers, servants, employees,
         attorneys and representatives and all persons acting in concert or
21       participating with Defendants, from implementing or enforcing
         ABX4 5 or engaging in the following actions until this Court rules on
22       a permanent injunction:

23       Reducing, terminating or modifying Medi-Cal Adult Day Health
         Care (ADHC) program benefits to the Plaintiffs and Class Members
24       from 4 or 5 days per week, to a maximum of 3 days per week,
         pursuant to ABX4 5, until and unless Plaintiffs and Members are
25       afforded notice and a right to a hearing regarding alternate Medi-Cal
         services which meet their medical needs as currently provided
26       through ADHC services in violation of their rights under the Due
         Process clause of the Constitution, and the Medicaid Act.

27   Pls.' Mot. at 1-2.

28

The Court set a briefing schedule for the filing of Defendants' opposition and Plaintiffs' reply, which were filed on September 1 and September 3, 2009, respectively.  The parties appeared before the Court on September 9, 2009 for oral argument on the motion.

## II.    LEGAL STANDARD

The decision of whether to grant or deny a motion for preliminary injunction is a matter of the district court's discretion.   Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009).  The standard for assessing a motion for preliminary injunction is set forth in Winter v. Natural Res. Def. Council, Inc., ---U.S. ---, 129 S.Ct. 365, 376 (2008).  "Under Winter, plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest."  Sierra Forest Legacy v. Rey, --- F.3d ---, 2009 WL 2462216 at *3 (9th Cir. Aug. 13, 2009).

## III.    DISCUSSION

### A.    LIKELIHOOD OF SUCCESS ON THE MERITS

#### 1.    ADA and Rehabilitation Act Claims

##### a)    Violation of the Integration Mandate

The ADA was enacted in 1990 to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).[2]  Title II of the ADA prohibits discrimination in access to public services by requiring that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

---

[2] Plaintiffs' first and second claims are for discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act, respectively.  The Court's analysis of the ADA applies equally to both claims.  Martin v. California Dept. of Veterans Affairs, 560 F.3d 1042, 1047 n.7 (9th Cir. 2009) ("Because '[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act,' we have consistently applied 'the same analysis to claims brought under both statutes,'") (quoting in part Zukle v. Regents of Univ. of Cal., 166 F.3d 1041, 1045 (9th Cir. 1999)).

1    The Ninth Circuit has counseled that "the ADA must be construed broadly in order to

2    effectively implement the ADA's fundamental purpose of providing a clear and comprehensive

3    national mandate for the elimination of discrimination against individuals with disabilities."

4    Barden v. City of Sacramento, 292 F.3d 1073, 1077 (9th Cir. 2002) (quotation marks and

5    alteration omitted).

6         One form of disability discrimination is a violation of the ADA's "integration mandate."

7    See Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 592, 600-601 (1999); Townsend v.

8    Quasim, 328 F.3d 511, 515-18 (9th Cir. 2003).  This mandate, which is embodied within the

9    ADA and its implementing regulations, specifies that persons with disabilities receive services

10   in the "most integrated setting appropriate to their needs."  28 C.F.R. § 35.130(d) ("[a] public

11   entity shall administer services, programs, and activities in the most integrated setting

12   appropriate to the needs of qualified individuals with disabilities."); see 42 U.S.C.

13   § 12182(b)(1)(B).  The "most integrated setting" is defined as "a setting that enables

14   individuals with disabilities to interact with non-disabled persons to the fullest extent possible."

15   28 C.F.R. pt. 35 app. A; Olmstead, 527 U.S. at 592.  This mandate "serves one of the principal

16   purposes of Title II of the ADA: ending the isolation and segregation of disabled persons."  Arc

17   of Wash. State Inc. v. Braddock, 427 F.3d 615, 618 (9th Cir. 2005).

18        To state a claim under Title II of the ADA based on a violation of the integration

19   mandate, the plaintiff must plead and prove that he or she:  (1) is a "qualified individual with a

20   disability"; (2) was either excluded from participation in or denied the benefits of a public

21   entity's services, programs, or activities or was otherwise discriminated against by the public

22   entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his

23

24

25

26

27

28

disability.  See Townsend, 328 F.3d at 517.[3]  A state's failure to provide services to a qualified

person in a community-based setting as opposed to a nursing home presents a violation of Title

II of the ADA.  See id. at 517; Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175, 1181-82

(10th Cir. 2003) (imposition of cap on prescription medications placed on participants in

community-based program at high risk for premature entry into nursing homes in violation of

the ADA).

