1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

9
10
11
12

HARRY COTA; GILDA GARCIA; ALLIE JO
WOODARD, by her guardian ad litem Linda
Gaspard-Berry; HARRY COTA; SUMI
KONRAI by her guardian ad litem Casey
Konrai; RONALD BELL by his guardian ad
litem Rozene Dilworth, individually and on
behalf of all other similarly situated,

13                    Plaintiffs,

14            vs.

15
16
17

DAVID MAXWELL-JOLLY, Director of the
Department of Health Care Services, State of
California, DEPARTMENT OF HEALTH
CARE SERVICES,

18                    Defendants.

Case No:  C 09-3798 SBA

**ORDER GRANTING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

Docket 90

19
20
21
22
23
24
25
26
27
28

Plaintiffs are elderly persons and adults with physical and mental disabilities who bring
the instant class action suit on behalf of themselves and those similarly situated against
Defendants California Department of Health Care Services (DHCS) and its Director, David
Maxwell-Jolly, to enjoin funding cuts as mandated by Assembly Bill ABx4 5 (ABx4 5) in the
Medi-Cal Adult Day Health Care (ADHC) program.  The Court previously entered a
preliminary injunction preventing Defendants from reducing the maximum number of days per
week of ADHC services from five to three.

The parties are now before the Court on Plaintiffs' second Motion for Preliminary
Injunction.  Specifically, Plaintiffs seek to prevent Defendants from implementing new, more

restrictive eligibility requirements for ADHC services that will take effect on or about March 1, 2010.  Plaintiffs allege that these new requirements will result in the loss of ADHC benefits to themselves and potentially thousands of Class Members in violation of Title II of the Americans with Disabilities (ADA), section 504 of the Rehabilitation Act, The Medicaid Act, and various other state laws.  Having read and considered the papers submitted and reviewed the record in this action, the Court hereby GRANTS Plaintiffs' motion for preliminary injunction.[1]

I.      BACKGROUND

        A.      OVERVIEW OF MEDICAID/MEDI-CAL

        In 1965, Congress enacted Title XIX of the Social Security Act, more generally referred to as Medicaid or The Medicaid Act, to provide states with funding to furnish medical assistance to individuals "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. §§ 1396-1; Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502 (1990).  A state's participation in Medicaid is voluntary, but when a state chooses to participate, it must comply with the provisions of the Medicaid Act and its implementing regulations.  Alaska Dept. of Health and Social Servs. v. Cnts. for Medicare and Medicaid Servs., 424 F.3d 931, 935 (9th Cir. 2005).  Thus, to receive federal funds, states are required to administer their programs in compliance with various federal requirements, including those set forth in 42 U.S.C. § 1396a(a)(1)-(71).  See also 42 C.F.R. §§ 430.0-456.725.

        California participates in Medicaid through the California Medical Assistance Program, also known as Medi-Cal, and has designated DHCS as the agency responsible for its administration.  See Cal. Welf. & Inst.Code §§ 10720, 14000.  One of the benefits offered by Medi-Cal is ADHC, which is a community-based program for low income seniors and younger disabled adults.  Muchmore Decl. ¶¶ 3-5.  This program provides organized day care that includes therapeutic, social and skilled nursing health activities for the purpose of restoring or

---

[1] Pursuant to Federal Rule of Civil Procedure 78(b), the Court adjudicates the instant motion without oral argument.

maintaining optimal capacity for self care.  Id. ¶ 3; Missaelides Decl. ¶ 21.  Services are

provided through privately-run ADHC centers, which provide a full range of services.  Id.

ADHC providers must be licensed by the DHCS.  Muchmore Decl. ¶ 4.  Each center

must obtain authorization from DHCS for each day of service provided to Medi-Cal

beneficiaries.  Id. ¶¶ 6, 8.  Persons wishing to receive ADHC services must obtain their medical

history and physical information from their personal physician (if they have one) and

participate in a three-day assessment performed by a multi-disciplinary team of clinicians

including physicians, registered nurses, social workers, physical therapists, recreational

therapists and dieticians, among others.  Missaelides Decl. ¶ 24.  The multidisciplinary team

designs an Individual Plan of Care (IPC) that specifies the types of services the applicant

requires and the amount of time each week those services are necessary.  Id.  In order to

receive ADHC services, the participant must be certified in the IPC that he or she has been

determined to have a "high potential for the deterioration of their medical, cognitive, or mental

health condition or conditions in a manner likely to result in emergency department visits,

hospitalization or other institutionalization if ADHC services are not provided."  Id. ¶ 25.  The

completed IPC is then sent for review to the Medi-Cal field office along with a Treatment

Authorization Request (TAR).  Id. ¶ 24; Muchmore Decl. ¶¶ 6, 17.  Approval for services

pursuant to the TAR must be reapproved by DHCS every six months.  Missaelides Decl. ¶ 28;

Bailey Decl. ¶ 8.

At present, there are approximately 328 approved ADHC centers located in 34 of

California's 58 counties.  Missaelides Decl. ¶¶ 29-30.  The projected number of monthly users

of ADHC services for Fiscal Year 2009-2010 is 36,860.  Id. ¶ 32.  Approximately 58% of

ADHC users are over the age of 75, and of that group, 14% are over the age of 85.  Id. ¶ 33.

The average ADHC participant is 75 years of age and takes 6 or more medications per day.  Id.

¶ 35.  More than two-thirds of those users face cardiovascular disease (39%), dementia (13%)

and diabetes (10%).  Id. ¶ 35.

**B.     ABx4 5**

Effective March 1, 2010, new medical necessity and eligibility criteria enacted under ABx4 5 will apply to individuals seeking ADHC services.  Bailey Decl. ¶ 3.  Presently, all participants must show that they require assistance or supervision with at least *two* of *fifteen* qualifying daily activities, which serve as a measure of the individual's overall physical, mental or cognitive functioning abilities.  Welf. & Inst.Code § 14525; 14526.2(d)(2)(A).  These activities are referred to as Activities of Daily Living (ADLs) or Instrumental Activities of Daily Living (IADLs).  Missaelides Decl. ¶ 48.  Currently, there are six qualifying ADLs (ambulation, bathing, dressing, self-feeding, toileting, and transferring) and nine IADLs (accessing resources, housework, hygiene, laundry, meal preparation, medication management, money management, shopping, and transportation).  Id.  The current eligibility criteria make no distinction between individuals with chronic mental illness, moderate to severe Alheimer's disease, or other cognitive impairments.  Id. ¶ 49.

