Elissa Gershon, State Bar No. 169741
elissa.gershon@disabilityrightsca.org
Elizabeth Zirker, State Bar No. 233487
elizabeth.zirker@disabilityrightsca.org
Kim Swain, State Bar No. 100340
kim.swain@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA  94612
Telephone:  (510) 267-1200
Facsimile:   (510) 267-1201

Attorneys for Plaintiffs

[Complete list of counsel on following pages]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTHER DARLING; RONALD BELL by his guardian ad litem Rozene Dilworth; GILDA GARCIA; WENDY HELFRICH by her guardian ad litem DENNIS ARNETT; JESSIE JONES; RAIF NASYROV by his guardian ad litem Sofiya Nasyrova; ALLIE JO WOODARD, by her guardian ad litem Linda Gaspard-Berry; individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        vs.<br><br>TOBY DOUGLAS, Director of the Department of Health Care Services, State of California, DEPARTMENT OF HEALTH CARE SERVICES,<br><br>        Defendants.<br>_____ | **Case No.: C09-03798 SBA**<br><br>CLASS ACTION<br><br>**SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

i

1   Anna Rich, State Bar No. 230195
    arich@nsclc.org
2   Kevin Prindiville, State Bar No. 235835
    kprindiville@nsclc.org
3   NATIONAL SENIOR CITIZENS LAW CENTER
    1330 Broadway, Suite 525
4   Oakland, CA 94612
    Telephone:  (510) 663-1055
    Facsimile:  (510) 663-1051
5
6   Eric Carlson, State Bar No. 141538
    ecarlson@nsclc.org
7   NATIONAL SENIOR CITIZENS LAW CENTER
    3435 Wilshire Boulevard, Ste 2860
    Los Angeles, CA 90010-1938
8   Telephone:  213-674-2813
    Facsimile:  213-639-0934
9
10  Barbara Jones, State Bar No. 88448
    bjones@aarp.org
11  AARP FOUNDATION LITIGATION
    200 So. Los Robles, Suite 400
12  Pasadena, CA 91101
    Telephone:  (626) 585-2628
    Facsimile:  (626) 583-8538
13
14  Kenneth W. Zeller, *Pro Hac Vice*
    kzeller@aarp.org
15  Kelly Bagby, *Pro Hac Vice*
    kbagby@aarp.org
16  AARP FOUNDATION LITIGATION
    601 E Street NW
17  Washington D.C. 20049
    Telephone:  (202) 434-2060
    Facsimile:  (202) 434-6424
18
19  Sarah Somers, State Bar No. 170118
    somers@healthlaw.org
20  Martha Jane Perkins, State Bar No. 104784
    perkins@healthlaw.org
21  NATIONAL HEALTH LAW PROGRAM
    211 N. Columbia Street
22  Chapel Hill, NC 27514
    Telephone:  (919) 968 - 6308
    Facsimile:  (919) 968-8855
23
24  Kenneth A. Kuwayti, State Bar No. 145384
    KKuwayti@mofo.com
25  MORRISON & FOERSTER LLP
    755 Page Mill Road
26  Palo Alto, CA 94304-1018
    Telephone:  (650) 813-5600
    Facsimile       650-494-0792
27

28

ii

# TABLE OF CONTENTS

I.      INTRODUCTION..................................................................................................... 1

II.     JURISDICTION ...................................................................................................... 3

III.    VENUE.................................................................................................................... 3

IV.     INTRADISTRICT ASSIGNMENT ....................................................................... 3

V.      PARTIES ................................................................................................................ 3

        Plaintiffs...................................................................................................................... 3

                Gilda Garcia — Limitation of Benefits Subclasses Representative ...................... 3

                Allie Jo Woodard — Limitation of Benefits Subclass Representative..................... 4

                Ronald Bell – Termination of Benefits Subclass Representative ................................ 5

                Esther Darling ........................................................................................................... 5

                Wendy Helfrich........................................................................................................... 6

                Jessie Jones ................................................................................................................ 7

                Raif Nasyrov .............................................................................................................. 7

        Defendants ................................................................................................................... 8

VI.     STATUTORY AND REGULATORY FRAMEWORK ....................................... 9

        Federal and State Anti-Discrimination Laws.............................................................. 9

        Medicaid and Medi-Cal Programs ............................................................................ 10

        Medicaid Due Process Requirements ........................................................................ 12

        Medi-Cal Covered Services ....................................................................................... 13

        2009 Legislation Affecting ADHC—ABx4 5 (Chapter 5, Statutes of 2009)........................ 16

        2011 Legislation Affecting ADHC – AB 97 (Chapter 3, Statutes of 2011) and SB 69
                (2011-2012 Budget) ...................................................................................... 17

VII.    FACTUAL ALLEGATIONS................................................................................ 19

        Background of the ADHC Program........................................................................... 19

        Cuts in Days of Service from a Maximum of Five to No More than Three Under
                ABx4 5 ........................................................................................................... 21

iii

New, Restrictive ADHC Eligibility Requirements Under ABx4 5 ........................................ 22

Implementation of New, Restrictive Eligibility Requirements Under ABx4 5 .................... 25

Elimination of ADHC Pursuant to AB 97 and SB 69.................................................. 26

Facts Related to Plaintiff Allie Jo Woodard — Limitation of Benefits Subclass
    Representative ........................................................................................ 28

Facts Related to Plaintiff Gilda Garcia—Limitation of Benefits Subclasses
    Representative ........................................................................................ 30

Facts Related to Plaintiff Ronald Bell – Termination of Benefits Subclass
    Representative ........................................................................................ 31

Facts Related to Plaintiff Esther Darling ................................................................. 34

Facts Related to Plaintiff Wendy Helfrich................................................................ 35

Facts Related to Plaintiff Jessie Jones ................................................................... 37

Facts Related to Plaintiff Raif Nasyrov .................................................................. 39

Failure to Provide Adequate Notice and Pre-Termination Hearing................................ 40

Allegations Regarding Limitations of Benefits Subclass ............................................ 41

Allegations Regarding Termination of Benefits Subclass ........................................... 42

Allegations Regarding Entire Certified and Amended Class ....................................... 43

Facts Related to Medi-Cal ADHC Participants Generally ........................................... 43

VIII.   CLASS DEFINITION AND ALLEGATIONS ................................................. 45

IX.   LEGAL CLAIMS.................................................................................. 48

X.   REQUEST FOR RELIEF ......................................................................... 55

*DARLING, ET AL. V. DOUGLAS, ET AL.*, C09-03798 SBA; SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# I.     INTRODUCTION

1.     Plaintiffs, who are elderly persons and adults with disabilities, brought this class action suit against the California Department of Health Care Services and its Director (Defendants) to stop devastating cuts to Adult Day Health Care (ADHC) services.  If implemented, these cuts will place named Plaintiffs and Class Members at imminent risk of harm, including institutionalization, hospitalization, injury and/or death.

2.     ADHC is a Medi-Cal funded community-based program for low-income seniors and disabled adults, which provides "a viable alternative to institutionalization for those elderly persons and adults with disabilities who are capable of living at home with the aid of appropriate health care or rehabilitative services."  Cal. Health & Safety Code § 1570.2(b). ADHC services are provided at centers located in communities throughout California.  ADHC participants live at home or in licensed residential care facilities, and participate in ADHC from one to five days per week, depending on their assessed needs.  ADHC services include professional nursing services, personal care services, social and therapeutic services, case management, medication management, meals, physical therapy, occupational therapy, speech therapy and transportation to and from the ADHC center.

3.     ABx4 5 (Chapter 5, Statutes of 2009), one of a number of bills passed in response to California's budgetary difficulties, imposed two cutbacks on the ADHC program, each of which was based solely on reducing State expenditures, with little or no consideration of the harm to vulnerable elderly and disabled persons.  The first cutback reduced the maximum weekly ADHC services from five to three days per week for all Medi-Cal funded program participants, with no exceptions, and regardless of existing treatment authorizations and the participant's health condition.  This cutback has been enjoined by this Court through a preliminary injunction issued on September 10, 2009.

4.     The second cutback established new and restrictive eligibility requirements for participation in an ADHC program.  This cutback was intended to go into effect when the Director of the California Department of Health Care Services (DHCS) provided a written declaration that the restrictive eligibility requirements were ready to be implemented.  This declaration would have

returned the maximum number of days allowable under the program to five per week, but would have caused termination of all ADHC services for an estimated 15,000 current participants who had been assessed to need those services and who currently receive them, and denial of services to otherwise qualified future ADHC applicants.  Defendants  targeted March 1, 2010 for the second cutback to go into effect; however, this cutback was enjoined by this Court on February 24, 2010 and the State's appeal is currently pending before the Ninth Circuit.

5. On March 24, 2011, the Governor signed Assembly Bill 97 (Statutes of 2011) ("AB 97"), which eliminates ADHC as a Medi-Cal optional benefit as early as July 1, 2011.  AB 97 authorizes the implementation of a "short-term program" to transition ADHC participants to other Medi-Cal or other services, and includes an uncodified intent to develop a new program, called Keeping Adults Free from Institutions ("KAFI") which is to be pursued through a "federal waiver." The funding for the short-term and new KAFI programs will be no more than 50 percent of the current ADHC appropriation.  Moreover, AB 97 contains no assurances that appropriate replacement services that participants need to avoid institutionalization will be in place upon the elimination of ADHC, or that any alternative services they ultimately receive will be adequate to meet their currently assessed needs.

6. Upon information and belief, some ADHC programs are already preparing to shut their doors in anticipation of the July 1, 2011 elimination date.  To date, at least two centers have announced that they are closing due to AB 97.

7. Without vital community-based ADHC services, or in the alternative, provision of alternative services to which Plaintiffs and Class Members are entitled, without interruption, under California's Medi-Cal program, Plaintiffs will experience immediate and irreparable harm. Plaintiffs and other Class Members are at risk of physical and/or mental deterioration in health and functioning, and will be forced into hospitals and nursing facilities due to Defendants' actions and inactions in violation of the Americans with Disabilities Act of 1990 (ADA), (42 U.S.C. §§ 12101-12213), Section 504 of the Rehabilitation Act of 1973 (Section 504), (29 U.S.C. §§ 794-794a ), Title

1  XIX of the Social Security Act (Medicaid Act), (42 U.S.C. § 1396a – 1396w-5) and California

2  Government Code section 11135 (Cal. Gov't. Code § 11135).

## II.      JURISDICTION

4    8.    This is an action for declaratory and injunctive relief for violation of the Due Process

5  Clause of the Fourteenth Amendment to the U.S. Constitution; Title XIX of the Social Security Act,

6  (the Medicaid Act), (42 U.S.C. §§ 1396a-1396w-5); Title II of the Americans With Disabilities Act

7  of 1990 (ADA), (42 U.S.C. § 12132); and Section 504 of the Rehabilitation Act of 1973 (Section

8  504), (29 U.S.C. § 794).

9    9.    Jurisdiction is based 28 U.S.C. §§ 1331 and 1343; Title II of the ADA, and Section

10  504.  Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201 -

11  2202.  At all times relevant to this action, Defendants have acted under color of state law.

12    10.    The Court has Supplemental Jurisdiction over Plaintiffs' state claim pursuant to

13  28 U.S.C. § 1367 and California Government Code section 11139.

## III.      VENUE

15    11.    Venue is proper in the Northern District of California pursuant to 28 U.S.C.

16  § 1391(b), because the Defendants operate and perform their official duties therein and thus reside

17  therein for purposes of venue, and because a substantial part of the events and omissions giving rise

18  to the claims herein occur in counties that are part of the Northern District of California.

## IV.      INTRADISTRICT ASSIGNMENT

20    12.    Pursuant to Civil Local Rule 3-2(c) this action should be assigned to the San

21  Francisco or Oakland Division of the Northern District of California, because a substantial part of

22  the events and omissions giving rise to the claims herein occur in counties in the Northern District of

23  California and certain Plaintiffs are residents of the City and County of San Francisco.

## V.      PARTIES

25  **Plaintiffs**

26  <u>Gilda Garcia — Limitation of Benefits Subclasses Representative</u>

27    13.    Named Plaintiff Gilda Garcia is a 78–year-old woman with unstable diabetes,

28

*DARLING V. DOUGLAS, ET AL.*, C09-03798 SBA; SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1   hypertension, Bells' Palsy, depression, and kidney problems.  She is Medi-Cal eligible and currently

2   receives five days a week of ADHC.

3          14.    Ms. Garcia needs supervision with bathing, dressing, medication management,

4   ambulation, and money management.  She needs assistance with toileting, ambulation, transferring,

5   accessing resources, hygiene, meal preparation, shopping, and transportation.  She is dependent on

6   others for housework and laundry.  She uses a cane and/or a walker for ambulation.

7          15.    In order to remain in her own home in the community, Ms. Garcia requires the

8   frequent daily medical monitoring she receives with her current level of ADHC services, and she is

9   at imminent risk of hospitalization due to her unstable diabetes if her services are reduced or

10   terminated.

11        <u>Allie Jo Woodard — Limitation of Benefits Subclass Representative</u>

12          16.    Plaintiff Allie Jo Woodard is an 81 year-old woman who is diagnosed with bipolar

13   affective disorder, depression, diabetes, glaucoma, a seizure disorder, hypertension, and

14   osteoarthritis.  Ms. Woodard receives Medi-Cal and is currently attending ADHC five days per

15   week.

16          17.    Ms. Woodard needs supervision with ambulation, and transferring; and assistance

17   with bathing and dressing, and toileting.  She is totally dependent on others for housework, hygiene,

18   laundry, shopping, transportation, medication management, money management, accessing

19   resources, and meal preparation.

20          18.    Ms. Woodard is proceeding in this litigation through her *Guardian ad Litem* Linda

21   Gaspard-Berry as she is not able to proceed on her own behalf.  Ms. Gaspard-Berry, who is Ms.

22   Woodard's daughter, has agreed to act as her *Guardian ad Litem,* and is qualified to do so.  She will

23   competently proceed on Ms. Woodard's behalf.  An application to appoint Ms. Gaspard-Berry to act

24   as a *Guardian ad Litem* in this action has been granted by this Court.

25          19.    Ms. Woodard and her family want her to remain in her own home with her current

26   level of ADHC services, and she is at imminent risk of institutionalization if these services are

27   reduced to three days per week or terminated entirely.

28

4

Ronald Bell – Termination of Benefits Subclass Representative

20.     Named Plaintiff Ronald Bell is a 46-year-old man with unstable diabetes, a seizure disorder, organic brain syndrome, hypertension, diabetic neuropathy, hyperlipidemia, and a cataract in one eye.  He is Medi-Cal eligible and has been approved by Medi-Cal for and receives ADHC services three days per week at the Graceful Senescence Adult Day Health Care Program in Los Angeles, California.

21.     Mr. Bell lives with his 80-year-old grandmother and caretaker Rozene Dilworth, who also has diabetes.  Because Mr. Bell is subject to seizures at any time, and because of his cognitive impairments, his grandmother can never leave him alone.

