Elissa Gershon, State Bar No. 169741
elissa.gershon@disabilityrightsca.org
Elizabeth Zirker, State Bar No. 233487
elizabeth.zirker@disabilityrightsca.org
Kim Swain, State Bar No. 100340
kim.swain@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA  94612
Telephone:  (510) 267-1200
Facsimile:  (510) 267-1201

Attorneys for Plaintiffs

[Complete list of counsel on following pages]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTHER DARLING; RONALD BELL by his guardian ad litem Rozene Dilworth; GILDA GARCIA; WENDY HELFRICH by her guardian ad litem Dennis Arnett; JESSIE JONES; RAIF NASYROV by his guardian ad litem Sofiya Nasyrova; ALLIE JO WOODARD, by her guardian ad litem Linda Gaspard-Berry; individually and on behalf of all others similarly situated, | Case No.: C09-03798 SBA<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Hearing Date:  July 26, 2011** |
|         Plaintiffs, | **Judge:**    Hon. Saundra B. Armstrong<br>**Address:**  1301 Clay Street |
| vs. |               Oakland, CA 94612<br>**Courtroom:** 1, 4th Floor |
| TOBY DOUGLAS, Director of the Department of Health Care Services, State of California, DEPARTMENT OF HEALTH CARE SERVICES, | |
|         Defendants. | |

Anna Rich, State Bar No. 230195
arich@nsclc.org
Kevin Prindiville, State Bar No. 235835
kprindiville@nsclc.org
NATIONAL SENIOR CITIZENS LAW CENTER
1330 Broadway, Suite 525
Oakland, CA 94612
Telephone:  (510) 663-1055
Facsimile:  (510) 663-1051

Eric Carlson, State Bar No. 141538
ecarlson@nsclc.org
NATIONAL SENIOR CITIZENS LAW CENTER
3435 Wilshire Boulevard, Ste 2860
Los Angeles, CA 90010-1938
Telephone:  213-674-2813
Facsimile:  213-639-0934

Barbara Jones, State Bar No. 88448
bjones@aarp.org
AARP FOUNDATION LITIGATION
200 So. Los Robles, Suite 400
Pasadena, CA 91101
Telephone:  (626) 585-2628
Facsimile:  (626) 583-8538

Kenneth W. Zeller, *Pro Hac Vice*
kzeller@aarp.org
Kelly Bagby, *Pro Hac Vice*
kbagby@aarp.org
AARP FOUNDATION LITIGATION
601 E Street NW
Washington D.C. 20049
Telephone:  (202) 434-2060
Facsimile:  (202) 434-6424

Sarah Somers, State Bar No. 170118
somers@healthlaw.org
Martha Jane Perkins, State Bar No. 104784
perkins@healthlaw.org
NATIONAL HEALTH LAW PROGRAM
101 E. Weaver Street, Suite G-7
Carrboro, NC 27510
Telephone:  (919) 968 - 6308
Facsimile:  (919) 968-8855

Kenneth A. Kuwayti, State Bar No. 145384
KKuwayti@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304-1018
Telephone:  (650) 813-5600
Facsimile      650-494-079

ii

# TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................2

II.  STATEMENT OF FACTS.........................................................................................................3

    A.  Purpose of and Approval Process for ADHC .................................................3

    B.  AB 97 ...................................................................................................................4

    C.  Lack of a Transition Plan ..................................................................................5

    D.  Inadequacy of Alternative Community-Based Services ...............................7

    E.  Need for ADHC-like Programs to Prevent Institutionalization.................10

    F.  Elimination of ADHC Will Cost the State More Money..............................12

    G.  Plaintiffs and Class Members ........................................................................13

        1.  Allie Jo Woodard:....................................................................13
        2.  Gilda Garcia ............................................................................14
        3.  Ronald Bell ..............................................................................14
        4.  Esther Darling .........................................................................15
        5.  Wendy Helfrich........................................................................15
        6.  Jessie Jones ..............................................................................16
        7.  Raif Nasyrov ...........................................................................17
        8.  Class Members .........................................................................18

    H.  Failure to Provide Individual Notice.............................................................19

III.  PLAINTIFFS MEET THE REQUIREMENTS FOR A PRELIMINARY
    INJUNCTION ........................................................................................................................20

    A.  Plaintiffs will Suffer Irreparable Harm in the Absence of an Injunction.........................20

    B.  Plaintiffs are Likely to Succeed on the Merits of their Claims that Defendants are
    Violating the ADA and Section 504. .................................................................21

        1.  Defendants' Implementation of AB 97 Violates the ADA and Section 504
        Prohibitions Against Unjustified and Unnecessary Institutionalization. ...............21
        2.  Defendants Use Methods of Administration that Result in Discrimination. .........23

    C.  Plaintiffs are Likely to Succeed on the Merits of their Claims that Defendants are
    Violating the Due Process Clause of the 14th Amendment and Medicaid Law by
    Failing to Provide Adequate Pre-termination Notice and Opportunity for a
    Hearing.................................................................................................................24

     D.     The Balance of Equities Tips Sharply in Plaintiffs' Favor and an Injunction is in the Public Interest ...................................................................................24

IV.    **CLASSWIDE RELIEF IS APPROPRIATE**.................................................**25**

V.    **PLAINTIFFS SHOULD NOT BE REQUIRED TO POST BOND** ...................**25**

VI.   **CONCLUSION** .........................................................................................**25**

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Cottrell*
   632 F.3d 1127 (9th Cir. 2011) ................................................................. 20

*AlohaCare v. Haw. Dept. of Human Services*
   572 F.3d 740 (9th Cir. 2009) ................................................................... 24

*Am. Trucking Ass'ns v. City of Los Angeles*
   559 F.3d 1046 (9th Cir. 2009) .................................................................. 20

*Beno v. Shalala*
   30 F. 3d 1057 (9th Cir. 1994) ................................................................... 20

*Brantley, et al. v. Maxwell-Jolly*
   656 F.Supp.2d 1161 (N.D. Cal 2009) ................................................... passim

*Catanzano by Catanzano v. Dowling*
   60 F.3d 113 (2d Cir. 1995) ........................................................................ 24

*Cota v. Maxwell-Jolly*
   668 F. Supp. 2d 997 ............................................................................ passim

*Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*
   572 F.3d 644 (9th Cir. 2009) .................................................................... 25

*Kathleen S. v. Dep't of Pub. Welfare of Pa.*
   10 F. Supp. 2d 460 (E.D. Pa. 1998) .......................................................... 24

*O'Bannon v. Town Court Nursing Center*
   447 U.S. 773 (1980) .................................................................................... 24

*Olmstead v. L.C. ex rel. Zimring*
   527 U.S. 581 (1999) .................................................................................... 22

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7, ___ (slip op. at 10) (2008) ..................................................... 20

## Statutes

42 U.S.C § 1396a(a)(5) ..................................................................................... 24

CAL. HEALTH & SAFETY CODE § 1570.2 ............................................................ 4

CAL. HEALTH & SAFETY CODE § 1570.2(b) ...................................................... 23

CAL. WELF & INST. CODE § 12301.06 ................................................................ 8

CAL. WELF. & INST. CODE § 12309 .................................................................... 8

CAL. WELF. & INST. CODE § 14132.95 ............................................................... 8

CAL. WELF. & INST. CODE § 14526.1(d)(4) ...................................................... 21

CAL. WELF. & INST. CODE § 14526.1(d)(5) .................................................. 4, 21

CAL. WELF. & INST. CODE § 14589.5(a) .............................................................. 4

CAL. WELF. & INST. CODE § 14589.5(d) .............................................................. 4

CAL. WELF. & INST. CODE § 14590(a) .................................................................. 5

CAL. WELF. & INST. CODE § 14590(d) .................................................................. 5

Sen. Bill No. 69 (2011-2012 Reg. Sess.) ............................................................. 5

## Regulations

28 C.F.R. § 35.130(b)(7) .................................................................................. 22

28 C.F.R. § 35.130(d) ....................................................................................... 22

28 C.F.R. § 41.51(b)(3)(i) ................................................................................................... 23

28 C.F.R. § 41.51(d) ............................................................................................................ 22

42 C.F.R. §§ 431.200 *et seq.* ............................................................................................... 24

45 C.F.R. § 84.4(b)(4) (2005) ............................................................................................ 23

CAL. CODE REGS. tit. 22, § 51014.1(a) ................................................................................ 24

### NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

TO DIRECTOR TOBY DOUGLAS,  DEPARTMENT OF HEALTH CARE SERVICES AND THEIR ATTORNEYS:  PLEASE TAKE NOTICE that on July 26, 2011, at 1:00 p.m., or soon thereafter as counsel may be heard before Judge Saundra Brown Armstrong, in Courtroom 1, U.S. District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA, Plaintiffs individually and on behalf of class members will move the Court pursuant to Rule 65(a) of the FRCP and Rule 65-2 and 7-2 of the Local Civil Rules for  a Preliminary Injunction immediately enjoining Defendants and all persons acting in concert or participating with them:

(a)     From implementing or enforcing AB 97 or engaging in the following actions until this Court rules on a permanent injunction:

(i)     Reducing, terminating or modifying Medi-Cal Adult Day Health Care (ADHC) program benefits to Plaintiffs and Class Members pursuant to AB 97, unless and until adequate, appropriate, and uninterrupted services are provided to replace the care prescribed in their ADHC plans of care, including through reasonable modifications to Defendants' programs, to prevent inappropriate institutionalization in violation of their rights under the Americans with Disabilities Act ("ADA") and Section  504 of the Rehabilitation Act of 1973 ("Section 504"); and

(ii)     Reducing, terminating or modifying Medi-Cal Adult Day Health Care (ADHC) program benefits to the Plaintiffs and Class Members pursuant to AB 97, unless and until Plaintiffs and Class Members are afforded notice and a right to a hearing regarding adequate, appropriate, and uninterrupted services which meet their medical needs as currently prescribed by their ADHC plans of care in compliance with their rights under the Due Process clause of the Constitution, and the Medicaid Act.

