KAMALA D. HARRIS
Attorney General of California
SUSAN M. CARSON
Supervising Deputy Attorney General
JOSHUA N. SONDHEIMER
Deputy Attorney General
State Bar No. 152000
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5615
  Fax:  (415) 703-5480
  E-mail:  Joshua.Sondheimer@doj.ca.gov
*Attorneys for Defendants Toby Douglas and the*
*California Department of Health Care Services*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **ESTHER DARLING; RONALD BELL by his guardian ad litem Rozene Dilworth; GILDA GARCIA; WENDY HELFRICH by her guardian ad litem Dennis Arnett; JESSIE JONES; RAIF NASSYROV by his guardian ad litem Sofiya Nasyrova; ALLIE JO WOODARD, by her guardian ad litem Linda Gaspard-Berry; individually and on behalf of all others similarly situated,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**TOBY DOUGLAS, Director of the Department of Health Care Services, State of California, DEPARTMENT OF HEALTH CARE SERVICES,**<br><br>Defendants. | C09-03798 SBA<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:         July 26, 2011<br>Time:         1:00 p.m.<br>Courtroom: 1, 4th Floor<br>Judge        Hon. Saundra Brown Armstrong<br>Trial Date   Not set<br>Action Filed:  August 18, 2009 |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................... 1

Background ..................................................................................................................... 2

    A.    DHCS's transition planning to date for discontinuation of ADHC ........... 2

    B.    Services that plaintiffs receive or may access are sufficient to avoid any risk of immediate institutionalization .................................................... 3

    C.    Plaintiffs ............................................................................................... 5

        Esther Darling ................................................................................. 5

        Ronald Bell ..................................................................................... 6

        Gilda Garcia .................................................................................... 6

        Wendy Helfrich ............................................................................... 7

        Jessie Jones ..................................................................................... 7

        Raif Nassyrov ................................................................................. 7

        Allie Jo Woodard ........................................................................... 8

    D.    There is ample support for the legislature's conclusion that discontinuing ADHC would save money ................................................. 8

Argument ........................................................................................................................ 9

    I.    Plaintiffs cannot demonstrate a likelihood of success on the merits ..................... 9

    A.    Plaintiffs fail to state cognizable or ripe discrimination claims ................. 9

    B.    Plaintiffs fail to and cannot establish discrimination based on a violation of the ADA's "integration mandate" ......................................... 11

        1.    The ADA does not require the State to provide transition or replacement services, or to maintain the same level of services provided under the ADHC program .................................... 11

        2.    Plaintiffs fail to meet their burden to demonstrate discrimination based on disability ................................................. 13

            a.    Plaintiffs must demonstrate more than a "risk" of institutionalization ................................................................. 13

            b.    Plaintiffs fail to meet their burden to demonstrate that the current lack of a transition program will force them to submit to institutional care ......................... 15

        3.    Any requirement that the State continue to provide all ADHC services by other means, as plaintiffs demand, would fundamentally alter the State's services ...................................... 17

    C.    Plaintiffs fail to identify any discriminatory "methods of administration" .................................................................................... 19

    D.    Plaintiffs have no likelihood of success on their due process claim ......... 19

    E.    Plaintiffs lack standing for a preliminary injunction ............................... 19

i

**TABLE OF CONTENTS**
(continued)

Page

II.     Plaintiffs fail to demonstrate a likelihood of immediate irreparable harm ........... 21

III.    The balance of equities and public interest support denial of plaintiffs'
        motion ................................................................................................................. 23

IV.     Plaintiffs' requested injunction is overbroad and improper .................................. 24

Conclusion ......................................................................................................................... 25

ii

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4
5

*Abbott Laboratories v. Gardner*
　　387 U.S. 136 (1967) ........................................................................................... 10

6

*Alexander v. Choate*
　　469 U.S. 287 ........................................................................................... 12, 15

7
8

*Angotti v. Rexam, Inc.*
　　2006 WL 164135 (N.D. Cal.) ........................................................................................... 24

9
10

*Arc of Wash. State, Inc. v. Braddock*
　　427 F.3d 615 (9th Cir. 2005) ........................................................................... 13, 17

11

*Arcamuzi v. Continental Airlines, Inc.*
　　819 F.2d 935 (9th Cir. 1987) ........................................................................................... 21

12
13

*Center for Food Safety v. Vilsack*
　　636 F.3d 1166 (9th Cir. 2011) ........................................................................................... 21

14

*Cercpac v. Health and Hosps. Corp.*
　　147 F.3d 165 (2d Cir. 1998) ........................................................................................... 12

15
16

*Crabtree v. Goetz*
　　2008 WL 5330506 (M.D. Tenn December 19, 2008) ........................................................... 15

17
18

*FCC v. Beach Communications, Inc.*
　　508 U.S. 307 (1993) ........................................................................................... 18

19
20

*Fisher. M.R. v. Dreyfus*
　　--- F.Supp.2d ----, No. C10-2052Z, 2011 WL 588511 (W.D. Wash. Feb 09, 2011) .................
　　........................................................................................... 14, 19, 20

21
22

*Fisher v. Okla. Health Care Auth.*
　　335 F.3d 1175 (10th Cir. 2003) ........................................................................... 14, 15

23
24

*G. v. Hawaii*
　　676 F. Supp. 2d 1046 (D. Haw. 2009) ........................................................................... 15

25

*Gaines v. Hadi*
　　No. 06-60129-CIV., 2006 WL 6035742 (S.D. Fla. Jan. 30, 2006) ........................................ 15

26
27

*Goldie's Bookstore, Inc. v. Superior Court*
　　739 F.2d 466 (9th Cir. 1984) ........................................................................... 22

28

# TABLE OF AUTHORITIES
### (continued)

Page

*Harris v. Mcrae*
448 U.S. 297 (1980) ........................................................................................... 13

*Hodgers-Durgin v. de la Vina*
199 F.3d 1037 (9th Cir. 1999) (en banc) ...................................................... 21, 22

*Indep. Living Ctr. of S. Cal., Inc.*
572 F.3d 644 (9th Cir. 2009) ........................................................................ 23, 24

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) ........................................................................................... 20

*Mandrigues v. World Savings, Inc.*
No. C 07-4497 JF (RS), 2009 WL 160213 (N.D. Cal. Jan. 20, 2009) ................... 24

*Mental Disability Law Clinic v. Hogan*
2008 WL 4104460 (E.D.N.Y. Aug. 28, 2008) ...................................................... 14

*Olmstead v. L.C. ex rel. Zimring*
527 U.S. 581 (1999) ...................................................................................... passim

*Price v. City of Stockton*
390 F.3d 1105 (9th Cir. 2004) ............................................................................ 24

*Rodriguez v. City of New York*
197 F.3d 611 (2d Cir. 1999) .......................................................................... 12, 14

*Rosen v. Goetz*
410 F.3d 919 (6th Cir. 2005) .............................................................................. 19

*Sanchez v. Johnson*
416 F.3d 1051 (9th Cir. 2005) ............................................................................ 17

*Summers v. Earth Island Inst.*
555 U.S. 488, 129 S.Ct. 1142 (2009) .................................................................. 20

*Texas v. United States*
523 U.S. 296 (1998) ........................................................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7, 129 S.Ct. 365 (2008) .................................................................... 9, 10

iv

# TABLE OF AUTHORITIES
## (continued)

Page

**STATUTES**

California Code of Regulations, Title 22
§ 78345 ................................................................................................................. 3, 10

California Welfare & Institutions Code
§ 14589(a) ................................................................................................................... 1
§ 14589(a)(1) ............................................................................................................. 18

**COURT RULES**

Fed. R. Civ. P. 65(d)(1)(B) and (C) ................................................................................ 25

**OTHER AUTHORITIES**

42 Code of Federal Regulations
§ 431.220(a) ............................................................................................................. 19
§ 431.220(b) ............................................................................................................. 19

DEFENDANTS' OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION (C09-03798 SBA)

**INTRODUCTION**

California is in undeniably experiencing a severe fiscal crisis.  The discontinuation of the Adult Day Health Care (ADHC) Medi-Cal benefit was only one of many extremely difficult reductions the Legislature felt obliged to make to its Medi-Cal program to meet its dual responsibilities to "find areas within the program where efficiencies can be achieved while continuing to provide community-based services that support independence."  Cal. Welf. & Inst. Code § 14589(a).  In advance of the discontinuation of the ADHC benefit, defendant Department of Health Care Services (DHCS) has been actively developing and implementing plans to ensure that ADHC participants receive assistance locating alternate services that will help them continue to live in the community.