      Defendants argue that the proposed cut in ADHC services does not violate the

integration mandate because Plaintiffs have not demonstrated that the loss of two days of

ADHC services will result in their institutionalization.  In particular, they argue that in order to

state a Title II violation, Plaintiffs must show that the program reduction leaves them "no

choice" other than to be institutionalized in the event their ADHC services are limited to three

days—and that Plaintiffs have not made such a showing.  Defs.' Opp'n at 7.[4]  Defendants fail

to cite any relevant authority imposing a "no choice" requirement.  Rather, cases involving

ADA integration claims have recognized that the risk of institutionalization is sufficient to

demonstrate a violation of Title II.  See Fisher, 335 F.3d at 1184 (holding that Medicaid

participants not currently institutionalized but at "high risk for premature entry into a nursing

home" could bring claim for violation of the integration mandate); Mental Disability Law

Clinic v. Hogan, 2008 WL 4104460 at *15 (E.D.N.Y. Aug. 28, 2008) ("even the risk of

unjustified segregation may be sufficient under Olmstead") .

---

      [3] Plaintiffs' motion recites the test set forth in Olmstead which requires a showing that
(1) the state's treatment professionals have determined that community-based services are
appropriate, (2) the disabled individual does not oppose treatment, and (3) the provision of
community-based services can be reasonably accommodated, taking into account the resources
available to the state and the needs of other disabled individuals.  527 U.S. at 587.
Nevertheless, in Townsend, the Ninth Circuit analyzed the plaintiffs' integration mandate claim
under the traditional test applicable to ADA claims brought under Title II.  E.g., Martin v.
California Dept. of Veterans Affairs, 560 F.3d 1042, 1047 (9th Cir. 2009).  Plaintiffs have
made a sufficient showing under either formulation.

      [4] Defendants do not frame their argument in the context of the test set forth in
Townsend.  Based on the substance of their arguments, however, it appears that they are
focusing on the second element of the test, i.e., whether Plaintiffs were excluded from or
denied benefits.  See Defs.' Opp'n at 6-9.

The above notwithstanding, Plaintiffs have sufficiently demonstrated for purposes of the instant motion that the proposed reduction in ADHC services will place them at serious risk of institutionalization.  As an initial matter, Plaintiffs' respective IPCs specify that each of them requires five days of ADHC care per week.  Davis Decl., Exhs. B, C; McCloud Decl., Exh. B. The IPC, which is prepared by a multidisciplinary team including medical and health care professionals following a three-day comprehensive assessment process, certifies that the participants' conditions "require" that they receive care "each day" that is specified.  Id. (Item 19).  In addition, the IPC includes a determination that the participant has been "determined to have a high potential for the determination of their medical, cognitive, or mental health condition or conditions in a manner likely to result in emergency department visits, hospitalization, or other institutionalization if ADHC services are not provided."  McCloud Decl. ¶ 17 (emphasis added).[5]  Notably, these IPCs are reviewed and approved by Medi-Cal before any services are rendered.  Davis Decl. ¶ 14; McCloud Decl. ¶ 13.

Moreover, Plaintiffs have proffered evidence that reducing ADHC services from five to three days per week poses serious risks that they will be transferred to a nursing or other skilled-care facility.  For example, Ms. Brantley is 84 years-old, and is severely impaired by Alzheimer's disease and dementia.  McLorin Decl. ¶ 3.  She cannot perform basic necessities such as bathing, using the bathroom or obtaining her medication on her own, and she cannot be left alone.  Id. ¶¶ 5-6.  Ms. Brantley's great niece, who works full-time and is raising a family, is only able to keep Ms. Brantley in her home because ADHC services are provided five days per week.  Id. ¶¶ 8-10.  Her caregiver, the Program Director of the ADHC center from which she receives services and Plaintiffs' well-qualified expert, Dr. Steinke, have concluded that if

---

[5] This requirement for approval is set forth in California Welfare and Institutions Code section 14526.1(d)(5).