ABx4 5 continues to require that individuals demonstrate two deficits; however, the number of qualifying daily activities will be reduced from fifteen to *eight* areas of need.  The eight remaining functional impairments consist of ambulation, bathing, dressing, self-feeding, toileting, transferring, medication management, and hygiene.  Cal.Welf. & Inst. Code §§ 14521.1(a)(2), 14526(d)(2)(A).[2]  The seven areas eliminated are transportation, money management, shopping, meal preparation, laundry, accessing resources, and housework.  Id.  According to Plaintiffs, approximately 8,000 to 15,000 individuals will lose their ADHC services under the new qualifying criteria, irrespective of whether they are at risk of institutionalization.  Missaelides Decl. ¶ 47; Supp. Missaelides Decl. ¶¶ 15-16.

The new eligibility requirements also effectively create two categories of beneficiaries, depending on whether the individual has "[1] chronic mental illness or [2] moderate to severe Alzheimer's disease or [3] other cognitive impairments . . . ."  Cal.Welf. & Inst. Code

---

[2] Plaintiffs assert that these activities must now be undertaken "while at the ADHC center," a point that Defendants vehemently dispute.  Pls.' Mot. at 4; Defs.' Opp'n at 1.  Because the "at the center" requirement is not critical to the Court's analysis, the Court need not resolve this dispute.

§§ 14525.1(b), (c), 14522.4(a)(11).  Individuals who fall into any of these three categories must show that they need "assistance" with two of the eight specified functional impairments (i.e., ambulation, bathing, dressing, self-feeding, toileting, transferring, medication management and hygiene).  Id. §§ 14525.1(a)(3)(B), 14526.2(d)(2)(B), 14522.4(a)(9).

Individuals who do *not* have chronic mental illness, moderate to severe Alzheimer's disease or other cognitive impairments, must show a *heightened* level of need in order to qualify for services.  First, such persons must demonstrate that they require "*substantial human assistance*" to perform two of the eight specified activities.  Cal.Welf. & Inst. Code §§ 14525.1(a)(3)(A), 14526.2(d)(2)(B), 14522.4(a)(10).  "Substantial human assistance" is defined as "direct, hands-on assistance provided by a qualified caregiver, which entails helping the participant perform the elements of ADLs and IADLs.  It also includes the performance of the entire ADL or IADL for participants totally dependent on human assistance."  Id. § 14522.4(a)(10).  Second, they must show the need for intermediate care services, as set forth in 22 Cal.Code.Regs. § 51120.  Cal.Welf. & Inst. Code § 14525.1(b).[3]

## C.   FACTS RELATING TO PLAINTIFFS[4]

### 1.   Ronald Bell

Ronald Bell is a 45 year-old-man with diabetes, organic brain syndrome, a seizure disorder, arthritis, hypertension, and hyperlipidemia.  Dilworth Decl. ¶ 3; Nolcox Decl. ¶ 30. He is Medi-Cal eligible and has been approved by Medi-Cal to receive three days a week of ADHC services through the Graceful Senescence ADHC Program in Los Angeles, California. Nolcox Decl. ¶ 30.  Due to seizures, he cannot work.  Dilworth Decl. ¶ 10.

---

[3] Despite the Byzantine nature of these new requirements, there apparently is no money budgeted to conduct training on the implementation of the new criteria.  Supp. Missaelides Decl. ¶ 8.

[4] The instant action was filed by Lillie Brantley (who recently passed), Allie Woodard and Gilda Garcia.  Plaintiffs Ronald Bell, Harry Cota and Sumi Konrai were joined as Plaintiffs in the First Amended Complaint to represent the subclass of individuals who face termination of their ADHC benefits.

Mr. Bell lives with his 78-year old grandmother, Rozene Dilworth, who has raised him since he was an infant.  Id. ¶¶ 4, 7, 13.  Ms. Dilworth, who suffers from arthritis, back problems and an irregular heartbeat, has difficulty caring for her grandson, and both rely on the ADHC services Mr. Bell receives to keep him safely at home with her.  Id. ¶¶ 13, 21-23.  In his most recent Medi-Cal approved IPC, Mr. Bell is authorized to receive the following ADHC services three days per week: professional nursing services; personal care; social services; therapeutic activities; physical therapy; occupational therapy; and registered dietician services.  He also receives mental health services, on a one-on-one basis, twice a month and as needed to assist him with coping skills and decrease his depression and social isolation.  Nolcox Decl. ¶ 34.

Due to his cognitive impairments, Mr. Bell needs assistance with accessing resources, housework, laundry, meal preparation, money management, and shopping, and is totally dependent on others for transportation and medication management.  Dilworth Decl. ¶ 20; Nolcox Decl. ¶ 30.  Mr. Bell's receipt of ADHC services has likely prevented him from suffering from a catastrophic medical incident and has helped him avoid being placed in a nursing home.  Nolcox Decl. ¶ 35; Dilworth Decl. ¶¶ 21-25; Gardner Decl. ¶ 16.  Because the only qualifying factor he meets under the new criteria is assistance with medication management, he will be terminated from ADHC under the new eligibility requirements, which specify that the beneficiary must have two areas of need.  Nolcox Decl. ¶ 35.

### 2.    Harry Cota

Plaintiff Harry Cota is a 60 year-old man with a left-sided hemiparesis (muscle weakness), hypertension, insulin dependent diabetes, arthritis, a peptic ulcer, a seizure disorder, muscle spasms, neuropathy, myelopathy, and obstructive sleep apnea.  French Decl. ¶¶ 22, 24; Burke Decl. ¶ 6; Chinn Decl. ¶ 9.  He is Medi-Cal eligible, and currently receives five days a week of ADHC at Lifelong Medical Care ADHC in Oakland, California.  French Decl. ¶ 22.  Mr. Cota lives alone and receives 134 hours of In Home Support Supportive Service (IHSS) per month.  French Decl. ¶¶ 22, 26.  He takes thirteen prescribed medications for his multiple chronic conditions.  Id. ¶ 26.

Mr. Cota depends upon ADHC services to remain living as independently as possible in the community.  According to Michele Burke, the Nursing Supervisor for Lifelong, and Mr. Cota's treating nurse, "Mr. Cota has suffered from multiple disabling conditions for decades. He tolerates excruciating pain, disabling spasticity and weakness and blood sugar abnormalities. He has fought fiercely to maintain his independence — for instance, he gets up at 4:00 AM every morning in order to take his high dose of diuretics and ensure that he has enough time to use the bathroom before he leaves his home so that he will not have incontinence at or on the way to the ADHC."  Burke Decl. ¶ 12.  His treating physician, Dr. Courtney Chinn, opines that "Mr. Cota has made the gains he has in terms of his mobility as a direct result of the physical therapies he receives on a daily basis at the ADHC program. [¶]  In addition, his complex medical conditions, which are frequently unstable because of the combination of effects from his diabetes, medication side effects, left-sided hemiparesis, muscle spasms, and neuropathy, make the daily availability of skilled nursing a critical part of his ability to remain safely in the community."  Chinn Decl. ¶¶ 12-13.