22.     Due to his cognitive impairments, Mr. Bell needs assistance with accessing resources, housework, laundry, meal preparation, money management, and shopping, and is totally dependent on others for transportation and medication management.

23.     In order to remain in his own home, Mr. Bell relies upon the skilled care and medical monitoring he receives with his current level of ADHC services, and he is at risk of emergency room visits and hospitalizations, and eventual out-of-home placement due to his unstable diabetes, his seizure disorder, and his cognitive impairments.

24.     Ronald Bell is proceeding in this litigation through his *Guardian ad Litem* Rozene Dilworth, as he is not able to proceed on his own behalf.  Ms. Dilworth has agreed to act as his *Guardian ad Litem* and is qualified to do so.  She will competently proceed on Mr. Bell's behalf.  An application to appoint Rozene Dilworth as Ronald Bell's *Guardian ad Litem* in this action has been granted by this Court.

25.     Mr. Bell and his family want him to remain in his own home with his current level of ADHC services, and he is at imminent risk of institutionalization if these services are reduced or terminated.

Esther Darling

26.     Plaintiff Esther Darling is a 74-year-old woman who is diagnosed with diabetes, post-stroke with with paralysis affecting her left side, atrial fibrillation, incontinence of urine, edema,

1    depression, hearing loss, hemorrhoids, and gout. Ms. Darling receives Medi-Cal and is currently

2    attending ADHC five days per week.

3         27.    Ms. Darling needs supervision with self-feeding, medication management, and

4    shopping.  She requires assistance with ambulation, toileting, transferring, accessing resources,

5    hygiene, meal preparation, money management, and shopping.  She is totally dependent on others

6    for bathing, dressing, housework, and laundry.  She uses a wheelchair and walker for mobility.

7         28.    Ms. Darling wants to continue to live in her own home with her current level of

8    ADHC services.

9         29.    In order to remain in her own home in the community, Ms. Darling requires the daily

10    skilled nursing, medical monitoring and social and therapeutic activities she receives at ADHC five

11    days per week.  Ms. Darling is at imminent risk of institutionalization if her current level of ADHC

12    services are reduced, modified, or terminated, and adequate long-term alternative services are not

13    provided without interruption in care.

14         <u>Wendy Helfrich</u>

15         30.    Plaintiff Wendy Helfrich is a 40-year-old woman who is diagnosed with anoxic brain

16    damage due to cardiac arrest.  Ms. Helfrich receives Medi-Cal and is currently attending ADHC

17    three days per week.

18         31.    Ms. Helfrich needs assistance with ambulation, bathing, dressing, self-feeding,

19    toileting and transferring.  She is totally dependent on others for accessing resources, housework,

20    hygiene, laundry, meal preparation, medication management, money management, shopping and

21    transportation.  She requires one-on one, handhold assistance for ambulation.

22         32.    Ms. Helfrich is proceeding in this litigation through her *Guardian ad Litem* Dennis

23    Arnett as she is not able to proceed on her own behalf.  Mr. Arnett, who is Ms. Helfrich's father and

24    conservator, has agreed to act as her *Guardian ad Litem,* and is qualified to do so.  He will

25    competently proceed on Ms. Helfrich's behalf.  An application to appoint Mr. Arnett to act as a

26    *Guardian ad Litem* in this action has been filed with this court.

27

28

33.     Ms. Helfrich and her family want her to remain at home with her current level of ADHC services.

34.     In order to remain in her own home in the community, Ms. Helfrich requires the medical monitoring, social and therapeutic activities, and the physical, occupational, and speech therapy services she receives at ADHC three days per week.  Ms. Helfrich is at imminent risk of institutionalization if her current level of ADHC services are reduced, modified, or terminated, and adequate long-term alternative services are not provided without interruption in care.

Jessie Jones

35.     Plaintiff Jessie Jones is a 67-year-old woman who has been disabled since 1990, when she had a severe stroke.  She has diabetes, convulsions, hypertension, and congestive heart failure. Ms. Jones receives Medi-Cal and is currently attending ADHC five days per week.

36.     Ms. Jones needs assistance with ambulation, self-feeding, toileting and transferring. She is totally dependent on others for bathing, dressing, housework, hygiene, laundry, shopping, transportation, medication management, money management, accessing resources, and meal preparation.  She uses a wheelchair and walker for mobility, and she wears a brace on her lower right leg.

37.     Ms. Jones wants to remain in her home in the community, where she lives with her daughter, with her current level of ADHC services.

38.     In order to remain at home with her family, Ms. Jones requires the daily skilled nursing, medical monitoring, and social and therapeutic activities she receives at ADHC five days per week.  Ms. Jones is at imminent risk of institutionalization if her current level of ADHC services are reduced, modified, or terminated, and adequate long-term alternative services are not provided without interruption.

Raif Nasyrov

39.     Plaintiff Raif Nasyrov is an 88-year-old monolingual Russian speaking man who is diagnosed with hypertension, arthritis, pulmonary vascular disease, cataracts, depression, dementia,

hearing loss, urinary and fecal incontinence, Alzheimer's disease, ulcer, and anxiety.   Mr. Nasyrov receives Medi-Cal and is currently attending ADHC five days per week.

40.     Mr. Nasyrov needs supervision with bathing, self feeding, and medication management and he needs assistance with hygiene, and ambulation.  He is totally dependent on others for accessing resources, housework, laundry, shopping, transportation, money management, and meal preparation.

41.     Mr. Nasyrov is proceeding in this litigation through his *Guardian ad Litem*, Sofia Nasyrova, as he is not able to proceed on his own behalf.  Ms. Nasyrova, who is Mr. Nasyrov's daughter, has agreed to act as his *Guardian ad Litem,* and is qualified to do so.  She will competently proceed on Mr. Nasyrov's behalf.  An application to appoint Ms. Nasyrova to act as a *Guardian ad Litem* in this action has been filed with this Court.

42.     Mr. Nasyrov and his family want him to remain in his own home with his current level of ADHC services.

43.     In order to remain in his own home in the community, Mr. Nasyrov requires the daily skilled nursing, medical monitoring and social and therapeutic activities he receives at ADHC five days per week.  Mr. Nasyrov is at imminent risk of institutionalization if his current level of ADHC services are reduced, modified, or terminated, and adequate long-term alternative services are not provided without interruption.

**Defendants**

44.     Defendant California Department of Health Care Services (DHCS) is a state agency which receives federal funds and is responsible for administering the federal Medicaid program, entitled, "Medi-Cal" in California.  Defendant DHCS is sued only under the Second Claim for Relief (Section 504 of the Rehabilitation Act) and the Seventh Claim for Relief (Cal. Gov't. Code § 11135).

45.     Defendant Toby Douglas is the Director of the California Department of Health Care Services, a state agency which receives federal funds.  Defendant Douglas is a public agency director responsible for operation of a public entity, pursuant to 42 U.S.C. §§ 12131(1)(A) and (B).

8

Defendant Douglas is sued in his official capacity.

## VI.    STATUTORY AND REGULATORY FRAMEWORK

### Federal and State Anti-Discrimination Laws

46.    In enacting the Americans With Disabilities Act, Congress found that "[i]ndividuals with disabilities continually encounter various forms of discrimination, including…segregation…" 42 U.S.C. § 12101(a)(5).  Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity or be subjected to discrimination by such entity."  42 U.S.C. § 12132.

47.    Regulations implementing Title II of the ADA provide:  "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (1991).

48.    Section 504 of the Rehabilitation Act of 1973, on which the ADA is modeled, sets forth similar protections against discrimination by recipients of federal funds, such as Defendant herein.  29 U.S.C. §§ 794-794a.  These protections include the prohibition against unnecessary segregation.  Regulations implementing Section 504 require that a public entity administer its services, programs and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities.  28 C.F.R. § 41.51(d).

49.    Regulations implementing Title II of the ADA and Section 504 also provide:  "A public entity may not, directly or through contractual or other arrangements, utilize criteria or other methods of administration:  (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities. . . ."  28 C.F.R. § 35.130(b)(3); 28 C.F.R. § 41.51(b)(3)(i); 45 C.F.R. § 84.4(b)(4).

50.    ADA regulations further provide: "A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of

individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."  28 C.F.R. § 35.130(b)(8).

51.   ADA regulations further provide:  "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

52.   The United States Supreme Court in *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581 (1999), held that the unnecessary institutionalization of individuals with disabilities is a form of discrimination under Title II of the ADA.  In doing so, the Court interpreted the ADA's "integration mandate" as requiring persons with disabilities to be served in the community when:  (1) the state determines that community-based treatment is appropriate; (2) the individual does not oppose community placement; and, (3) community placement can be reasonably accommodated.  527 U.S. at 607.

53.   Similar to the ADA, California's anti-discrimination statute prohibits discriminatory actions by the state and state-funded agencies or departments, and provides civil enforcement rights for violations.  Cal. Gov't. Code §§ 11135-11139.

**Medicaid and Medi-Cal Programs**

54.   Medicaid is a cooperative, jointly-funded program between the federal and state governments that provides medical assistance to, *inter alia*, low-income elderly persons and persons with disabilities.  42 U.S.C. §§ 1396-1396w-5.  The purpose of Medicaid is to furnish, as far as practicable, "medical assistance on behalf of …aged, blind or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services" and "to help such families and individuals to attain or retain capability for independence or self-care…" 42 U.S.C. § 1396-1.

55.   On the federal level, Medicaid is administered by the Centers for Medicare and

10

Medicaid Services (CMS), an agency within the United States Department of Health and Human Services (DHHS).

56.     California has elected to participate in Medicaid, and, therefore, must comply with the requirements of the federal Medicaid Act, and its implementing regulations.  42 U.S.C. § 1396-1396v.  California's Medicaid program is known as "Medi-Cal," and is set forth in the Welfare and Institutions Code.  Cal. Welf. & Inst. Code §§ 14000-14685.

57.     States participating in Medicaid must designate a "single State agency" to administer or supervise the administration of the plan.  The California Department of Health Care Services (DHCS) is the single state agency and administers the California Medicaid program.

58.     States participate in Medicaid by submitting a State Medicaid Plan to CMS for approval.  42 U.S.C. § 1396; 42 C.F.R. § 430.12 (2009).  States can make changes to their Medicaid programs by submitting state plan amendments to CMS for approval.  *Id*.  Coverage of certain services is mandatory under Medicaid.  For one, States that elect to participate in the Medicaid program must cover nursing facility services for individuals over 21 years of age.  42 U.S.C. § 1396d(a)(4)(A).  States must also offer: home health agency services, including skilled nursing services; other rehabilitative services; and, at state option, physical therapy, occupational therapy, and speech pathology.  42 U.S.C. § 1396d(a)(xiii)(7), (13); 42 C.F.R.§ 440.70 (2009).  California offers physical and occupational therapy and speech pathology as part of its home health agency service.  22 C.C.R. § 51337(a)(3).

59.     California's Medi-Cal plan provides payments for a variety of services, including but not limited to:  Adult Day Health Care, personal care services, home health agency services, skilled nursing facility services, hospital services, specialty mental health services, targeted case management, and medical and non-medical transportation.

60.     "Categorically needy" Medicaid beneficiaries are beneficiaries who fit into a particular category and have incomes below specified levels.  "Medically needy" Medicaid beneficiaries are those who meet categorical requirements for such assistance, *e.g.*, they are over age 65, blind, or disabled, and whose incomes exceed categorically needy levels, but have medical

11

expenses which are high enough to reduce their available monthly income to a specified low level.

61.     Under federal Medicaid requirements, states must provide comparable benefits, *i.e.*, benefits that are equal in "amount, duration and scope," to all categorically needy Medicaid beneficiaries.  42 U.S.C. § 1396a(a)(10)(B)(i); 42 C.F.R. §§ 440.240(a), (b)(1).  States must also provide comparable benefits to all medically needy Medicaid beneficiaries.  States can provide benefits to the medically needy that are less in amount, duration and scope than benefits to the categorically needy, but California has not elected to do so.  Therefore (with certain exceptions for some groups such as pregnant women, certain aliens and services provided pursuant to waiver of federal requirements) California must provide benefits under its Medicaid program that are equal in amount, duration and scope to all eligible beneficiaries.

62.     A State Medicaid program must use "reasonable standards (which shall be comparable for all groups …) for determining eligibility for and the extent of medical assistance under the plan which … are consistent with the objectives" of the program.  42 U.S.C. § 1396a(a)(17).

63.     The federal Medicaid Act requires that states provide individuals with the opportunity to make application for medical assistance and that such assistance shall be furnished, as an entitlement, with reasonable promptness to all eligible individuals.  42 U.S.C. § 1396a(a)(8).

**Medicaid Due Process Requirements**

64.     Recipients and applicants for Medicaid services have rights to written notice and an opportunity for a hearing before coverage of services can be denied, suspended, reduced or terminated.  *Goldberg v. Kelly,* 397 U.S. 254 (1970); 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.200-250.

65.     At least ten days before termination, suspension, or reduction of Medicaid eligibility or covered services, written notice must be mailed to Medicaid beneficiaries. 42 C.F.R. §§ 431. 201, .206(b), .211.

66.     Such notice must include:

(a)     a statement of the action the State intends to take;

12

(b) the reasons for the intended action;

(c) the specific regulations that support, or the change in federal or state law that requires, the action;

(d) an explanation of the individual's right to request an evidentiary hearing or a state agency hearing; and in cases of an action based on a change in law, the circumstances under which a hearing will be granted; and

(e) an explanation of the circumstances under which Medicaid is continued if a hearing is requested.  42 C.F.R. § 431.210.

67.     The state agency must grant an opportunity for a hearing when a recipient requests it because he or she believes that services have been denied, reduced, suspended, or terminated erroneously.  The agency need not grant a hearing if the *sole issue* is a Federal or State law requiring an automatic change adversely affecting some or all recipients.  42 C.F.R. §§ 431.220(a)(2), (b) (emphasis added).

68.     If, after notice of reduction, suspension, or termination of covered services is provided, a recipient requests a hearing before the action takes place, services must be continued at the same level until a decision is rendered after the hearing.  42 C.F.R. § 431.230.

69.     Medi-Cal recipients are entitled to notice of their right to a fair hearing when there is any action by the Department to deny, terminate, defer, or reduce any medical service.  Cal. Code Regs. tit. 22 § 51014.1(a).