(b)     Granting a Preliminary Injunction compelling Defendants, their officers, agents, employees, attorneys, and all persons who are in active concert or participation with them, to take all actions necessary within the scope of their authority to implement the above injunctions; and ordering Defendants to maintain this Preliminary Injunction until this Court rules on a permanent injunction.

(c)     Granting other relief as the Court deems necessary and appropriate.

Plaintiffs further request that the Court waive the requirement for the posting of a bond as security for the entry of preliminary relief, on the grounds of Plaintiffs' indigency.

This Motion is based upon the Second Amended Complaint, this Notice of Motion and Motion, the Memorandum in support, supporting declarations and exhibits, the pleadings and records on file, any oral and written argument and supporting evidence presented on reply and at the Motion hearing.  The

1   Motion is made on the grounds that Plaintiffs and Class Members are likely to succeed on the merits of

2   their claims that Defendants are violating the ADA and Section 504, as well as their rights under the

3   Due Process clause of the Constitution and the Medicaid Act, and that they will suffer irreparable injury

4   unless the activities are enjoined.

5                  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

6   **I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

7          Unless this Court issues a Preliminary Injunction, illegal and devastating cuts to Adult Day

8   Health Care (ADHC) services under the State Medi-Cal program will occur, causing irreparable harm to

9   almost 35,000 elderly and disabled individuals.

10         These cuts will take place as soon as September 1, 2011, the date the State plans to implement

11  Assembly Bill 97 (Statutes of 2011) (AB 97).  The ADHC program provides cost-effective community

12  based services to seniors and younger people with disabilities, enabling them to avoid unnecessary

13  hospitalization and institutionalization.  AB 97 will eliminate Medi-Cal funding for ADHC in its

14  entirety.  The funding for transition to and provision of replacement services will be no more than half

15  the current ADHC budget, and possibly significantly less.  For Plaintiffs and Class Members, these cuts

16  will mean the difference between remaining at home and being institutionalized.

17         Crucially, although AB 97 authorizes the provision of short-term transition services, these

18  services have yet to be designed, implemented, or funded, and Defendants have failed to identify any

19  transition plan to avoid a harmful interruption in care.  To the extent Defendants intend to rely on a

20  "theoretical availability" of alternative services, without ensuring that services are actually in place prior

21  to termination of their ADHC services, the Court has already rejected this argument once.  *See, Brantley,*

22  *et al. v. Maxwell-Jolly*, 656 F.Supp.2d 1161, 1174 (N.D. Cal 2009).  The declarations submitted with

23  this motion from clinical and health care systems experts, and ADHC providers and recipients, show

24  that the State has failed to take adequate steps to prevent gaps and/or reductions in care needed to

25  prevent unnecessary institutionalization and other harm to thousands of individuals.

26         Similarly, while AB 97 expresses a legislative intent to develop a new program called "Keeping

27  Adults Free From Institutions" ("KAFI"), there is no assurance this program will ever be enacted or

28  funded, and the services it will provide and who it will serve are entirely speculative.  What is certain,

however, is that this program will not be in effect when ADHC is eliminated, leaving a critical gap in care.  Decl. of Lydia Missaelides, Ex. I, at 22: 13-17.

Without ADHC services, or a safe and seamless transition to adequate and appropriate replacement services, Plaintiffs will experience immediate and irreparable harm.  Plaintiffs and Class Members will be at great risk of deterioration in health and functioning, and will be forced into hospitals and nursing facilities in violation of the ADA and Section 504.  Ironically, this will cost the State more money, not less.  Moreover, Defendants have consistently taken the position that they have no obligation to issue statutorily required written notice and offer pre-termination hearings, in violation of federal Medicaid law and the Fourteenth Amendment of the U.S. Constitution.

This Court has already twice preliminarily enjoined cuts in ADHC services on the basis that an across-the-board reduction in service days without provision for adequate replacement services, and the imposition of restrictive new eligibility criteria would unlawfully and irreparably harm affected individuals.  *See, Brantley*, 656 F.Supp.2d 1161; *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980 (N.D. Cal. 2010).  The effects of AB 97 will be even more extreme.  Plaintiffs request that a preliminary injunction be issued prohibiting Defendants from implementing AB 97 prior to ensuring that Plaintiffs and Class Members are provided with adequate, appropriate, and uninterrupted replacement services that they need to avoid institutionalization, and their due process rights.

## II.   STATEMENT OF FACTS

### A.   Purpose of and Approval Process for ADHC

This Court has previously described the purpose and background of ADHC.  *Brantley,* 656 F. Supp. 2d 1161, 1164.  In short, ADHC is a community-based day program for low-income seniors and younger disabled adults who live at home or in non-medical board and care homes.  Among its unique benefits, ADHC offers:  comprehensive skilled services and medical monitoring provided in one location; coordination with primary health care; health oversight by familiar and consistent staff; socialization and cognitive stimulation; and respite assistance for family caregivers.  *Id.*; Decl. of Dr. Gary Steinke  ¶¶ 11, 13-17, 21; Decl. of Dr. Kathleen Wilber ¶ 9; Decl. of Dr. William Gardner ¶¶ 11, 26, 29; Decl. of Roger Auerbach ¶ 11; Decl. of Cordula Dick-Muehlke ¶¶ 8-11, 14-20; Missaelides

Decl. ¶¶ 24, 26; Decl. of Dawn Myers Purkey ¶ 9-10; Decl. of Diane Puckett ¶¶ 47-48; Decl. of Dr. Jeffrey Yee ¶ 20.

ADHC services were specifically designed to "ensure that elderly persons and adults with disabilities are not institutionalized inappropriately or prematurely," recognizing that overreliance on nursing facilities and institutions has proven to be a "costly panacea in both financial and human terms, often traumatic, and destructive of continuing family relationships and the capacity for independent living." CAL. HEALTH & SAFETY CODE § 1570.2. Forty-nine of the 50 states provide some type of adult day health program, either as a Medicaid optional service or a Medicaid Waiver program. Auerbach Decl. ¶ 11; Missaelides Decl.¶ 17.

ADHC centers must provide a full range of medical, nursing, therapeutic, and rehabilitative services for a daily all-inclusive Medi-Cal rate of $76.27. Missaelides Decl. ¶ 26. To receive Medi-Cal approval for funding, individuals must be certified as having a need for ADHC services on each day of attendance in order to "avoid emergency department visits, hospitalizations, or other institutionalization" and "a high potential" for deterioration without ADHC services. CAL. WELF. & INST. CODE §§ 14526.1(d)(4) and (5). *See also*, *Brantley*, 656 F. Supp. 2d 1165, 1171. These certifications are documented in each participant's Individual Plan of Care ("IPC"), as illustrated below:

| (16)  MEDICAL NECESSITY CRITERION #4 | |
|---|---|
| **Criterion Met**<br>YES        NO<br>●          O | A high potential exists for the deterioration of the participant's medical, cognitive, or mental health condition or conditions in a manner likely to result in emergency department visits, hospitalization, or other institutionalization if ADHC services are not provided. |

Defendants define "high potential" as "having at least a 50% probability of occurring within [six months] . . . (more likely to occur than not to occur)." Missaelides Decl. ¶ 34.

**B.     AB 97**

AB 97 eliminates funding for ADHC as an optional service under California's Medicaid State Plan on the first day of the first calendar month following sixty days after the State secures federal approval. CAL. WELF. & INST. CODE §§ 14589.5(a), (d). Defendants submitted a proposed Medicaid State Plan Amendment on May 12, 2011, asking for federal approval of the elimination of the program in time to permit them to implement AB 97 on September 1, 2011. Missaelides Decl., ¶ 72, Ex. K.

AB 97 authorizes Defendants to create a "short-term program" to provide transition services when ADHC is eliminated, subject to a budget appropriation. CAL. WELF. & INST. CODE §§ 14590(a), (d). AB 97 also states the Legislature's intention to create a new program during the 2011-12 Regular Session, called the Keeping Adults Free from Institutions (KAFI) program. The program is not described with any specificity, but purports to "provide a well-defined scope of services to eligible beneficiaries who meet a high medical acuity standard and are at significant risk of institutionalization in the absence of such community-based services." Assem. Bill 97 sec. 105. Defendants have stated very clearly that the KAFI program will not be implemented until *after* the funding to ADHC has been cut, if at all. Missaelides Decl. Ex. I, at 22: 13-17.