Among other things, DHCS has completed a detailed review of the needs of ADHC participants who utilize the service most heavily—four and five days per week, and after consulting with stakeholders and state and local government partners, identified existing medical and social services and benefits that participants may access or further utilize, managed care and related case management services, and other programs that should enable plaintiffs to receive needed services in the community and avoid any precipitous decline in their physical or mental condition.  DHCS is now coordinating with the partner state and local agencies to help ensure that these services are made available, as appropriate, as soon as possible to ADHC participants, and preparing information for ADHC centers and other agencies to ensure that ADHC participants receive assistance accessing these existing and alternative services.

Plaintiffs fear that the anticipated discontinuation of the ADHC benefit on September 1, 2011, puts them "at risk" of institutionalization because defendants have not yet "ensured" that they will receive alternate services that help maintain their physical or mental condition.  However, plaintiffs fail to and cannot make the requisite showing that absent a preliminary injunction they will face no alternative but to be placed immediately in long-term institutional care because of they have not yet been assured adequate replacement care.  The named plaintiffs all presently receive and are entitled services in the community that should allow them to avoid any risk of institutionalization.  Plaintiffs' claims seek to mandate that the State, in discontinuing

1

1    an optional Medi-Cal benefit, guarantee the results of its public medical and social services

2    program (that ADHC participants face no increased risk of institutionalization).  However, the

3    ADA's "integration mandate" protects against "unjustified institutional isolation," and does not

4    impose on states a "'standard of care' for whatever medical services they render, or require[]

5    States to 'provide a certain level of benefits to individuals with disabilities.'"  *Olmstead v. L.C. ex*

6    *rel. Zimring*, 527 U.S. 581, 597, 603 n.14 (1999).

7            Notwithstanding the State's severe fiscal crisis, California has, overall, continued to expand

8    programs that help the disabled to leave or remain out of institutions.  Requiring the State to

9    effectively preserve the optional ADHC benefit, particularly without federal assistance, would

10   require even greater cuts to other critical benefits, including ones utilized by plaintiffs, and

11   fundamentally alter the state's program of assistance.

12           For these reasons, plaintiffs' request for the extraordinary remedy of a preliminary

13   injunction should be denied.

14                                        **BACKGROUND**

15           **A.    DHCS's Transition Planning to Date for Discontinuation of ADHC**

16           Contrary to plaintiffs' already-dated mischaracterizations of DHCS's efforts to prepare for

17   the discontinuation of the ADHC benefit, DHCS and partner agencies have engaged in extensive

18   planning efforts to ensure that ADHC participants can receive assistance accessing alternate

19   services that help allow them to continue to live in the community.  As DHCS Deputy Director

20   Jane Ogle details in her accompanying declaration, these efforts include:

21           • Holding numerous and ongoing meetings with stakeholders, partner agencies, and

22              local entities with relevant responsibilities to develop and coordinate transition

23              options (Ogle Decl., ¶¶6-7, 12-13)

24           • Coordinating with the California Department of Social Services (CDSS) and county

25              In-Home Supportive Services (IHSS) agencies to ensure that ADHC participants

26              who also receive IHSS may quickly be reassessed for additional personal care

27              services (*Id.* ¶16)

28

                                              2

- Coordinating with other state and local agencies with relevant responsibilities to ensure that they are prepared to facilitate transition to appropriate services, including the Department of Developmental Services (DDS) which is working, in turn with Regional Centers to address the needs of participants with developmental disabilities (*Id.* ¶ 13, 19.)

- Ensuring that ADHC centers update required participant discharge plans, and preparing county-specific resource information to help them carry out their responsibilities to refer participants to outside resources for needed services (*Id.* ¶¶ 10-11; Ex. B to Pltffs' Toth Decl. (Doc. 256); *see* 22 Cal. Code Regs., tit. 22, § 78345)

- Working with managed care plans to ensure that they are prepared to assist participants with care coordination and management (*Id.* ¶ 20.)

- Reviewing the availability of, and possibilities for expansion of, existing programs, including Targeted Case Management, programs under the Older Americans Act, and waiver programs (*Id.* ¶¶ 17, 18, 23)

DHCS and California Department of Aging (CDA) staff also have nearly completed reviewing the Individual Care Plans (IPCs) of *all* ADHC beneficiaries who receive four or five days of ADHC services per week to identify the community resources that may be able provide an alternative to ADHC.  The results of these reviews are being communicated with the pertinent state and local agencies to help ensure that these participants can obtain needed alternate services. (Ogle Decl. ¶ 15; Ferreira Decl. ¶ 7.)

**B.    Services that Plaintiffs Receive or May Access Are Sufficient to Avoid any Risk of Immediate Institutionalization**

DHCS's assessment of the array of existing medical, social and case management services that plaintiffs already receive, or that are or are likely available to them, demonstrates that ADHC participants may access services that will enable them to remain in the community upon the discontinuation of the ADHC.  The great majority of ADHC participants (74%) attend ADHC

3

1    three or fewer days per week, and live in urban areas where health care and social services are

2    relatively accessible.  Ex. A, Ogle Decl.

3         Particularly for the elderly and disabled ADHC population, case management services

4    available under managed care plans are a key available resource.  Five plantiffs (Darling,

5    Helfrich, Jones, Nassyrov, and Garcia) already are on managed care plans (Ferreira Decl. ¶ 13),

6    and the remaining two (Bell and Woodard) are eligible to enroll in a managed care plan.  Portela

7    Decl., ¶¶4, 11; Ogle, ¶ 20.

8         Managed care plans are required to provide "case management" to all participants, which

9    includes developing treatment plans for medical care, and ensuring that beneficiaries do not

10   experience gaps in services ("continuity of care"), and for either providing any needed medical

11   care to the participant, or if the plan does not have an appropriate provider or program, referring

12   the participant to an appropriate provider.  Portela Decl. ¶ 6-7; Owen Decl. ¶¶ 12, 13; Ogle Decl.,

13   ¶¶ 17, 20.  The plans have a duty to reevaluate any plaintiff who is in an ADHC that closes and to

14   determine whether they are still receiving necessary services and, if they are not, to either provide

15   them or refer them to an appropriate provider.  Portela Decl.¶ 8.  Managed care plans are also

16   required to ensure that basic comprehensive medical case management is provided to each

17   member, as well to determine whether members require Targeted Case Management (TCM)

18   services and to refer members accordingly if they do. For example, social service needs that a

19   beneficiary has that are not provided by managed care plans may be obtained through a plan

20   referring the beneficiary to TCM.  *Id.;* Baucom Decl. ¶ 2.  The goal of TCM is to ensure that

21   changing needs of eligible beneficiaries are addressed on an ongoing basis.  Baucom Decl. ¶ 2.

22   As all individuals with negative health or psycho-social outcomes or who at risk of

23   institutionalization are eligible for TCM, many plaintiffs may be eligible for TCM.  *Id.* ¶ 3.

24        As part of its transition program and ADHC elimination notices, DHCS intends to assist

25   participants enroll in managed care plans and to advise centers, participants, and groups tasked

26   with assisting participants with the transition, about the availability of managed care plans.

27   Portela Decl. ¶ 8; Ogle Decl. ¶ 20.

28

4

All plaintiffs will continue to have access to the full scope of Medi-Cal benefits available to them, so long as they meet the medical necessity criteria.  These services necessarily include any medical services they receive through the ADHC, including physical therapy, mental health services, nursing care, and other skilled therapeutic services that several plaintiffs contend they will "lose" when the ADHC program is discontinued.  Ogle Decl. ¶ 21.  Beneficiaries with certain mental health disorders may also qualify for a specialty mental health services program. Kokkos-Gonzales Decl., ¶¶ 8-9.