ADHC services are reduced, Ms. Brantley faces institutionalization.  McLorin Decl. ¶ 10, 16-17; Steinke Decl. ¶¶ 18-22; Davis Decl. ¶ 32.[6]

Ms. Allie Jo Woodard, who is 79 years-old and lives with her daughter Linda Gaspard-Berry on weekends and some weeknights, suffers from bipolar affective disorder, depression, diabetes, glaucoma, hypertension and osteoarthritis.  Gaspard-Berry Decl. ¶¶ 3, 7-8.  Like Ms. Brantley, Ms. Woodard cannot be left unattended and she requires assistance and relies on Ms. Gaspard-Berry and her brother for bathing, toileting, shopping and managing her medications.  Id. ¶¶ 5-7.  Ms. Gaspard-Berry and her brother both work full-time and take turns watching Ms. Woodard when she is not with her IHSS worker or at the ADHC center from which she received daily services for the last nine years.  Id. ¶ 4.  Neither Ms. Gaspard-Berry nor her brother is in a position to quit their jobs to take care of their mother in the absence of daily ADHC services or alternative replacement services.  Id. ¶¶ 16-17.  In addition, neither can afford private in-home care.  Id. ¶ 15.  As a result, any reduction of ADHC services would necessitate Ms. Woodard's placement in an out-of-home facility.  Id. ¶ 16.

The risk of institutionalization as to Ms. Brantley and Woodard posed by the ADHC service reduction is further supported by evidence provided by Catherine Davis, the Program Director of the Bayview Hunter's Point Adult Health Care Program, the ADHC center used by Ms. Brantley and Ms. Woodard.  Davis Decl. ¶ 3.  The center serves approximately 100 seniors and younger individuals with disabilities, all of whom live at the poverty level or below.  Id. ¶ 9.  Of the 100 participants, 44 of them have Medi-Cal approved IPCs certifying a need for four to five days per week of attendance to avoid institutionalization.  Id. ¶ 19.  With regard to Ms. Brantley and Ms. Woodard, Ms. Davis confirms that the center provides them with critical and extensive physical and mental health support.  Id. ¶¶ 21-32.  Ms. Davis opines that without the center's support five days per week, both individuals will require placement in a nursing home

---

[6] At the hearing on the motion, Defendants posited that the 283 hours of monthly IHSS services received by Ms. Brantley could be rearranged and coordinated with her great niece's schedule to counter the loss of ADHC services.  However, IHSS services are unskilled and are not a substitute for skilled services provided by her ADHC center.  Supp. Steinke Decl. ¶ 9.  In addition, as noted, the IPC specifies that her conditions necessitate the provision of service on each of the five days specified therein.

1    or other institution.  Id. ¶¶ 25, 32.  Plaintiffs' expert, Dr. Steinke, concurs with that opinion.

2    Steinke Decl. ¶¶ 22, 24.[7]

3           The third named Plaintiff, Gilda Garcia, also faces the risk of hospitalization in the

4    event her five days of ADHC services are reduced to three.  Steinke Decl. ¶ 23; McCloud Decl.

5    ¶ 29; Perelman Decl. ¶ 14.  Ms. Garcia, who is 77 years-old, has suffered from unstable

6    diabetes since 1995.  Garcia Decl. ¶ 3.  Since 2004, she has received services from the Institute

7    on Aging ADHC center.  Id. ¶ 6.  Though Ms. Garcia's condition is not as severe as the other

8    Plaintiffs, the provision of ADHC services as prescribed by her IPC is critical to her ability to

9    live independently.  Steinke Decl. ¶ 23.  A reduction in those services would place her at high

10   risk of hospitalization and/or institutionalization, where her condition would likely deteriorate

11   rapidly.  Id.

12          It also is apparent that the risk of institutionalization is likely to be suffered by putative

13   Class Members, as well as the named Plaintiffs.  For example, Ilene McKay suffers from a host

14   of maladies including uncontrolled diabetes, schizophrenia, hypertension, amputation and

15   hyperlipidemia (high lipid level in bloodstream).   Supp. Zirker Decl. Exh. A.  She requires

16   services five days per week consisting of professional nursing care for diabetic complications,

17   related skin problems, ambulation using a prosthetic device, along with specialized meal

18   preparation, social services.  Id.  Wilrene Lamar suffers from depression, cirrhosis of the liver,

19   and bladder issues, among other conditions.  Id. Exh. B.  Likewise, Charles Peterson suffers

20   from joint disease, blindness, hypertension, urinary issues and depression.  Id. Exh. C.  Both

21   individuals receive a variety of skilled services, five days per week, that are intended to address

22   their specific conditions.