Mr. Cota's most recent Medi-Cal approved IPC authorizes him to receive the following ADHC services on a daily, weekly, and monthly basis: professional nursing; personal care services; social services; therapeutic activities including social groups, physical therapy, occupational therapy, and pain treatments; and registered dietician counseling services as needed.  French Decl. ¶ 24.  Mr. Cota needs supervision with ambulation; assistance with accessing resources, housework, meal preparation, shopping, and transportation; and is dependent on others for laundry.  Id. ¶ 23.  He relies primarily on a wheelchair, although he sometimes uses a walker.  Id.  Because Mr. Cota does not have a chronic mental illness, Alzheimer's disease or other cognitive impairments, and because he does not require "substantial human assistance" with any of the qualifying factors, he is subject to termination from ADHC under the new criteria.  French Decl. ¶¶ 23, 27.  Without ADHC services, Mr. Cota is at risk for deterioration and injury, and faces hospitalization and nursing home placements.  Burke Decl. ¶¶ 16-17; see also Steinke Decl. ¶¶ 22-25; Chinn Decl. ¶¶ 11-16.

### 3. Sumi Konrai

Sumi Konrai is an 87 year-old woman with dementia, hypertension, and a history of depression.  Toth Decl. ¶ 33; Konrai Decl. ¶ 3.  Mrs. Konrai has been attending the Mt. Diablo Center for ADHC in Pleasant Hill, California, for four years.  Toth Decl. ¶ 33.  She is Medi-Cal eligible and approved by Medi-Cal to receive ADHC services five days per week.  Konrai Decl. ¶ 5.  Mrs. Konrai and her family rely on her receiving ADHC services five days a week in order for her to be able to remain in her own apartment and avoid institutionalization.  Id. ¶ 16.  Pursuant to her most current IPC, Mrs. Konrai receives, on a daily, weekly, or monthly basis: professional nursing services; personal care services; assistance with consuming appropriate and adequate nutrition; social services case management; therapeutic activities including cognitive stimulation activities, physical therapy, and occupational therapy; and registered dietician services to address her poor intake of food and history of failure to thrive.  Toth Decl. ¶ 37.

As set forth in her most current IPC, which was approved by the Mt. Diablo Center multi-disciplinary team, Mrs. Konrai needs supervision with bathing, dressing, and hygiene, and assistance with housework.  Id. ¶ 35.  She is dependent on others for medication and money management accessing resources, laundry, meal preparation, shopping, and transportation. She can feed herself, but she needs to have her food portions prepared specially.  Id. ¶¶ 35-36. Because the only qualifying factor she meets is assistance with medication management, she may no longer will qualify for ADHC services when the new criteria go into effect.  Id. ¶ 39.  Without ADHC services, Mrs. Konrai's family will have to place her in a nursing home.  Konrai Decl. ¶ 16; see also Toth Decl. ¶ 52; Steinke Decl. ¶ 32.

### 4. Harm to Class Members

Based on the data presented, it appears that the new eligibility criteria could reduce the number of persons eligible for ADHC services by twenty to forty percent.  This translates into approximately 8,000 to 15,000 affected individuals.  Missaelides Decl. ¶¶ 32, 47; Supp. Missaelides Decl. ¶¶ 15-16.  The new requirements also will affect persons who remain eligible for services.  Many programs will be forced to discharge dozens of their participants, which

1  may jeopardize their ability to continue to operate, threatening access to services even for
2  people who remain eligible.  McCloud Decl. ¶ 83; Regalia Decl. ¶¶ 22-24, 35; French Decl.
3  ¶ 18; Toth Decl. ¶¶ 28, 69; Puckett Decl. ¶ 24; Davis Decl. ¶ 24; Myers Purkey Decl. ¶¶ 25-26,
4  49; Nolcox Decl. ¶ 11.

5        **D.**      **PROCEDURAL HISTORY**

6        Plaintiffs Lillie Brantley, Gilda Garcia and Allie Jo Woodward commenced the instant
7  action on August 18, 2009, alleging claims, *inter alia*, under the ADA and section 504 of the
8  Rehabilitation Act.  DHCS and David Maxwell-Jolly, Director of DHCS, are named as
9  defendants.  On September 10, 2009, the Court granted Plaintiffs' motion for preliminary
10 injunction to enjoin Defendants from reducing ADHC services from a maximum of five days
11 to three days per week.  See Brantley v. Maxwell-Jolly, 656 F. Supp. 2d 1161 (N.D. Cal.
12 2009).  Among other things, the Court found that Plaintiffs had demonstrated a likelihood of
13 success on their claim that the elimination of up to two days per week of ADHC services
14 violates the ADA, and that Plaintiffs would suffer immediate and irreparable harm if an
15 injunction did not issue.  Id. at 1175-77.

16       On December 18, 2009, Plaintiffs filed a First Amended Complaint for Injunctive and
17 Declaratory Relief ("Amended Complaint"), which joined Mr. Cota, Mrs. Konrai and Mr. Bell
18 as additional plaintiffs.  The Amended Complaint alleges seven claims for relief:  (1) Violation
19 of Title II of the ADA; (2) Violation of Section 504 of the Rehabilitation Act; (3) Violation of
20 Procedural Due Process Rights; (4) Violation of the Medicaid Act, Failure to Provide
21 Opportunity for Hearing; (5) Violation of Medicaid Comparability Requirement; (6) Violation
22 of Medicaid Reasonable Standards Requirement; and (7) Violation of Government Code
23 Sections 11135 and 11139.

24       Plaintiffs purport to bring this action on behalf of "all recipients of Medi-Cal in the
25 State of California who receive Adult Day Health Care Services whom Adult Day Health Care
26 Benefits will be reduced, suspended, denied or terminated under the provisions of ABx4 5[.]"
27 Am. Compl. ¶ 171.  There also are two subclasses:  (1) "Limitation of Benefits Subclass,"
28 consisting of "Medi-Cal beneficiaries who, as of August 26, 2009, have been authorized to

receive five days of Adult Day Health Care Services by DHCS, whose services will be reduced to a maximum of three days under the provisions of ABx4 5"; and (2) "Termination of Benefits Subclass," which is defined as "all present and future Medi-Cal beneficiaries who have been authorized to receive any Adult Day Health Care services, and whose ADHC services will be reduced, suspended, terminated, and otherwise qualified future ADHC applicants who will be denied ADHC services, when the eligibility and medical necessity requirements of ABx4 5 become operative." Id. ¶ 172a-b.

Presently pending before the Court is Plaintiffs' Motion for Preliminary Injunction, filed on January 19, 2010.  In this motion, Plaintiffs seek to enjoin Defendants from implementing the new eligibility requirements for ADHC services under ABx4 5, which are scheduled to take effect on March 1, 2010.  Plaintiffs allege that the new criteria, which the State of California is attempting to implement to reduce its budget deficit, will result in the indiscriminate termination of ADHC services to thousands of individuals who are at risk of institutionalization.  In response, Defendants contend that they have the right to cut services, that the cutbacks are not discriminatory and that it is too early to determine precisely how many individuals will lose eligibility for ADHC benefits.  The parties have submitted voluminous papers in support of their respective positions, and the motion is now ripe for adjudication.