**Medi-Cal Covered Services**

70.     <u>ADHC</u>:  Under Medi-Cal, each adult day health care center shall provide, directly on the premises, at least the following services:  1)  rehabilitation services, including physical therapy, occupational therapy, and speech therapy; 2) medical services supervised by either the participant's personal physician or a staff physician or both; 3) nursing services, including:  (a) skilled nursing care rendered by  professional nursing staff, who evaluate the particular nursing needs of each participant and provide the care and treatment indicated, and (b) self-care training and services oriented toward activities of daily living and personal hygiene, such as toileting, bathing and

1    grooming; 4) nutrition services, including (a) a minimum of one meal per day and (b) dietary

2    counseling and nutrition education for participants and their families; 5) psychiatric and

3    psychological services including:(a) consultation, (b) individual assessment, (c) supervision of

4    treatment by a psychiatrist, psychologist, psychiatric social worker or psychiatric nurse, when

5    indicated; 6) medical social services to participants and their families to help with personal, family

6    and adjustment problems that interfere with the effectiveness of treatment; 7) recreational and social

7    activities suited to the needs of the participants and designed to encourage physical exercise to

8    prevent deterioration and to stimulate social interaction; and 8) non-medical and medical

9    transportation service for participants, if necessary, to and from their homes, including the use of

10   specially equipped vehicles when medically necessary to accommodate participants with severe

11   physical disabilities that limit mobility.  Cal. Code Regs. tit. 22 (2009) § 54309(a) (1995); Cal. Welf.

12   & Inst. Code § 14520, *et seq.*; Cal. Health & Safety Code § 1570, *et seq.*.

13           71.     IHSS:  Under Medi-Cal, Plaintiffs and class members are entitled to the following

14   personal care services in their own homes through the In-Home Supportive Services (IHSS)

15   program, depending on individual need, up to a statutory cap of 283 hours per month:  meal

16   preparation and cleanup, feeding, transportation to and from medical appointments, ambulation,

17   bowel and bladder care, paramedical services, protective supervision, and other personal care

18   services.  Cal. Welf. & Inst. Code §§ 12300, 14132.95, 14132.951.

19           72.     Home Health:  Under Medi-Cal, Plaintiffs and class members are entitled to the

20   following home health agency services depending on individual need and when prescribed by a

21   physician:  part-time or intermittent skilled nursing services by licensed nursing personnel; in-home

22   medical care services as defined in California Welfare and Institutions Code section 14132(s);

23   physical, occupational or speech therapy; medical social services; home health aide services, which

24   include assisting with personal care, bathroom needs and ambulation, and performing medically

25   necessary household services to facilitate self-care such as changing the bed and light cleaning;

26   medical supplies other than drugs and biologicals; and the use of medical appliances, provided for

27   under an approved treatment plan.  Cal. Code. Regs. tit. 22 §§ 51003, 51146, 51217, 51337, 51455,

28
                                                        14

51523; Cal. Health & Safety Code §§ 1725 *et seq.* ; Chapter 9.1., Medi-Cal Manual of Criteria R-15-98E.

73.   <u>Nursing Facilities:</u>  Under Medi-Cal, Plaintiffs and class members are entitled to skilled nursing facility services to provide skilled nursing care and supportive care to individuals, depending on individual need.  Cal. Health & Safety Code § 1250(c).

74.   <u>Acute Hospitals:</u>  Under Medi-Cal, Plaintiffs and class members are entitled to 24-hour inpatient acute hospital care, including the following basic services: medical, nursing, surgical, anesthesia, laboratory, radiology, pharmacy, and dietary services, depending on individual need. Cal. Health & Safety Code § 1250(a).

75.   <u>Specialty Mental Health:</u>  Under Medi-Cal, Plaintiffs and Class members are entitled to receive Specialty Mental Health services in the community, which include rehabilitation services and medication management, depending on individual need.  Cal. Welf. & Inst. Code §§ 14021(a), 14021.4, 14681, 14683, 14684; Cal. Code Regs. tit. 9 §§ 1810.100; 1810.247.

76.   <u>Targeted Case Management:</u>  Under Medi-Cal, Plaintiffs and Class members are entitled to receive Targeted Case Management (TCM) to assist them, depending on individual need, in gaining access to needed medical, social, educational and other services, including assistance in obtaining services covered under the Medi-Cal State Plan, assessment, service/support planning, and monitoring services and supports to ensure their needs are met.  Cal. Welf. & Inst. Code § 14132.44.

77.   <u>Transportation:</u>  Under Medi-Cal, Plaintiffs and Class members are entitled to receive medical and non-medical transportation, depending on individual need. 42 C.F.R. § 431.53; Cal. Welf. & Inst. Code §§ 14132(i), 14133.6, 14133.65, 14136 *et seq.*; Cal. Code Regs tit. 22 §§ 51151.7, 51151 *et seq.*

78.   In addition to Medi-Cal State Plan services, federal law allows the federal government to waive certain provisions of federal Medicaid law in order to allow states to provide home and community-based services in lieu of institutional care, for qualifying individuals. 42 U.S.C. § 1396n(c) and (d).  These programs are known as "Home and Community-Based Waivers" and they offer a broad range of community-based long-term care services, such as personal

15

1  care assistance, nursing care, home modifications, and habilitation.  CAL. CODE REGS. tit. 22
2  §§ 51173.1, 51176.

3      79.    California currently has six (6) Home and Community-Based Services (HCBS)
4  waivers for adults, including:

5      a)    The "Nursing Facility Acute Hospital Waiver," or "NF/AH Waiver" which
6      provides people with disabilities a variety of in-home long-term care services,
7      rather than receive these services in an institution.  Cal. Welf. & Inst. Code
8      §§14137; 14132.99(a-f).

9      b)    The Multipurpose Senior Services Program (MSSP), which provides case
10      management to frail elderly individuals 65 years of age and older who are
11      certifiable for placement in a nursing facility.  Cal. Welf. & Inst. Code §§
12      9560-9568.

13      80.    In addition, federal law allows states to apply for a Medicaid State Plan Amendment
14  to provide home and community-based services for individuals who meet specific needs-based
15  criteria.  42 U.S.C. § 1396n(i).  These are commonly known as "1915(i) Waivers" or "State Plan
16  Amendments."

17      81.    Upon information and belief, California has one 1915(i) State Plan Amendment
18  which serves only individuals with developmental disabilities and does not offer Adult Day Health
19  Care services.

20  **2009 Legislation Affecting ADHC—ABx4 5 (Chapter 5, Statutes of 2009)**

21      82.    ABx4 5 was passed by the Legislature on July 28, 2009 and was scheduled to go into
22  effect on August 27, 2009.  The new law would have made two significant cutbacks to the ADHC
23  program.

24      83.    First, effective August 27, 2009, ABx4 5 would have reduced Medi-Cal funding for
25  ADHC to a maximum of three days per week for all Medi-Cal beneficiaries, with no exceptions.
26  Cal. Welf. & Inst. Code § 14132(p)(2).  This provision of ABx4 5 was enjoined by this Court on
27  September 10, 2009. In addition to this cut, new arbitrary and restrictive eligibility requirements

28  

16

limiting who will receive ADHC services were to go into effect when the Director of DHCS provided a written declaration that the restrictive eligibility requirements were ready to be implemented.  Cal. Welf. & Inst. Code § 14521.1.  These restrictive eligibility requirements would have terminated or denied ADHC services to individuals based on their need for assistance with eight specified activities of daily living and need for a certain institutional level of care.  Defendants targeted March 1, 2010 as the date that the restrictive eligibility requirements would have gone into effect.  This provision was enjoined by this Court on February 24, 2010.

84.    ABx4 5 provided that upon the declaration by the Director, Medi-Cal would again cover the ADHC benefit up to a maximum of five days per week for the participants who remained eligible.

85.    The new requirements created arbitrary and ambiguous eligibility standards, which would have  resulted in termination of ADHC for approximately 15,000 individuals who received ADHC services — 40 % of the participants, according to Defendants.  These individuals would have been  terminated entirely from the program, and otherwise qualified future applicants would have been denied ADHC services, leaving them at risk of institutionalization, hospitalization, or physical and/or mental deterioration resulting in hospitalization and/or institutionalization.  The legislation contains no exceptions for individuals who would be at risk of institutionalization without ADHC services or for whom adequate alternatives are not available.  Cal. Welf. & Inst. Code §§ 14525.1, 14526.2, 14522.4.

**2011 Legislation Affecting ADHC – AB 97 (Chapter 3, Statutes of 2011) and SB 69 (2011-2012 Budget)**

86.    AB 97 was passed by the Legislature on March 17, 2011, and signed into law on March 24, 2011.  AB 97 eliminates ADHC as a Medi-Cal optional benefit as early as July 1, 2011, or 60 days after federal approval, whichever is later.  Cal. Welf. & Inst. Code § 14589.5.

87.    AB 97 authorizes Defendant DHCS to implement a "short-term program" to fund organizations to transition ADHC participants to other Medi-Cal, social or respite services, or to provide "social activities and respite assistance" for such individuals.  Cal. Welf. & Inst. Code

17

§ 14590(a).  These short-term programs may be implemented via contracts with DHCS, pursuant to a competitive bidding process established by DHCS.  Cal. Welf. & Inst. Code § 14590(c).  Implementation of the short-term program is subject to appropriation in the Budget Act.  Cal. Welf. & Inst. Code § 14590(e).

88.    AB 97 contains no assurances that the short-term program will be in effect when ADHC is eliminated, or even that ADHC participants will receive, without interruption in care, adequate alternative services that they have been assessed to need to avoid unnecessary institutionalization.

89.    AB 97 also states that "legislation will be adopted to create a new program called the Keeping Adults Free from Institutions (KAFI) program."  KAFI, if developed as indicated, will be more limited than the current ADHC program, as its stated purpose is to "provide a well-defined scope of services to eligible beneficiaries who meet a high medical acuity standard and are at significant risk of institutionalization in the absence of such community services."  If such legislation is passed, Defendant DHCS will be authorized to pursue a "federal waiver" to draw down federal reimbursement for KAFI.

90.    AB 97 contains no provisions for long-term alternative services for individuals who do not qualify for KAFI or for whom KAFI may not be available due to funding or eligibility limitations.

91.    The 2010-2011 budget for ADHC was $369.8 million, of which $176.6 million came from state general funds.  In the budget bill passed by the Legislature, SB 69 (Budget Act of 2011), this appropriation has been essentially reduced by at least 50% for 2011-2012, replaced by an $85 million general fund appropriation, with unspecified federal matching funds, for transition of current ADHC enrollees and future waiver services.

92.    To date, SB 69 has not been signed by the Governor and thus, there is currently no appropriation for the short-term program or KAFI to replace ADHC when it is eliminated.

## VII.      FACTUAL ALLEGATIONS

**<u>Background of the ADHC Program</u>**

93.      Adult Day Health Care is a community-based day program for low- income elderly persons and younger disabled adults.  ADHC programs provide comprehensive health and social services centered on a multi-disciplinary team approach with skilled professionals providing individualized care, treatment, and services to frail elderly and disabled persons, in order to maintain their ability to reside in the community.

94.      The California legislature specifically intended ADHC as an alternative to institutional care.  Cal. Health & Safety Code § 1570.2.  The ADHC program includes as an eligibility criteria for receipt of services that: "*A high potential exists for the deterioration of the participant's medical, cognitive, or mental health condition or conditions in a manner likely to result in emergency department visits, hospitalization, or other institutionalization if adult day health care services are not provided.*"  Cal. Welf. & Inst. Code § 14526.1(d)(4).  The goal of the ADHC program is to prevent avoidable hospitalizations, emergency department use and nursing facility placement by improving and stabilizing an individual's daily functioning, medical conditions and mental status.  Cal. Health & Safety Code § 1570.2.

95.      Adult Day Health Care services are typically provided at a community based center. Participants live at home or in a residential care facility, and are transported to and from the program center on a daily basis.  In order to attend ADHC, each participant's conditions must "require adult day health care services … on each day of attendance, that are individualized and designed to maintain the ability of the participant to remain in the community and avoid emergency department visits, hospitalizations, or other institutionalization."  Cal. Welf. & Inst. Code § 14526.1(d)(5).

96.      For one daily all-inclusive Medi-Cal reimbursement rate of $76.22, ADHCs are required to provide skilled nursing, skilled social work, therapeutic activities, dietician and nutritionally customized meal services, skilled physical therapy, skilled occupational therapy, skilled speech and language pathology services, skilled mental health services and non-emergency

19

transportation to and from the center.  The number of days of service per week are based on the participant's needs and Medi-Cal authorizations.

97.    Statewide, participants funded through Medi-Cal comprise approximately 90% of the 37,235 individuals who were projected to be served in ADHC centers in Fiscal Year 2009-10. ADHCs serve a disproportionate number of Medi-Cal beneficiaries because the program was designed, as a matter of public policy, to be a community-based alternative to nursing facilities for low-income adults with disabling physical, mental, or cognitive conditions.

98.    Based on the most recent available information provided by the California Department of Aging, 61.8% of those served in ADHC are 75 years of age or older.  Of that group, 21% are over the age of 85, the most rapidly growing segment of California's population.  There are few options comparable to ADHC services for those older adults who choose to live out their lives with dignity and independence in their own homes or in community-based settings.

99.    While many persons served are elderly and physically frail, ADHCs also serve elderly and younger adults with chronic and disabling mental health, cognitive or physical conditions: for example, chronic schizophrenia, mental retardation, Parkinson's disease, Alzheimer's disease, stroke, or head injury.

100.    Individuals wishing to receive ADHC services must have a physician submit historical and physical information and participate in a three-day assessment performed by a multi-disciplinary team of clinicians including a registered nurse, social worker, and therapist, at a minimum.  An Individual Plan of Care (IPC) is designed and submitted to Medi-Cal along with the Treatment Authorization Request (TAR).  All individuals with Medi-Cal insurance must be prior-authorized by the DHCS through a local Medi-Cal field office to attend the ADHC center for a certain number of days per week.

101.    This approval to receive services is re-authorized every six months.  The State adjudicates the number of days of attendance based on the documented need of each beneficiary. Medi-Cal funds up to five days per week of attendance, depending on the individual need of the participant.

102.    The State of California pays significantly more to institutionalize disabled individuals in nursing facilities or other institutions than it does to cover their care in community-based settings, *e.g.*, ADHC services.  The average daily rate for nursing facility services is approximately $161.81, or $4,854.30 per month.

103.    The ADHC program helps prevent costly and unnecessary institutionalization, saving the State significant funds, and, at the same time, improving the quality of life for the individuals served.

**Cuts in Days of Service from a Maximum of Five to No More than Three Under ABx4 5**

104.    The Governor signed ABx4 5 on July 28, 2009.  The bill provided that, effective 30 days after the law was signed by the Governor, the maximum number of days that any ADHC participant may be authorized for Medi-Cal funding to attend ADHC is cut from five to three, regardless of current authorizations or the health condition of the individual.  Cal. Welf. & Inst. Code § 14132 (p)(2),.  These cuts were preliminarily enjoined by this Court on September 10, 2009 and have not taken effect.

105.    Defendants have estimated that the reduction in the ADHC benefit from four or five days to three days would have affected approximately 8,000 individuals.

106.    Upon information and belief, Defendants did not arrange for provision of alternative, community-based Medi-Cal services to be provided to ADHC participants affected by ABx4 5.  Defendants have represented that they do not intend to secure the alternative services that, pursuant to this Court's Preliminary Injunction Order, would allow them to cut ADHC to no more than three days per week and thus, Welfare and Institutions Code section 14132(p)(2) has not been implemented.