ADHC's 2010-2011 budget was $388 million in total, of which $194 million came from state general funds. Missaelides Decl. Ex. D, at PL00868. SB 69, the budget bill passed by the Legislature on March 17, 2011, appropriates $85 million in state general funds, with unspecified federal matching funds—less than 50 percent of the current budget for ADHC-- to fund *both* the short term transition programs and the new KAFI program. Sen. Bill No. 69 (2011-2012 Reg. Sess.); *see also*, Missaelides Decl., Ex. G. That bill was not signed by the Governor, however, and it is not certain that even this drastically reduced amount of funding will be appropriated. The Governor's proposed revised 2011-2012 budget, released on May 16, 2011, provides only $25 million to transition ADHC recipients to other Medi-Cal services. Missaelides Decl. Ex. H, at PL00891. The proposed budget contains no reference to or funding for "social activities and respite assistance" as contemplated by AB 97. There are no funds proposed for the KAFI program, for replacement services, or to modify existing Medi-Cal or other services that are provided in ADHC recipients' prescribed ADHC plans of care.

###    C.    Lack of a Transition Plan

In their rush to eliminate Medi-Cal funding for ADHC in less than 90 days, the only concrete step Defendants have taken is to proceed with the request for federal approval to eliminate funding for the program. Missaelides Decl. Ex. K. Defendants have demonstrated their utter lack of accountability in this process by their disregard for concerns expressed by providers and others as to, among other things, the inadequacy of alternative services, insufficient time for the safe and orderly discharge of participants and closure of programs, and the need for a seamless transition to the KAFI program.

Missaelides Decl. Ex. I. and Ex. L.; Docket Nos. 208-5, 208-6, Decl. of Elissa Gershon Ex. E and F (Correspondence between Plaintiffs' Counsel and Defendant Toby Douglas).

Dr. Kathleen Wilber, Professor of Gerontology and Health Services Administration at the University of Southern California, notes that an adequate transition plan for each ADHC participant:

> …would need to address the eligibility requirements for any replacement services, whether services are actually available to the participant, timelines to get into each service, caps on usage, and the scope and adequacy of available alternatives. DHCS' entire transition plan is based on the premise that ADHC providers and participants should "trust us," despite DHCS' admission that there is nothing actually in place to ensure beneficiaries will receive the care they need after the program is eliminated.

Wilber Decl. ¶ 22.

Defendants have placed the burden of discharge and transition on ADHC providers without any instructions, guidance, assistance or resources to assist them.  Defendants held only one stakeholder meeting on May 13, 2011, attended by over 300 participants.  Missaelides Decl., Ex. O, at PL00908. The meeting transcript and Defendants' written response to questions are attached herein.  Missaelides Decl., Ex. I, Ex. O.  ADHC providers were told "the actual transition process begins with the discharge planning on behalf of the ADHC centers themselves" referring to a two-page letter sent to them on May 6, 2011 by the California Department of Aging (CDA) "informing them of their….continued responsibilities."  Decl. of Debbie Toth, Ex. B, at PL00912; Missaelides Decl. Ex. I, at 5: 2-6.

Defendants repeatedly rebuffed the concerns of ADHC providers and others, providing vague, boilerplate, and non-responsive answers to critical and basic questions.  *See, e.g.,* Missaelides Decl. Ex. I, 5:10-13; 18:14-23; 20:3-7; 27:19-27 (lack of availability of alternative services,); 8:1-6; 13:11-14; 28:6-16-19; 30:9-13 (lack of DHCS assistance for transition,); 6:7-8; 13:13-14; 19: 12-14  (lack of specificity re: transition process,); 14: 8-15; 22:13-18 (lack of information about timing and availability of KAFI program,  ); 6:22-24;  8: 2-6 (lack of information regarding additional funding.  ADHC providers were informed, however, that they would not receive any additional funding to complete the monumental task of continuing to provide services while simultaneously discharging a large percentage of their participants and likely planning to close their doors.  *See*, Missaelides Decl., Ex. L, at PL00840. Defendants have failed to offer any timeline as to when providers should begin discharging participants, when or if KAFI might be operational, and when a State transition plan might be developed or

1   implemented.  Missaelides Decl., Ex. L, at PL 00838, 00841-842.  Some ADHC programs have already

2   closed, and most are certain to shut their doors.  Decl. of Catherine Davis ¶ 36; Decl. of Denise

3   Houghton  ¶¶ 10-11; Decl. of Peter Behr ¶ 18; Decl. of Tracy McCloud ¶ 15; Missaelides Decl. ¶¶ 77-

4   79; Myers Purkey Decl. ¶ 43; Puckett Decl. ¶ 19.

5       Moreover, while In-Home Supportive Services (IHSS) has been identified as a primary

6   alternative service to ADHC (Missaelides Decl., Ex. I, at 3:19-25; 4:1-8), Defendants have not taken

7   adequate steps to ensure timely receipt of additional hours for ADHC recipients.  According to the

8   Program Director of San Francisco's IHSS Program, while counties were told they will need to reassess

9   ADHC participants for an increase in IHSS hours, no money has been allocated for this monumental

10  task.  Elliott Decl. ¶¶ 19, 21.  In San Francisco alone, 1,184 ADHC recipients receive IHSS (and an

11  unknown number might qualify in the absence of ADHC).  *Id.* ¶¶ 19-20.  With caseloads of 350 clients

12  per social worker, assessing and reassessing ADHC participants on the accelerated and uncertain

13  schedule planned by Defendants will be extremely difficult if not impossible.  *Id.* ¶¶ 18-19, 21.

14  Moreover, because the timing of the elimination is unknown, planning will be extremely difficult, likely

15  resulting in a gap in services.  *Id.* ¶¶ 19-20.

16      In response to concerns regarding monitoring of the safety of discharged participants due to

17  isolation, or abuse and neglect, Defendants have offered the boilerplate response:  "Assistance in

18  accessing alternative community services will be offered during the transition."  Missaelides Decl., Ex.

19  L, at PL00839.  Defendants indicated no intention or capability of monitoring what happens to

20  participants after they lose ADHC.  Wilber Decl. ¶¶ 7.C, 21; Missaelides Decl., Ex. I, at 23:1-10 (no

21  system to track outcomes).

22      In the words of a longtime ADHC provider, "I believe unless the transition is implemented

23  appropriately in a way that makes sense, people will be hurt and possibly die."  Decl. of Nina Nolcox ¶

24  37.  Dr. Wilber concludes that "…careful planning and assuring that replacement services are in place

25  and working, prior to termination of ADHC services, is necessary to guard against devastating

26  consequences statewide."  Wilber Decl. ¶¶ 10, 7.B, 21-22.

27      **D.      Inadequacy of Alternative Community-Based Services**

28      Defendants have indicated their intention to transition almost 35,000 ADHC recipients to

7

*Darling, et al. v. Douglas, et al.*, C09-03798 SBA; Pltfs' Notice of Motion and Motion for Prel. Injunction

1   existing Medi-Cal services by September 1, 2011.  Their stated plans rely heavily on several Medi-Cal

2   services, discussed in more detail below.  Plaintiffs have submitted declarations from six experts, and 13

3   ADHC providers, as well as declarations from the Director of the Statewide Home Care Association and

4   the Program Director of the City and County of San Francisco's IHSS Program, each of whom testifies

5   that these services, as currently configured, are not adequate to meet the needs of ADHC recipients as

6   prescribed in their ADHC plans of care.  *See* Dick-Muehlke Decl. ¶¶ 21-23, 26-30; Elliott Decl. ¶¶ 22-

7   24; Decl. of Joseph Hafkenschiel  ¶12-18, 20-28, 31; Missaelides Decl. ¶¶ 80-92; Wilber Decl. ¶¶ 11-19,

8   22; Yee Decl. ¶¶ 15, 18-19; Behr Decl. ¶¶ 30-35; Davis Decl. ¶¶ 24-29, 31-35; Houghton Decl. ¶¶ 16-

9   20; McCloud Decl. ¶¶ 21-26, 28,40-51; Myers Purkey Decl. ¶¶ 14, 21-24, 28, 34-35, 37, 39-40; Nolcox

10   Decl. ¶¶ 16-22, 34; Puckett Decl. ¶¶ 17, 22-34, 41-43,45; Decl. of Celine Regalia ¶¶ 20-28, 36, 39, 44,

11   46, 55; Toth Decl. ¶¶ 30-41, 50-51, 58-60.  For example:

12        1.   <u>IHSS</u>:  The In-Home Supportive Services program ("IHSS") offers unskilled, in-home

13   attendant care up to a statutory cap of 283 hours per month.  CAL. WELF. & INST. CODE §§ 12309,

14   14132.95.  This program provides help with discrete, non-medical tasks, such as housecleaning and

15   bathing.  However it "does not provide any of the skilled services, such as nursing or therapies, provided

16   through ADHC."  Wilber Decl. ¶ 12.  It also "cannot replace the social support or mental stimulation

17   which is critical for this population in order to guard against isolation, depression, and cognitive

18   decline."  *Id.*; Puckett Decl. ¶ 22 (IHSS as a replacement is a "tremendous misunderstanding of both the

19   IHSS and ADHC programs").  According to Defendants, 67.46% of ADHC recipients already receive

20   IHSS.  Missaelides Decl., Ex. J, at 5.

21        Additional IHSS hours will not be available for many ADHC participants, including those who

22   receive the statutory maximum of 283 hours per month, and those who do not have an available care