Some 67.5% percent of ADHC participants receive personal care services in their home through the IHSS program, which pays caregivers — often a family member — to provide personal care to vulnerable populations in the home.  Ogle Decl., Ex. A.  All plaintiffs receive IHSS, and all but plaintiffs Helfrich and Woodard should be entitled to increase their IHSS hours. Carroll Decl. 6.  Although, as plaintiffs note, IHSS does not provide medical services, it provides a wide ranges of monitoring, personal care, transportation, protective supervision, bodywork, and paramedical services that are highly relevant to the ADHC population.  *Id.*  While a number of plaintiffs express concern about "losing" the assistance they receive at their ADHCs managing medications and obtaining assistance with insulin injunctions, services available under IHSS unquestionably include assistance with these tasks.  *Id.* ¶ 4.

### C.   Plaintiffs

A review of available records regarding plaintiffs sheds additional light on their circumstances and existing services that are likely available to plaintiffs.[1]

### Esther Darling

Ms. Darling is enrolled in the Partnership Health Plan of California, a managed care plan. Under the Plan, she is assigned to a primary care physician, and is entitled to receive case management services.  If there are medical services that she is not receiving upon the elimination of the ADHC benefit, Ms. Darling may consult with her physician or case manager, and the Plan should arrange for these services.  In addition, Ms. Darling is authorized to receive 100.24 hours

---

[1] The facts discussed regarding plaintiffs are based on the Declaration of Debra Ferreira, ¶ 13 under each plaintiffs' name unless indicated otherwise.

1   of IHSS each month.  Carroll Decl. ¶ 6 (chart identifying authorized IHSS services).  According

2   to her most recent IPC, she sees her primary care physician once a month, and she was

3   hospitalized briefly in May with a notation that home health was to follow up.  Ms. Darling also

4   receives benefits under Medicare.

5       **Ronald Bell**

6       Mr. Bell is authorized to receive ADHC services three times a week.  (He was authorized to

7   receive the services five times a week between August 2010 and January 2011, but only attended

8   two to three times per week.)  In March this year, he informed the center's social worker that he

9   no longer wished to attend the program.

10      Mr. Bell currently is authorized to receive 98.6 hours of IHSS per month.  Carroll Decl. ¶ 6

11  (chart).  His current provider is his 80-year-old grandmother whom the center has described as

12  "burned out" and overwhelmed by caring for her grandson.[2]  In addition to IHSS, Mr. Bell also

13  receives home health agency services three times per week to help him manage his diabetes.

14  Unfortunately, even with these services, Mr. Bell was seen in an emergency room 14 times

15  between February 2009 and November 2010 for treatment of diabetes or related conditions; on

16  five of those occasions he was admitted to the hospital.  The ADHC staff believes that this is at

17  least in part due to Mr. Bell's failure to comply with dietary recommendations and other personal

18  behavior.  Mr. Bell is also eligible for services under Medicare.

19      **Gilda Garcia**

20      Ms. Garcia has been authorized to receive ADHC center services five days a week since she

21  first began receiving this Medi-Cal benefit.  However, she has had poor attendance and has

22  generally only attended the center three times per week.  Out of the 22 days approved for both

23  May and June 2011, Ms. Garcia only attended 16 and three days, respectively.  Ms. Garcia does

24  not need medication management, and she does not receive either occupational or physical

25  therapy at the center.  Ms. Garcia is currently authorized to receive 103.38 hours per month of

26  IHSS.  Carroll Decl. ¶ 6 (chart).  Ms. Garcia is enrolled on the enrolled on the Multi Senior

---

27      [2] After Mr. Bell announced he no longer wanted to attend the program, the center
28  discussed signing up his grandmother as a client "to prevent burnout."  Ferreira Decl. ¶13, Ex. B.

DEFENDANTS' OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION (C09-03798 SBA)

Services Program (MSSP) waiver which provides case management, and is currently being served through County Mental Health.  She also receives Medicare services.

**Wendy Helfrich**

Ms. Helfrich has been authorized to receive ADHC services since August 2009 three days a week.  Until later last year, her attendance at the center was irregular ranging from six to nine days per month.  She apparently is attending three days per week more regularly now.  She only participates in "maintenance exercise" one time per week.

She is enrolled in the Partnership Plan of California, a managed care plan, through which she should be receiving case management, and she is authorized to receive 283 hours of IHSS per month.  Carroll Decl. ¶6 (chart).

**Jessie Jones**

Ms. Jones is authorized to receive ADHC services five times per week.  She does not require daily nursing services and she does not participate in any maintenance groups so it is unclear why she has been authorized for five days per week.  There is an entry in her center Reassessment/Nursing that states:  "Prefers socializing with peers and playing dominoes." Ferreria Decl., Ex. C.  The center does not have a discharge plan for Ms. Jones other than: "[Patient] to [decide] if GADHC is unable to meet her needs."  Ferreira Decl., Ex. D.

Ms. Jones is enrolled in a managed care plan, Contra Costa Health Plan, through which she should be receiving case management.  In addition, she is authorized to receive 94.4 hours of IHSS per month.  Carroll Decl. ¶6 (chart).  Her daughter, who works full-time, is her IHSS provider, and apparently Ms. Jones attends the ADHC center for safety reasons.

**Raif Nassyrov**

In June 2006, Mr. Nassyrov was initially authorized to receive ADHC services two days per week primarily for social interaction and to participate in a regular exercise program.  Ferreira Decl., Ex. F.  He now is authorized to receive ADHC services five days per week in order to be supervised while his daughter, and primary caregiver, works.  *Id,* Ex. G.  He currently is authorized to receive 100 hours of IHSS per month.  Carroll Decl. ¶ 6 (chart).  He is also enrolled on the MSSP waiver which arranges and pays for most social, support and personal services.

7

1   Owen Decl. ¶8.  And, he is enrolled in the Contra Costa Health Plan, a medical managed care

2   plan which could also provide him with case management.

3   **Allie Jo Woodard**

4   Ms. Woodard is authorized to receive ADHC services five days per week.  She suffers from

5   bipolar disorder and began receiving Electric Shock Therapy (ECT) one a month in November

6   2009.  She was hospitalized for a month in Spring 2010 due to her bipolar disorder.  She is

7   currently receiving mental health services through the Mission Geriatric Program.  She is

8   authorized to receive 283 hours of IHSS per month; her son and her daughter are her providers,

9   both of whom work full-time.  Carroll Decl. ¶6 (chart).  It appears that she is attending the ADHC

10  center primarily for supervision while her children are working.

11  **D.     There is Ample Support for the Legislature's Conclusion that
         Discontinuing ADHC Would Save Money**

12

13  In eliminating the optional ADHC benefit, the Legislature believed that discontinuing the

14  ADHC benefit would provide budget savings, while still ensuring that participants' medical and

15  support needs could be met.  Plaintiffs invite the Court to second-guess the Legislature's

16  determination, citing the conclusion of a "Lewin Group" report, commissioned by ADHC

17  advocates, that concluded that eliminating the ADHC benefit would lead to *increased* costs of

18  $51.6 million in the first year.  While the Court need not inquire into the merits of plaintiffs'

19  contentions on this point, if it is so inclined, the report cited by plaintiffs, is fatally flawed and

20  cannot be given credence.[3]

21  _____

22          [3] The report fails to take into account publicly-available DHCS audit data which
    demonstrates that for 2007, the most recent year available, *one out of every three* ADHC claims
    was improper because the participant lacked the requisite medical necessity for the ADHC
23  service.  Mimnaugh Decl. ¶¶ 16-17 and Ex. A.  Preliminary results for 2009 suggest an even
    higher rate of improper claims.  *Id.*  The report underestimates straight Medi-Cal savings by a full
24  $*40 million*, utilizing a figure of $130 when plaintiffs themselves have never disputed the
    Department and Legislature's estimates of $170 million in Medi-Cal savings.  Watkins Decl.
25  ¶ 13.  Finally, the report's calculation is premised on a faulty and baseless "paper" estimate that
    over 14,000 ADHC beneficiaries (36% of all 37,000 ADHC beneficiaries) would be placed in
26  institutional care *in the first year alone*.  Muchmore Decl. ¶ 7.  The Lewin report shares the
    "common weakness" of studies lacking control groups "to speculate that patients would have
27  gone into nursing homes for long stays, calculate what they would have spent, and then subtract
    CBLTC costs and claim savings."  Ex. B, Muchmore Decl.
28