23

24   _____

25          [7] Defendants claim that the only reason proffered by Dr. Steinke that Ms. Brantley is at risk
     of institutionalization is that she cannot be left alone.  Defendants contend that supplemental IHSS
     services could be used in place of the eliminated ADHC services.  However, Dr. Steinke's opinion
26   is not isolated to paragraph 22 of his declaration, and must be viewed in tandem with his entire
     declaration in which he renders opinions regarding the serious detriment that would result from
27   eliminating two days of services.  In addition, Defendants ignore other evidence in the record,
     including Ms. Brantley's IPC and the opinion of the director of the ADHC center that provides her
28   services.

In addition to evidence specific to Plaintiffs and putative Class Members, Plaintiffs have proffered evidence supporting their conclusion that the harm likely to result from the reduction in ADHD services will be experienced by similarly situated class members.  Ms. Davis and her staff analyzed the needs of other participants who receive services from the center four to five days per week and reached the conclusion that 22 of them face "imminent risk of institutionalization, hospitalization, or death" if the maximum ADHC benefit were limited to three days per week.  Davis Decl. ¶ 33.  Her findings are consistent with those reached by Plaintiffs' expert, Dr. Gary Steinke, who believes that "an across-the-board reduction in the maximum number of allowable days from five to three per week will cause immediate or imminent harm to thousands of current participants who currently attend ADHC more than three days per week."  Steinke Decl. ¶ 10.  He notes that ADHC services play a critical role in monitoring patients who suffer from a myriad of physical and mental health issues, thus decreasing the likelihood of hospitalization and/or institutionalization.  Id. ¶¶ 10-15, 18.  In Ms. Brantley and Ms. Woodard's case, Dr. Steinke notes that if their ADHC services are reduced to three days per week, "[they] would need to be placed in a nursing facility" where they would likely "deteriorate rapidly."  Id. ¶¶ 22, 24.  As to Ms. Garcia, he believes that the reduction in ADHC services would increase her chances of requiring hospitalization or institutionalization.  Id. ¶ 23.

Relying on the declaration of Rosemary Lamb, Chief of the Northern Field Operations Branch in the Utilization Management Division of the Department of Health and Human Services, Defendants argue that each of the Plaintiffs only needs three days of ADHC services and therefore will be unaffected by the elimination of two days of services.  Defs.' Opp'n at 8; Lamb Decl. ¶¶ 8, 13, 17.[8]  Ms. Lamb, who is a registered nurse, further claims that she reviewed unspecified "records" pertaining to each Plaintiff and concluded that none of them are at "imminent risk for institutionalization."  Lamb Decl. ¶¶ 8, 13, 17, 21, 25, 29.  The Court

---

[8] Plaintiffs have filed objections to various portions of Ms. Lamb's declaration which are meritorious.  Irrespective of those objections, the Court finds that her declaration does not adequately refute Plaintiffs' claim that the anticipated ADHC benefit reduction poses a serious risk of institutionalization.

finds Ms. Lamb's conclusions unpersuasive.  As noted, Plaintiffs' IPCs, which were prepared following an comprehensive assessment by a team of health care professionals—and approved by Medi-Cal—are compelling evidence that Plaintiffs require five, not three, days of services. At oral argument, Defendants were unable to offer any compelling reasons that the Court should credit the opinions of Ms. Lamb, a nurse who has no personal knowledge of Plaintiffs' medical history or needs and has never examined or spoken to them, over those proffered by the multidisciplinary team of physicians, nurses, therapists and various health care professionals who have.[9]

Equally unavailing is Defendants' assertion that Plaintiffs can avoid the risk of institutionalization by availing themselves of other, largely unspecified Medi-Cal or other community services.  Defs.' Opp'n at 7-9.  The Court notes that there is no dispute between the parties that there are alternative services available that could fill the void left by the reduction in ADHC benefits.  However, the Court is persuaded by Plaintiffs' concern that Defendants have failed to implement any means of ensuring that, if and when the cuts take effect, the necessary alternative services will be identified and in place for Plaintiffs so that there will not be a period where they are not receiving the care prescribed by their IPCs.[10]  Plaintiffs and putative class members, many of whom are elderly and frail, have complex medical needs which are met by a combination of skilled services provided at the ADHC.  See Steinke Decl. ¶ 18; McCloud Decl. ¶ 20-27, Exh. B., Davis Decl. ¶¶ 20-31, Exh. B; Zirker Supp. Decl., Exhs.