## II.    LEGAL STANDARD

The decision of whether to grant or deny a motion for preliminary injunction is a matter of the district court's discretion.  Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009).  The standard for assessing a motion for preliminary injunction is set forth in Winter v. Natural Res. Def. Council, Inc., ---U.S. ---, 129 S.Ct. 365, 376 (2008).  "Under Winter, plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest."  Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1021 (9th Cir. 2009).  District courts are empowered to grant preliminary injunctions "regardless of whether

1    the class has been certified."  Schwarzer, Tashima and Wagstaffe, Fed.Civ.P. Before Trial, §

2    10:773 at 10-116 (TRG 2008).

3    **III.      DISCUSSION**

4         **A.      LIKELIHOOD OF SUCCESS ON THE MERITS**

5              **1.      Medicaid Act Claims**

6         Plaintiffs allege that the new eligibility requirements for ADHC services violate the

7    "comparability" and "reasonable standards" provisions of the Medicaid Act.  The Court

8    discusses each claim in turn.

9                        **a)      Reasonable Standards Requirement**

10        The Medicaid Act requires that all participating states use "reasonable standards (which

11   shall be comparable for all groups) . . . for determining eligibility for and the extent of medical

12   assistance under the plan which . . . are consistent with the objectives" of the program.  42

13   U.S.C. § 1396a(a)(17).  States generally have "broad discretion" under this provision to set

14   standards for determining the amount of medical assistance to be afforded.  See State of Wash.

15   Dept. of Soc. and Health Servs. v. Bowen, 815 F.2d 549, 555 (9th Cir. 1987).  Nevertheless, a

16   state may run afoul of the reasonable standards requirement where it seeks to impose eligibility

17   requirements that fail to reasonably measure the individual's need for a particular service.  V.L.

18   v. Wagner, --- F. Supp. 2d ---, 2009 WL 3486708 at *6, *9 (N.D. Cal., Oct. 23, 2009)

19   (enjoining California Department of Social Services from implementing new eligibility criteria

20   for In-Home Supportive Services that did not measure "the individual need of a disabled or

21   elderly person for a particular service.").

22        Citing Watson v. Weeks, 436 F.3d. 1152, 1162 (9th Cir. 2006), Defendants argue, as a

23   threshold matter, that Plaintiffs lack standing to allege a violation of the reasonable standards

24   requirement because there is no private right of action to enforce its provisions.  See Defs.'

25   Opp'n at 11.  While it is true that Watson precludes Plaintiffs from bringing a claim under 42

26   U.S.C. § 1983 based on section 1396a(a)(17), it does not prevent them from stating a claim

27   under the Supremacy Clause.  Indep. Living Cntr. of S. Cal. v. Shewry, 543 F.3d 1050, 1060

28   (9th Cir. 2008).  In Indep. Living, plaintiffs brought a section 1983 action to enjoin

enforcement of California Assembly Bill X35 (AB 5), which reduced the payments to Medi-Cal providers by ten percent, on the ground that such reduction violated both the "quality of care" and "access to care" requirements of 42 U.S.C. § 1396a(a)(30)(A).  Id. at 1053.  The district court denied plaintiffs' motion for preliminary injunction on the ground that section 1396a(a)(30)(A) does not confer a private right of action.  Id. at 1054 (citing Sanchez v. Johnson, 416 F.3d 1051, 1062 (9th Cir. 2005)).  Though acknowledging that plaintiff filed their case under the Supremacy Clause as opposed to section 1983, the district court reasoned that was a "distinction without a difference."  Id.  The Ninth Circuit reversed and held that such distinction was, in fact, dispositive.  Under the Supremacy Clause, "a state or territorial law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption."  Id. at 1060.[5]

Turning to the merits, the Court finds that Plaintiffs have demonstrated a likelihood of success on their claim that Defendants' new eligibility criteria violate the reasonable standards requirement.  The seemingly arbitrary elimination of essentially half of the qualifying impairments (i.e., ADLs and IADLs) will result in individuals who previously could show two impairments now only being able to meet one of the requirements.  Although these individuals' need for services and risk of institutionalization are the same as before—or the same as individuals who *are* able to meet the new requirements—they will no longer be allowed access to ADHC services.  Significantly, Defendants make no attempt to explain how these changes are linked to the individual's circumstances, particular need for ADHC services or their risk of institutionalization.  Though Defendants claim that "[t]hese criteria are especially geared toward determining who is in the greatest need for services and who meets nursing facility

---

[5] Defendants assert that Indep. Living is distinguishable on the ground that section 1396a(a)(30)(A) "creates specific standards that evince a Congressional intent to preempt state law," whereas section 1396a(a)(17) allegedly does not.  Defs.' Opp'n at 12.  However, the Ninth Circuit's analysis in Indep. Living does not rest upon the purported existence of a Congressional intent to preempt state law.  Rather, the court predicated its decision on the basic principle under the Supremacy Clause that state and local governments may not enact laws that are inconsistent with federal law.

1   level of care," they provide no analysis or evidentiary support for this general assertion.  See

2   Defs.' Opp'n at 13.[6]

3          In addition, the new eligibility requirements impose disproportionate burdens on a

4   particular class of disabled individuals; namely, those with mental or cognitive impairments.

5   As discussed, ABx4 5 eliminates seven of the existing fifteen assessment criteria without

6   taking into account the individual's specific need for ADHC services.  In particular, the

7   remaining assessment activities relate primarily to an individual's physical care needs, and do

8   not account for consideration of activities that require the use of judgment and cognition.  See

9   Gardner Decl. ¶ 14.  In effect, this means that persons with significant physical disabilities and

10  care needs are more likely to be able to establish eligibility over those with mental and

11  cognitive disabilities.  Id.

12         This conundrum is exemplified by the situation facing Plaintiff Ronald Bell, who

13  suffers from dementia, seizures and a host of other conditions.  Nolcox Decl. ¶ 30; Gardner

14  Decl. ¶ 16.  He lives with his 78 year-old grandmother, who is barely able to care for him,

15  Dilworth Decl. ¶ 13, and requires assistance with accessing resources, housework, laundry,

16  meal preparation, money management and shopping, and is completely dependent upon others

17  for transportation, Gardner Decl. ¶ 16.  Yet, his only need cognizable under the new criteria is

18  for medicine management which, standing alone, will be insufficient to qualify him for ADHC.

19  Id.  As a result, it is likely that Mr. Bell's existing benefits will be terminated, thereby

20  increasing the likelihood that he will require institutionalization.  Id.  Other Plaintiffs and Class

21  Members will be similarly affected.  Steinke Decl. ¶ 26, 35; Gardner Decl. ¶ 18, Regalia Decl.

22  ¶ 32.