107.    The group of individuals affected by the five-to-three day cut are members of the "Limitation of Benefits Subclass" discussed below.

108.    On April 20, 2010, the parties stipulated that section 14132(p)(2) "will be permanently inoperative" and the parties agreed that they would not conduct further litigation as to

*Darling v. Douglas, et al.*, C09-03798 SBA; Second Amended Complaint for Injunctive and Declaratory Relief

1   the claims previously alleged by the Limitation of Benefits subclass, except for litigation regarding

2   attorneys' fees and costs and enforcement of the stipulation.  (Docket No. 187).

3   **New, Restrictive ADHC Eligibility Requirements Under ABx4 5**

4        109.   New, restrictive eligibility requirements limiting who would receive ADHC services

5   were scheduled to go into effect when the Director of DHCS provided a written declaration that the

6   requirements are ready to be implemented.  The State targeted March 1, 2010 as the date that these

7   restrictive eligibility requirements would have gone into effect.  This declaration was intended to

8   trigger reinstatement of the maximum number of days allowable under the ADHC program to five

9   per week, while at the same time triggering the new eligibility restrictions, resulting in termination

10  of all services for many current beneficiaries who need and receive them, and denial of eligibility for

11  otherwise qualified future applicants to ADHC.  There was no exception process for individuals who

12  were determined to be at risk of institutionalization without ADHC services or for whom adequate

13  alternatives are not available.  Cal. Welf. & Inst. Code § 14525.1.

14       110.   The new and restrictive eligibility criteria would require that in order to receive

15  ADHC services, individuals without any cognitive impairment had to:  (1) meet the Nursing

16  Facility- level A (Intermediate Care Facility) level of care set forth in Title 22 Section 51120 of the

17  California Code of Regulations; and (2) due to functional impairments, require "substantial human

18  assistance" to perform two or more specified activities:  ambulation, bathing, dressing, self-feeding,

19  toileting, transferring, medication management, and hygiene.  Cal. Welf. & Inst. Code § 14525.1.

20       111.   The new requirements defined "substantial human assistance" as direct, hands-on

21  assistance provided by a qualified caregiver, which entails physically helping the participant perform

22  the activity.  It entails more than cueing, supervision, or stand-by assistance and includes the

23  performance of the entire activity for participants totally dependent on human assistance.  Cal. Welf.

24  & Inst. Code § 14522.4(a)(10).

25       112.   The new level of care criteria that individuals without cognitive impairments would

26  be required to meet, contained in Title 22, Section 51120 of the California Code of Regulations

27  states that individuals must require "intermediate care services" which means that they, inter alia,

28

"require protective and supportive care, because of mental or physical conditions or both, above the level of board and care." (emphasis added).  While "board and care" is not a term of art, and was not defined by ABx4 5 or the Defendants, the term loosely refers to licensed residential care facilities whose services vary widely — some offer simply meals and housing, while others offer supportive services.  Upon information and belief, many current recipients would have been terminated from, and otherwise qualified future applicants would be denied access to, ADHC simply because of their living arrangement.

113.    Different eligibility requirements would apply for certain individuals with cognitive impairments – specifically, those individuals who: (1) are residents of an Intermediate Care Facility for Persons with Developmental Disabilities (ICF-DD H), and have disabilities and a level of functioning that are of such a nature that, without supplemental intervention through Adult Day Health Care, placement to a more costly institutional level of care would be likely to occur; (2) have chronic mental illness; (3) have moderate to severe Alzheimer's disease; or (4) have other "cognitive impairments."  These individuals would be required to show a need for "assistance" with the eight specified activities:  ambulation, bathing, dressing, self-feeding, toileting, transferring, medication management, and hygiene.

114.    The new eligibility requirements define "assistance" as "verbal or physical prompting or aid, including cueing, supervision, stand-by assistance, or hands-on support to complete the task correctly."  Cal. Welf. & Inst. Code § 14522.4(a)(9).

115.    The new requirements define "cognitive impairment" as "the loss or deterioration of intellectual capacity characterized by impairments in short- or long-term memory, language, concentration and attention, orientation to people, place or time, visual-spatial abilities or executive functions, or both, including, but not limited to, judgment, reasoning, or the ability to inhibit behaviors that interfere with social, occupational, or everyday functioning due to conditions, including, but not limited to, mile cognitive impairment, Alzheimer's disease or other form of dementia, or brain injury."  Cal. Welf. & Inst. Code § 14522.4(a)(11).

23

116.     Upon information and belief, the definition of "cognitive impairment" does not include people with mental retardation or other developmental disabilities who have not experienced a "loss or deterioration of intellectual capacity" but rather, who were born with such impairments. This means that such individuals, unless they reside in an ICF-DD H facility, would be subject to the same stringent criteria as individuals without any cognitive impairment, rather than the less restrictive requirements that would apply to others with cognitive impairments or mental illness.

117.     Upon information and belief, Defendants interpreted eligibility requirements under ABx4 5 as requiring that individuals demonstrate that they would require assistance or substantial human assistance with the eight specified activities **at the ADHC center**.  Since participants do not typically bathe, dress, or maintain hygiene at the center, individuals who require assistance or substantial human assistance with those activities would not be allowed to count a need for such assistance towards ADHC eligibility.

118.     The new ADHC eligibility requirements are not a reasonable measure of need for ADHC services.  The new ADHC eligibility requirements are a particularly poor measure of need for certain groups of ADHC recipients, such as those who are medically fragile or those who have a high level of need in one area but not others, or those with cognitive impairments that affect their judgment but not their ability to perform the eight specified activities.

119.     Individuals who did not meet the new eligibility requirements would have had their services terminated, and future, otherwise-qualified applicants would be denied ADHC services. Upon information and belief, those individuals most likely to be affected by the new, restrictive eligibility requirements would have included those with unstable diabetes or other unstable medical conditions, and medically frail elders who do not meet the test of requiring "substantial human assistance" in performing two of eight activities of daily living because they are ambulatory and can move their limbs, but are dependent on the medical monitoring, nursing treatments, medication management, structured environment and social work to maintain stability, and avoid hospitalization, deterioration, or nursing facility placement.  In addition, individuals harmed by the new eligibility requirements would likely have been those with cognitive impairments such as mild

24

Alzheimer's disease, mental illness, developmental disabilities or brain injury who are physically able to care for themselves but who may forget to take medications or eat when alone, and require the structure, stability, socialization, frequent assessment, and medication management offered by ADHC.

120.   The group of individuals who would have been  terminated from or denied ADHC based on the new, restrictive eligibility requirements are members of the "Termination of Benefits Subclass", discussed below.

**Implementation of New, Restrictive Eligibility Requirements Under ABx4 5**

121.   ABx4 5 required that prior to issuing the declaration that would have implemented the new, restrictive eligibility requirements, Defendants had to meet and confer with stakeholders for determining the methods and procedures necessary to implement the new requirements.  Cal. Welf. & Inst. Code §§ 14525.1(f) and (g).  Defendants held two two-hour meetings, on November 17, 2009 and December 1, 2009, during which they reviewed the new eligibility requirements and draft participant plan of care with attendees.

122.   The ADHC providers in attendance at these meetings raised significant issues with respect to definition and interpretation of terms; asked questions about the State's expectation of the role of ADHC providers — including provision of notice, hearings, and obligation to secure alternative services; and requested training on the implementation of the new requirements.  The California Association of Adult Day Services (CAADS), provided a written list of questions and concerns to the State.

123.   Defendants failed to provide clarification as to essential definitional and procedural aspects of implementation of the new eligibility requirements, and declined to offer training to the ADHC providers who would have been required to conduct assessments and make eligibility determinations, despite repeated requests by providers.  Defendants failed to respond adequately to the questions raised by CAADS.  Thus, there was, prior to the Court's Order enjoining implementation of ABx4 5, a virtual certainty of overly broad, improper and inconsistent application of the new requirements.

124.     Prior to the Court's February 24, 2010 Order enjoining implementation of the new eligibility criteria, Defendants failed to arrange for or provide information about securing alternative community services, steps to take to avoid institutionalization, or procedures for requesting reasonable accommodations.

125.     On March 3, 2010, Defendants issued the Declaration pursuant to Welfare and Institutions Code section 14525.1(g).

126.     On April 20, 2010, the parties entered into a stipulation in which Defendants agreed that issuance of the March 3 Declaration "is not intended to, nor has the effect of, modifying, voiding, or otherwise altering any terms of the February 24, 2010 Injunction." (Docket No. 187).

**Elimination of ADHC Pursuant to AB 97 and SB 69**

127.     On March 24, 2011, the Governor signed Assembly Bill 97 (Chapter 3, Statutes of 2011) which eliminates ADHC as an optional Medicaid benefit as soon as July 1, 2011.  Cal. Welf. & Inst. Code § 14589(b).

128.     AB 97 references alternative services to which ADHC participants can be transitioned upon the elimination of ADHC; however there are numerous barriers to these individuals' receipt of such services, including eligibility restrictions, enrollment caps, geographic limitations, and limitations on coverage and scope of services for those who do qualify.  Cal. Welf. & Inst. Code §§ 14589(a)(3) and (4).

129.     AB 97 mandates the creation of a "short term program" to fund organizations to assist former ADHC participants to transition to other Medi-Cal services and/or to provide social or respite services to those participants.  Cal. Welf. & Inst. Code § 14590(a).

130.     There is no requirement in AB 97 that such "short-term programs" be fully in place before the elimination of ADHC, nor assurances that ADHC participants will not experience gaps in services when ADHC is eliminated.  Cal. Welf. & Inst. Code § 14590(a).

131.     Upon information and belief, Defendants do not have a plan to ensure that upon the elimination of ADHC, the alternative services that have been assessed to be necessary to avoid

26

1    institutionalization will be identified and in place to ensure that Plaintiffs will not suffer any gap in

2    the services required by their ADHC plans of care.

3        132.    AB 97 also indicates that "[d]uring the 2011–12 Regular Session of the Legislature,

4    legislation will be adopted to create a new program called the Keeping Adults Free from Institutions

5    (KAFI) program… [a]s prescribed by subsequent statute, the Department of Health Care Services

6    shall develop a federal waiver to maximize federal reimbursement for the KAFI program to the

7    extent permitted by federal law."  AB 97, Sec. 105.

8        133.    Upon information and belief, the KAFI program will narrow the scope of ADHC

9    services and eligibility requirements for receipt of ADHC services: "This program will provide a

10   well-defined scope of services to eligible beneficiaries who meet a high medical acuity standard and

11   are at significant risk of institutionalization in the absence of such community-based services." AB

12   97 Sec. 105.

13       134.    Upon information and belief, the KAFI program will not be in place when ADHC is

14   eliminated, nor is there any certainty that the Legislature will pass and the Governor will sign

15   legislation to authorize the KAFI program.

16       135.    Upon information and belief, Defendant DHCS has not applied for a federal waiver to

17   provide KAFI services.

18       136.    For those Class Members who will not qualify for the KAFI program, or who exceed

19   expected enrollment or funding caps, AB 97 contains no provisions for long-term community-based

20   alternatives to ensure they are not unnecessarily institutionalized.

21       137.    Upon information and belief, Defendants have no plan to ensure that uninterrupted

22   long-term alternative services are in place for Class Members who will not receive KAFI services.

23       138.    ADHC's 2010-2011 budget was $369.8 in total, of which $176.6 came from state

24   general funds. In the budget bill passed by the Legislature, SB 69 (Budget Act of 2011), this

25   appropriation has been reduced by at least 50%, replaced by an $85 million general fund

26   appropriation, with unspecified federal matching funds, for transition of current ADHC enrollees and

27   future waiver services.

28

*Darling v. Douglas, et al.*, C09-03798 SBA; Second Amended Complaint for Injunctive and Declaratory
Relief

139.    To date, SB 69 has not been signed by the Governor and thus, there is currently no appropriation to provide short-term transition and/or KAFI services.

140.    Upon information and belief, over 37,000 individuals currently receive Medi-Cal funded ADHC services and thus will be affected by AB 97.

141.    The group of individuals affected by the elimination of ADHC are members of the amended Class discussed below.

142.    Upon information and belief, some ADHC centers are already planning to close in anticipation of the July 1, 2011 elimination date.  To date, at least two centers have announced plans to close prior due to AB 97.

**Facts Related to Plaintiff Allie Jo Woodard — Limitation of Benefits Subclass Representative**

143.    Allie Jo Woodard attends the Bayview Hunter's Point ADHC program in San Francisco California.  She has been attending the program for eleven years.  She is authorized to receive and does receive Medi-Cal funded ADHC services five days a week.  Her most current IPC is approved through June 30, 2011.

144.    In accordance with her most recent IPC at the Bayview Hunter's Point ADHC program, Ms. Woodard receives:

a)    professional nursing services every day to monitor her for fall risk, for her hypertension, for her pain and mobility related to her arthritis, and for orthostasis due to cardiac and psychiatric medications;

b)    personal care services daily to monitor her exertion level to prevent cardiac compromise and to prevent injuries due to her impaired cognition;

c)    social services intended to prevent psychiatric hospitalization in the form of group activities, weekly psychological counseling, daily check in with the program social worker to reorient her to reality, and assistance in interactions due to altered communication related to her psychiatric disorder;

28

d)      therapeutic activities to decrease her feelings of isolation, and improve her
interactions with peers, including through skilled observation of her socializations
and peer interaction, group therapies, and music and art activities; and

e)      physical therapy maintenance program to address her decreased functional mobility
and impaired mobility requiring assistance for transfers and ambulation during
episodes of emotional and mental decompensation, two days per week.

f)      registered dietician services to address her weight and hypertension, as well as history
of diabetes.

145.    Mrs. Woodard's current IPC states that she is at a high risk of institutionalization if she does not receive ADHC services five days per week, based on her two or more chronic medical conditions, poor judgment, frailty, isolation, risk for falls, self neglect, periodic acute psychotic symptoms, inappropriate affect, appearance, or behavior, and dementia-related behavioral problems.

146.    Ms. Woodard lives alone, however she is never able to actually be alone because she is at risk of wandering.  A few years ago she was missing for two full days.

147.    Ms. Woodard has the maximum hours of IHSS allowable, 283 hours per month.  In addition, her daughter and son rotate spending the night with her.  On the weekends her daughter Linda Gaspard-Berry brings her to Ms. Gaspard-Berry's home in Fremont.

148.    Ms. Woodard's disability causes her to be very fragile emotionally, and she has had frequent psychiatric hospitalizations as a result.  She is also at risk of falling, and sometimes needs constant physical and verbal cueing to use her walker.

149.    Her daughter believes that Ms. Woodard's attendance and services at the ADHC five days per week are essential to support her, and that without the program's services, Ms. Woodard would have been hospitalized more frequently than she has been.

150.    Both Ms. Gaspard-Berry and her brother work full-time and cannot afford to quit their jobs to care for their mother.  If her ADHC services are cut she will not be safe alone, and her children will have to place her in an institution.