23   provider.  Davis Decl. ¶ 27; Regalia Decl. ¶ 21; McCloud Decl. ¶ 51; Elliott Decl. ¶ 13.  Moreover, the

24   State recently imposed an across-the-board 3.6% reduction in IHSS services.  CAL. WELF & INST. CODE

25   § 12301.06; *see also* Missaelides Decl. ¶ 82.  And even for those who can receive additional hours,

26   IHSS reassessments may take months.  Elliot Decl. ¶¶ 19-21; Wilber Decl. ¶¶ 11-14.

27        2.   <u>MSSP</u>:  The Multi-Purpose Senior Services Program (MSSP) is a limited Medi-Cal

28   Waiver program that primarily provides case management to link clients to other community services,

such as ADHC.  MSSP does not itself provide the actual substantive services.  MSSP is not available to individuals under age 65, those who reside in board and care facilities, and those who do not currently meet the nursing home level of care.  Moreover, MSSP has only 11,789 slots statewide, is available in only certain parts of the state, has suffered budget cuts, and has waitlists at many sites.  *See,* Missaelides Decl. ¶ 91, Ex. N, at PL00907; Wilber Decl. ¶ 16; Behr Decl. ¶ 31; Davis Decl. ¶ 29; Houghton Decl. ¶ 16; Myers Purkey Decl. ¶¶ 23, 35; Nolcox Decl. ¶ 19; Puckett Decl. ¶ 26.

3.     Home Health Agency Services:  Home health services are provided through home health agencies, which employ nurses, skilled therapists, and home health aides.  They are typically provided for a relatively short period of time for rehabilitation in response to an acute episode and are limited by state prior authorization requirements or Medicare rules.  Hafkenschiel Decl. ¶¶ 18, 23, 24; Yee Decl. ¶ 18.  Because of low Medi-Cal rates, home health services are in extremely short supply.  According to Joseph Hafkenschiel, the President of the California Association for Health Services at Home, almost half of all home health agencies in the State do not accept Medi-Cal billing at all, and those who do typically provide only a very limited amount of service.  Hafkenschiel Decl. ¶ 16. While Medi-Cal home health could theoretically replace some of the skilled care provided at ADHC, Defendants would need to substantially increase provider rates as well as broaden the availability of prior authorization to enable home health agencies to meet the needs of 35,000 ADHC recipients.  *Id.* ¶ 31.

4.     Other Services:  Many critical services provided by ADHC have not been addressed by Defendants at all.  McCloud Decl. ¶¶ 46-47 [medication management], 48-49 [mental health services]; Houghton Decl. ¶ 20 [dementia-focused day care, respite]; Myers Purkey Decl. ¶ 39 [coordination of care in rural areas, mental health services]; Nolcox Decl. ¶ 21 [hot meals]; Puckett Decl. ¶¶ 29, 44 [mental health], 32 [medical transportation].  Defendants have identified a list of some services to which to which ADHC recipients may be referred, without explaining how these services will be modified to allow for a safe and adequate transition for ADHC recipients.  In reality, inadequacy and unavailability of these services will prevent ADHC recipients from receiving adequate and uninterrupted replacement services when ADHC is eliminated.  Wilber Decl. ¶¶ 18-19 [therapies, respite, social activities]; Davis Decl. ¶ 34 [senior centers]; Dick-Muehlke Decl. ¶¶ 23-27 [respite/senior centers], 30 [primary care/clinics]; Houghton Decl. ¶¶ 19-20 [residential care, transportation]; Myers Purkey Decl. ¶ 14

[transportation]; Nolcox Decl. ¶ 20 [regional centers]; Puckett Decl. ¶¶ 23, 25, 27-28, 30-33 [senior centers, physicians and clinics, transportation].

But even if available, the expectation that this fragile population would be able to negotiate such a complicated array of separate services is simply not realistic.  The coordination of unbundled services "would be complex, it would be difficult for participants to identify and access the variety of needed services…"  Wilber Decl. ¶ 9.  These services "are now provided efficiently at ADHC centers…" Steinke Decl. ¶ 24.  In particular, individuals with psychiatric and cognitive disabilities often lack the capacity to manage community services on their own, in the absence of a program that provides integrated services and supports such as ADHC.  Gardner Decl. ¶ 16.

**E.     Need for ADHC-like Programs to Prevent Institutionalization**

ADHC services cannot be replaced solely by the current configuration of community based services, which do not provide many of the important benefits offered by ADHC.  For example, unlike ADHC, other current Medi-Cal programs do not offer ongoing rehabilitation for chronically ill patients. Stanford Medical School Professor Dr. Gary Steinke, the Associate Chief of Geriatrics in the Primary Care Division of the Department of Medicine for Santa Clara County, explains that without rehabilitative services uniquely provided at ADHC, which are "essential for the participants to maintain coordination and strength," some individuals will "experience a wholesale loss of functioning . . . result[ing] in increasedpreventable emergency room visits . . . and institutionalization."  Steinke Decl. ¶¶ 21-25.  In addition, ADHC recipients who reside in non-medical board and care facilities receive "complementary set of supports" to the medical services at ADHC, and "are often able to remain there and avoid placement in more restrictive and more costly nursing facilities because of their attendance at ADHC."  *Id.* ¶ 20.

Participants with cognitive and psychiatric disabilities are at particular risk of institutionalization without ADHC.  Gardner Decl. ¶¶ 28-29. Such individuals have a substantial need for therapeutic social interaction, stability and consistency of care, and medication management, which is crucial with psychiatric drugs, to maintain their emotional and psychological well-being.  *Id.* ¶¶ 28-29; McCloud Decl. ¶ 47.  In the opinion of Dr. William Gardner, Emeritus Professor in the Rehabilitation Psychology Program at University of Wisconsin at Madison, for many participants with cognitive and psychiatric

10

*Darling, et al. v. Douglas, et al.*, C09-03798 SBA; Pltfs' Notice of Motion and Motion for Prel. Injunction

1    disabilities, "[d]ue to their high risk of hospitalization or institutionalization, these individuals need the

2    integrated services provided by ADHC, including medication management and social supports which

3    guard against social isolation, debilitating anxiety, depression, and other psychiatric symptoms such as

4    delusional thought processes."  Gardner Decl. ¶ 26.

5         The regular, ongoing monitoring of the medical conditions of ADHC participants is also vital to

6    the program's success in maintaining health and enabling participants to remain in the community,

7    without which people with chronic conditions can "suffer an irreversible downward spiral[.]"  Steinke

8    Decl. ¶¶ 21-22.  The Program Administrator of an ADHC program that closed due to AB 97 expressed

9    her concern that, "the current medical system many of our participants access does not provide the

10   monitoring and intervention that will prevent them from suffering from a spiraling deterioration in their

11   physical and mental health."  Houghton Decl. ¶ 21.

12        The unique combination of services provided in the ADHC setting is critical as well.  As one

13   provider states:

14          There is no other program that does what we do.  ADHC provides ongoing oversight and
             treatment for our participants in one location, instead of requiring people to go to multiple sites
15          to receive care and treatment.  Most significantly, we reduce isolation by providing these
             services in a setting that fosters therapeutic interaction, cognitive stimulation and opportunities
16          for socialization. This combination of services, which is not available in any other setting, makes
             a critical difference to the lives and health of our participants.
17

18   Puckett Decl. ¶ 48.  Another provider emphasizes that "ADHC is now serving the frailest, neediest

19   individuals who are still living in the community.  It is the last resort before the nursing home…"  Myers

20   Purkey Decl. ¶ 44.  Sadly, nursing facilities are the only alternative that provides the continuity of

21   skilled care that ADHC offers.  Steinke Decl. ¶ 17; Houghton Decl. ¶¶ 13-15; Nolcox Decl. ¶ 22; Myers

22   Purkey Decl. ¶¶ 37, 44; Yee Decl. ¶ 17; Missaelides Decl. ¶¶ 112, 113.

23        AB 97 itself acknowledges the need for an ADHC-like program to prevent unnecessary

24   institutionalization, expressing the intent to develop the KAFI program for individuals who "are at high

25   risk of institutionalization in the absence of such community-based services."  Assem. Bill 97 sec. 105.

26   But, as discussed above, Defendants have made clear that the KAFI program will not be implemented

27   until after Medi-Cal funding for AB 97 has been eliminated, if at all.  This leaves a crucial gap in

28   services that even the State has recognized are necessary.

11

*Darling, et al. v. Douglas, et al.*, C09-03798 SBA; Pltfs' Notice of Motion and Motion for Prel. Injunction

1    Unless current Medi-Cal and other long-term care programs are modified in substance and to

2    ensure adequate access, for many ADHC recipients the only current replacement is institutionalization in

3    a nursing facility or other facility.  Steinke Decl. ¶¶ 21-25; Gardner Decl. ¶¶ 28, 30-31; Behr Decl.