8

1    Yet, *even using* the report's projected cost analysis, if DHCS's audit data also is factored in

2    (overlooked by the Lewin report authors), the State would in fact *save money* by eliminating

3    ADHC.  Based on the rigorous audit results, DHCS determined that approximately $149.3 million

4    was unnecessarily paid in 2007 for ineligible ADHC claims, 82% of which ($122.4 million) were

5    improper because records demonstrated that the ADHC participant lacked medical need for the

6    ADHC service.  Mimnaugh Decl. ¶ 16-17 and Ex. A at 8, 129.  Even using the dated $122.4

7    million figure,[4] incorporating the savings from eliminating these improper claims into the Lewin

8    Group's calculations ($122.4 million saving - $51.6 costs) suggests that eliminating ADHC

9    would *save* the state some $70.8 million in the first year alone.

10                                              **ARGUMENT**

11           A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

12   clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*,

13   555 U.S. 7, 129 S.Ct. 365, 376 (2008).  Although plaintiffs accurately identify the factors under

14   *Winter*, by which this court should evaluate their motion,[5] plaintiffs fail to and cannot make a

15   sufficient showing under the applicable factors that a preliminary injunction is appropriate.

16   **I.    PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS**

17           **A.    Plaintiffs Fail to State Cognizable or Ripe Discrimination Claims**

18           Plaintiffs recognize that the Legislature had discretion to discontinue the ADHC benefit as

19   it is an optional Medi-Cal program, and accordingly do not challenge the legality of the

20   elimination of the benefit itself.  Defendants understood plaintiffs' new claims to allege, instead, a

21   failure to ensure an adequate program of assistance to transition ADHC participants to alternate

22   or replacement services.  As the ADHC benefit had not yet been scheduled for elimination, and

23   DHCS's transition planning was still in process, DHCS argued that plaintiffs' claims were unripe.

24   (Doc. 225.)  In rejecting defendants' ripeness challenge, the Court held that "Plaintiffs are not

25   _____

26           [4] More recent estimated payments for medically unnecessary ADHC services would likely
     be higher.  Mimnaugh Decl. ¶ 16.
27           [5] While plaintiffs acknowledge the Ninth Circuit's recent reaffirmation of its "sliding
     scale" approach to preliminary injunctions, defendants maintain for purposes of preserving their
     argument that standard is inconsistent with *Winter,* 129 S.Ct. at 374.

28

                                                    9

1    seeking to challenge the adequacy of the yet-to-be-implemented [transition][6] programs." (*Id.*)

2    Rather, the Court characterized plaintiffs' claims as a challenge to the Legislature's intention to

3    terminate ADHC services "*without* developing, implementing or funding adequate short and long

4    term replacement services . . . ." (*Id.* at 10 (emphasis in original).)

5         Under the Court's characterization, the issue appears to be one of *timing*: i.e., whether it

6    constitutes a violation of the ADA for the Legislature or DHCS to have failed *by now* to have in

7    place a transition assistance plan.  However, to the extent plaintiffs claim that the State must

8    implement a transition assistance plan sufficiently in advance of discontinuing the ADHC benefit,

9    plaintiffs fail to and cannot constitute a cognizable ADA claim.  Absent proof that DHCS cannot

10   or will not implement an adequate plan before the ADHC benefit is eliminated, any contention

11   that plaintiffs will be forced into an institution is only speculation.  Plaintiffs do not offer any

12   such proof.[7]

13        Notwithstanding the Court's characterization of plaintiffs' complaint, plaintiffs' claims and

14   arguments here focus heavily on the State's alleged failure to ensure that an adequate transition

15   plan is in place upon discontinuance of the ADHC benefit.[8]  Notwithstanding that elimination of

16   the benefit is likely to take effect on September 1, 2011, these allegations are undeniably

17   premature.  *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967).  The

18   Department's transition assistance is being implemented and remains in process, and the

19   short-term transition "program" required under AB 97 has not yet been funded or scheduled for

20   implementation.  Thus, DHCS cannot, at present, provide *assurances* about the features or likely

21   effectiveness of its transition assistance.  Plaintiffs' allegations that DHCS "will eliminate"

22   _____

23        [6] The Court used the term "KAFI," but referred to "programs," and so appears to have
     been referring to both the required short-term transition assistance program and the long-term
24   KAFI program the Legislature pledged to establish in AB 97.
         [7] While plaintiffs note that some ADHC centers allegedly have closed or may close in
25   anticipation of the discontinuance of the ADHC benefit, the consequence of a center's closure, at
     present, is no different than if a center elected to close for reasons other than the impending
26   elimination of the ADHC benefit.  Centers are required to prepare discharge plans and to assist
     participants with referrals for alternative services.  22 Cal. Code Regs., tit. 22, § 78345.
27        [8] DHCS anticipates that CMS will approve elimination of the benefit before July 1, 2011,
     and that the discontinuance would accordingly become effective September 1, 2011.  Orlich Decl.
28   ¶ 4.

1  ADHC services "without ensuring" that adequate alternative services are "in place," (SAC,

2  ¶¶ 234, 246) are necessarily speculative and unripe until or unless plaintiffs can demonstrate that

3  such assistance will not be made available when the elimination of the ADHC benefit becomes

4  effective.  "A claim is not ripe for adjudication if it rests upon contingent future events that may

5  not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296,

6  300 (1998) (internal quotations and citations omitted).

7        The circumstances are not, as plaintiffs contend, similar to the first injunction, in which the

8  Court found that "the parties had acknowledged that there is no mechanism to ensure that upon

9  the reduction of ADHC benefits that the alternative services will be identified and in place to

10  ensure that Plaintiffs and class members will not suffer any gap in services . . . ."  (Doc. 57, at 7.)

11  Here, as described above, DHCS is establishing the mechanisms to ensure that alternative

12  services may be identified and put in place upon elimination of the benefit.  Thus, plaintiffs'

13  claims premised on harm from the lack of a concrete or adequate transition plan being in place

14  upon elimination of the ADHC benefit are necessarily premature.

15       **B.**    **Plaintiffs Fail to and Cannot Establish Discrimination Based on a Violation**
             **of the ADA's "Integration Mandate"**

16

17           **1.**    **The ADA does not require the State to provide transition or**
                  **replacement services, or to maintain the same level of services**
                  **provided under the ADHC program**

18

19   Plaintiffs do not contend that the ADA bars the State from discontinuing ADHC as a

20  Medi-Cal benefit. [9]  Rather, plaintiffs contend only that the State may not discontinue the benefit

21  without first ensuring that they continue to receive all of the services they presently receive under

22  their current plans of care.  However, as the State need not have established an ADHC program in

23  the first place, the ADA cannot be construed to require the State to continue the same services or

24  to establish a program to ensure a "seamless" transition of beneficiaries to such services once the

25

26

_____

27      [9] The ADA bars states from discriminating "only with respect to the services they in fact
provide."  *Olmstead.* 527 U.S. at 603 n.14.

28

1    benefit is discontinued.[10]  Plaintiffs' claims regarding the untimeliness or inadequacy of the

2    intended transition program, thus are not cognizable.

3        Plaintiffs appear to claim the ADA requires the State to maintain the exact same level of

4    benefits as were provided under the ADHC program, contending that the State must ensure that

5    ADHC participants continue to receive uninterrupted services that replace those "prescribed in

6    their ADHC plans of care."  (SAC, ¶¶ 234, 246; Prop. Order, 4:26-5:9; Mot. 10-13 ("Need for

7    ADHC-like Programs to Prevent Institutionalization").)  Indeed, plaintiffs go further, contending

8    that to avoid violating the ADA, the State's existing medical and long-term care programs must

9    be "modified in substance and to ensure access" in order to replicate the ADHC model of care.