---

[9] Ms. Lamb's opinions are of limited probative value given the limited scope of her review and analysis.  She did not review any of the declarations of Plaintiffs' caregivers or HDHC providers, who care for and provide services to them on a daily basis.  Ms. Lamb's decision to limit her review to unspecified "records" pertaining to each Plaintiff undermines the reliability of her various opinions.  For example, she opines that Ms. Brantley could be cared for by other family members or caregivers, id. ¶ 8, despite the declaration from Ms. Brantley's caregiver, who declares that she works full-time and cannot give up her job in the event ADHC services are limited to three days, McLorin Decl. ¶ 8.  Similarly, with regard to Ms. Garcia, Ms. Lamb opines that her medical needs can be met with only three ADHC visits per week.  Lamb Decl. ¶ 13.  Given the limited scope of materials reviewed by Ms. Lamb, the Court finds that her declaration is of limited value, particularly when compared to the declarations of those who have personal knowledge of each Plaintiffs' condition, living circumstances and medical requirements.

[10] Eligibility for ADHC services does not automatically confer authorization for alternative services.  Muchmore Decl. ¶ 13.  Each of these services has their own qualification criteria, and Plaintiffs will have to separately apply for each of those services.  Id.

A-C.  Given their precarious conditions, even temporary gaps in services would present serious consequences for Plaintiffs and place them at great risk of being institutionalized.

Defendants concede that they bear the ultimate responsibility for ensuring compliance with federal disability laws.  Nevertheless, they have taken an arguably cavalier approach to ensuring their continuing compliance with the ADA and Rehabilitation Act by placing full responsibility for identifying and securing alternative services to replace those eliminated by Assembly Bill ABX4 5 on the individual ADHC programs.  See Defs.' Opp'n at 8 (citing Peach Decl. ¶ 7).[11]  At the same time, Defendants refuse to specify how they will ensure their continuing compliance with the ADA and Rehabilitation Act in the event that the ADHC programs fail to comply with their "expectation" to secure alternative services for their participants.[12]  Thus, to the extent that Defendants are claiming that alternative services satisfy their obligations under the integration mandate, Defendants certainly bear the burden of ensuring more than a "theoretical" availability of such services.  C.f., Hillburn v. Maher, 795 F.2d 252, 261 (2d Cir. 1986) ("CDIM, as the single agency designated by Connecticut, retains the authority to '[e]xercise administrative discretion in the administration or supervision of the plan,' and to '[i]ssue policies, rules, and regulations on program matters.' []  These regulations do not permit CDIM's responsibility to be diminished or altered by the action or inaction of other state offices or agencies.").

---

[11] In their opposition brief and at the hearing, Defendants asserted that the individual ADHC program is responsible for identifying and ensuring Plaintiffs' access to alternative services.  However, in the declaration of Phyllis Muchmore submitted by Defendants, Ms. Muchmore asserts that "[e]ach of these alternative/supplemental services must be sought out by the beneficiary and his/her family or caregiver(s) with the assistance of the ADHC center and with a referral by the beneficiary's personal health care provider."  Muchmore Decl. ¶ 13.  The Court also notes that Denise Peach, who is in charge of the state's ADHC centers, states that in light of the changes implemented by Assembly Bill ABX4 5, ADHC centers "will be" engaged in various activities such as assessing the needs of their participants and making referrals to other health care providers and community agencies.  Peach Decl. ¶ 7.  She does not state when those assessments and referrals will take place—or what alternatives ADHC participants and caregivers may avail themselves of once the ADHC benefit is reduced to a three day per week maximum.

[12] During the hearing, the Court inquired how Defendants planned to ensure that the various ADHC programs would comply with their obligation to assist ADHC recipients in securing alternative services.  In response, Defendants stated that it was their "expectation" that the programs would do so.

In sum, the Court is satisfied that Plaintiffs have demonstrated a likelihood of success as to their first and second claims for disability discrimination under the ADA and the Rehabilitation Act.  The evidence presented by Plaintiffs show that the continuing availability of five days of ADHC services per week is critical to their physical and mental health and their continuing ability to remain integrated in their community, as opposed to being isolated in a nursing home or other institution.  While alternative services may exist to replace those eliminated by the program cuts, Defendants have failed to ensure that there are any measures in place to ensure that the transition from ADHC service to alternative services is seemless.