23

24

_____

25         [6] Defendants apparently base this assertion on a statement made by Phyllis Muchmore,
    who was previously employed by DHCS as a Nurse Consultant III.  Muchmore Decl. ¶ 1.  In
26  her declaration, Ms. Muchmore states that "what is clear is that the services will be available to
    those individuals with the highest medical need and at most risk of hospital or skilled nursing
27  facility admission."  Id. ¶ 18.  Ms. Muchmore provides no facts or offers any analysis to
    support these conclusions.  In the absence of such a foundation, the Court finds her conclusory
28  statements to be unsupported and unpersuasive.

1   Based on the foregoing, the Court is persuaded that Plaintiffs have made a sufficient

2   showing of merit as to their claim that Defendants' new eligibility criteria violate the

3   reasonable standards requirement.

4                  **b)        Comparability Requirement**

5   The "comparability" requirement of the Medicaid Act is set forth at 42 U.S.C.

6   § 1396a(a)(10)(B), which provides that a state plan for medical assistance made available to an

7   individual "shall not be less in amount, duration, or scope than the medical assistance made

8   available to any other such individual. . . ." Id.; see also 42 C.F.R. § 440.240.  "The

9   'comparability' requirement of the Medicaid Act mandates comparable services for individuals

10  with comparable needs and is violated when some recipients are treated differently than others

11  where each has the same level of need." V.L., -- F. Supp. 2d at --, 2009 WL 3486708 at *6

12  (citing cases); Conlan v. Bonta, 102 Cal.App.4th 745, 754 (2002) ("[a] state that participates in

13  Medicaid must provide comparable medical services to every participant.").

14  As stated above, Plaintiffs contend that ABx4 5 violates the comparability requirement

15  because it fails to take into account the specific circumstances and needs of the individual, and

16  as such, will result in some persons receiving ADHC services while others will not—

17  notwithstanding that both are in critical need of such services.  Defendants do not dispute

18  Plaintiffs' contention, but instead argue that they have the right to place limits on eligibility

19  requirements.  While that may be true *as a general matter*, that principle has no application in a

20  case, such as the present, where it has not been established that the eligibility criteria bears any

21  reasonable relation to the particular needs of the individual.  See V.L., -- F. Supp. 2d at --, 2009

22  WL 3486708 at *6 (comparability requirement violated where eligibility criteria for in-home

23  services failed to measure the individual needs of the disabled or elderly persons for a

24  particular service).  In addition, Defendants' right to place limits on eligibility requirements is

25  not unfettered, but is circumscribed by the comparability requirements which Defendants have

26  chosen not to address.  Thus, Plaintiffs have demonstrated a likelihood of success as to their

27  comparability claim, as well.

28

### 2.       ADA and Rehabilitation Act Claims

#### a)       Integration Mandate

Title II of the ADA prohibits discrimination in access to public services by requiring that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.7.  The ADA contains an "integration mandate," which requires that persons with disabilities receive services in the most integrated setting appropriate to their needs.  See Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597 (1999) (states have an obligation "to avoid unjustified isolation of individuals with disabilities"); Townsend v. Quasim, 328 F.3d 511, 516-17 (9th Cir. 2003) ("the failure to provide Medicaid services in a community-based setting as a form of discrimination on the basis of disability."); 28 C.F.R. § 35.130(d) ("[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."); see 42 U.S.C. § 12182(b)(1)(B).

Olmstead articulated a three-prong test to analyze whether a state's actions violate the integration mandate:  "[U]nder Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when [1] the State's treatment professionals determine that such placement is appropriate, [2] the affected persons do not oppose such treatment, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." 527 U.S. at 607; Townsend, 328 F.3d at 519.  Pursuant to Olmstead and its progeny, this Court established in its prior preliminary injunction order that the loss of one to two days per week of ADHC services is sufficient to establish violation of the integration mandate.  Brantley, 656 F. Supp. 2d at 1170-175; Fisher v. Okl. Health Care Auth., 335 F.3d 1175, 1181-82 (10th Cir.

---

[7] Plaintiffs' ADA and Rehabilitation Act claims may be analyzed together.  See Martin v. Cal. Dept. of Veterans Affairs, 560 F.3d 1042, 1047 n.7 (9th Cir. 2009) ("Because '[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act,' we have consistently applied 'the same analysis to claims brought under both statutes,'") (quoting in part Zukle v. Regents of Univ. of Cal., 166 F.3d 1041, 1045 (9th Cir. 1999)).

2003) (imposition of cap on prescription medications placed on participants in community-based program at high risk for premature entry into nursing homes in violation of the ADA).

In the instant case, the Court is persuaded that Plaintiffs have demonstrated a likelihood of success on their integration mandate claim based on the planned implementation of the new eligibility requirements.  As an initial matter, there is no dispute that each of the three class representatives for the "Termination and Limitation of Benefits" subclass (i.e., Harry Cota, Sumi Konrai and Ronald Bell) has an IPC that documents their respective need for ADHC services to avoid unnecessary institutionalization.  See McCloud Decl. ¶ 51-54; Toth Decl. ¶ 35; French Decl. ¶ 25; Regalia Decl. ¶¶ 25-27; Nolcox Decl. ¶¶ 30-34; Myers Purkey Decl. ¶¶ 36-37.  Likewise, each desires to remain in their homes, as opposed to being institutionalized.  See Cota Decl. ¶¶ 14-16; Burke Decl. ¶¶ 7, 12; Konrai Decl. ¶ 16; Dilworth Decl. ¶¶ 22, 25; Smith Decl. ¶¶ 8-9; French Decl. ¶ 25; Nolcox Decl. ¶ 35; Myers Purkey Decl. ¶ 39; Peterson Decl. ¶¶ 7-9.  Thus, the first two Olmstead prongs have been satisfied, as it is clear that the continuation of ADHC services is critical to their ability to avoid institutionalization, and to remain in a community setting.  See Steinke Decl. ¶¶ 20, 23-25, 29-30, 32-34, 36; Gardner Decl. ¶¶ 11, 15-18; Chinn Decl. ¶ 15; Regalia Decl. ¶ 29; Toth Decl. ¶¶ 52-53.  Finally, there is no dispute as to the third Olmstead prong; namely, that Defendants have an obligation to and can reasonably accommodate Plaintiffs' needs.  See Olmstead, 527 U.S. at 627.

Largely ignoring Olmstead, and without citing any authority, Defendants argue that they have no obligation to maintain the same level of services as before, and are thus entitled to cut services at will to accommodate the State's budgetary constraints.  Defs.' Opp'n at 6-7.  It is true that "[t]he State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless."  Olmstead, 527 U.S. at 603.  In that regard, ADA regulations provide that "[a] public entity shall make *reasonable modifications* in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, *unless* the public entity can demonstrate that making the modifications would *fundamentally alter* the nature of the service, program, or activity."  28 U.S.C.