29

151.    Plaintiff Allie Jo Woodard would be irreparably harmed by a reduction in ADHC to three days per week or termination of ADHC.  Ms. Woodard lives in her own home with family alternating caring for her, and she receives the maximum amount of attendant care through the IHSS program.  Given her complex medical and mental health conditions, she cannot be left alone safely and there would be no one to care for her on the days that she would no longer be able to attend ADHC.  Ms. Woodard relies on ADHC services for pain and medication management, and the socialization provided at ADHC assists her mental health condition.  Without five days per week of ADHC, Ms. Woodard would need to be placed in a nursing facility.  Most likely, she would deteriorate physically and mentally if that were to occur.

**Facts Related to Plaintiff Gilda Garcia—Limitation of Benefits Subclasses Representative**

152.    Gilda Garcia attends the Institute on Aging ADHC program in San Francisco California.  She has been attending the program since 2005.  She is authorized to receive and does receive Medi-Cal funded ADHC services five days a week.  Her most current IPC is approved through April 30, 2011.  A new IPC will be submitted for approval for the period of May 1, 2011 through October 31, 2011.

153.    In accordance with her current IPC at the Institute on Aging ADHC program, Ms. Garcia receives:

    a)    professional nursing services: five days a week to monitor her for hypoglycemic reactions; once per month to monitor her blood  pressure and weight; and as needed to order her medications as Ms. Garcia is unable to do so herself;

    b)    personal care services five days a week to assist her with ambulation, toileting, and transfers and prevent falls due to her poor vision and impulse control;

    c)    social services five days a week to increase her opportunities for socialization, twice per month to encourage continued attendance and monitor for increased anxiety, and on an as needed basis help her coordinate her IHSS and MSSP services;

    d)    therapeutic activities five days a week to increase her physical activity, leisure and cognitive opportunities,

*DARLING V. DOUGLAS, ET AL., C09-03798 SBA; SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF*

e)    registered dietician services to ensure she understands the importance of maintaining a diabetic diet.

154.    Ms. Garcia's most recent IPC states that she is at a high risk of institutionalization if she does not receive ADHC services five days per week, based on her two or more chronic medical conditions, frailty, hyper/hypoglycemia, inappropriate affect/appearance or behavior, poor judgment, risk for falls, isolation, lack of safety awareness, and medication mismanagement.  In addition Ms. Garcia is at risk because she gets anxious easily, and is not able to self modulate her emotional reactions, which in turn can exacerbate her blood sugar fluctuations.

155.    Ms. Garcia lives alone, and receives 102 hours of  IHSS services, and case management through the Multipurpose Senior Services Program (MSSP). In January of 2011, Ms. Garcia was hospitalized for approximately one week for sepsis, and five days because of hyperglycemia.  In February she was hospitalized again following a fall in the community.

156.    Ms. Garcia fears she will face hospitalization due to her unstable diabetes, and the risks that this condition poses, including a heightened risk of falls.

157.    Ms. Garcia is also highly dependent on the socialization that the ADHC program offers her.

158.    Ms. Garcia would be irreparably harmed by termination of her ADHC services, or reduction in ADHC to three days per week.  Ms. Garcia has unstable diabetes such that the frequent medical monitoring by ADHC nursing cannot be replicated by periodic primary care visits.  Ms. Garcia relies on ADHC for medical stabilization.

159.    Without five days per week of ADHC, she is at high risk for acute hospitalization and/or institutionalization.  In addition, Ms. Garcia is protected from isolation and depression by attending ADHC five days per week.  If she were to remain at home every day she would likely see a rapid decrease in her mental state and thus, her physical state, which would likely result in acute hospitalization and institutionalization.

**Facts Related to Plaintiff Ronald Bell – Termination of Benefits Subclass Representative**

160.    Ronald Bell has been attending the Graceful Senescence ADHC program since January 2009.  He lives with his grandmother and Guardian ad Litem, Rozene Dilworth, who raised him, and who provides him with 101 hours per month of IHSS services.  He receives home health nursing services two to three times per week in addition to ADHC services to address his diabetic regimen at home.  He is authorized to receive and does receive Medi-Cal funded ADHC services three days a week.  His most current IPC is approved through July 31, 2011.

161.    In accordance with his current IPC at the Graceful Senescence ADHC program, Mr. Bell receives:

a)    professional nursing services three days a week to coordinate his care with ADHC, primary care physician, diabetic clinic, and home health agency; monitor: his diabetes, including pain and numbness due to diabetic neuropathy; any changes in cognitive or visual status; for seizures; his diabetic diet; for wounds and boils;  for adverse effects of medications; shortness of breath, edema; and monitor his blood pressure;

b)    personal care services three days a week to observe for changes with his self-care abilities and promote self-care, as well as to monitor him for falls due to seizures;

c)    social services on an as needed basis to maintain cognitive functioning, and support his remaining in the community,  including group counseling twice per week.

d)    therapeutic activities three days a week to assist with his interactions with peers;

e)    physical therapy services three days a week to maintain and/or increase his functional mobility, strength, and endurance, and prevent physical decline;

f)    occupational therapy services three days a week to maintain or improve his strength, endurance, and range of motion;

g)    registered dietician services to support compliance with a modified diet related to his diabetes and high cholesterol, including through providing him a modified diabetic diet for both breakfast and lunch three days a week;

h)      mental health services, on a one-on-one basis, twice a month and as needed to assist

him with coping skills and decrease his depression and social isolation;

162.    Mr. Bell's most current IPC states that he is at risk of institutionalization due to his poor judgment, medication mismanagement, two or more chronic conditions, fall risk and isolation, and behavior problems.

163.    Prior to receiving ADHC services, Mr. Bell's blood sugar levels fluctuated wildly, and he was taken to the emergency room on average more than once per month.

164.    Mr. Bell began receiving ADHC services in January 2009, and since then his blood sugar levels have stabilized and his trips to the emergency room have been reduced significantly. However, over the past year, Mr. Bell has had an increase in episodes of hyperglycemia which have required more interventions, as well as emergency room visits.  In addition, Mr. Bell has had falls due to seizures in November of 2010 and January of 2011.

165.    Mr. Bell's grandmother believes that ADHC services are critical for Mr. Bell to continue to be able to remain in the community in part due to his difficulty complying with a diabetic diet, as well as his inability to administer his own insulin.  The ADHC arranged for a lock box at the house so that Mr. Bell cannot access the insulin, and his blood sugar levels, though still elevated, are now generally under control.

166.    Mr. Bell would be irreparably harmed by the loss of ADHC services.  If Mr. Bell were to lose ADHC services, he would use increased emergency services, require more hospitalizations, and would face out-of-home placement.

167.    According to Graceful Senescence, Mr. Bell will be terminated from the program by the new, restrictive eligibility requirements of  California Welfare and Institutions Code section 14521.1 contained in AB x4 5, because although he has a cognitive impairment, he is only dependent in one of the eight specified activities, medication management.

168.    Mr. Bell's need for skilled medical and therapeutic ADHC services is as high or higher than the needs of others who, under the new eligibility criteria contained in ABx4 5 will not be terminated from or denied ADHC.

33

1    **Facts Related to Plaintiff Esther Darling**

2           169.    Esther Darling attends Yolo Adult Day Health Center program in Woodland,

3    California.  She has been attending the program for 14 years.  She is authorized to receive and does

4    receive Medi-Cal funded ADHC services five days a week.  Her most current IPC is approved

5    through June 30, 2011.

6           170.    In accordance with her most recent IPC at Yolo ADHC program, Ms. Darling

7    receives:

8           a)      professional nursing services to: monitor her diabetes through bimonthly blood sugar

9                   checks and daily observation for hypo or hyperglycemia, manage her lower body

10                  edema weekly, monitor her atrial fibrillation and observe for signs and symptoms of

11                  heart failure, monitor for increased pain and fall risk associated with gout, monitor

12                  her mood for depression or anxiety, and administer laxatives to help her hemorrhoids;

13          b)      personal care services daily to fully assist with toileting due to her inability to

14                  independently address self care such as skin cleaning and clothing;

15          c)      social services to monitor her mood,  prevent depression by increasing her feelings of

16                  self-worth, and encouraging her to participate in activities and social interaction, and

17                  financial assistance by helping her retain her programs and services;

18          d)      therapeutic activities to encourage participation in group exercise activities and

19                  provide opportunities for social interaction with peers;

20          e)      physical therapy maintenance program to address her decreased strength and

21                  coordination and reduced range of motion on her left side twice a week;

22          f)      occupational therapy maintenance program to maintain and improve range of motion

23                  and maintain skin integrity in her left arm twice a week, and maintain and improve

24                  the functionality of her left hand;

25          g)      specialized physical therapy services treatment once times a week to improve her gait

26                  and reduce her risk of falls, and to increase range of motion.

27

28

171.   Ms. Darling's current IPC states that she is at a high risk of institutionalization if she does not receive ADHC services five days per week, based on her two or more chronic medical conditions, frailty, isolation, risk for falls, and inappropriate affect, appearance, or behavior.

172.   Ms Darling lives alone in her own home in Woodland, California.  Ms. Darling receives 114 hours of IHSS per month.

173.   IHSS is unable to assist Ms. Darling with her medication management, medical monitoring and therapy needs.  She is on the waitlist for Multipurpose Senior Services Program (MSSP) services, which offers case management but would not provide the necessary therapies, skilled care or socialization she receives at ADHC.

174.   In December of 2010, Ms. Darling was hospitalized due to dehydration and acute renal failure and was subsequently admitted into a skilled nursing facility for several days before she was able to return to ADHC.

175.   Ms. Darling wants to be able to stay at home and to continue to receive services at Yolo ADHC.  Ms. Darling has a history of depression due to isolation; however, she does not qualify for county mental health services. Without ADHC, Ms. Darling would be irreparably harmed; her medical, physical, and emotional conditions would decline, placing her at risk of nursing facility placement.

**Facts Related to Plaintiff Wendy Helfrich**

176.   Wendy Helfrich attends the Napa Valley Hospice and Adult Day Services program in Napa, California.  She has been attending the program for five and a half years.  She is authorized to receive and does receive Medi-Cal funded ADHC services three days a week.  Her most current IPC is approved through July 31, 2011.

177.   In accordance with her most recent IPC at her ADHC program, Ms. Helfrich receives:

   a)   professional nursing services to: monitor her weight and blood pressure once a month, and for each day she attends:  provide specialized diet to meet her nutritional needs, administer medication and monitor side effects from her medication regimen, and monitor her for seizure activity;

35

b)      personal care services each day assist her to with toileting;

c)      social services to: address her anxiety and prevent overstimulation, to provide respite, education, and support to her caregivers and minimize caregiver stress, daily monitoring of her cognitive status and monthly monitoring of her mood to address her poor judgment, lack of safety awareness and prevent depression, and increase her opportunities for socialization to prevent isolation;

d)      therapeutic activities three days a week to decrease agitation from visual and auditory stimuli due to her anoxic brain injury, and minimize her cognitive deficits due to her brain injury through mentally stimulating activities;

e)      physical therapy maintenance program once a week to improve her motor control and range of motion to improve her mobility skills;

f)      occupational therapy maintenance program three days a week to maximize self-feeding independence and improve upper extremity range of motion and motor skills;

g)      specialized physical therapy services treatment once a week to address decreased strength and functional mobility;

h)      specialized occupational therapy services once a week to address diminished strength, range of motion, and motor control, and once a month to improve self-feeding;

i)      speech and language pathology services twice a month to address profound deficit in cognitive-linguistic function, including reduced attention, inability to express wants and needs, and need for supervision for safety.

178.    Mrs. Helfrich's current IPC states that she is at a high risk of institutionalization if she does not receive ADHC services three days per week, based on her two or more chronic medical conditions, frailty, isolation, risk for falls, self neglect, poor judgment, and inappropriate affect, appearance, or behavior.

179.    Ms. Helfrich lives at home with her parents and her grandmother in Napa, California. She also has partial custody of her three minor children, who stay at her home several days a week.

180.    Ms. Helfrich receives the maximum allowable number of IHSS hours per month, 283 hours.  IHSS does not provide Ms. Helfrich with the skilled care and therapies she needs.  Prior to receiving Medi-Cal funded ADHC, Ms. Helfrich did not receive physical or occupational therapy for several months.  During this time, Ms. Helfrich started to lose much of her strength and range of motion, and she started to "draw up" and "spent hours curled into a fetal position."  The skilled physical and occupational therapy allows Ms. Helfrich to maintain mobility and maximizes her functional independence.

181.    Ms. Helfrich's father, Mr. Arnett, works part-time.  Mr. Arnett and his wife also take care of Ms. Helfrich's 82-year-old grandmother and Ms. Helfrich's minor children.  Due to the severity of her cognitive and linguistic deficits, Ms. Helfrich requires round-the-clock supervision to remain in her home. ADHC provides much-needed respite and support for Ms. Helfrich's parents.

182.    Without the services she receives at ADHC, Ms. Helfrich would be irreparably harmed; without the skilled therapeutic services she receives at ADHC, her physical and cognitive condition would decline, placing her at risk for institutional placement.

**Facts Related to Plaintiff Jessie Jones**

183.    Jessie Jones attends Guardian ADHC program in El Sobrante, California.  She has been attending the program since 1997.  She is authorized to receive and does receive Medi-Cal funded ADHC services five days a week.  Her most current IPC is approved through August 31, 2011.

184.    In accordance with her most recent IPC at Guardian ADHC program, Ms. Jones receives:

    a)    professional nursing services five days per week to monitor her for: seizure activity, for risk of falls, her blood pressure related to hypertension, and her weight; supervision during meal time to monitor her diabetic diet; and monitoring of her diabetes through monthly blood sugar checks and on an as needed basis;

    b)     personal care services five days per week to assist her with toileting;

37

c)   social services five days per week to provide supervision and prevent cognitive decline;

d)   therapeutic activities five days per week to stimulate and motivate her for cognitive stimulation, socialization and maintain her functional abilities by participating in group activities;

e)   physical therapy maintenance program five days per week to address her decreased strength and functional mobility;

f)   occupational therapy maintenance program five days per week to maintain and improve functional abilities with her upper extremities;

g)   specialized physical therapy services treatment 1-2 days a week to address decreased strength and functional mobility;

h)   specialized occupational therapy services 1 – 2 times a week to increase her physical functioning, including ambulation, transfers, expressive aphasia, and independent feeding;

i)   speech and language pathology services twice per month to address her aphasia and prevent deterioration of cognitive-linguistic skills;

j)   registered dietician services to address her diabetes.

185.   Mrs. Jones's current IPC states that she is at a high risk of institutionalization if she does not receive ADHC services five days per week, based on her two or more chronic medical conditions, frailty, isolation, risk for falls, self neglect, medication mismanagement, and inappropriate affect, appearance, or behavior.

186.   Ms. Jones lives at home with her daughter, and her daughter's family in Richmond, California.  Ms. Jones receives 99 hours of IHSS per month.