4    ¶¶ 34-36; Decl. of Dennis Arnett ¶¶ 15-16; Decl. of Esther Darling ¶¶  8-12, 16; Davis Decl. ¶ 30; Dick-

5    Muehlke Decl. ¶¶ 33-34; Decl. of Rozene Dilworth ¶¶ 23-24, 26; Decl. of Gilda Garcia ¶¶ 14-18; Decl.

6    of Linda Gaspard-Berry ¶¶ 17-19; Houghton Decl. ¶¶ 21-24; Decl. of Ben Jaworski ¶¶ 13-14; Decl. of

7    Jessie Jones ¶¶ 8, 10; McCloud Decl. ¶¶ 39, 43-52; Myers Purkey Decl. ¶ 44; Nolcox Decl. ¶¶ 22, 35;

8    Decl. of Sofiya Nasyrova ¶¶ 10-11; Decl. of Helene Philips ¶ 14; Puckett Decl. ¶¶ 22-34, 45-46; Regalia

9    Decl. ¶¶ 20-31, 33, 41, 45, 55-56; Decl. of Ron Smith ¶ 9; Decl. of Thomas Swenson ¶ 8; Toth Decl.

10   ¶¶ 30-41, 66-67, 46, 49, 61, 68; Yee Decl. ¶¶ 14-15, 17, 20.

11   The Lewin Group, a nationally recognized health care policy research and consulting firm,

12   conducted a comprehensive analysis of the impact of the elimination of ADHC in California, estimates

13   that in the first year alone, 14,000 ADHC recipients would be eligible to be admitted into nursing

14   homes.  Auerbach Decl., Ex. B, The Lewin Group, "*Projected Economic Impact of Eliminating*

15   *California's Medi-Cal Adult Day Health Care Program*" (2010) at 4.

16   In the recent experience of one ADHC program that closed due to AB 97, two individuals were

17   immediately placed in nursing facilities; "another 10 will likely be in crisis within the next six months"

18   and 13 more are anticipated to "begin a steady decline . . . [which] will jeopardize their ability to live in

19   the community."  Houghton Decl. ¶ 24.  Another person who needed immediate placement in a nursing

20   facility found that no bed was available.  *Id.* ¶ 15.  Thus, even the institutional alternative may be

21   unavailable for individuals who remain at risk of harm without it.  *Id.* ¶¶ 15, 19; Puckett Decl. ¶ 34.

22   **F.    Elimination of ADHC Will Cost the State More Money**

23   Although the State's purported reason for eliminating ADHC is to save state funds, the opposite

24   will be true.  The State has not prepared any fiscal analysis to support this, and the only analysis of the

25   economic impact of this decision, conducted by the Lewin Group, concludes that elimination of ADHC

26   will cost the State $51 million more than it saves in the first year alone.  Auerbach Decl., Ex. B, at 1.

27   The additional cost of nursing facility placements would be $93.4 million in the first year, ballooning to

28   over $150 million by 2020-21.  Auerbach Decl., Ex. B, at 5.

Despite its oft-stated expectation that ADHC recipients will receive alternative Medi-Cal services, the cost of those services provided individually would, if actually provided commensurate with the services prescribed in recipients' IPCs, greatly exceed the $76.27 per day that the State pays for ADHC.  For instance, an ADHC recipient who needed both skilled nursing service and physical therapy at home during one day would cost $143.70 (assuming that such services were available at all).  *See*, Hafkenschiel Decl., Ex. B, (Medi-Cal home health reimbursement rate chart); Auerbach Decl. ¶ 10(d), Ex. B, at 1-2.  Moreover, if ADHC programs close, even their private-pay participants will be left without services and may be forced into nursing facilities at public expense.  Myers Purkey Decl. ¶ 43; Steinke Decl. ¶ 31; Yee Decl. ¶¶ 19-20.

      **G.**    **Plaintiffs and Class Members**

        1.   <u>Allie Jo Woodard:</u>

This Court previously found that Plaintiff Allie Jo Woodard would be irreparably harmed by a 2-day per week reduction in ADHC services.  *Brantley*, 656 F. Supp. 2d 1171-1172, 1176.  Ms. Woodard is an 81-year-old woman who is diagnosed with bipolar affective disorder, depression, glaucoma, seizure disorder, hypertension, osteoarthritis, and is pre-diabetic.  Davis Decl. ¶ 19.  Although Ms. Woodard lives alone, after a two-day disappearance a few years ago, her family ensures that she is never alone.  Gaspard-Berry Decl. ¶ 6.  Her daughter and son take turns spending the nights with her, as they juggle full time jobs and their own families.  *Id.* ¶ 7.  Ms. Woodard currently receives the maximum amount of IHSS and is not eligible for an increase in hours.  Davis Decl. ¶ 31.  Without ADHC, she would require daily nurse visits, psychotherapy, physical therapy, and dietician services.  *Id.*  She would need "supervision 24 hours a day, seven days a week to keep her safe because of her risk of falls and her wandering behaviors."  Steinke Decl. ¶ 26.  A day program or senior center would not be able to address Ms. Woodward's medical and psychosocial needs; however, if she were to attend she would require an attendant and transportation.  Davis Decl. ¶¶ 31, 34.  Without ADHC or adequate and appropriate services to replace those prescribed in her IPC, provided without interruption in care, Ms. Woodward would need to be placed in a nursing facility immediately.  Steinke Decl. ¶ 26; Davis Decl. ¶ 30; Gaspard-Berry Decl. ¶¶ 17-18.

13

*Darling, et al. v. Douglas, et al.,* C09-03798 SBA; Pltfs' Notice of Motion and Motion for Prel. Injunction

2.  <u>Gilda Garcia</u>

This Court previously found that Plaintiff Gilda Garcia would be irreparably harmed by a 2-day per week reduction in ADHC services.  *Brantley*, 656 F. Supp. 2d 1172, 1176.  Ms. Garcia is a 76-year-old woman with unstable diabetes, hypertension, Bells' Palsy, depression, peripheral neuropathy, and arthritis.  McCloud Decl. ¶ 29.  Ms. Garcia lives alone; her ability to do so depends on receipt of services "as prescribed by her IPC."  *Brantley*, 656 F. Supp. 2d 1172; *see also*, Steinke Decl. ¶ 27.

Ms. Garcia has unstable diabetes such that the frequent medical monitoring by ADHC nursing cannot be replicated by periodic doctor visits.  McCloud Decl. ¶ 40; Steinke Decl. ¶ 27.  Ms. Garcia receives 102.8 hours of IHSS per month and MSSP case management.  McCloud Decl. ¶¶ 27-28.  However MSSP and IHSS do not provide the medical monitoring that Ms. Garcia's condition requires.  Steinke Decl. ¶ 27.  Without ADHC, Ms. Garcia would require in-home nurse visits at least once per day five days a week, an increase in IHSS hours, access to daily social and therapeutic interaction and registered dietician services.  McCloud Decl. ¶ 41.  Without ADHC or adequate and appropriate services to replace those prescribed in her IPC, provided without interruption in care, Ms. Garcia would likely see a rapid decrease in her mental and physical states, which would likely result in acute hospitalization and institutionalization.  Steinke Decl. ¶ 27; McCloud Decl. ¶ 39; Garcia Decl. ¶ 18; Decl. of Vitta Perelman ¶¶ 14-15.

3.  <u>Ronald Bell</u>

This Court previously found that Plaintiff Ronald Bell would be irreparably harmed by loss of ADHC services.  *Cota*, 688 F. Supp. 2d 994, 997.  Mr. Bell is a 46-year-old-man with diabetes, organic brain syndrome, a seizure disorder, arthritis, hypertension, and hyperlipidemia.  Nolcox Decl. ¶¶ 24, 34.  Mr. Bell lives with his 80-year-old grandmother, who relies on the ADHC services Mr. Bell receives to keep him safely at home with her.  Dilworth Decl. ¶¶ 16-24.

Mr. Bell's brittle diabetes requires careful management and constant medical monitoring that IHSS cannot provide. Nolcox Decl. ¶¶ 28, 34.  Prior to attending ADHC, home health services alone were not enough to keep Mr. Bell from being taken to the emergency room approximately twice a month.  *Id.* ¶ 29.  Without ADHC or adequate and appropriate services to replace those prescribed in his IPC, provided without interruption in care, Mr. Bell likely would suffer a catastrophic medical incident

and he would likely end up in nursing home care.  *Id.* ¶¶ 33-34; Gardner Decl. ¶ 17.

### 4.   Esther Darling

Plaintiff Esther Darling is a 74-year-old woman who is diagnosed with diabetes, post-stroke with paralysis affecting her left side, atrial fibrillation, incontinence of urine, edema, depression, hearing loss, hemorrhoids, and gout.  Myers Purkey Decl. ¶ 30; Darling Decl. ¶ 4.  Ms. Darling receives Medi-Cal and attends ADHC five days per week.  Myers Purkey Decl. ¶ 29; Darling Decl. ¶ 3.  Ms. Darling receives 114 hours of IHSS per month and she is on the waitlist for MSSP services.  Myers Purkey Decl. ¶¶ 34, 35.  She lives alone and has no one who can take care of her; she relies on ADHC to remain in her own home.  Darling Decl. ¶¶ 8, 13-15; Steinke Decl. ¶ 28.

ADHC helps manage Ms. Darling's complex medication regime consisting of 19 different medications.  Myers Purkey Decl. ¶ 32.  Since she began attending ADHC, her mobility, balance, and left side functionality have improved and been maintained.  Darling Decl. ¶¶ 10-11.  Ms. Darling depends on the therapeutic activities and opportunities for socialization fostered at ADHC to address her depression and prevent isolation and loneliness.  Myers Purkey Decl. ¶ 38; Darling Decl. ¶¶ 12, 14, 15.  According to her doctor, "[o]ne of the most crucial aspects of ADHC" is the medical monitoring by a nurse at ADHC, which cannot be replicated by IHSS.  Yee Decl. ¶ 15; *see also*, Steinke Decl. ¶ 28.