10   (Mot. 12.)  The Supreme Court, however, has rejected the view that "the ADA imposes on the

11   States a 'standard of care' for whatever medical services they render, *or that the ADA requires*

12   *States to 'provide a certain level of benefits to individuals with disabilities.'"  Olmstead,* 527 U.S.

13   at 603, n.14 (emphasis added); s*ee also Alexander v. Choate,* 469 U.S. 287 ("Section 504 does

14   not require the State to alter [the] definition of the benefit being offered simply to meet the reality

15   that the handicapped have greater medical needs," and states retain "discretion to choose the

16   proper mix of amount, scope, and duration limitations on services covered by state Medicaid.)

17       Consistent with *Olmstead,* courts have rejected attempts to secure a certain level of care

18   from the state under the ADA or the Rehabilitation Act because "it is not [a court's] role to

19   determine what Medicaid benefits [a state] must provide." *Rodriguez v. City of New York*, 197

20   F.3d 611, 619 (2d Cir. 1999).  As the *Rodriguez* court observed: "*Olmstead* does not . . . stand for

21   the proposition that states must provide disabled individuals with the opportunity to remain out of

22   institutions."  *Id.*; *see also Cercpac v. Health and Hosps. Corp.*, 147 F.3d 165, 168 (2d Cir. 1998)

23   _____

    [10] The general principal that a State may not discriminate with respect to programs and
24   services it provides does not have an easy or reasonable application to "reverse" integration
    mandate claims where a plaintiff's claim is based on the alleged inadequacy of a new transition
25   program or reduced optional service.  It requires circular reasoning to conclude that a State could
    violate the ADA by reducing or newly offering a service that it is not required by the ADA or
26   Medicaid Act to provide, solely because the new or reduced services that *are* offered are not
    sufficient to avoid any risk of deterioration in the health of beneficiaries.  To the extent that this
27   court's decisions have suggested otherwise, DHCS urges reconsideration.  Any ruling otherwise
    would discourage states, on discontinuing voluntary benefits, from attempting to provide
28   transitional or alternate services, or from adopting new optional benefits at all.

1    ("[T]he disability statutes do not guarantee any particular level of medical care for disabled

2    persons, nor assure maintenance of service previously provided.").

3        To the extent that plaintiffs allege that the State must effectively continue the existing

4    ADHC program by other means, plaintiffs' requested relief necessarily would constitute a

5    "fundamental alteration" of the State's program of assistance.  *See Olmstead,* 527 U.S. at 604.[11]

6    After the elimination of the ADHC program from the State Medicaid Plan becomes effective, the

7    State would be obliged under the proposed injunction to continue the ADHC program as a

8    state-only program without federal financial participation until the Court determined that DHCS

9    had provided "adequate, appropriate, and uninterrupted services" to replace participants' existing

10   ADHC services.  This would be fundamentally incompatible with the "cooperative federalism" of

11   the Medicaid program, whose "cornerstone . . . is financial contribution by both the Federal

12   Government and the participating State."  *Harris v. Mcrae*, 448 U.S. 297, 308 (1980).

13       For these reasons, plaintiffs cannot a state cognizable ADA claim.

14           **2.      Plaintiffs Fail to Meet Their Burden to Demonstrate Discrimination
                        Based on Disability**

15

16           **a.      Plaintiffs Must Demonstrate More than A "Risk" of
                        Institutionalization**

17       *Olmstead* involved circumstances in which disabled individuals, voluntarily admitted to a

18   state psychiatric facility, remained institutionalized after state's doctors certified that services in a

19   community setting were appropriate.  *Olmstead,* 527 U.S. at 593-94.  In this

20   "deinstitutionalization" context, the Court concluded that "unjustified isolation" of the disabled

21   may constitute a violation of the ADA's "integration mandate."  *Id.* at 597.  However, translating

22   *Olmstead's* "unjustified isolation" to cases involving a state's reduction or elimination of medical

23   or social services to those *already* living in the community raises interpretive problems.

24       While this court has previously suggested that a "risk" of institutionalization is sufficient to

25   state a claim under the ADA's integration mandate, DHCS submits that the ADA cannot properly

26

27       _____

         [11] The Court's "fundamental alteration" discussion, though it attracted only a plurality, is
28   controlling.  *Arc of Wash. State, Inc. v. Braddock*, 427 F.3d 615, 619 (9th Cir. 2005).

1    be read so broadly.[12]  Virtually all government action directly or even indirectly affecting

2    eligibility for, or the scope, level, or availability of health or social services could, depending on

3    each beneficiary's unique circumstances, have the effect of increasing the risk or even serious risk

4    of causing a deterioration in their physical or mental condition.  An ADA violation, however,

5    must rest on the *necessary* impact of a state's action, not the impact to an individual based on

6    their unique personal, social, and economic circumstances.  Requiring that any change or

7    reduction in services avoid any "risk" of institutionalization would turn the ADA into an

8    affirmative mandate to the states to maintain "a certain level of benefits," contrary to *Olmstead*.

9    *Olmstead* does not demand states to provide the disabled "with the opportunity to remain out of

10   institutions."  *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999).[13]

11        Instead, most courts have found that to establish a claim under the ADA's "integration

12   mandate" to a public entity's reduction or elimination of services affecting disabled persons

13   already living in the community, a plaintiff must demonstrate that the state's action necessarily

14   leaves disabled individuals no choice but to submit to institutionalization in order to receive care

15   necessary for the preservation of their health or safety.  *See Fisher v. Okla. Health Care Auth.*,

16   335 F.3d 1175, 1178 (10th Cir. 2003) (prescriptions were limited to five per month for

17   individuals living in the community and unlimited for those living in skilled nursing facilities;

18   state's action "does not allow the plaintiffs to receive services for which they are qualified unless

19   they agree to enter a nursing home"); *M.R. v. Dreyfus*, --- F.Supp.2d ----, No. C10-2052Z, 2011

20

21        [12] The court cited *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1184 (10th Cir.
     2003) and *Mental Disability Law Clinic v. Hogan*, 2008 WL 4104040 at *15 (E.D.N.Y. Aug. 28,
22   2008) for this proposition.  However another district court has observed that the Court's
     conclusion is based on a misreading of *Fisher.  M.R. v. Dreyfus*, --- F.Supp.2d ----, No. C10-
23   2052Z, 2011 WL 588511 at *14 (W.D. Wash. Feb 09, 2011) (noting that *Fisher* discusses
     "serious risk" of institutionalization only in context of irreparable harm, and requires showing of
24   "no choice" but to enter nursing home to obtain needed care).  *Hogan* is likewise based on a
     misreading of *Fisher.*
25        [13] Construing the mandate as one that bars any government action that creates a "risk" or
     even "serious risk" of institutionalization also would lead to inappropriate results in application.
26   For example, to demonstrate Article III standing, or a likelihood of irreparable harm in support of
     an injunction, a plaintiff must demonstrate actual injury or the imminent or immediate threat of
27   harm.  To the extent that the injury or harm plaintiffs allege is merely being put at greater "risk"
     of deteriorating health that could lead to institutionalization, the definition of the actionable injury
28   would eviscerate the requirements of imminence and immediacy.

14

1   WL 588511 at *14 (W.D. Wash. Feb 09, 2011) ("The proper standard to show a violation of the

2   integration mandate, set forth in *Fisher*, requires plaintiffs to show that the State's action leaves

3   them no choice but to submit to institutional care to obtain services for which they are otherwise

4   qualified."); *G. v. Hawaii*, 676 F. Supp. 2d 1046, 1058 (D. Haw. 2009) ("A state's reduction in

5   services may violate the integration mandate where it unjustifiably forces or will likely force

6   beneficiaries from an integrated environment into institutional care."); *Crabtree v. Goetz*, No.