> *b)    Methods of Administration*

As part of their ADA and Rehabilitation Act claims, Plaintiffs also allege that Defendants have violated the "methods of administration provision" of both statutes based on their alleged discriminatory effect.   Pls.' Mot. at 20-21; Compl. ¶¶ 121, 126.  This claim is based on 28 C.F.R. § 35.130(b)(3), which states:

> A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:  ¶ (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; ¶ (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities….

28 C.F.R. § 35.130(b)(3) (emphasis added).  Section 504 regulations contain similar requirements.  See 28 C.F.R. § 41.51(b)(3)(i); 45 C.F.R. § 84.4(b)(4).  Plaintiffs allege that Defendants violated these regulations, *inter alia,* by cutting services before providing notice and a hearing, failing to provide information regarding alternative, community-based services that would avoid hospitalization or placement in an institution, and by failing to afford sufficient notice to Plaintiffs to secure replacement services prior to the reduction in ADHC services.  Pls.' Mot. at 17-21.

Defendants argue that Plaintiffs lack standing to assert a violation of these regulations because they do not expressly provide for a private right of action.  Defs.' Opp'n at 9.  As a general proposition, Defendants are correct that under Alexander v. Sandoval, 532 U.S. 275, 291 (2001), only statutes can create enforceable rights.  However, a regulation may be enforced

1   through a private action where the regulation construes a statute under which a private right of

2   action exists.  Mark H. v. Lemahieu, 513 F.3d 922, 935-36 (9th Cir. 2008) (discussing

3   Sandoval).  "For purposes of determining whether a particular regulation is ever enforceable

4   through the implied right of action contained in a statute, the pertinent question is simply

5   whether the regulation falls within the scope of the statute's prohibition."  Id. at 938.

6        The ADA broadly prohibits disability discrimination, and both are enforceable through

7   private actions.  See Barnes v. Gorman, 536 U.S. 181, 184-85 (2002); Mark H., 513 F.3d at

8   935.  The regulation at issue does not create rights that do not exist under the ADA.  Rather, it

9   merely prohibits public entities from employing methods of administration which have the

10  effect of discriminating against qualified disabled individuals on the basis of their disabilities.

11  This falls well within the ambit of the ADA's proscription against disability discrimination.

12  Dillery v. City of Sandusky, 398 F.3d 562, 567 (6th Cir. 2005) ("if the regulation simply

13  effectuates the express mandates of the controlling statute, then the regulation may be enforced

14  via the private cause of action available under that statute."); c.f., McGary v. City of Portland,

15  386 F.3d 1259, 1265-66 (9th Cir. 2004) (recognizing that ADA prohibits discrimination

16  based on disparate treatment and disparate effect).  It is thus unsurprising that the few

17  decisions addressing claims based on 28 C.F.R. § 35.130(b)(3) have concluded that a plaintiff

18  may state a methods of administration claim without running afoul of Sandoval.  See Frederick

19  L. v. Department of Public Welfare, 157 F. Supp. 2d 509, 538-39 (E.D. Pa. 2001) ("The ADA

20  regulations at issue here are merely rules for the implementation of the statutory directives;

21  they do not prohibit otherwise permissible conduct"); Crabtree v. Goetz, 2008 WL 5330506 at

22  *24 (M.D. Tenn. Dec. 19, 2008) (ruling that plaintiffs had standing to enforce 28 C.F.R. §

23  35.130(b)); see also Pennsylvania Prot. and Advocacy, Inc. v. Pennsylvania Dept., 402 F.3d

24  374, 385 (3rd Cir. 2005) (remanding action for consideration of plaintiffs' discriminatory

25  administration claim under 28 C.F.R. § 35.130(b)).[13]

26

27  _____

28     [13] In light of the Court's conclusion regarding Plaintiffs' first and second claims, the Court
    need not reach their due process claim at this juncture.