§ 35.130(d)(7).  "<u>Olmstead</u> made clear that courts evaluating fundamental alteration defenses must take into account financial and other logistical limitations on a state's capacity to provide services to the disabled[.]"  <u>Townsend</u>, 328 F.3d at 520.

Defendants have not asserted any fundamental alteration defenses in response to Plaintiffs' integration mandate claim.  Defs.' Opp'n at 6-7.  Rather, they merely state that "the Legislature, faced with an unprecedented, severe budget crisis made a policy determination to limit ADHC services to those individuals who need the services most and who are at risk of admission to a skilled nursing facility."  <u>Id.</u> at 7.[8]  Though the Ninth Circuit has not yet reached this issue, other federal circuits have held that a state defendant cannot rely on budgetary constraints alone as the basis for a fundamental alteration defense.  <u>Frederick L. v. Dept. of Public Welfare of Pa.</u>, 364 F.3d 487, 495 (3rd Cir. 2004) ("We have not previously considered the extent to which states may assert a fundamental-alteration defense based on fiscal concerns alone, but now hold that if the District Court's opinion is read as focusing only on immediate costs, . . . it would be inconsistent with <u>Olmstead</u> and the governing statutes."); <u>accord</u> <u>Fisher</u>, 335 F.3d at 1183.  "If every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed."  <u>Id.</u>

> **b)    Methods of Administration**

In addition to their claim under the integration mandate, Plaintiffs also allege a "methods of administration" claim under ADA and Rehabilitation Act regulations.  These regulations provide, *inter alia*, that "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration . . . [t]hat have *the effect* of subjecting qualified individuals with disabilities to discrimination on the basis of disability . . . ."  28 C.F.R. § 35.130(b)(3) (emphasis added); <u>see also</u> 28 C.F.R. § 41.51(b)(3) (regulation under the Rehabilitation Act).  This provision applies to written policies as well as actual practices, and is intended to prohibit both "blatantly exclusionary policies or practices"

---

[8] Defendants' assertion that the new eligibility requirements focus on individuals who "need the services most" is conclusory and unsupported.  <u>See</u> fn.6, *supra*.

as well as "policies and practices that are neutral on their face, but deny individuals with disabilities an effective opportunity to participate."  28 C.F.R. Pt. 35, App. A; c.f., Crowder v. Kitagawa, 81 F.3d 1480, 1483 (9th Cir. 1996) ("Congress intended to prohibit outright discrimination, as well as those forms of discrimination which deny disabled persons public services disproportionately due to their disability").

Defendants contend that section 35.130(b)(3) "just precludes the State from administering its programs in a manner that will discriminate against individuals with disabilities," and that ABx4 5 comports with that edict because it does not single out disabled individuals.  Defs.' Opp'n at 7-8.  Though not entirely clear, Defendants appear to argue that their administration of Medi-Cal is not discriminatory, since all applicants are subject to the same eligibility criteria.  However, the mere fact Defendants are imposing the same eligibility requirements upon all persons seeking access to ADHC services does not insulate Defendants from liability.  The disparate impact occasioned by such requirements (discussed *supra* on a particular class of disabled persons is sufficient to demonstrate a violation of section 35.130(b)(3).  See Smith-Berch, Inc. v. Baltimore County, Md., 68 F. Supp. 2d 602, 621-22 (D. Md. 1999) (zoning policy applicable to methadone clinics imposed "disproportionate burdens on a particular class of disabled individuals:  opiate addicts who require methadone therapy to aid in their recovery."); Crowder, 81 F.3d at 1483.  Accordingly, the Court finds that Plaintiffs have demonstrated a likelihood of success on their claim that Defendants new eligibility requirements violate ADA and Rehabilitation Act regulations.

### c)    Improper Eligibility Criteria

ADA and Rehabilitation Act regulations also prohibit the use of "[e]ligibility criteria that screens out or tends to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."  28 C.F.R. § 35.130(b)(8); see also 45 C.F.R. § 84.4(b)(4).  "This concept . . . makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities, *indirectly prevent or limit their ability to participate*."  28 C.F.R.

Pt. 35, App. A (emphasis added).  As discussed, the new eligibility criteria likely will result in the termination of ADHC services for a large number of persons with disabilities, without regard to the individual's particular need for such services.  While these requirements do not overtly appear to target any particular group of disabled persons, in practice, they will. Defendants tacitly concede Plaintiffs' probability of success on this claim by failing to address Plaintiffs' argument in their opposition.

### 3.      Due Process Claim

In addition to their ADA claims, Plaintiffs allege that Defendants' new ADHC eligibility requirements violate their fourteenth amendment right to due process.  See U.S. Const. amend. XIV, § 1.  Medicaid recipients, such as Plaintiffs, are entitled to notice and an opportunity to be heard at an administrative hearing before their benefits can be terminated. See 42 U.S.C. § 1396a(a)(3) ("State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied . . . ."); Goldberg v. Kelly, 397 U.S. 254, 267-78 (1970) (Medicaid recipients entitled to continued benefits pending a pre-termination hearing, and a fair and impartial pre-termination hearing).

Likewise, Medicaid's implementing regulations set forth requirements for notice related to the right to appeal and the reasons for the termination of benefits.  Title 42 of the Code of Federal Regulations, section 431.206, states that at the time of any action affecting an individual's claim, he or she is entitled to receive notice of the right to a hearing or method by which to obtain a hearing and that he or she may represent himself or use legal counsel, a relative, a friend, or other spokesman.  42 C.F.R. §§ 431.206(b)-(c), 431.210.  The notice must be sent at least ten days prior to the proposed action, id. § 431.211, and must set forth, *inter alia,* the type of action that will be taken and the reasons for the change, id., § 431.210.  If a timely hearing request is made, benefits must continue until the agency reaches a final decision.  Id. § 431.230(a).

Defendants do not contest Plaintiffs' contention that no pre-termination notice will be sent to current Medicaid recipients regarding the potential termination of ADHC services

1    following the implementation of  more restrictive eligibility requirements.  Instead, they argue

2    that the determination of whether an individual qualifies for benefits will be made by private

3    ADHC providers, and as such, the State's purported lack of involvement in that process renders

4    Goldberg and the above-cited regulations inapposite.  See Defs.' Opp'n at 8-9.  Defendants'

5    attempt to "pass the buck" is unpersuasive.  As the sole state agency administering Medi-Cal,

6    Defendants are obligated to ensure compliance with federal law.  42 U.S.C. § 1396a(a)(5);

7    AlohaCare v. Haw. Dept. of Human Servs., 572 F.3d 740, 743 (9th Cir. 2009) ("Medicaid

8    generally requires a State to conform with federal guidelines prior to receiving federal funds.").