187.   Ms. Jones's daughter, who is also her caregiver, works and is raising children.  If Ms. Jones were unable to attend ADHC, she would be at home alone, and would not receive needed therapies, including speech therapy to address her significant aphasia.   Ms. Jones and her family fear she would be isolated alone at home, in addition to being at risk of medical and physical decline,

38

1    if she were to lose ADHC services.  Without ADHC she is at risk for placement in a nursing facility,

2    which she and her family believe would be terrible for her.

3        188.    Plaintiff Jessie Jones would be irreparably harmed by a reduction in ADHC services,

4    or an interruption, modification, or termination, of ADHC services without adequate long-term

5    alternative services in place.

6    **Facts Related to Plaintiff Raif Nasyrov**

7        189.    Raif Nasyrov attends the Mt. Diablo Center for Adult Day Health Care program in

8    Pleasant Hill California.  He has been attending the program since June 2006.  He is authorized to

9    receive and does receive Medi-Cal funded ADHC services five days a week.  His most current IPC

10   is approved through May 31, 2011.

11       190.    In accordance with his most recent IPC at the Mt. Diablo Center for Adult Day Health

12   Care, Mr. Nasyrov receives:

13       a)    professional nursing services five days per week to monitor him for: pain, including

14             providing pain medication as needed; skin integrity for rashes related to his urinary

15             and bowel incontinence; maintain his participation in program activities, and notify

16             his family of any behavioral changes;

17       b)    personal care services five days per week to monitor him for incontinence and assist

18             with toileting;

19       c)    social services five days per week to address his isolation, and supervision due to his

20             increasing cognitive deficits;

21       d)    therapeutic activities  five days per week to address his language barrier which

22             prevents socialization activities, through participation in the Adult Day Health

23             Russian Program run by the center;

24       e)    physical therapy maintenance program five days a week to address his potential for

25             decline in functional mobility;

26       f)    occupational therapy maintenance program five days a week  to address his potential

27             for decreased upper extremity range of motion and strength;

28

g)       registered dietician services to supervise his low sodium diet and address his

hypertension;

h)       mental health services five times per week to address his increasing depression.

191.     Mr. Nasyrov's current IPC states that he is at a high risk of institutionalization if he does not receive ADHC services five days per week, based on his two or more chronic medical conditions, frailty, isolation, medication mismanagement, cognitive decline and depression.

192.     Mr. Nasyrov lives with his daughter in Martinez, California.  He receives 99.2 hours per month in IHSS; his daughter Sofia Nasyrova is his IHSS care provider.  He and his wife previously lived with Ms. Nasyrova, however, Mr. Nasyrov and his daughter were forced to place his wife into a nursing facility in 2007 due to her unstable diabetes and advanced Alzheimer's disease.  Mr. Nasyrov's wife died last year.  The ADHC's Russian Program helps him avoid depression and isolation, particularly since the loss of companionship of his wife.

193.     Mr. Nasyrov's receipt of language-appropriate skilled services and socialization from the ADHC program are essential to support him living in the community with his daughter.  He relies on the skilled ADHC services, particularly the therapeutic activities provided in Russian, his sole language, at ADHC, which assist in reducing the negative impacts of Alzheimer's disease, and his increasing depression.

194.     Ms. Nasryova is increasingly unable to leave her father alone because of his risk for wandering.  Ms. Nasyrova believes that without ADHC she would be forced to seek out of home placement for him, which she would hate to have to do, and which she believes would be terrible for her father.

195.     Plaintiff  Raif Nasyrov would be irreparably harmed by a reduction in ADHC services, or an interruption, modification, or termination, of ADHC services without adequate long-term alternative services in place.

**Failure to Provide Adequate Notice and Pre-Termination Hearing**

196.     Plaintiffs have all been found eligible for and currently receive ADHC services on an individualized basis as set forth in their Individual Plans of Care.  As part of their ADHC Individual

40

1  Plan of Care (IPC), Plaintiffs have each been found eligible for specific ADHC services on each day

2  of attendance authorized by Medi-Cal.  Plaintiff Allie Jo Woodard has a Medi-Cal approved IPC

3  through June 30, 2011 for five days a week of services through ADHC.  Plaintiff Gilda Garcia has a

4  Medi-Cal approved IPC through April 30, 2011 for five days a week of services through ADHC.

5  Plaintiff Ronald Bell has a Medi-Cal approved IPC through July 31, 2011 for three days a week of

6  services through ADHC.   Plaintiff Esther Darling has a Medi-Cal approved IPC through June 30,

7  2011 for five days a week of services through ADHC.  Plaintiff Wendy Helfrich has a Medi-Cal

8  approved IPC for three days a week of services through ADHC.  Plaintiff Jessie Jones has a Medi-

9  Cal approved IPC through August 31, 2011 for five days a week of services through ADHC.

10  Plaintiff Raif Nasyrov has a Medi-Cal approved IPC through May 31, 2011 for five days a week of

11  services through ADHC.

12  **Allegations Regarding Limitations of Benefits Subclass**

13        197.    On July 30, 2009, Defendant sent a fax to ADHC providers, stating that:

14              "Effective August 27, 2009. . . ..and until the State law is amended or
15              becomes inoperative, Medi-Cal will no longer approve or pay for a
              beneficiary to attend an ADHC center for more than three days per week.  If
16              your ADHC center currently has participants attending the ADHC center more
              than three days per week pursuant to a currently approved Treatment
17              Authorization Request (TAR), DHCS will send those beneficiaries a notice
              informing them that their authorized ADHC services will be reduced to a
18              maximum of three days of ADHC per week, effective 30 days after signing of
              the Trailer Bill.  In addition, DHCS will notify all Medi-Cal beneficiaries who
19              receive ADHC services of the reduction to this ADHC benefit.  Copies of all
              notices released regarding ADHC benefit changes will be provided on the
20              DHCS website at www.dhcs.ca.gov and on the Medi-Cal website at
              www.medi-cal.ca.gov.  Please feel free to print, post, and/or distribute these
21              notices for your ADHC participants."

22        198.    Following this communication, Defendant posted a two-page notice on the DHCS

23  website.  The first page, addressed to Medi-Cal beneficiaries, states that the "ADHC benefit is

24  reduced to a maximum of three days of ADHC per week."  The second page is directed at ADHC

25  participants affected by the cut and states:

26              "Dear Medi-Cal Beneficiary:

27

28

> This is to notify you that a recent change in California law will reduce the Adult Day Health Care benefit to a maximum of three days per week for any beneficiary.  This change will occur 30 days after signing of the law that accompanies the State Fiscal Year 2009-2010 Budget.  The Department of Health Care Services records show that you are currently authorized to receive four or more days per week of Adult Day Health Care.  Effective August 27, 2009, Medi-Cal will only authorize and pay for a maximum of three days per week of Adult Day Health Care.  Due to this change of State law, carry-over days and make-up days will not be allowed.  If you have any questions, please contact the Medi-Cal beneficiary Services line at 1-888-284-0623 or speak with your ADHC provider."

199.    Upon information and belief, Plaintiffs Gilda Garcia and Allie Jo Woodard have not received individualized written notice of the cuts to their services nor have they been informed  of their right to hearing before services are denied, suspended, reduced or terminated, nor about whether and how to assert their rights to alternative services offered through Medi-Cal.

200.    The above-described notice to Medi-Cal beneficiaries does not comply with federal and state requirements governing notice and hearing because, among other reasons, it was not mailed to beneficiaries and, moreover, fails to advise Plaintiffs of (a) their right to a fair hearing if they are disagree with the reductions or terminations in services, (b) the manner in which they can request a hearing, (c) their right to continuation of benefits pending a hearing.

201.    Plaintiffs Woodard and Garcia are representative of the broader population of ADHC participants throughout the state who would be affected by the cuts contained in ABx4 5 and who have not received required notice and hearing rights.

**Allegations Regarding Termination of Benefits Subclass**

202.    With respect to the Termination of Benefits subclass, upon information and belief, Defendant does not intend to issue notice to the vast majority of potentially affected individuals. Rather, individuals who are assessed by their ADHC provider and determined not to meet the new eligibility requirements are supposed to receive a termination or denial notice from the ADHC provider.  For current participants, such notice will not offer them a pre-termination Medi-Cal hearing nor will they be entitled to continuation of benefits pending the hearing.  For the small number of individuals whose ADHC provider determines meet the new eligibility requirements, the ADHC provider will submit a Treatment Authorization Request (TAR) to the Medi-Cal field office

for approval. If the field office determines that the individual does not meet the new requirements, then the field office will issue a Medi-Cal notice, offer a pre-termination hearing, and the opportunity to have services continued pending the hearing.

**Allegations Regarding Entire Certified and Amended Class**

203. Plaintiffs Woodard, Garcia, Bell, Darling, Helfrich, Jones, and Nasyrov, are representative of the broader population of ADHC participants throughout the state who would be affected by the cuts contained in ABx4 5 and AB 97 who have not received required notice and hearing rights.

204. Defendants have asserted, in this Court and in the Ninth Circuit, that they are not obligated to provide adequate notice and hearing rights when ADHC benefits are denied, reduced, suspended or terminated.

205. In this Court and in the Ninth Circuit, Defendants have represented that private ADHC providers, not Defendants, are responsible for issuance of notice of denial, reduction, suspension or termination of ADHC services.

206. In this Court and in the Ninth Circuit, Defendants have asserted that Class Members have no right to a hearing challenging the reduction or termination of their underlying Medi-Cal benefits when ADHC services are reduced or terminated.

207. Defendants have given no indication of a plan to, nor have they provided sufficient time to, provide notice and hearing rights as to the elimination of ADHC pursuant to AB 97.

208. Upon information and belief, Defendants do not intend to issue adequate notice and the opportunity for a fair hearing upon elimination of the ADHC program.

**Facts Related to Medi-Cal ADHC Participants Generally**

209. All ADHC participants have been authorized to receive and do receive Medi-Cal funded ADHC services in accordance with physician recommendations and an Individual Plan of Care (IPC) submitted to and approved by Defendants.

43

210.     Upon information and belief, virtually all ADHC participants are receiving services between one and five days per week and have approved treatment authorizations approved by Medi-Cal.

211.     Upon information and belief, ADHC participants have not received individualized notification of the cuts or changes in services, nor have Defendants ensured that they are informed of the availability of alternative services available under the Medi-Cal State Plan, such as home health agency services, IHSS, rehabilitation services, specialty mental health services, targeted case management, and transportation, nor have Defendants ensured that they have access to these alternative services.

212.     Upon information and belief, Defendants do not intend to provide such information or secure adequate alternative services needed to prevent unnecessary institutionalization, without interruption, to replace those eliminated by ABx4 5 and/or AB 97.

213.     Denials, suspensions or termination of, or reductions to ADHC services will cause Class Members to suffer decline in physical functioning, will lead to increased preventable emergency room visits, and will lead to institutionalization.

214.     Significantly, for many participants, such as people whose physical or cognitive impairments are such that they cannot be left alone, or whose health conditions are extremely unstable, or those whose families rely on the individual being out of home in order to work, sleep, or care for other family members, the loss of one or two days, or complete termination of ADHC, will mean imminent and irreparable harm, including hospitalization, out-of-home placement in a nursing facility, or physical and/or mental deterioration resulting in hospitalization or institutionalization.

215.     To the extent there are any applicable administrative remedies, exhaustion on the part of Plaintiffs would be futile.  On August 10, 2009, Plaintiffs sent a demand letter to Defendants requesting that the reduction, elimination or termination of services pursuant to ABx4 5 be halted until Defendants provided Plaintiffs with due process, continued services and/or replacement services needed to maintain them in the community in accordance with the law.  On August 13, 2009, Defendants responded by letter, refusing to do so.

44

216.     Regarding the elimination of ADHC pursuant to AB 97, Plaintiffs sent a letter to Defendants on April 1, 2011, outlining their concerns and requesting specific assurances regarding the timing and process for elimination of ADHC and planned conversion to a federal waiver. Defendants responded by letter on April 8, 2011, stating generally a goal to "facilitate the transition of current ADHC beneficiaries to appropriate services that address their needs" but failing to provide any specific assurances regarding timing, process or conversion to a waiver without interruption in care or adequacy of replacement services to prevent unnecessary institutionalization.

## VIII.  CLASS DEFINITION AND ALLEGATIONS

217.     On August 10, 2010, this Court issued an Order pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure certifying a class to include:  "All Medi-Cal beneficiaries in the State of California for whom Adult Day Health Care benefits will be reduced, suspended, denied or terminated under the provisions of ABx4 5."  (Docket No. 198).

218.     The August 10, 2010 Order further certified a subclass, the "Termination of Benefits" subclass, defined as:  "All present and future Medi-Cal beneficiaries who have been authorized to receive any ADHC services, and whose ADHC services will be reduced, suspended, or terminated, and otherwise qualified future ADHC applicants who will be denied ADHC services, when the eligibility and medical necessity requirements of ABx4 5 become operative."  (Docket No. 198).

219.     On May 14, 2010, the Court certified a subclass, the "Limitation of Benefits" subclass, defined as:  "All Medi-Cal beneficiaries who, as of August 26, 2009, have been authorized to receive four or five days of Adult Day Health Care Services by DHCS, and whose services will be reduced to a maximum of three days under the provisions of ABx4 5."  (Docket No. 190).

220.     The Court found that the Class certified on August 10, 2010 meets the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2).  (Docket No. 198).

221.     Pursuant to Rule 23(a) and Rule (b)(2) of the Federal Rules of Civil Procedure, Plaintiffs Woodard, Garcia, Bell, Darling, Helfrich, Jones, and Nasyrov bring this action on behalf of themselves and all other persons similarly situated.  Plaintiffs bring this action on behalf of the certified class and an amended class consisting of "all Medi-Cal beneficiaries in the State of

45

California for whom Adult Day Health Care benefits will be reduced, suspended, denied or terminated under the provisions of ABx4 5 and/or AB 97" (hereinafter the "Class").  Fed. R. Civ. P. 23(a), (b)(2).

222. Plaintiffs Woodard and Garcia also plead a subclass of individuals as follows:

    a. "**Limitation of Benefits Subclass**" to be defined as "all Medi-Cal beneficiaries who, as of August 26, 2009, have been authorized to receive four or five days of Adult Day Health Care Services by DHCS, and whose services will be reduced to a maximum of three days under the provisions of ABx4 5." Plaintiffs Garcia and Woodard are typical of this subclass.

    b. "**Termination of Benefits Subclass**" to be defined as "all present and future Medi-Cal beneficiaries who have been authorized to receive any Adult Day Heath Care services, and whose ADHC services will be reduced, suspended, or terminated, and otherwise qualified future ADHC applicants who will be denied ADHC services, when the eligibility and medical necessity requirements of ABx4 5 become operative."  Plaintiff Bell is typical of this subclass.