Without ADHC, Ms. Darling would require a significant increase in her IHSS hours, professional nursing for medical monitoring and medication management, and physical therapy.  Myers Purkey Decl. ¶ 37.  Without ADHC or adequate and appropriate services to replace those prescribed in her IPC, provided without interruption in care, Ms. Darling would not be able to remain safely in her own home and she would be at risk for increased hospitalizations and institutionalization.  Steinke Decl. ¶ 28; Myers Purkey Decl. ¶ 38; Yee Decl. ¶¶ 14-15.

### 5.   Wendy Helfrich

Plaintiff Wendy Helfrich is a 40-year-old woman who is diagnosed with anoxic brain damage due to cardiac arrest.  Regalia Decl. ¶ 47.  Ms. Helfrich receives Medi-Cal and is currently attending ADHC three days per week.  *Id*. ¶¶ 47-48.  Arnett Decl. ¶ 4.

Ms. Helfrich lives at home with her parents in Napa, California.  Arnett Decl. ¶ 3.  She also has partial custody of her three minor children, who stay at her home several days a week.  Arnett Decl.

¶ 17.  Ms. Helfrich receives the maximum number of IHSS hours; she used to receive 283 hours per month but due to state budget cuts, she now receives 274 hours per month.  Arnett Decl. ¶ 5.  Due to the severity of her cognitive and physical disabilities, Ms. Helfrich requires round-the-clock supervision to remain in her home.  Arnett Decl. ¶ 6; Regalia Decl. ¶ 50.  Ms. Helfrich depends on the physical, occupational and speech therapies and therapeutic social interactions she receives at ADHC to prevent further physical and cognitive decline; when she did not receive ADHC for four months, her physical condition greatly deteriorated.  Arnett Decl. ¶ 11; Regalia Decl. ¶ 53.  ADHC also provides much-needed respite and support for Ms. Helfrich's parents.  Arnett Decl. ¶¶ 9, 16, 18.

Even if she qualified for more IHSS, unskilled, in-home attendant care could not provide the therapies and social services she receives at ADHC.  *Id.* ¶ 15.  Ms. Helfrich does not qualify for MSSP due to her age, or any other case management program which could help her coordinate the many services she requires.  Regalia Decl. ¶ 55.  "There is no program other than ADHC that can provide Ms. Helfrich with the medical care and support she requires for her severe cognitive deficiencies."  *Id.* ¶ 55.  Without ADHC or adequate and appropriate services to replace those prescribed in her IPC, provided without interruption in care, Ms. Helfrich would be irreparably harmed; without the skilled therapeutic services she receives at ADHC, her physical and cognitive condition would decline, placing her at risk for institutional placement.  Gardner Decl. ¶¶ 18-19; Arnett Decl. ¶ 18; Regalia Decl. ¶ 53.

6.  Jessie Jones

Plaintiff Jessie Jones is a 67-year-old woman who has been disabled since 1990, when she had a severe stroke.  Jones Decl. ¶ 3; Behr Decl. ¶ 24.  She has a seizure disorder, hypertension, and congestive heart failure.  Ms. Jones receives Medi-Cal and currently attends ADHC five days per week.  Behr Decl. ¶ 24.  Ms. Jones lives with her daughter and her daughter's family and receives 99 hours of IHSS per month.  *Id.* ¶ 27.

Ms. Jones has right-side hemiparesis and significant aphasia.  Jones Decl. ¶¶ 4-5; Philips Decl. ¶¶ 7, 9, 13.  Ms. Jones attributes her ability to transfer with assistance and to speak to the therapies she receives at ADHC.  Jones Decl. ¶ 5; *see also*, Steinke Decl. ¶ 29.  The daily medical monitoring she receives at ADHC for skin breakdowns, proper fitting of her leg brace, and seizure disorder cannot be replicated by family members or unskilled staff.  Steinke Decl. ¶ 29; Philips Decl. ¶¶ 10-11.  Neither

1   IHSS nor MSSP would provide these services, nor would they offer ADHC's cognitive stimulation and

2   socialization, without which she would be isolated at home alone all day.  Philips Decl. ¶ 13; Behr

3   Decl.¶¶ 34-35.  Without ADHC or adequate and appropriate services to replace those prescribed in her

4   IPC, provided without interruption in care, Ms. Jones would have to be placed into a nursing facility.

5   Steinke Decl. ¶ 29; Behr Decl. ¶¶ 27, 36; Jones Decl. ¶ 10; Philips Decl. ¶ 14.

6                   7.   Raif Nasyrov

7           Plaintiff Raif Nasyrov is an 88-year-old monolingual Russian speaking man who is diagnosed

8   with hypertension, arthritis, pulmonary vascular disease, cataracts, depression, dementia, hearing loss,

9   urinary and fecal incontinence, Alzheimer's disease, ulcer, and anxiety.  Mr. Nasyrov receives Medi-Cal

10  and attends ADHC five days per week.  Toth Decl. ¶ 40.  He lives with his daughter who relies on

11  ADHC to keep him at home.  Nasyrova Decl. ¶¶ 3, 5.  His daughter states that she cannot leave Mr.

12  Nasyrov alone because he may wander away.  *Id.* ¶ 8.  His wife passed away in 2010 and her passing has

13  contributed to his feelings of depression and isolation.  Toth Decl. ¶ 47; Nasyrova Decl. ¶¶ 4, 9.

14          The therapeutic activities and socialization Mr. Nasyrov receives through ADHC are critical for

15  him because of his Alzheimer's disease and depression diagnoses.  Toth Decl. ¶ 48.  At his ADHC

16  Center, he participates in the Adult Day Health Russian Program, and he is able to interact with program

17  staff and other Russian language-speaking participants.  Toth Decl. ¶¶ 45, 48; Nasyrova Decl. ¶ 7.

18          Mr. Nasyrov already receives MSSP case management and County Mental Health services.  Toth

19  Decl. ¶¶ 50-51.  MSSP does not provide skilled therapies nor does it provide the socialization in a group

20  setting that is so critical to Mr. Nasyrov's psychiatric and cognitive well-being.  *Id.* at ¶ 50.  The mental

21  health services he receives through the county are limited, and are supplemented by those he receives at

22  ADHC each day.  *Id.* ¶ 51.  Mr. Nasyrov receives 99.2 hours of IHSS a month.  Nasyrova Decl. ¶ 8.

23          Without ADHC, Mr. Nasyrov would need additional IHSS; daily physical and occupational

24  therapy, nursing services, therapeutic and social services, mental health services; and registered dietician

25  services on a regular basis.  Toth Decl. ¶ 51.  Without ADHC or adequate and appropriate services to

26  replace those prescribed in his IPC, provided without interruption in care, Mr. Nasyrov would be

27  irreparably harmed and would have to be placed in a nursing facility.  *Id.* ¶ 49.  Gardner Decl. ¶ 23.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8.  <u>Class Members</u>

Approximately 35,000 putative Class Members who will lose services face serious harm resulting from the loss of ADHC services, including emergency room visits, hospitalizations, institutionalizations, and even death.  According to one ADHC provider, who is also an expert in this case:  "Overall, the elimination of the ADHC Medi-Cal benefit would be catastrophic for our ADHC participants and their families.  Our participants rely on ADHC to allow them to stay safely at home.  Without ADHC, many would be at serious health risk and likely to be forced to move into a nursing home or similar institution."  Dick-Muehlke Decl. ¶ 33, *see also,* ¶¶ 27, 30; Steinke Decl. ¶¶ 21-25; Toth Decl. ¶ 68; McCloud Decl. ¶¶ 43, 52; Puckett Decl. ¶¶ 46-48; Myers Purkey Decl. ¶¶ 38-44; Regalia Decl. ¶¶ 29-31, 56-58; Nolcox Decl. ¶¶ 22, 35-37; Davis Decl. ¶¶ 36-40; Behr Decl. ¶¶ 34, 36; Houghton Decl. ¶ 21-24.

For example, Margaret Fedele is a 79-year-old-woman with Lewy Body Dementia who attends ADHC five days a week.  Toth Decl. ¶ 53.  She relies on ADHC for daily physical and occupational therapy, nursing services, therapeutic and social services, and registered dietician services on a regular basis.  Toth Decl. ¶ 56.  If Ms. Fedele loses ADHC, neither IHSS nor MSSP can replace the therapies and skilled nursing, nor can they provide her services in a congregate setting like ADHC.  Toth Decl. ¶¶ 58-60; Decl. of Margaret Fedele ¶¶ 10, 12.  Ms. Fedele states," When I was in the nursing home after my accident, I was miserable there and I wanted to come home every day.  It is really important for me to be able to stay at home with my family."  Fedele Decl. ¶ 12.