7   Civ. A. 3:08-0939, 2008 WL 5330506 at *25 (M.D. Tenn. December 19, 2008) (Tennessee

8   drastically reduced maximum allowable hours of home health care services that severely disabled

9   plaintiffs had received 24 hours/day and needed to survive); *Gaines v. Hadi*, No. 06-60129-CIV.,

10  2006 WL 6035742, at *28 (S.D. Fla. Jan. 30, 2006) ("Plaintiffs need to show that the only way

11  they can get needed services is to submit to an institutional facility.").

12       This standard strikes an appropriate balance between the goals of the ADA to bar

13  "unjustified institutional isolation" of the disabled, and the states' "discretion to choose the

14  amount, scope, and duration limitations on services covered by state Medicaid."  *Alexander,* 469

15  U.S. at 307.  Additionally, the standard avoids basing violations of federal law on predictions of

16  the effects of a state's action on the health of individuals—a determination that necessarily

17  depends on each individual's unique level of family or other support, and their physical, mental,

18  economic, family, social, and other circumstances.

19              **b.    Plaintiffs Fail to Meet their Burden to Demonstrate that the
                        Current Lack of a Transition Program Will Force Them to
20                      Submit to Institutional Care**

21       Plaintiffs and some their caregivers have submitted declarations regarding their fear that

22  with the elimination of ADHC services, plaintiffs will have to be admitted to skilled nursing

23  facilities.  These declarations are generally premised on speculation and fail to accurately reflect

24  the services that are available in the community, and in some cases, the services plaintiffs receive.

25  In fact, while each of the seven named plaintiffs have different medical diagnoses and living

26  situations, as discussed above, all currently receive or are eligible for a variety of medical and

27  supportive services in the community.  Similarly, a number of plaintiffs do not receive critical

28  medical care or other skilled nursing care, but attend ADHC centers for supervision or

15

1    socialization while their adult children (who in many cases are their IHSS providers) work full-

2    time in another capacity.  Plaintiffs are eligible to receive care coordination and the direct health

3    care services they need in the community from other sources, and plaintiffs can only speculate as

4    to whether they will suffer any gaps in essential care and what the length or consequences of any

5    such interruptions would be.  Plaintiffs fail to demonstrate that the alleged lack of sufficient or

6    timely transition planning would oblige them to submit to an institutional placement to obtain

7    essential care upon the elimination of the ADHC program.

8         Plaintiffs also rely heavily on the findings by the centers that each plaintiff meets "Medical

9    Necessity Criterion #4" in their Individual Plan of Care (IPCs) to suggest that each face imminent

10   and "unnecessary institutionalization," because ADHC will be eliminated without adequate

11   replacement services "to replace the services prescribed in their ADHC plans of care."  (*See* Mot.

12   22; *Prop. Ord.,* 4:3-11.)  However, the findings in their IPCs provide no support for their claims.

13   The finding under this criterion that the centers must make, to be eligible for Medi-Cal

14   reimbursement for ADHC services to participants, is only that a "high potential exists for the

15   deterioration of the participant's . . . condition . . . in a manner likely to result in *emergency visits,*

16   *hospitalization, or other* institutionalization if ADHC services are not provided."  (*See* Mot. 4.)

17   Emergency visits and hospitalization are not the indefinite "unjustified institutional isolation"

18   against which the ADA's integration mandate is directed.  Moreover, neither the IPC form nor its

19   instructions provide any definition or guidance regarding construction of the term "other

20   institutionalization."  Thus, the fact that each plaintiff's was determined to meet this criterion

21   does not support the conclusion that plaintiffs would face a risk of indefinite placement in an

22   *institutional care facility* without ADHC services*.*

23        Additionally, DHCS's most recent audit findings cast considerable doubt on the reliability

24   of ADHC centers' findings regarding medical necessity, including under Criterion #4.  For the

25   most recent year in which figures are available, 2007, a multidisciplinary team of medical

26   professionals, auditors, analysts and researchers determined that an estimated 42.5% of all ADHC

27   claims were improperly submitted (the error rate), a full *82%* of which were due to improper

28   findings of medical necessity.  Mimnaugh Decl. ¶ 16, and Ex. A.  Preliminary review of audit

16

1   data for 2009 suggests an even greater rate of improper claim submissions.  *Id.* ¶ 16.  And

2   DHCS's audits determined that almost *one of every five* claims in 2007 demonstrated indicators

3   of fraud.  *Id.* and Ex. A.  This rate appears to have remained the same in a preliminary review of

4   2009 data.  (*Id.*)

5              **3.      Any Requirement that the State Continue to Provide All ADHC
                         Services by Other Means, as Plaintiffs Demand, Would
6                        Fundamentally Alter the State's Services**

7         Plaintiffs do not clearly identify what "modifications" to the State's Medi-Cal program

8   they believe would be sufficient to avoid running afoul of the ADA.  They suggest that the State,

9   upon discontinuing the ADHC benefit, must ensure that "adequate, appropriate, and uninterrupted

10  services" are provided to replace the services identified in their ADHC plans of care.  (Prop. Ord.

11  5:5-9.)  As noted above, to the extent that plaintiffs contend that the State must effectively

12  continue the discontinued ADHC services by other means, plaintiffs' requested relief necessarily

13  would constitute a fundamental alteration of the State's Medi-Cal program.  A preliminary

14  injunction also would constitute a fundamental alteration of the state's Medi-Cal program because

15  it would require painful reductions to other essential programs, particularly to the extent that the

16  State would be required to continue ADHC as a state-only benefit.

17        As the Supreme Court recognized in *Olmstead,* "[t]he State's responsibility, once it

18  provides community-based treatment to qualified persons with disabilities, is not boundless."

19  *Olmstead*, 527 U.S. at 603.  Under the ADA's "reasonable modification" provisions, a state may

20  not be required to continue, add, or change a service to comply with the ADA's integration

21  mandate if it would fundamentally alter the state's program of assistance, for example, by

22  compelling cutbacks to other Medicaid recipients.  *See id.,* 527 U.S. at 605-07**;** *Sanchez v.*

23  *Johnson,* 416 F.3d 1051, 1067-1068 (9th Cir. 2005).  "The Supreme Court has instructed courts to

24  be sympathetic to fundamental alteration defense, and to give States 'leeway' in administering

25  services for the disabled."  *Arc. of Wash. v. Braddock,* 427 F.3d at 618.

26        The Legislature faced a number of difficult choices in making cuts to a variety of Medi-Cal

27  programs and benefits in AB 97.  *See* Watkins Decl. ¶¶ 5-14.  In approving elimination of the

28  ADHC benefit, the Legislature made a specific finding that given the current state fiscal crisis, it

17

1    was "crucial to find areas within the [Medi-Cal] program where efficiencies can be achieved

2    while continuing to provide community-based services that support independence.  Cal. Welf. &

3    Inst. Code § 14589(a)(1).  The Legislature found that ADHC had been "vulnerable to fraud,"

4    despite efforts to curtail and prevent it, and that "there are alternative services to meet the needs

5    of Medi-Cal beneficiaries."  *Id.* § 14589(a)(2) and (a)(4).  These findings and the extent of other

6    cuts made in AB 97 to Medi-Cal programs demonstrate that if the State were obliged to continue

7    to provide identical replacement services to all ADHC recipients and/or continue to fund the

8    services at same level, it would need to make cuts to other programs.

9        While plaintiffs contend (based on a fatally flawed advocate-funded study) that the costs of

10   replacement services will be greater than providing ADHC, it would be inappropriate for the

11   court to inquire beyond the Legislature's legitimate finding that elimination of ADHC would

12   provide efficiencies.  "[A] legislative choice is not subject to courtroom fact-finding and may be

13   based on rational speculation unsupported by evidence or empirical data."  *FCC v. Beach*

14   *Communications, Inc.*, 508 U.S. 307, 315 (1993).  However, as discussed above (Background,

15   Part D), even ADHC advocates' own study, if considered together with DHCS's audit findings,

16   confirms that the State would save money by discontinuing the ADHC benefit.  Plaintiffs' attempt

17   to illustrate the cost savings of preserving ADHC (Mot. 13) is overly simplistic, failing to take

18   into account, among other things, that ADHC participants generally do not utilize all authorized

19   medical services, such as physical therapy, on all days that they attend an ADHC.[14]

20       It remains an unfortunate reality given the present economic circumstances that if the State

21   is unable to realize cost savings, as anticipated, through the discontinuance of the ADHC benefit,

22   it would be required to make reductions to other programs and services, some of which plaintiffs

23   themselves also may use.  (Ogle Decl., ¶¶ 4-5.)  Granting plaintiffs preliminary relief would thus

24   fundamentally alter of the State' Medi-Cal program.