**B.    IRREPARABLE HARM**

The next issue presented is whether Plaintiffs have shown that ADHC beneficiaries will be irreparably harmed if their services are reduced from five to three days per week.  Numerous federal courts have recognized that the reduction or elimination of public medical benefits irreparably harms the participants in the programs being cut.  See Beltran v. Myers, 677 F.2d 1317, 1322 (9th Cir. 1982) (holding that possibility that plaintiffs would be denied Medicaid benefits sufficient to establish irreparable harm); Newton-Nations v. Rogers, 316 F. Supp. 2d 883, 888 (D. Ariz. 2004) (citing Beltran and finding irreparable harm shown where Medicaid recipients could be denied medical care as a result of their inability to pay increased co-payment to medical service providers ); Edmonds v. Levine, 417 F. Supp. 2d 1323, 1342 (S.D. Fla. 2006) (finding that state Medicaid agency's denial of coverage for a off-label use of prescription pain medication would irreparably harm plaintiffs).  In addition, Plaintiffs have presented ample evidence to support their claim of irreparable harm.  Each of the Plaintiffs suffers from debilitating physical and/or mental conditions for which the availability of ADHC services is critical to ensuring that their tenuous physical and mental conditions remain stable, enabling them to remain in the community.  At least two of the three named Plaintiffs are incapable of living independently, and the ability of the third to do so is dependent upon the receipt of ADHC services.

The harm in this instance is particularly irreparable and imminent.  The ADHC cuts are scheduled to take effect immediately, at which time Plaintiffs and putative Class Members will immediately have their services significantly reduced.  As discussed, these services are necessary and critical to Plaintiffs' physical and mental well-being.  Given the tenuousness and complexities of their conditions, an interruption in their care, even if temporary, will have serious consequences for Plaintiffs.  While alternative services may be available to replace the ADHC services at issue, Defendants have admitted that they are unable to assure the Court that such services will be identified and provided to Plaintiffs before the reduction in their ADHC benefits.

1    Defendants ignore the case law holding that the reduction in public medical benefits

2    standing alone is sufficient to demonstrate irreparable harm.  Instead, Defendants resort to their

3    earlier argument that the likelihood that they will be institutionalized is speculative.  As

4    discussed above, Plaintiffs have presented ample evidence from percipient and expert

5    witnesses demonstrating that the danger of having to institutionalize Plaintiffs if ADHC

6    services are reduced is both real and imminent.  The Court therefore finds that Plaintiffs have

7    met their burden of demonstrating irreparable harm.

8        **C.    BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST**

9        The final two inquiries presented by Plaintiffs' motion—but ignored in Defendants'

10   opposition—are whether the balance of hardships tips sharply in their favor and whether the

11   public will benefit from the proposed preliminary injunction.  These factors may be viewed

12   together.  See Independent Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly, 572 F.3d 644,657-58

13   (9th Cir. 2009) (Independent Living).  In a case such as the present where the issue concerns

14   the proposed reduction in medical benefits to indigents due to budgetary concerns, the Ninth

15   Circuit has recognized that both the balance of hardships and public interest favor plaintiffs.

16   Id.

17       In Independent Living, the Ninth Circuit affirmed the district court's order granting the

18   plaintiffs' motion for preliminary injunction to enjoin the California Department of Health

19   Care Services—the same Defendant here—from implementing payment reductions to Medi-

20   Cal providers as a result of California's budgetary woes.  In discussing the balance of

21   hardships, the Ninth Circuit held that financial considerations due to state's "fiscal crisis" were

22   outweighed by the "robust public interest in safeguarding access to healthcare for those eligible

23   for Medicaid, whom Congress has recognized as 'the most needy in the country.'" Id. at 659;

24   see also Beltran, 677 F.2d at 1322 ("Balancing the medical or financial hardship to the

25   plaintiffs-appellees against the financial hardship to the state resulting from its inability to

26   recover for medical services should its rules ultimately be held valid, it was not an abuse of

27   discretion for the district judge to find that the balance of hardships tipped sharply in favor of

28

1  plaintiffs.").  Given these considerations, and Defendants' lack of response thereto, the Court

2  finds that that the balance of hardships and public interest favor Plaintiffs.