9    As such, Defendants cannot disclaim responsibility for compliance with federal law based on

10   its decision to rely on private entities to administer ADHC services.  Catanzano by Catanzano

11   v. Dowling, 60 F.3d 113, 118 (2d Cir. 1995) (noting that it would be "patently unreasonable to

12   presume that Congress would permit a state to disclaim federal responsibilities by contracting

13   away its obligations to a private entity.") (citation and internal quotations omitted).[9]

14          As an ancillary matter, Defendants contend that their role in the approval process is

15   limited to the approval, denial or modification of the TAR (submitted by ADHC providers),

16   and that such decisions are subject to secondary review, consistent with Goldberg.  Defs.'

17   Opp'n at 9.  This does not address Plaintiffs' legitimate due process concerns, however.

18   ADHC providers will submit TARs *only* for those individuals for whom they have determined

19   meet the new, restrictive eligibility criteria.  Muchmore Decl. ¶ 17.  No TARs will be sent to

20   Defendants for review in those cases where the individual does not meet the new requirements.

21   As a result, potentially thousands of individuals who currently receive ADHC services will

22   never have a TAR submitted on their behalf, meaning that the termination of their services will

23   never be reviewed.  Therefore, the Court finds that Plaintiffs have demonstrated a likelihood of

24   success on their due process claim.

25

26

27          [9] Indeed, Defendants previously acknowledged in court that "they bear the ultimate
     responsibility for ensuring compliance with federal disability laws."  Brantley, 656 F. Supp. 2d

28   at 1174.

**B.     IRREPARABLE HARM**

This Court has previously recognized in this case that the reduction or elimination of public medical benefits is sufficient to establish irreparable harm to those likely to be affected by the program cuts.  See Brantley, 656 F. Supp. 2d at 1176 (citing cases).  The evidence presented indicates that between 8,000 to 15,000 individuals will lose their ADHC services under the new criteria.  Defendants do not dispute that the loss of ADHC benefits could result in potentially serious and irreparable harm to Plaintiffs and Class Members.  Instead, they summarily dismiss Plaintiffs' estimate of the number of persons likely to be affected as "irresponsible" and unsubstantiated.  Defs.' Opp'n at 17-18.  Defendants studiously avoid committing to any estimate of the number of persons who will lose eligibility for ADHC services, and admit only that "*some individuals* will no longer qualify for ADHC services as a result of ABx4 5 . . . ."  Muchmore Decl. ¶ 18 (emphasis added).  These contentions are misplaced.

The estimates of the number of persons who will be impacted by ABx4 5 are based on information provided *by DHCS* in the first instance.  In July 2009, Toby Douglas, Chief Deputy Director of Health Care Programs at DHCS, informed Lydia Missaelides, Executive Director of the California Association for Adult Day Care Services, that 40% of the ADHC population will be terminated under the new eligibility requirements.  Supp. Missaelides Decl. ¶ 15.  Forty percent of an estimated ADHC user population of 36,840 (for fiscal year 2009-2010) amounts to almost 15,000.  Missalaedes Decl. Ex. D at 2.  Defendants object to Mr. Douglas' statement as hearsay.  Defs.' Supp. Obj. to Evid. at 5.  However, his statement is an admission by a party-opponent, which the Federal Rules of Evidence specifically exclude from the definition of hearsay.  Fed.R.Evid. 801(d)(2).

Similarly, a report by DHCS from November 2009, attached as Exhibit B to the Supplemental Declaration of Lydia Missaelides, indicates that "[t]here are approximately 55,400 unduplicated ADHC users per year."  Supp. Missaelides Decl. Ex. B.  DHCS estimates that "20% of ADHC users will no longer be eligible for ADHC services" once the new eligibility criteria take effect on March 1, 2010.  Id.  Twenty percent of 55,400 is 11,080.

1   Another projection in the report anticipates that 8,014 users "will no longer be eligible for

2   ADHC services" in the 2009-2010 and 2010-2011 fiscal years.  Id.  Defendants object to this

3   exhibit on the ground that the document is not relevant and properly authenticated.  Defs.'

4   Supp. Obj. to Evid. at 2-3.  Neither objection is compelling.  The document clearly is relevant

5   to the extent that it pertains to the number of ADHC recipients who are likely to be adversely

6   impacted by the new eligibility requirements.  As to Defendants' authentication concerns, the

7   Court notes that the *identical* document is available on the DHCS website at

8   http://www.dhcs.ca.gov/dataandstats/reports/mcestimates/Pages/nov_2009_estimate.aspx#reg_

9   pc (last accessed February 21, 2010).  The Court may properly take judicial notice of the

10  documents appearing on a governmental website.  See, e.g., Paralyzed Veterans of Am. v.

11  McPherson, No. 2008 WL 4183981 at *5 (N.D. Cal. Sept. 9, 2008) (citing cases).

12          Even if the Court were to disregard the evidence presented concerning the number of

13  ADHC recipients likely to lose their benefits under the new eligibility criteria, Defendants'

14  claim that Plaintiffs cannot show irreparable harm is illogical.  Defendants acknowledge that

15  ABx4 5 is a cost saving measure enacted in response to the "severe and unprecedented budget

16  crisis . . . ."  Defs.' Opp'n at 19.  Given the purpose of the new law, it is axiomatic that in order

17  to have any significant impact on the State's budget, the curtailment of ADHC services

18  arguably will be dramatic.  As such, it is somewhat disingenuous for Defendants to downplay

19  the impact of the proposed changes by suggesting that only "some" individuals will lose their

20  ADHC services.  Nor is the Court persuaded by Defendants' assertion that there is no way of

21  ascertaining precisely who will lose their benefits until after ADHCs centers complete their

22  assessments under the new criteria and submit their IPCs to DHCS for review.  See Defs.'

23  Opp'n at 18.   As this Court recognized previously, Plaintiffs need not wait until the harm is

24  actually suffered before seeking injunctive relief.  See Brantley, 656 F. Supp. 2d at 1176.

25          **C.      BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST**

26          The final two considerations on a motion for preliminary injunction, i.e., the balance of

27  hardships and the public interest, may be considered contemporaneously.  See Indep. Living

28  Ctr. of S. Cal., Inc. v. Maxwell-Jolly, 572 F.3d 644, 657-58 (9th Cir. 2009).  Plaintiffs argue

1 that the balance of hardships weighs in their favor because they face the loss of services that

2 are critical to avoid institutionalization.  <u>See</u> Pls.' Mot. at 25.  Defendants respond that

3 Plaintiffs' claim that they are at risk of losing services is unsubstantiated, and that if the new

4 eligibility criteria is not implemented, other medical and social programs will have to be cut as

5 a result of the State's fiscal constraints.  Defs.' Opp'n at 17-18.  Plaintiffs' position is more

6 persuasive.