223. <u>Numerosity</u>:  The Plaintiff class is so numerous that joinder of all its members is impracticable.  Upon information and belief, there are in excess of 37,000 persons in the amended class.  Upon information and belief, the "Limitation of Benefits subclass" consists of more than 8,000 people.  Upon information and belief the "Termination of Benefits subclass" will consist of approximately 15,000 people who will be terminated from ADHC.   Joinder of individuals in the subclasses is also impracticable because of the size of the subclasses, and because Class Members lack the knowledge and financial means to maintain individual actions and are geographically disbursed throughout the state.

224. <u>Commonality</u>:  Common questions of law and fact predominate over questions affecting individual Class Members.  Questions of law and fact common to members of the class include, but are not limited to: the fact that all Plaintiffs and Class Members have been determined

1   by Defendants to have a high potential for, and to need the ADHC services they receive on each day

2   of attendance in order to avoid, emergency room visits, hospitalization or other institutionalization

3   (Cal. Welf. & Inst. Code §§ 14526.1(d)(4) and (5)); the fact that Plaintiffs and Class Members have

4   been determined to need Medi-Cal funded ADHC services that will be suspended, reduced, or

5   terminated, or they will otherwise be denied access to ADHC services, due to the common policies

6   and actions of Defendants that apply to all of the Class Members; the determination of whether

7   Defendants' policies and actions violate federal and/or state law; the determination of whether

8   Defendant's new, restrictive eligibility requirements are reasonable; and the determination of

9   whether Defendants have failed to give adequate notice and the opportunity for a pre-termination

10  hearing to all affected Class Members.  The prosecution of separate actions by individual members

11  of the class would create a risk of inconsistent or varying adjudication, establishing incompatible

12  rules of law for the provision of services to people with disabilities served by the ADHC program.

13      225.   Typicality:  The claims of the Plaintiffs are typical of the claims of the class as a

14  whole and are typical of the claims of the subclasses in that the Plaintiffs and Class members

15  currently are Medi-Cal eligible ADHC participants and qualified individuals with disabilities, who

16  face the risk of institutionalization, hospitalization, and/or mental or physical deterioration resulting

17  in hospitalization and/or institutionalization, when subjected to the termination, suspension,

18  reduction or denial of ADHC services.  The claims arise from the same unlawful and discriminatory

19  policies and practices of Defendants.

20      226.   Adequate representation:  The Plaintiffs will fairly represent and adequately protect

21  the interests of members of the class as a whole.  The Plaintiffs do not have any interests

22  antagonistic to those of other Class Members.  By filing this action, the Plaintiffs have displayed an

23  interest in vindicating their rights, as well as the claims of others who are similarly situated.  The

24  relief sought by the Plaintiffs will inure to the benefit of members of the class generally.  The

25  Plaintiffs are represented by counsel who are skilled and knowledgeable about civil rights litigation,

26  disability discrimination, Medicaid law, practice and procedure in the federal courts and the

27  prosecution and management of class action litigation.

28

227.     Defendants have acted, refused to act, or will act on grounds generally applicable to the class, thereby making final injunctive and declaratory relief appropriate with respect to the class as a whole under Rule 23(b)(2) of the Federal Rules of Civil Procedure.  Class Members share a common need for ADHC services and/or replacement services and Defendants' policies and actions in reducing, suspending, denying or terminating ADHC services are applicable to the entire class.  A class action is superior to individual lawsuits for resolving this controversy.

228.     Defendants' actions, as alleged herein, have resulted in, and will continue to result in irreparable injury to Plaintiffs and Class Members for which they have no plain, speedy, or adequate remedy at law.  Plaintiffs and Class Members will suffer irreparable injury in that they will be placed at risk of institutionalization, hospitalization, or deterioration resulting in hospitalization and/or institutionalization.

229.     An actual controversy exists between Plaintiffs and Class Members and Defendants in that Defendants are seeking to implement denials, suspensions, reductions and terminations of Medi-Cal services to which Plaintiffs and Class Members are entitled, and which, if implemented will place Plaintiffs and Class Members at risk of unnecessary institutionalization and that such denial will violate the rights of Plaintiffs and Class Members under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the Americans With Disabilities Act, Section 504, the Medicaid Act, and California Government Code section 11135.  Plaintiffs and Class Members therefore seek a declaration as to their rights and Defendants' corresponding duties with respect to the matters alleged herein.

## IX.   LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF

### (Defendant Director Douglas)

### (Claim by Entire Certified and Amended Class)

### Violation of Title II of the Americans with Disabilities Act

230.     Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

48

231.     Each named Plaintiff and Class Member is a "qualified individual with a disability" within the meaning of the ADA in that they (1) have a physical impairment that substantially limits one or more major life activities; and (2) meet the essential eligibility requirements for community-based long-term care under California's Medicaid program.

232.     Defendant Douglas is the Director of the Department of Health Care Services and is therefore a public entity under the ADA.

233.     As to the Limitations of Benefits Subclass, Defendant has required that ADHC services to Plaintiffs and Class Members arbitrarily be reduced from five days per week to no more than three days per week without reassessment of need or the provision of alternative services they need to avoid institutionalization, thereby placing Plaintiffs and Class Members at risk of institutionalization in violation of the ADA's integration mandate.

234.     As to the Termination of Benefits Subclass, Defendant has imposed new, restrictive eligibility requirements on Plaintiffs and Class Members which will result in complete termination or denial of ADHC services regardless of their need for ADHC to remain safely in their own homes or in community settings, and without securing alternative services they need to avoid unnecessary institutionalization, thereby placing Plaintiffs and Class Members at risk of institutionalization in violation of the ADA's integration mandate.

235.     As to the Termination of Benefits Subclass, Defendant has imposed arbitrary eligibility requirements which unlawfully screen out or tend to screen out equally needy and qualified classes of individuals with disabilities from fully and equally enjoying ADHC services, based on their need for assistance with activities of daily living and/or level of care.

236.     Pursuant to AB 97, Defendant will eliminate ADHC services to Plaintiffs and Class Members without ensuring that upon the elimination of ADHC, alternative services which are needed to avoid institutionalization are in place to ensure that Plaintiffs and Class Members will not suffer any gap in the services required by their ADHC plans of care, thereby placing Plaintiffs and Class Members at risk of institutionalization in violation of the ADA's integration mandate.

237.     Defendant has discriminated against all Plaintiffs and Class Members in ways that include, but are not limited to failing to provide reasonable modifications to programs and services.

238.     Defendant has utilized criteria and methods of administration that subject Plaintiffs and Class Members to discrimination on the basis of disability, including risk of unnecessary institutionalization, by, including but not limited to the following:  (1) failing to properly assess for replacement services and supports that would enable Plaintiffs and Class Members to remain in the community; (2) failing to provide ADHC or replacement services needed to enable Plaintiffs and Class Members to remain in the community; (3) basing their decision on levels of service solely on economic considerations not taking into account the assessed needs of the participants; and (4) allocating resources for institutional versus community long-term care contrary to the desires and needs of people with disabilities.

239.     Defendant's actions are in violation of Title II of the ADA.

**SECOND CLAIM FOR RELIEF**

**(Defendants DHCS and Director Douglas)**

**(Claim by Entire Certified and Amended Class )**

**Violation of Section 504 of the Rehabilitation Act**

240.     Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

241.     Each Plaintiff and Class Member is a "qualified person with a disability" within the meaning of Section 504, because they (1) have physical and/or mental impairments that substantially limit one or more major life activities; and (2) meet the essential eligibility requirements for community-based services under California's Medicaid programs.

242.     Defendants conduct, operate or administer the state Medicaid program, entitled Medi-Cal, and are recipients of federal funds and are therefore subject to the requirements of Section 504.

243.     As to the Limitations of Benefits Subclass, Defendants have required that ADHC services to Plaintiffs and Class Members arbitrarily be reduced from five days per week to no more

50

than three days per week without reassessment of need or the provision of alternative services they need to avoid institutionalization, thereby placing Plaintiffs and Class Members at risk of institutionalization in violation of Section 504's integration mandate.

244.    As to the Termination of Benefits Subclass, Defendants have imposed new, restrictive eligibility requirements on Plaintiffs and Class Members which will result in complete termination or denial of ADHC services regardless of their need for ADHC to remain safely in their own homes or in community settings, and without securing alternative services they need to avoid unnecessary institutionalization, thereby placing Plaintiffs and Class Members at risk of institutionalization in violation of Section 504's integration mandate.

245.    As to the Termination of Benefits Subclass, Defendants have imposed arbitrary eligibility requirements which unlawfully screen out or tend to screen out equally needy and qualified classes of individuals with disabilities from fully and equally enjoying ADHC services, based on their need for assistance with activities of daily living and/or level of care.

246.    Pursuant to AB 97, Defendants will eliminate ADHC services to Plaintiffs and Class Members without ensuring that upon the elimination of ADHC, alternative services which are needed to avoid institutionalization are in place to ensure that Plaintiffs and Class Members will not suffer any gap in the services required by their ADHC plans of care, thereby placing Plaintiffs and Class Members at risk of institutionalization in violation of Section 504's integration mandate.

247.    Defendants have discriminated against all Plaintiffs and Class Members in ways that include, but are not limited to, failing to provide reasonable modifications to programs and services.

248.    Defendants have utilized criteria and methods of administration that subject all Plaintiffs and Class Members to discrimination on the basis of disability, including risk of unnecessary institutionalization, by, including but not limited to the following:  (1) failing to properly assess for replacement services and supports that would enable Plaintiffs and Class Members to remain in the community; (2) failing to provide ADHC or replacement services needed to enable Plaintiffs and Class Members to remain in the community; (3) basing their decision on levels of service solely on economic considerations not taking into account the assessed needs of the

51

participants; and (4) allocating resources for institutional versus community long-term care contrary to the desires and needs of people with disabilities.

249. Defendants' actions are in violation of Section 504 of the Rehabilitation Act.

**THIRD CLAIM FOR RELIEF**

**(Defendant Director Douglas)**

**(Claim by Entire Certified and Amended Class)**

**Claim under 42 U.S.C. § 1983, Deprivation of Federal Constitutional Rights – Violation of Procedural Due Process Rights**

250. Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

251. Defendant Douglas, as the Director of the Medicaid single state agency, is ultimately responsible for administration of the Medi-Cal program, including ensuring the provision of adequate notice and pre-termination hearing rights.

252. Plaintiffs receive ADHC services which are being cut to three days per week and/or are being terminated by application of new eligibility and medical necessity criteria. Plaintiffs have not received notice informing them of their rights to a pre-termination or pre-reduction hearing or been informed of their right to alternative services available through Medi-Cal.

253. Defendant's practices and procedures alleged herein violate the Due Process clause of the Fourteenth Amendment to the U.S. Constitution by, among other things, denying Plaintiffs and Class Members adequate notice and the opportunity for a fair hearing prior to reduction, suspension or termination of services previously authorized by the State.

254. In all of this, Defendant has, under color of state law, deprived Plaintiffs and Class Members of rights, privileges or immunities secured to them by the Constitution of the United States, in violation of 42 U.S.C. § 1983.

**FOURTH CLAIM FOR RELIEF**

**(Defendant Director Douglas)**

**(Claim by Entire Certified and Amended Class)**

**Violation of Medicaid Act, Failure to provide Opportunity for Hearing**

255.     Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

256.     Defendant Douglas, as the Director of the Medicaid single state agency, is ultimately responsible for administration of the Medi-Cal program, including ensuring the provision of adequate notice and pre-termination hearing rights.

257.     Pursuant to the Medicaid Act, the state of California has established a procedure to provide a fair hearing to any Medi-Cal beneficiary whose services are denied, reduced, suspended, or terminated.  In denying, reducing, suspending, or terminating services to Plaintiffs and Class Members as set forth above, Defendant has deprived Plaintiffs and Class Members of an opportunity for a fair hearing in violation of 42 U.S.C. § 1396a(a)(3).

258.     Defendant's practices and procedures alleged herein violate 42 U.S.C § 1396a(a)(3) by among other things, failing to ensure that individuals whose ADHC services will be denied, suspended, terminated or reduced have access to a fair hearing.

259.     Defendant has under color of state law, deprived Plaintiffs and Class members of rights or privileges and immunities secured to them by the Constitution and laws of the United States in violation of 42 U.S.C. § 1983.

**FIFTH CLAIM FOR RELIEF**

**(Defendant Director Douglas)**

**(Claim by Termination of Benefits Subclass Only)**

**Violation of Medicaid Comparability Requirement**

260.     Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

261.    The California Legislature has enacted a statute that will reduce, suspend, deny or terminate coverage of ADHC services for many eligible Medicaid beneficiaries based solely on their ability to perform eight specified activities and their institutional level of care.  Defendant, by creating one eligibility standard for individuals with certain conditions or types of disabilities while applying a separate standard for all other individuals, establishes Medi-Cal eligibility criteria in contravention of the comparability provisions of the Medicaid Act.  42 U.S.C. § 1396a(a)(10)(B).

262.    Defendant has, under color of state law, deprived Plaintiffs and Class members of rights, privileges, or immunities secured to them by the Constitution and laws of the United States in violation of 42 U.S.C. § 1983.  In addition, ABx4 5 is in conflict with and inconsistent with 42 U.S.C. § 1396a(a)(10)(B) and therefore preempted by the Supremacy Clause of the United States Constitution art. IV.

### SIXTH CLAIM FOR RELIEF

### (Defendant Director Douglas)

### (Claim by Termination of Benefits Subclass Only)

### Violation of Medicaid Reasonable Standards Requirement

263.    Plaintiffs reallege and incorporate herein by reference each and every allegation and paragraph set forth previously.

264.    Federal Medicaid law requires participating states to establish reasonable standards, consistent with the objectives of the Medicaid Act, for determining the extent of covered services. 42 U.S.C. § 1396a(a)(17).

265.    Pursuant to ABx4 5 and subsequent amendments, Defendant will provide ADHC services for some Medi-Cal recipients, while denying the same services to other ADHC recipients who have comparable needs, and will use eligibility criteria that do not provide a reasonable measure of need for ADHC services.

266.    ABx4 5 is inconsistent and in conflict with the reasonable standards requirements of the federal Medicaid Act, 42 U.S.C. § 1396a(a)(17), and interpretive federal guidelines, and is thus preempted by the Supremacy Clause of the United States Constitution, art. IV.

1

**SEVENTH CLAIM FOR RELIEF**

2

**(Defendants DHCS and Director Douglas)**

3

**(Claim by Entire Certified and Amended Class )**

4

**Violation of Government Code Sections 11135 and 11139**

5      267.    Plaintiffs reallege and incorporate herein by reference each and every allegation and

6 paragraph set forth previously.

7      268.    Plaintiffs and Class Members are persons with disabilities within the meaning of

8 California Government Code section 11135(c) *et seq*. and its implementing regulations.

9      269.    Plaintiffs and Class Members meet the essential eligibility requirements for Medi-Cal

10 services, including services necessary to maintain them in their homes in the community.