Thomas Swenson is a 52-year-old man disabled by a stroke in 2007, who attends ADHC five days a week.  Puckett Decl. ¶¶ 35, 37.  Mr. Swenson relies on ADHC for skilled medical monitoring for changes in his neurological condition and hypertension, as well as for signs of stroke, and for physical therapy.  *Id.* ¶ 39.  He is too young to receive MSSP, and an increase in IHSS would not provide him with the skilled nursing and therapies he receives through ADHC, nor the opportunities for socialization and cognitive stimulation that the group setting offers.  Puckett Decl. ¶¶ 41-43.  Mr. Swenson and his family already struggle to maintain him in the community; he says that loss of ADHC "would be a punishing personal tragedy both to me to and to my family."  Swenson Decl. ¶ 8.  Without the skilled services of ADHC, he would need to be placed in a nursing facility.  Puckett Decl. ¶ 45.

1    Putative Class Members Ron Smith, and Phillip Jaworski also face harm from the loss of ADHC.

2   Without ADHC, they are at high risk for mental health decompensation, hospitalization, and institutional

3   placement.  Gardner Decl. ¶¶ 14-16, 20-21; Regalia Decl. ¶¶ 37, 45; Jaworski Decl. ¶¶ 11, 13; Smith

4   Decl.  ¶¶ 4-10.  Ron Smith is a 53-year-old man with schizophrenia and cerebral palsy who relies on

5   ADHC for mental health and medication management services, as well as physical therapy.  Regalia

6   Decl. ¶¶ 32, 34-35; Smith Decl. ¶¶ 4-10.  Mr. Smith has also received treatment from ADHC for suicidal

7   thoughts, and although this treatment has helped him avoid institutionalization, he is at high risk without

8   these services.  Regalia Decl. ¶ 36.

9    Phillip Jaworski is a 41-year-old man with a brain injury due to a brain tumor, and bipolar

10   disorder.  Regalia Decl. ¶ 40.  He relies on ADHC for medical monitoring for side effects from

11   antipsychotic drugs and for seizures, physical and occupational therapies to improve his mobility and

12   feeding, and speech therapy.  Jaworski Decl. ¶ 9; Regalia Decl. ¶ 42.  Mr. Jaworski lives with his

13   parents, both of whom have cancer.  Jaworski Decl.¶¶ 3, 13.  Without the medical and physical therapy

14   provided by ADHC, Mr. Jaworski's parents will be unable to care for him and will have to place him in

15   an institution.  Jaworski Decl.¶ 13.  Both Mr. Smith and Mr. Jaworski are too young to receive MSSP;

16   an increase in their IHSS hours would not provide the skilled monitoring and therapies they receive.

17   Regalia Decl. ¶¶ 39, 44.  Furthermore, there are currently no services aside from ADHC that can provide

18   the mental health services that both Mr. Jaworski and Mr. Smith require.  Regalia Decl. ¶¶ 36, 39, 46;

19   Gardner Decl. ¶¶ 15-16, 21, 28.

20    Most ADHC programs will have to close their doors and will be forced to discharge all of their

21   participants without any ability to ensure these individuals' needs will be met.  Missaelides Decl.

22   ¶¶ 107-113; Houghton Decl. ¶¶ 10-11, 21-24; Behr Decl. ¶¶ 18, 21,33,36; Toth Decl. ¶¶ 65-66; Puckett

23   Decl. ¶¶ 17, 19; McCloud Decl. ¶¶ 15-16, 43-52; Myers Purkey Decl. ¶¶ 40-44; Regalia Decl. ¶¶ 57-58;

24   Nolcox Decl. ¶¶ 13, 15; Davis Decl. ¶¶ 36, 40.

25    **H.    Failure to Provide Individual Notice**

26    Defendants have indicated that they intend to inform ADHC recipients of the elimination of

27   ADHC 45-60 days prior to the effective elimination date, but have not said that they will issue Medi-Cal

28   notices.  Missaelides Decl., Ex. O, at PL00908.  Defendants have not responded to direct questions as to

1   whether they will afford recipients the opportunity for a fair hearing to challenge the reduction or

2   termination of the Medi-Cal services they receive at the ADHC center (i.e., therapies, skilled nursing,

3   mental health services) or the adequacy of their discharge plans.  Missaelides Decl., Ex. I, at 25: 7-25.

4   Defendants have previously stated in this case that they are not obligated to offer pre-termination

5   hearings to individuals whose ADHC services are terminated.  *See, Cota*, 668 F. Supp. 2d 997.

## III.  PLAINTIFFS MEET THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION

7       "A plaintiff seeking a preliminary injunction must establish that he is [1] likely to succeed on the

8   merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the

9   balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Am. Trucking*

10   *Ass'ns v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir. 2009); *Winter v. Natural Res. Def. Council*,

11   *Inc.,* 555 U.S. 7, ___ (slip op. at 10), 129 S. Ct. 365, 374 (2008); *Brantley*, 656 F. Supp. 2d 1169; *Cota*,

12   668 F. Supp. 2d 991.  All four criteria strongly favor an injunction here.

13       The Ninth Circuit has also traditionally advanced, and recently reaffirmed, the validity of the

14   "sliding-scale" approach to preliminary injunctions, under which a stronger showing of one element can

15   offset a weaker showing on another.  This approach provides that "'serious questions going to the

16   merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a

17   preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury

18   and that the injunction is in the public interest."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

19   1127, 1135 (9th Cir. 2011).  Plaintiffs also meet this alternative formulation.

20       **A.    Plaintiffs will Suffer Irreparable Harm in the Absence of an Injunction**

21       Plaintiffs and putative Class Members will be irreparably harmed by the implementation of AB

22   97.  In its prior Orders involving cuts to ADHC, this Court has held that "the reduction or elimination of

23   public medical benefits is sufficient to establish irreparable harm to those likely to be affected by the

24   program cuts."  *Cota,* 668 F. Supp. 2d 997; *Brantley,* 656 F. Supp. 2d 1176; *see also, Beno v. Shalala*,

25   30 F. 3d 1057, 1063-64, n. 10 (9th Cir. 1994).  That is particularly true for the fragile ADHC population.

26       This Court has previously determined that "[e]ach of the Plaintiffs [threatened with reduction of

27   ADHC services] suffers from debilitating physical and/or mental conditions for which the availability of

28   ADHC services is critical to ensuring that their tenuous physical and mental conditions remain stable,

1    enabling them to remain in the community." *Brantley*, 656 F. Supp. 2d 1176.  The Court concluded that,

2    "[g]iven the tenuousness and complexities of their conditions, an interruption in their care, even if

3    temporary, will have serious consequences for Plaintiffs." *Id.*  Three of the Plaintiffs, Allie Jo Woodard,

4    Gilda Garcia, and Ronald Bell, continue as class representatives in this action.  The remaining Plaintiffs

5    and putative Class Members have similarly debilitating conditions and are threatened with complete

6    termination of ADHC.  As described in detail in Section II.G. *supra*, the harm they will suffer is

7    irreparable and imminent.  In the words of expert Dr. Kathleen Wilber, "careful planning and assuring

8    that replacement services are in place and working, prior to termination of ADHC services, is necessary

9    to guard against devastating consequences statewide."  Wilber Decl. ¶ 10.

10       The Court has also noted that Defendants' own conditions of eligibility, and Medi-Cal

11   authorization for ADHC on each day of service in order to avoid hospitalization and institutionalization,

12   establish a risk of irreparable harm to individuals threatened with reduction or termination of ADHC

13   services.  *See,* Brantley, 656 F. Supp. 2d 1176-1177; Cota, 668 F. Supp.2d 994; CAL. WELF. & INST.

14   CODE §§ 14526.1(d)(4), (5)  Each ADHC recipient has an IPC, approved by Defendants, which

15   authorizes them to receive ADHC on each day of attendance, to avoid hospitalization or

16   institutionalization.  Behr Decl. ¶¶ 26, 28-29; Davis Decl. ¶¶ 19, 21-23; McCloud Decl. ¶¶ 31-33; Myers

17   Purkey Decl. ¶¶ 32-33, 38; Nolcox Decl. ¶¶ 23-24, 27, 33; Puckett Decl. ¶¶ 37, 39-40, 45; Regalia Decl.

18   ¶¶ 33-34, 38, 41-42, 45, 48-49; Toth Decl. ¶¶ 45-46; 56-57, 61.

19       **B.    Plaintiffs are Likely to Succeed on the Merits of their Claims that Defendants are
20              Violating the ADA and Section 504.**

21       This Court has held that the loss of ADHC, without adequate and uninterrupted replacement

22   services, constitutes a violation of the "integration mandate" of the ADA and Section 504.[1]  Defendants

23   have further violated the ADA and Section 504 by utilizing discriminatory methods of administration.

24       1.    Defendants' Implementation of AB 97 Violates the ADA and Section 504
25             Prohibitions Against Unjustified and Unnecessary Institutionalization.