25

26

27       [14] The Supreme Court in *Olmstead* rejected overly simplistic comparisons of the costs of
     institutional versus community care.  *Olmstead,* 527 U.S. at 604 & n.15.

28

DEFENDANTS' OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION (C09-03798 SBA)

1

### C.    Plaintiffs Fail to Identify any Discriminatory "Methods of Administration"

As plaintiffs rely on the same allegations and theory to support their "methods of

administration" claims as their claim under the "integration mandate," (*see* Mot. 23-24) plaintiffs

fail to and cannot demonstrate a likelihood of success on this claim for the same reasons as set out

above.  In any event, plaintiffs fail to identify any policy, practice, or procedure that properly may

be considered a discriminatory "method of administration" under the pertinent regulations.

### D.    Plaintiffs Have No Likelihood of Success on their Due Process Claim

Plaintiffs now acknowledge that DHCS intends to provide individual notice of the

discontinuation of ADHC to all participants well in advance of the effective date of the program's

elimination.  Plaintiffs claim, however, that each of the roughly 37,000 ADHC participants are

entitled to an individual "fair hearing" before the program is discontinued.  Plaintiffs' claim is

misguided.  There is no right to an individual "fair hearing" to challenge a "mass change" in

benefits such as the discontinuance of ADHC that requires an automatic change affecting some or

all beneficiaries.  42 C.F.R. § 431.220(b); *see M.R.,* 2011 WL 588511 at *11-12.  This rule is

grounded on the fact that a hearing would serve little, if any purpose, as such mass changes do not

raise any factual disputes.  *Rosen v. Goetz,* 410 F.3d 919, 926 (6th Cir. 2005).

Plaintiffs are misguided in claiming that they must be provided a hearing regarding

"whether they continue to be entitled" to skilled nursing, personal care, or other Medi-Cal

services."  The effect of a reduction in services "does not create factual questions as to the

reduction itself."  *M.R.,* 2011 WL 588511 at *12.  Moreover, plaintiffs do not identify any factual

dispute as to how their eligibility could be affected by the discontinuation of the ADHC benefit.

*See Rosen,* 410 F.3d at 626.  Nor must plaintiffs and other ADHC participants be provided

individual pre-elimination hearings regarding entitlement to a "reasonable modification to prevent

their unnecessary institutionalization."  (Mot. 24.)  Such a claim is not a factual dispute over

which individual fair hearings are mandated.  *See* 42 C.F.R. § 431.220(a).

### E.    Plaintiffs Lack Standing for a Preliminary Injunction

Plaintiffs lack Article III standing as plaintiffs fail to establish that they will imminently

have no alternative but to submit to institutionalization solely because a transition program, or an

19

adequate one, is not yet in place.  The "irreducible constitutional minimum of standing" under Article III, including for claims for a preliminary injunction, requires that each plaintiff's alleged injury—here, unjustified institutionalization—be "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S.Ct. 1142, 1149 (2009).  To "ensure that the alleged injury is not too speculative for Article III purposes," a plaintiff alleging injury in fact that is not actual must demonstrate that the injury is "*certainly* impending."  *Id.* at 564 n.2 (internal quotations and citations omitted) (emphasis in original).  When a plaintiff "alleges only an injury at some indefinite future time," as here, the Supreme Court has "insisted that the injury proceed with a *high degree of immediacy*, so as to reduce the possibility of deciding a case in which no injury would have occurred at all."  *Id.* (emphasis added).

Plaintiffs' claims of harm are premised on an inability to receive "adequate, appropriate, and uninterrupted" alternative services upon the elimination of the ADHC program.  However, it is wholly speculative and premature at present for plaintiffs to contend that such care will not be available upon the elimination of the benefit.  Moreover, plaintiffs' allege a risk of institutionalization based on a gradual "deterioration" of their physical or mental condition without opportunities to receive, from other sources, services such as physical therapy or opportunities for socialization that ADHC provides.  Plaintiffs fail to and cannot legitimately demonstrate that they will "likely" suffer any decline in their condition, or that if they did, any such decline would be so certain and precipitous that they would imminently have no alternative but to submit to, and become qualified for, institutional care.

None of the plaintiffs alleges that they have already availed themselves of existing avenues for assistance in obtaining the services they need from other sources, including assistance their ADHC centers are required to provide to participants upon their discharge, case management programs in which they already participate, and assigned social workers.  Thus, plaintiffs also fail to demonstrate that any alleged imminent and severe threat of deterioration in their condition sufficient to require institutionalization would be *caused by* the lack of a transition plan in place *at present* (or the lack of a sufficient one).  *See M.R.,* 2011 WL 588511 *9 (noting that until State

20

1   had opportunity to correct a gap in care through available case management, "the Court cannot

2   determine whether the threat of harm is the result of the State's reduction"). Finally, for the

3   reasons discussed earlier, plaintiffs' evidence is insufficient to demonstrate that they will have no

4   alternative but to immediately submit to institutional care. Accordingly, plaintiffs fail to identify

5   any actual or imminent ADA injury.

6        DHCS does not suggest that a plaintiff must actually experience an immediate and

7   significant deterioration in their physical or mental condition to establish. However, plaintiffs fail

8   to establish that the fact that DHCS has not completed the process of helping participants

9   transition to alternate services will cause them imminently to be institutionalized. As such,

10  plaintiffs lack Article III standing.

11       Because plaintiffs have failed to demonstrate serious question or any likelihood of success

12  on the merits of their substantive claims, their motion should be denied. *Arcamuzi v. Continental*

13  *Airlines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987).

14

15  **II.     PLAINTIFFS FAIL TO DEMONSTRATE A LIKELIHOOD OF IMMEDIATE IRREPARABLE
        HARM**

16       Even if the court concludes that plaintiffs have established standing, they fail to

17  demonstrate that they are likely to suffer "immediate irreparable harm" sufficient to support a

18  preliminary injunction.[15] *Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir.

19  2011) ("[A] plaintiff may establish standing to seek injunctive relief yet fail to show the

20  likelihood of irreparable harm necessary to obtain it").

21       The Supreme Court has "repeatedly cautioned" that in light of the need to maintain a

22  "proper balance" between state and federal authority, the federal courts should not enjoin the

23  operations of state government "absent a threat of *immediate* and irreparable harm." *Hodgers-*

24  *Durgin*, 199 F.3d at 1042. "[W]hen a plaintiff seeks to enjoin the activity of a government

25  agency, . . . his case must contend with the well-established rule that the Government has

26  _____

27       [15] Plaintiffs' allegations of harm to unnamed members of a putative class are not
     cognizable in determining plaintiffs' entitlement to a preliminary injunction. *Hodgers-Durgin v.*
28   *de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc).

DEFENDANTS' OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION (C09-03798 SBA)

1    traditionally been granted the widest latitude in the dispatch of its own internal affairs." *Id.* at

2    1043 (quoting *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)) (internal quotation marks omitted).

3          Plaintiffs do not and cannot demonstrate that they are likely to suffer any "immediate" and

4    "irreparable" harm.  Because the State intends to implement an adequate program of transition

5    assistance before ADHC program is discontinued, and because the discontinuation cannot be

6    implemented until September 1, 2011, at the earliest, plaintiffs cannot demonstrate that they are

7    likely to face "immediate" and "irreparable" harm.  While plaintiffs again rely heavily on the

8    findings in their IPCs regarding the potential for hospitalization of participants if ADHC services

9    are not provided, the criterion do not support plaintiffs' claims of irreparable injury here.  The

10   criterion does not establish that any deterioration in a plaintiffs' care requiring an emergency

11   room visit, hospitalization, or other institutional care would be "immediate."  (*See* Mot. 4.)  And,

12   as discussed earlier, the criterion are indefinite often of questionable accuracy.