3        **D.**    **SCOPE OF THE INJUNCTION**

4        At the preliminary injunction hearing, Defendants intimated that if the Court were to issue

5  an injunction, it would be limited to the named Plaintiffs.  That contradicts Defendants' prior

6  representation to the Court in opposing a previous motion.  Specifically, Plaintiffs filed a motion to

7  shorten time on their motion for class certification, requesting that it be heard on the same day as

8  the motion for preliminary injunction.  In opposing Plaintiffs' motion for an order shortening time,

9  Defendants stated its position that "if plaintiffs meet the requirement for a preliminary injunction as

10  to the named plaintiffs and they establish that putative class members will face the same harm,

11  there is no need for plaintiffs' motion for class certification to be heard now in order for plaintiffs

12  to obtain the relief they seek now [because] … plaintiffs can obtain classwide injunctive relief

13  without certifying a class…." (Docket 28 at 2.)  As stated previously, the Court finds that the

14  putative class members will face the same harm as Plaintiffs.  As such, Defendants are judicially

15  estopped from now arguing that a classwide injunction cannot issue.  See United Nat'l Ins. Co. v.

16  Spectrum Worldwide, Inc., 555 F.3d 772, 778 (9th Cir. 2009).[14]

17        **E.**    **BOND**

18        Federal Rule of Civil Procedure 65(c) "invests the district court 'with discretion as to

19  the amount of security required, if any.'"  Jorgensen v. Cassiday, 320 F.3d 906, 919 (9th Cir.

20  2003) (emphasis in original; quoting Barahona-Gomez v. Reno, 167 F.3d 1228, 1237 (9th Cir.

21  1999)).  A district court has the discretion to dispense with the security requirement where

22  giving security would effectively deny access to judicial review.  See Save Our Sonoran, Inc. v.

23  Flowers, 408 F.3d 1113, 1126 (9th Cir. 2005) (citation omitted).  Similarly, a district court may

24  waive the bond requirement where the plaintiffs are indigent.  See Walker v. Pierce, 665 F.

25  Supp. 831, 844 (N.D. Cal. 1987).  Plaintiffs, all of whom are Medicaid recipients, request that

26

27      [14] District courts are empowered to grant preliminary injunctions "regardless of whether the class has been certified."  Schwarzer, Tashima and Wagstaffe, Fed.Civ.P. Before Trial, § 10:773 at

28  10-116 (TRG 2008).

1  the Court waive the bond requirement on the ground that they are indigent and to ensure their

2  ability to access to the courts on behalf of themselves and other class members.  Defendants

3  offer no response to Plaintiffs' request for a bond waiver.  Thus, given the factual record

4  presented, coupled with Defendants' lack of opposition, the Court will not require Plaintiffs to

5  post a bond in order for a preliminary injunction to take effect.

6  **IV.      CONCLUSION**

7           For the reasons stated above,

8           IT IS HEREBY ORDERED THAT Plaintiffs' Motion for a Preliminary Injunction is

9  GRANTED.

10          1.      Defendants David Maxwell-Jolly, in his official capacity as Director of the

11  Department of Health Care Services, and the Department of Health Care Services, including their

12  successors, agents, officers, servants, employees, attorneys and representatives and all persons

13  acting in concert or participating with them, are hereby ENJOINED AND RESTRAINED from

14  implementing or enforcing ABX4 5, codified at Welfare and Institutions Code section 14132(p), or

15  reducing, terminating or modifying Medi-Cal Adult Day Health Care (ADHC) program benefits to

16  the Plaintiffs and putative Class Members from four or five days per week, to a maximum of three

17  days per week, pursuant to ABX4 5, unless and until appropriate alternative Medi-Cal services are

18  provided to prevent inappropriate institutionalization in violation of their rights under the ADA and

19  Section 504 of the Rehabilitation Act.

20          2.      Defendants David Maxwell-Jolly, in his official capacity as Director of the

21  Department of Health Care Services, and the Department of Health Care Services, including

22  their successors, agents, officers, servants, employees, attorneys and representatives and all

23  persons acting in concert or participating with them are HEREBY ORDERED to:

24                  a.  Take all actions necessary within the scope of their authority to implement

25                      the above injunction;

26                  b.  Provide prompt notice to all Adult Day Health Care program providers of the

27                      terms of this Preliminary Injunction; and

28

c.   Provide prompt notice to all recipients of four or five days per week of Adult

Day Health Care program services of the terms of this Preliminary

Injunction.

3.      The Court WAIVES the requirement for the posting of a bond as security for the

entry of preliminary injunctive relief on the grounds of Plaintiffs' indigency.

IT IS SO ORDERED.

Dated: September 10, 2009

SAUNDRA BROWN ARMSTRONG
United States District Judge