7        As discussed, there can be no legitimate dispute that implementation of the new

8 eligibility requirements will result in the loss of ADHC services to a significant number of

9 disabled persons.  Indeed, that is the specific purpose of ABx4 5—to save money by

10 eliminating services.  Similarly, the Ninth Circuit has held that financial considerations

11 attributable to state's "fiscal crisis" are outweighed by the "robust public interest in

12 safeguarding access to healthcare for those eligible for Medicaid, whom Congress has

13 recognized as 'the most needy in the country.'"  <u>Indep. Living Ctr. of S. Cal.</u>, 572 F.3d at 659;

14 <u>see also</u> <u>Beltran v. Myers</u>, 677 F.2d 1317, 1322 (9th Cir. 1982) ("Balancing the medical or

15 financial hardship to the plaintiffs-appellees against the financial hardship to the state resulting

16 from its inability to recover for medical services should its rules ultimately be held valid, it was

17 not an abuse of discretion for the district judge to find that the balance of hardships tipped

18 sharply in favor of plaintiffs.").  Given these considerations, the Court finds that that the

19 balance of hardships and public interest favor Plaintiffs.

20        **D.    SCOPE OF THE INJUNCTION AND BOND REQUIREMENT**

21        Finally, Plaintiffs request that in the event the Court grants their motion that such relief

22 be afforded on a classwide basis and a waiver of their bond requirement due to the Plaintiffs'

23 indigency.   The propriety of both requests was discussed in the Court's prior order and is not

24 disputed by Defendants in their opposition to the instant motion.  <u>See</u> <u>Brantley</u>, 656 F. Supp. 2d

25 at 1177-78.

26        **E.    OBJECTIONS TO EVIDENCE**

27        Each side has filed written objections to the other's evidence submitted in support of

28 their respective positions.  (Docket Nos. 157, 159, 168.)  Defendants "generally object" to the

1   declarations of Plaintiffs' experts, Gary Steinke, M.D., and William I. Gardner, Ph.D, on the

2   grounds that their statements and opinions do not meet the standard for admissibility under

3   Federal Rule of Evidence 702 or Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589-93

4   (1993).  Defs.' Obj. to Evid. at 2.

5          Rule 702 allows for the admission of "scientific, technical, or other specialized

6   knowledge" when "(1) the testimony is based upon sufficient facts or data, (2) the testimony is

7   the product of reliable principles and methods, and (3) the witness has applied the principles

8   and methods reliably to the facts of the case."  Daubert provides guidance on the admissibility

9   of testimony under Rule 702.  "A district court may rely on various factors in evaluating such

10  evidence, including (1) whether the theory can be or has been tested; (2) whether the theory has

11  been subjected to peer review; (3) whether the error rate is known and standards exist to

12  control the operation of the technique; and (4) whether the theory has gained general

13  acceptance."  United States v. McCaleb, 552 F.3d 1053, 1060 (9th Cir. 2009).  The court has

14  "broad discretion" in determining the admissibility of expert testimony and is not required to

15  "mechanically apply the Daubert factors[.]"  Id. (internal quotations and citation omitted).

16  Indeed, in certain cases, the Daubert factors may be inapplicable.  See Boyd v. City and County

17  of San Francisco, 576 F.3d 938, 945 n.4 (9th Cir. 2009) (noting that Daubert's list of factors

18  neither necessarily nor exclusively applies to all experts or in every case).

19         Defendants discuss none of the Daubert factors, and instead, simply assert that neither

20  individual is an expert in "eligibility criteria, which is the focus of their declarations."  Defs.'

21  Obj. to Evid. at 3.  This contention lacks merit.  Neither Drs. Steinke nor Gardner were

22  proffered as experts in "eligibility criteria."  In addition, Defendants are unclear with respect to

23  what knowledge, training, skill or experience is necessary to become an expert in "eligibility

24  criteria," to the extent such an expertise even exists.  Rather, the opinions of both individuals

25  focus on the specific conditions associated with cognitive and mental disabilities and the types

26  of care necessary to support individuals with these conditions in a manner to avoid

27  institutionalization.  Both individuals are well-credentialed and have extensive experience in

28  areas concerning the treatment, care and support of persons with developmental and mental

1   disabilities as well as conditions associated with advanced age.  See Gardner Decl. ¶¶ 5-10;

2   Steinke Decl. ¶¶ 5-9.  For purposes of the instant motion, the Court finds Defendants have not

3   shown that these experts lack the requisite qualifications to render the opinions set forth in their

4   respective declarations.

5          Next, Defendants object to the opinions in the declarations of the various ADHC

6   providers as speculative, particularly with respect to their opinions regarding "what might

7   happen to their clients if the new eligibility criteria requirements for the ADHC program go

8   into effect."   Defs.' Obj. to Evid. at 3.  The Court overrules the objection.  The ADHC

9   providers have firsthand experience with the Plaintiffs and Class Members who likely will be

10  impacted by the new eligibility criteria resulting from ABx4 5.  Based on their knowledge of

11  the specific needs of these individuals, the ADHC providers are in a unique position to predict

12  the likely impact on persons in their programs in the event the services currently being

13  provided no longer are available.  While these declarants may not be able to opine with

14  absolute certainty as to what impact the loss of ADHC services will have on each individual,

15  they certainly are qualified to opine about what is likely to occur in the event services to their

16  clients are terminated.  Defendants' objections to this evidence are overruled.

17  **IV.    CONCLUSION**

18         For the reasons stated above,

19         IT IS HEREBY ORDERED THAT Plaintiffs' Motion for a Preliminary Injunction is

20  GRANTED.  Defendants David Maxwell-Jolly, in his official capacity as Director of the

21  Department of Health Care Services; the Department of Health Care Services; and their

22  successors, agents, officers, servants, employees, attorneys and representatives and all persons

23  acting in concert or participating with them are hereby:

24         1.      ENJOINED and RESTRAINED from implementing or enforcing ABx4 5,

25  codified at California Welfare & Institutions Code §§ 14522.4, 14525.1 and 14526.2, or

26  engaging in the following actions until further order of this Court:  reducing, terminating,

27  suspending, or denying Medi-Cal Adult Day Health Care program benefits to the Plaintiffs and

28

1  all similarly situated individuals based on new eligibility and medical necessity criteria

2  contained in California Welfare & Institutions Code §§ 14522.4, 14525.1 and 14526.2.

3      2.      ORDERED to take all actions necessary within the scope of their authority to

4  implement the above injunction.

5      3.      ORDERED to provide prompt notice to all Adult Day Health Care program

6  providers of the terms of this Preliminary Injunction.

7      4.      ORDERED to provide prompt notice to all recipients of Adult Day Health Care

8  program services of the terms of this Preliminary Injunction, in an understandable format.

9      The Court WAIVES the requirement for the posting of a bond as security for the entry

10  of preliminary injunctive relief on the grounds of Plaintiffs' indigency.

11      IT IS SO ORDERED.

12  Dated:  February 24, 2010

13  _____
    SAUNDRA BROWN ARMSTRONG
    United States District Judge