11      270.    Defendants DHCS and Director Douglas conduct, operate or administer the state

12 Medicaid program, entitled Medi-Cal, which is directly funded, in part, by state financial assistance

13 within the meaning of California Government Code section 11135(a) and implementing regulations.

14      271.    Defendants' actions, in denying, reducing, suspending or terminating community-

15 based Medi-Cal services and not assessing for or providing replacement services and placing

16 plaintiffs and Class Members at risk of institutionalization have discriminated against Plaintiffs and

17 Class Members, thereby excluding them from participation in, denying them the benefits of, and

18 otherwise subjecting them to discrimination in violation of California Government Code section

19 11135 *et seq*. and implementing regulations.

20      272.    Plaintiffs and Class Members further allege that violations of their rights under the

21 Americans with Disabilities Act and implementing regulations contained in the First Claim for

22 Relief are incorporated herein and constitute a violation of California Government Code section

23 11135 *et seq*. as well, as set forth in section 11135(b).

24                     **X.      REQUEST FOR RELIEF**

25      WHEREFORE, Plaintiffs pray that the Court order the following relief and remedies on

26 behalf of themselves and all others similarly situated:

27

28

55

1    A.    Assume jurisdiction over this action and maintain continuing jurisdiction until

2    Defendants are in full compliance with every order of this court;

3    B.    Certify an amended class consisting of:  "all Medi-Cal beneficiaries in the State of

4    California  for whom Adult Day Health Care benefits will be reduced, suspended, denied or

5    terminated under the provisions of ABx4 5 and/or AB 97";

6    C.    As to all Defendants, declare that Defendants' policies, practices, acts and omissions,

7    in implementing and enforcing ABx4 5 and AB 97, as set forth above, violate Plaintiffs' and Class

8    Members' rights under the American with Disabilities Act, Section 504 of the Rehabilitation Act, the

9    Medicaid Act, the United States Constitution, and California Government Code section 11135 by,

10   *inter alia:*

11        1)    Denying Plaintiffs and Class Members their entitlement to services in the

12              most integrated setting;

13        2)    Discriminating against Plaintiffs and Class Members on the basis of disability,

14              and on the basis of severity of disability, by utilizing methods of

15              administration, adopting and applying policies, failing to make reasonable

16              modifications to programs and policies, and engaging in practices that result

17              in unnecessary segregation and institutionalization; and

18        3)    Failing to provide Medi-Cal covered services without interruption and without

19              adequate notice or opportunity for a fair hearing.

20   D.    Declare that Defendant Douglas' denial, termination, reduction or suspension of

21   Plaintiffs' and Class Members' Medi-Cal-covered services to which they are entitled, without

22   adequate notice or opportunity for a fair hearing, and failure to provide adequate Medi-Cal-covered

23   alternative services to which they are entitled, without interruption of services, constitutes a denial of

24   due process of law guaranteed to them under:

25        1)    The Fourteenth Amendment to the Constitution of the United States;

26        2)    The Medicaid program, Title XIX of the Social Security Act, Title 42 U.S.C.

27              § 1396a – 1369w-5.

28

56

*Darling v. Douglas, et al.*, C09-03798 SBA; Second Amended Complaint for Injunctive and Declaratory Relief

1         E.      Declare that Defendants' elimination of Plaintiffs' Medicaid skilled nursing and

2   rehabilitation services provided through the ADHC program, without the provision of alternative

3   services in community-based settings which are the most integrated setting appropriate to the needs

4   of Plaintiffs and Class Members, and conditioning the receipt of medically necessary Medicaid

5   services on segregation in an institutional or non-community setting, violate laws which prohibit

6   discrimination on the basis of disability and unjustified institutionalization and which require

7   Defendants to administer their services and programs in the most integrated setting appropriate to the

8   needs of the individuals with disabilities, including:

9               1)      The Americans with Disabilities Act ("ADA"), (42 U.S.C.A. §§ 12101-

10                      12213)

11              2)      Section 504 of the Rehabilitation Act ("Section 504"), (29 U.S.C.A. §§ 794-

12                      794a),

13              3)      California Government Code section 11135.  (Cal. Gov't. Code § 11135).

14        F.      Grant a preliminary and permanent injunction enjoining Defendants, their officers,

15  agents, employees, attorneys, and all persons who are in active concert or participation with them

16  from implementing or enforcing ABx4 5 or AB 97 in violation of Plaintiffs' and Class Members'

17  rights under the American with Disabilities Act, Section 504 of the Rehabilitation Act, the Medicaid

18  Act, the United States Constitution, and California Government Code section 11135.

19  **For the "Limitation of Benefits Subclass" only:**

20        G.      As to all Defendants, declare that Defendants' policies, practices, acts and omissions,

21  in implementing and enforcing ABx4 5, as set forth above, violate Plaintiffs' and Class Members'

22  rights under the American with Disabilities Act, Section 504 of the Rehabilitation Act, the Medicaid

23  Act, the United States Constitution, and California Government Code section 11135 by, *inter alia*:

24              1)      Denying Plaintiffs and Class Members their entitlement to services in the

25                      most integrated setting;

26              2)      Discriminating against Plaintiffs and Class Members on the basis of disability,

27                      and on the basis of severity of disability, by utilizing methods of

28

administration, adopting and applying policies, failing to make reasonable modifications to programs and policies, and engaging in practices that result in unnecessary segregation and institutionalization; and

     3)     Failing to provide Medi-Cal covered services without interruption and without adequate notice or opportunity for a fair hearing.

H.     Declare that Defendant Douglas' denial, termination, reduction or suspension of Plaintiffs' and Class Members' Medi-Cal-covered services to which they are entitled, without adequate notice or opportunity for a fair hearing, and failure to provide adequate Medi-Cal-covered alternative services to which they are entitled, without interruption of services, constitutes a denial of due process of law guaranteed to them under:

     1)     The Fourteenth Amendment to the Constitution of the United States;

     2)     The Medicaid program, Title XIX of the Social Security Act, Title 42 U.S.C. § 1396a – 1369w-5.

I.     Declare that Defendants' elimination of Plaintiffs' Medicaid skilled nursing and rehabilitation services provided through the ADHC program, without the provision of alternative services in community-based settings which are the most integrated setting appropriate to the needs of Plaintiffs and Class Members, and conditioning the receipt of medically necessary Medicaid services on segregation in an institutional or non-community setting, violate laws which prohibit discrimination on the basis of disability and unjustified institutionalization and which require Defendants to administer their services and programs in the most integrated setting appropriate to the needs of the individuals with disabilities, including:

     1)     The Americans with Disabilities Act ("ADA"), (42 U.S.C.A. §§ 12101-12213)

     2)     Section 504 of the Rehabilitation Act ("Section 504"), (29 U.S.C.A. §§ 794-794a),

     3)     California Government Code section 11135.  (Cal. Gov't. Code § 11135).

1    J.    Grant a preliminary and permanent injunction enjoining Defendants, their officers,

2  agents, employees, attorneys, and all persons who are in active concert or participation with them

3  from implementing or enforcing ABx4 5 in violation of Plaintiffs' and Class Members' rights under

4  the American with Disabilities Act, Section 504 of the Rehabilitation Act, the Medicaid Act, the

5  United States Constitution, and California Government Code section 11135;

6    K.    Grant a preliminary and permanent injunction enjoining Defendants, their officers,

7  agents, employees, attorneys, and all persons who are in active concert or participation with them

8  from reducing ADHC program benefits from five or four days to a maximum of three days to the

9  Plaintiffs and Class Members and reinstate full ADHC program benefits until such time as

10  Defendants provide Plaintiffs and Class Members the Medi-Cal skilled nursing, physical and

11  occupational therapy, and other Medi-Cal-covered alternative services Plaintiffs and Class Members

12  are entitled to in the most integrated and least restrictive setting appropriate to their needs.

13    L.    Grant a preliminary and permanent injunction enjoining Defendant Douglas,  his

14  officers, agents, employees, attorneys, and all persons who are in active concert or participation with

15  him from denying, terminating, reducing or suspending Plaintiffs' and Class Members' Medi-Cal

16  skilled nursing, physical and occupational therapy, and other services to which they are entitled,

17  until such time as alternative community-based services are provided by Defendant for each Plaintiff

18  and Class Member; and until Defendant provides Plaintiffs and Class Members full notice and due

19  process appeal rights from any  denials, terminations, reductions or suspensions of their Medi-Cal

20  benefits, as required under the U.S. Constitution and the Medicaid Act.

21    M.    Maintain the injunctions above until such time as skilled nursing, physical and

22  occupational rehabilitation therapy, and other services are provided to the extent required under

23  federal law and so as to ensure each Plaintiff and Class Member receives the services which meet

24  their needs in the most integrated setting appropriate to their needs.

25  **For the "Termination of Benefits Subclass" only:**

26    N.    As to all Defendants, declare that Defendants' policies, practices, acts and omissions,

27  in implementing and enforcing ABx4 5, as set forth above, violate Plaintiffs' and Class Members'

28
<center>59</center>

rights under the American with Disabilities Act, Section 504 of the Rehabilitation Act, the Medicaid Act, the United States Constitution, and California Government Code section 11135, by, *inter alia*:

      1)    Denying Plaintiffs and Class Members their entitlement to services in the most integrated setting;

      2)    Discriminating against Plaintiffs and Class Members on the basis of disability, and on the basis of severity of disability, by utilizing methods of administration, adopting and applying policies, failing to make reasonable modifications in programs and policies, imposing arbitrary and illegal eligibility criteria, and engaging in practices that result in unnecessary segregation and institutionalization; and

      3)    Failing to provide Medi-Cal covered services without interruption and without adequate notice or opportunity for a fair hearing.

O.    Declare that Defendant Douglas' denial, termination, reduction or suspension of Plaintiffs' and Class Members' Medi-Cal-covered services to which they are entitled, without adequate notice or opportunity for a fair hearing, and failure to provide Plaintiffs and Class Members to adequate Medi-Cal-covered alternative services to which they are entitled, without interruption of services, constitutes a denial of due process of law guaranteed under:

      1)    The Fourteenth Amendment to the Constitution of the United States;

      2)    The Medicaid program, Title XIX of the Social Security Act, Title 42 U.S.C. § 1396a – 1396w-5.

P.    Declare that Defendants' elimination of Plaintiffs' Medicaid skilled nursing and rehabilitation services provided through the ADHC program, without the provision of alternative services in community-based settings which are the most integrated setting appropriate to the needs of Plaintiffs and Class Members, and conditioning the receipt of medically necessary Medicaid services on segregation in an institutional or non-community setting, violate laws which prohibit discrimination on the basis of disability and unjustified institutionalization and which require

1    Defendants to administer their services and programs in the most integrated setting appropriate to the

2    needs of the individuals with disabilities, including:

3              1)      The Americans with Disabilities Act ("ADA"), (42 U.S.C.A. §§ 12101-

4                      12213)

5              2)      Section 504 of the Rehabilitation Act ("Section 504"), (29 U.S.C.A. §§ 794-

6                      794a),

7              3)      California Government Code section 11135.  (Cal. Gov't. Code § 11135).

8         Q.      As to Defendant Douglas, declare that Defendant's new, restrictive eligibility

9    requirements violate the comparability and reasonable standards requirements of the Medicaid Act,

10   Title XIX of the Social Security Act, 42 U.S.C. §§ 1396a(a)(10)(B) and (17) and are preempted by

11   the Supremacy Clause;

12        R.      Grant a preliminary and permanent injunction enjoining Defendants, their officers,

13   agents, employees, attorneys, and all persons who are in active concert or participation with them

14   from implementing or enforcing ABx4 5 in violation of Plaintiffs' and Class Members' rights under

15   the American with Disabilities Act, Section 504 of the Rehabilitation Act, the Medicaid Act, the

16   United States Constitution, and California Government Code section 11135.

17        S.      Grant a preliminary and permanent injunction enjoining Defendants, their officers,

18   agents, employees, attorneys, and all persons who are in active concert or participation with them

19   from denying, terminating, reducing, or suspending ADHC program benefits to Plaintiffs and Class

20   Members and reinstate full ADHC program benefits until such time as Defendants provide Plaintiffs

21   and Class Members the Medi-Cal skilled nursing, physical and occupational therapy, and other

22   Medi-Cal-covered alternative services Plaintiffs and Class Members are entitled to in the most

23   integrated and least restrictive setting appropriate to their needs.

24        T.      Grant a preliminary and permanent injunction enjoining Defendant Douglas, his

25   officers, agents, employees, attorneys, and all persons who are in active concert or participation with

26   him from denying, terminating, reducing or suspending Plaintiffs' and Class Members' Medi-Cal

27   skilled nursing, physical and occupational therapy, and other services to which they are entitled,

28

1     until such time as alternative community-based services are provided by Defendant for each Plaintiff

2     and Class Member; and until Defendant provides Plaintiffs and Class Members full notice and due

3     process appeal rights from any  denials, terminations, reductions or suspensions of their Medi-Cal

4     benefits, as required under the U.S. Constitution and the Medicaid Act.

5         U.      Grant a preliminary and permanent injunction enjoining Defendants, their officers,

6     agents, employees, attorneys, and all persons who are in active concert or participation with them

7     from implementing the restrictive eligibility requirements on ADHC participants provided for in

8     ABx4 5.

9         V.      Maintain the injunctions above until such time as skilled nursing, physical and

10     occupational rehabilitation therapy, and other services are provided to the extent required under

11     federal law and so as to ensure each Plaintiff and Class Member receives the services which meet

12     their needs in the most integrated setting appropriate to their needs.

13     **For All Class Members:**

14         W.     Grant a preliminary and permanent injunction compelling Defendants, their officers,

15     agents, employees, attorneys, and all persons who are in active concert or participation with them to

16     take all actions necessary within the scope of their authority to implement the above injunctions.

17         X.      Maintain the injunctions above until such time as skilled nursing, physical and

18     occupational rehabilitation therapy, and other services are provided to the extent required under

19     federal law and so as to ensure each Plaintiff and Class Member receives the services which meet

20     their needs in the most integrated setting appropriate to their needs.

21         Y.      Waive the requirement for the posting of a bond as security for the entry of

22     preliminary relief, on the grounds of Plaintiffs' indigency.

23         Z.      Award the Plaintiffs the costs of this action and reasonable attorneys' fees pursuant to

24     20 U.S.C. § 794a; 42 U.S.C. §§ 1988, 12133, 12205; California Code of Civil Procedure section

25     1021.5; and as otherwise may be allowed by law.

26         AA.    Order such other and further relief as the Court deems just.

27

28

1

Dated: <u>June 2, 2011</u>                    Respectfully Submitted,

2                                            DISABILITY RIGHTS CALIFORNIA
                                             NATIONAL SENIOR CITIZENS LAW CENTER
3                                            AARP FOUNDATION LITIGATION
                                             NATIONAL HEALTH LAW PROGRAM
4                                            MORRISON & FOERSTER LLP

5

6                              By:        _____/s/_____

7                                            Elissa Gershon

8                                            Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28