26       This Court has found that "[a] State's failure to provide services to a qualified person in a

27

28   _____
     [1] The ADA and Rehabilitation Act may be analyzed together.  *Cota*, 668 F. Supp. 2d at 993, fn. 7 (citation omitted).

community-based setting as opposed to a nursing home presents a violation of Title II of the ADA."
*Brantley,* 656 F. Supp. 2d at 1170 (citation omitted); *see also Cota*, 668 F. Supp. 2d at 994 (citation omitted).  States must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d); *see also,* 28 C.F.R. § 41.51(d).  The integration mandate requires that persons with disabilities be served in the community when: (1) the state's treatment professionals have determined that community placement is appropriate; (2) community placement is not opposed by the individual; and (3) "the placement can be reasonably accommodated, taking into account the resources available" and the needs of others with disabilities.  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999).  Plaintiffs do not need to wait until they are institutionalized to bring a claim under the "integration mandate."  *See Fisher v. Okl. Health Care Auth.,* 335 F.3d 1175, 1181-82 (10th Cir. 2003).  Individuals at risk of placement in nursing homes are also protected.  *Id.*

That Plaintiffs satisfy the first two prongs of *Olmstead* is hardly in dispute.  Defendants have determined that community-based care, including ADHC on each approved day of attendance, is appropriate for each Plaintiff and Class Member to remain safe in the community.  *Brantley,* 656 F. Supp. 2d at 1171; *Cota*, 668 F. Supp. 2d at 994.  Such need is documented on each individual's IPC, which this Court has found to be "compelling evidence" of their need for ADHC.  *Brantley,* 656 F. Supp. 2d 1173; *see supra*, Sections II.G and III.A.  And far from opposing community placement, Plaintiffs are fighting to remain in their homes.  Arnett Decl. ¶ 18; Darling Decl. ¶¶ 14-16; Dilworth Decl. ¶¶ 21, 24, 26; Fedele Decl. ¶ 12; Garcia Decl. ¶¶ 15-18; Gaspard-Berry Decl. ¶¶ 15, 19; Jaworski Decl. ¶ 14; Jones Decl. ¶ 10; Nasyrova Decl. ¶ 11; Smith Decl. ¶¶ 8-10; Swenson Decl. ¶¶ 7-8; Yee Decl. ¶ 14.  The third prong requires Defendants to make "reasonable modifications in policies, practices, or procedures [so as] to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity."  28 C.F.R. § 35.130(b)(7); *Olmstead*, 527 U.S at 581 (citation omitted) .  ADHC services enable Plaintiffs to be supported in the community by providing cost-effective community-based care. Indeed, one of the express purposes of California's ADHC program is to "[p]rovide a viable alternative to institutionalization for those elderly persons and adults with disabilities who are capable of

22

living at home with the aid of appropriate health care or rehabilitative and social services." CAL. HEALTH & SAFETY CODE § 1570.2(b).  This Court previously found that Defendants "bear the ultimate responsibility for ensuring compliance with federal disability laws" and that one means of their doing so is by offering ADHC to qualified individuals. *Brantley,* 656 F. Supp. 2d at 1174-75; *Cota,* 668 F. Supp. 2d at 993-95 (citation omitted).

As Defendants move forward with the elimination of Medi-Cal funding for ADHC, which poses the risk of severe harm to Plaintiffs and Class Members, they "bear the burden of ensuring more than a 'theoretical' availability" of alternative services to meet the care needs prescribed in their IPCs. *Brantley,* 656 F. Supp. 2d at 1174.  Defendants must ensure that adequate and appropriate replacement services are in place, prior to termination of ADHC, and must make modifications as necessary to ensure access.  Dr. Wilber identifies the "minimum components . . . to secure a safe and orderly transition, *all of which are absent in the current DHCS plan.*" Wilber Decl. ¶ 21 (emphasis added).  These components include:  (1) a comprehensive assessment of each individual's needs and resources; (2) identification of specific replacement services; (3) facilitated transition to replacement services; (4) confirmation that services are in place prior to termination of ADHC; (5) "monitor[ing] to ensure that the new services are effective and working"; and (6) adjustment to address unmet needs.  *Id.*

Thus, Defendants must continue to provide ADHC unless and until Defendants demonstrate that recipients will receive adequate, appropriate, and uninterrupted replacement services necessary to prevent institutionalization.  Plaintiffs' request can be reasonably accommodated; it simply requires, in the interim, "the preservation of a program as it has existed for years." *Fisher,* 335 F.3d. 1183. Defendants' rush to cut ADHC services, without adequate planning or any assurances that affected individuals will receive the replacement services they need to avoid institutionalization, violates both the ADA and Section 504.

2.     Defendants Use Methods of Administration that Result in Discrimination.

The ADA and Section 504 prohibit methods of administration or contractual arrangements which have a discriminatory effect on people with disabilities.  28 C.F.R. §§ 35.130(b),  41.51(b); 45 C.F.R. § 84.4(b) (2005).  This provision is violated by Defendants' "failure to adequately plan" for a timely transition and failure to "shift funding" to enable individuals to receive community-based, rather than

institutional care. *Kathleen S. v. Dep't of Pub. Welfare of Pa.*, 10 F. Supp. 2d 460, 471, 473 (E.D. Pa. 1998). Defendants' actions violate this provision by, *inter alia*, their failure to develop and implement a timely and seamless transition plan for the provision of adequate and appropriate services to replace those prescribed in Plaintiffs' and Class Members' IPCs, to prevent their unnecessary institutionalization and hospitalization. *See, supra*, Sections II. C-G. Plaintiffs have also shown a likelihood of success on this claim.

### C.   Plaintiffs are Likely to Succeed on the Merits of their Claims that Defendants are Violating the Due Process Clause of the 14th Amendment and Medicaid Law by Failing to Provide Adequate Pre-termination Notice and Opportunity for a Hearing.

Medicaid program recipients have rights to adequate written notice and a predetermination fair hearing if the benefits they are receiving are reduced, suspended or terminated, as well as a statutory entitlement to benefits that is protected by the Due Process Clause of the 14th Amendment. 42 C.F.R. §§ 431.200 *et seq.*; CAL. CODE REGS. tit. 22, § 51014.1(a); *see, e.g., O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 787 (1980). This Court has held that as the single state Medicaid agency, "Defendants cannot disclaim responsibility for compliance with federal law based on its decision to rely on private entities to administer ADHC services." *Cota,* 668 F. Supp. 2d at 997(citing *Catanzano by Catanzano v. Dowling*, 60 F.3d 113, 118 (2d Cir. 1995)).

Defendants have represented in this case that they are not required to offer pre-termination hearings to individuals losing ADHC services. *Id.* As the single State Medicaid agency, however, "Defendants are obligated to ensure compliance with federal law." *Id.*citing 42 U.S.C § 1396a(a)(5) and *AlohaCare v. Haw. Dept. of Human Servs*, 572 F.3d 740, 743 (9th Cir. 2009)). There are important issues that individuals are entitled to have addressed at a hearing, however. These include whether they continue to be entitled to skilled nursing services, personal care services, and other Medi-Cal services for which they qualify, and whether they are entitled to a reasonable modification to prevent their unnecessary institutionalization. Defendants have not met their procedural due process obligations under the Medicaid law, or the Constitution's due process clause. Plaintiffs have a strong likelihood of success on these claims as well.

### D.   The Balance of Equities Tips Sharply in Plaintiffs' Favor and an Injunction is in the Public Interest

1    The balance of hardships and the public interest may be considered contemporaneously.  *Cota,*

2    668 F. Supp. 2d at 999 (citation omitted).  This Court has already found Plaintiffs' loss of the services

3    they rely upon to avoid institutionalization outweighs the State's fiscal concerns.  *Id.*  Where, as here,

4    the proposed reduction in medical benefits to indigent people is due to purported budgetary concerns,

5    the Ninth Circuit has recognized that both the balance of hardships and the public interest favor

6    Plaintiffs.  *Brantley,* 656 F. Supp. 2d 1177 (citing *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly,*

7    572 F.3d 644, 657-58 (9th Cir. 2009)); *Cota,* 668 F. Supp. 2d at 999 (citation omitted).  That is

8    particularly true here, where the harm is widespread and severe, and the only study concluded that

9    eliminating ADHC will actually cost the state money.  *See* Auerbach Decl., Ex. B, at 1.

10   **IV.    CLASSWIDE RELIEF IS APPROPRIATE**

11   This Court has certified a class of thousands of ADHC recipients, all of whom stand to be

12   harmed by the elimination of ADHC pursuant to AB 97.  Plaintiffs seek relief for both the currently

13   certified class and the proposed amended class, which greatly overlaps with the existing class, but is

14   broader because it also includes individuals who may not have been affected by the lesser cuts proposed

15   in ABx4 5.  Consistent with this Court's prior Order, the parties have stipulated that "certification of an

16   amended or new class is not required to obtain preliminary injunctive relief applicable to all members of

17   the putative class."  Docket No. 204; *Brantley,* 656 F. Supp. 2d 1177-78; *Cota*, 668 F. Supp. 2d at 999.

18   **V.    PLAINTIFFS SHOULD NOT BE REQUIRED TO POST BOND**

19   Bond should be waived due to Plaintiffs' indigency.  *Cota,* 668 F. Supp. 2d at 1001.

20   **VI.    CONCLUSION**

21   Plaintiffs request that this Court enjoin the elimination of ADHC as Medi-Cal benefit pursuant to

22   AB 97 unless and until Defendants demonstrate that recipients will receive adequate, appropriate, and

23   uninterrupted replacement services necessary to prevent institutionalization.

24   Date:   June 9, 2011                    Respectfully submitted,

25                                            DISABILITY RIGHTS CALIFORNIA

26                                       By:   /s/

27                                            Elissa Gershon

28                                            Attorneys for Plaintiffs