13         Plaintiffs offer no *evidence* supported by a qualified health professional familiar with their

14   individual physical and mental condition, that they would be forced to submit to institutional care.

15   Rather, plaintiffs offer only speculation and inaccurate contentions that they will not be able to

16   continue to receive medical and social services they need to enable them to continue to live in the

17   community.  However, "[s]peculative injury does not constitute irreparable injury." *Goldie's*

18   *Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984).

19         In fact, in contrast to plaintiffs' and their advocates' fears, controlled studies have

20   consistently shown "*no difference in nursing home placement*" between groups receiving ADHC

21   and control groups who did not, as even the Lewin Group report cited by plaintiffs acknowledges.

22   Ex. B to Pltffs' Auerbach Decl., at 15 (Doc. 228-2) (emphasis added).  Another literature review

23   concluded that "in clinical trials, control groups *have proved that most patients would not go to*

24   *nursing homes* even if they did not have [ADHC or other community-based care]."  Muchmore

25   Decl., Ex. A.

26         Thus, plaintiffs fail to and cannot demonstrate that "immediate" and "irreparable" harm is

27   "likely" absent an injunction.

28

III.  **THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT DENIAL OF PLAINTIFFS' MOTION**

Contrary to plaintiffs' suggestion, this Court's analysis regarding of the balance of equities and the public interest in connection with plaintiffs' previous preliminary injunction motions are not controlling here.  Unlike under the previous motions, plaintiffs will not, for the reasons discussed above, "lose" medical services; rather, they may obtain services for which they are qualified from other providers, and the State has declared its intention to assist plaintiffs in locating those services.  Plaintiffs establish a false dichotomy suggesting that the equities and public interest on plaintiffs' side concerns a "reduction in medical services."

The Ninth Circuit's weighing of these factors in *Indep. Living Ctr. of S. Cal., Inc.,* 572 F.3d 644, 658-59 (9th Cir. 2009) is similarly inapposite.  The Ninth Circuit's rejection of a state's fiscal crisis as a decisive factor in its analysis was premised on its *already having found* that that State's proposed Medicaid rate reductions violated federal law.  *Id.* at 652, 659 ("A budget crisis does not excuse ongoing violations of federal law.")  No such finding would be appropriate here on the merits, and at most, the Court may find only that plaintiffs are "likely" to prevail on their ADA claims.

Here, the real balance of equities is the relative harm or benefit of cuts to the ADHC program *as opposed to cuts to other essential Medicaid programs* serving other needy and vulnerable groups.  The Legislature has made an accurate determination, not properly subject to second-guessing by the Court, that efficiencies may be obtained by discontinuing the ADHC benefit, among other cuts to Medi-Cal programs, without causing undue harm to participants given that they may generally obtain replacement services from other providers.  While neither plaintiffs nor the Court have the responsibility, as does the Legislature and DHCS, of distributing limited care and resources available to needy groups "with an even hand," (*Olmstead,* 597 U.S. at 605), plaintiffs ask the Court to consider only their circumstances in isolation.  Absent a responsible showing that another program or beneficiary group is more appropriate for reductions or termination of services, the balance of equities rests with the judgment of the elected

23

1    representatives of the people of the State as to how to responsibly and equitably administer the

2    Medi-Cal program.

3         For similar reasons, an injunction is not in the public interest.  Plaintiffs will continue to

4    have access to necessary services under Medi-Cal even if a preliminary injunction is not granted,

5    so the public's interest in "safeguarding access" to such services is not threatened.  *Indep. Living,*

6    572 F.3d at 659.  At the same time, the public interest is particularly well-served when, as here,

7    the Legislature has taken seriously its dual mandate to make necessary health care services

8    available to a vulnerable population *and* to efficiently and responsibly manage public funds.

9    **IV.   PLAINTIFFS' REQUESTED INJUNCTION IS OVERBROAD AND IMPROPER**

10        Preliminary injunctions "must be narrowly tailored . . . to remedy only the specific harms

11   shown by the plaintiffs.'"  *Price v. City of Stockton,* 390 F.3d 1105, 1117 (9th Cir. 2004) (citation

12   omitted).  Plaintiffs' requested preliminary injunction is overbroad in several respects:  1)

13   plaintiffs fail to demonstrate entitlement to the requested classwide relief; 2) it would require

14   DHCS to provide services regardless of the State's or providers' individual determination of

15   need; and 3) it would subject the State to unprecedented judicial interference in administrative

16   decisions more appropriately left to DHCS expertise.

17        Although certification of a class is not necessary to obtain relief applicable to a putative

18   class, a party seeking a preliminary injunction on a classwide basis nevertheless "must prove that

19   (1) the named plaintiffs face imminent, irreparable harm, and (2) there is reason to believe that

20   the putative class members face the same harm."  *Mandrigues v. World Savings, Inc.,* No. C 07-

21   4497 JF (RS), 2009 WL 160213 at *3 (N.D. Cal. Jan. 20, 2009), citing *Angotti v. Rexam, Inc.,*

22   No. C 05-5264 CW, 2006 WL 1646135, at *14-15 (N.D. Cal. June 14,2006).  Plaintiffs have

23   failed to and cannot demonstrate that putative class members face the same harm.

24        Because the circumstances of each individual ADHC participant is necessarily different, the

25   impact of the State's alleged failure to ensure that adequate transition assistance will be in place

26   upon elimination of the ADHC benefit will be different for each individual.  Factors including

27   each participant's health and mental condition, economic and living circumstances, available

28   family and community support, capacities of their current caregivers, location, and even their own

24

1   personal character, will determine whether and to what extent any participant would be affected

2   by the adequacy of the State's transition plans.  Five of the seven plaintiffs are authorized to

3   attend ADHC five days each week, rendering them unrepresentative of the vast majority of

4   ADHC participants, who are authorized for three or less days.  As plaintiffs cannot demonstrate

5   that they are representative of all ADHC participants, there is no basis to award a classwide

6   injunction, and any relief can only appropriately be awarded to those plaintiffs who sufficiently

7   demonstrate entitlement to a preliminary injunction.

8       To the extent plaintiffs' proposed injunction would require DHCS to ensure that

9   participants continue to receive the same amount and type of services received by a participant

10  based on their ADHC center's findings in their current IPCs, the requested injunction would

11  improperly interfere with other providers' responsibilities to independently determine whether

12  any such services are medically necessary.  Providers cannot be obliged to abide by

13  determinations made by the centers in plaintiffs' IPCs.

14      Finally, plaintiff's proposed injunction against DHCS from discontinuing ADHC "until

15  adequate, appropriate, and uninterrupted services are provided" to plaintiffs would subject DHCS

16  to an unprecedented level of judicial oversight over the DHCS's transition assistance efforts.

17  These conditions on relief from the injunction would constitute an affirmative mandate to provide

18  certain services, but fail to provide any specificity as to what DHCS must do to be relieved from

19  the injunction.  Thus, the proposed injunction is impermissibly vague.  Fed R. Civ. P. 65(d)(1)(B)

20  and (C).

21                              **CONCLUSION**

22      Plaintiffs have not met their burden to establish entitlement to the extraordinary and drastic

23  remedy of a preliminary injunction.  Accordingly, DHCS respectfully requests that the Court

24  deny plaintiffs' motion.  If the Court is inclined to grant plaintiffs preliminary relief, the

25  injunction should be narrowly tailored consistent with the principles discussed above.

26

27

28

DEFENDANTS' OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION (C09-03798 SBA)

1   Dated:  June 30, 2011

2

Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
SUSAN M. CARSON
Supervising Deputy Attorney General

*/s/ JOSHUA N. SONDHEIMER*

JOSHUA N. SONDHEIMER
Deputy Attorney General
*Attorneys for Defendants*

SF2009404616
20480624.doc

DEFENDANTS' OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION (C09-03798 SBA)