Elissa Gershon, State Bar No. 169741
elissa.gershon@disabilityrightsca.org
Elizabeth Zirker, State Bar No. 233487
elizabeth.zirker@disabilityrightsca.org
Kim Swain, State Bar No. 100340
kim.swain@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA  94612
Telephone:   510.267.1200
Facsimile:   510.267.1201

Attorneys for Plaintiffs

[Complete list of counsel on following pages]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTHER DARLING; RONALD BELL by his guardian ad litem Rozene Dilworth; GILDA GARCIA; WENDY HELFRICH by her guardian ad litem Dennis Arnett; JESSIE JONES; RAIF NASYROV by his guardian ad litem Sofiya Nasyrova; ALLIE JO WOODARD, by her guardian ad litem Linda Gaspard-Berry; individually and on behalf of all others similarly situated, | Case No.: C09-03798 SBA  **CLASS ACTION**  **PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | **Hearing Date:** July 26, 2011  **Time:** 1:00 p.m. |
| vs. | **Judge:** Hon. Saundra B. Armstrong  **Address:** 1301 Clay Street    Oakland, CA 94612 |
| TOBY DOUGLAS, Director of the Department of Health Care Services, State of California, DEPARTMENT OF HEALTH CARE SERVICES, | **Courtroom:** 1, 4th Floor |
| Defendants. | |

i

*Darling, et al. v. Douglas, et al.*, C-09-03798 SBA; Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Notice of Motion and Motion for Preliminary Injunction

1   Kenneth A. Kuwayti, State Bar No. 145384
    Kkuwayti@mofo.com
2   Benjamin A. Petersen, State Bar No. 267120
    Bpeterson@mofo.com
3   Morrison & Foerster LLP
    755 Page Mill Road
4   Palo Alto, California  94304-1018
    Telephone:  650.813.5600
5   Facsimile:   650.494.0792

6   Eric Carlson, State Bar No. 141538
    Ecarlson@nsclc.org
7   NATIONAL SENIOR CITIZENS LAW CENTER
    3435 Wilshire Boulevard, Suite 2860
8   Los Angeles, CA  90010
    Telephone:  213.674.2813
9   Facsimile:   213.639.0934

10  Kenneth W. Zeller, *Pro Hac Vice*
    kzeller@aarp.org
11  Kelly Bagby, *Pro Hac Vice*
    kbagby@aarp.org
12  AARP FOUNDATION LITIGATION
    601 E Street N.W.
13  Washington, D.C.  20049
    Telephone:  202.434.2060
14  Facsimile:   202.434.6424

Anna Rich, State Bar No. 230195
arich@nsclc.org
Kevin Prindiville, State Bar No. 235835
kprindiville@nsclc.org
NATIONAL SENIOR CITIZENS LAW
CENTER
1330 Broadway, Suite 525
Oakland, California  94612
Telephone:  510.663.1055
Facsimile:   510.663.1051

Barbara Jones, State Bar No. 88448
bjones@aarp.org
AARP FOUNDATION LITIGATION
200 So. Los Robles, Suite 400
Pasadena, California  91101
Telephone:  626.585.2628
Facsimile:   626.583.8538

Sarah Somers, State Bar No. 170118
somers@healthlaw.org
Martha Jane Perkins, State Bar No. 104784
perkins@healthlaw.org
NATIONAL HEALTH LAW PROGRAM
101 East Weaver Street, Suite G-7
Carrboro, North Carolina  27510
Telephone:  919.968.6308
Facsimile:   919.968.8855

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.  FACTUAL UPDATE ..................................................................................................1

II.  DEFENDANTS' FAIL TO REFUTE PLAINTIFFS' EVIDENCE .................................2

    A.  Defendants' Transition Planning is A "Bridge to Nowhere"..............................2

    B.  Eliminating ADHC will Result in Nursing Facility Placements and Cost the State More Money than it Saves ..................................................................5

III.  PLAINTIFFS' CLAIMS ARE RIPE ........................................................................7

IV.  DEFENDANTS' ACTIONS PLACE PLAINTIFFS AND CLASS MEMBERS AT RISK OF INSTITUTIONALIZATION IN VIOLATION OF THE ADA ..........................7

    A.  Defendants' Actions Constitute Discrimination Under the ADA .....................7

    B.  Defendants Cannot Support their Fundamental Alteration Defense................9

    C.  Plaintiffs' Demonstrated Risk of Institutionalization is Sufficient to State an *Olmstead* Claim ........................................................................................10

V.  DEFENDANTS ARE IN VIOLATION OF FEDERAL STATUTORY AND CONSTITUTIONAL DUE PROCESS REQUIREMENTS ....................................11

VI.  DEFENDANTS CONFLATE ARTICLE III STANDING REQUIREMENTS WITH PLAINTIFFS' *OLMSTEAD* CLAIM..................................................................13

VII.  PLAINTIFFS MEET THE ADDITIONAL *WINTER* STANDARDS FOR GRANTING OF A PRELIMINARY INJUNCTION.............................................14

    A.  Plaintiffs have Shown a Likelihood of Irreparable, Imminent Harm ..............14

    B.  The Balance of Equities and the Public Interest Support a Preliminary Injunction .........14

VIII.  PLAINTIFFS' REQUESTED INJUNCTION IS PROPER ......................................15

IX.  CONCLUSION .....................................................................................................15

iii

*DARLING, ET AL. V. DOUGLAS, ET AL.*, C-09-03798 SBA; PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Alexander v. Choate*

4
     469 U.S. 287 (1985).............................................................................................8

5

*Ball v. Rodgers*

6
     No. 00-CV-67, 2009 WL 1395423 (D. Ariz. April 24, 2009). .............................7, 11

7

*Beno v. Shalala*
     30 F.3d 1057 (9th Cir. 1994) ....................................................................................14

8

*Brantley v. Maxwell-Jolly*

9
     656 F. Supp. 2d 1161 (N.D. Cal. 2009) ...............................................9, 11, 14, 15

10

*Cota v. Maxwell-Jolly*
     688 F. Supp. 2d 980 (N.D. Cal. 2010) ...............................................................9, 14

11

*Fisher v.Oklahoma Health Care Authority*

12
     335 F. 3d 1175 (10th Cir. 2003) .........................................................9, 10, 11

13

*G. v. Hawaii*

14
     676 F. Supp. 2d 1046 (D. Haw. 2009) ..................................................................11

15

*Harris v. Bd. of Supervisors, Los Angeles County*
     366 F.3d 754 (9th Cir. 2004) ....................................................................................13

16

*Hodgers-Durgin v. de la Vina*

17
     199 F.3d 1037 (9th Cir. 1999) ..................................................................................13

18

*Indep. Living Ctr. of S. Cal., Inc. v. Shewry*

19
     543 F.3d 1050 (9th Cir. 2008) ..................................................................................13

20

*Lujan v. Defenders of Wildlife*
     504 U.S. 555 (2009)...................................................................................................13

21

*M.R. v. Dreyfus*

22
     767 F. Supp. 2d 1149 (W.D. Wash. Feb. 9, 2011)............................................12, 13

23

*Makin ex rel. Russell v. Hawaii*
     114 F. Supp. 2d 1017 (D. Haw. 1999) .................................................................11

24

*Marlo M. ex rel. Parris v. Cansler*

25
     679 F. Supp. 2d 635 (E.D.N.C. 2010).....................................................................11

26

*Mental Disability Law Clinic v. Hogan*

27
     Civ. No. CV 06-6320 (E.D.N.Y. Aug. 28, 2008) ......................................................11

28

iv

*Darling, et al. v. Douglas, et al.*, C-09-03798 SBA; Plaintiffs' Reply to Defendants' Opposition to Plaintiffs'
Notice of Motion and Motion for Preliminary Injunction

*Nelson v. Milwaukee Cty*
    No. 04 C 0193, 2006 WL 290510 (E.D. Wis. Feb. 7, 2006) ........................ 11

*Rodriguez v. City of New York*
    197 F.3d 611 (2d Cir. 1999)........................................................................ 8

*Rosen v. Goetz*
    410 F.3d 919 (6th Cir. 2005) ..................................................................... 12

*Townsend v. Quasim*
    328 F.3d 511 (9th Cir.2003) ....................................................................... 8

*V.L. v. Wagner*
    669 F. Supp. 2d 1106 (N.D. Cal. 2009) ................................................... 11

**Statutes**

Cal. Health & Safety Code § 1570.2 ........................................................... 7

Cal. Welf. and Inst. Code § 12301.07(a)(1) .............................................. 3

**Regulations**

Cal. Manual of Policies and Procedures  §§ 30-780 (7), (9) ..................... 4

**Legislation**

Assembly Bill No. 96 (2011-2012 Reg. Sess.) ........................................... 1

Senate Bill No. 87 (2011-2012 Reg. Sess.) ............................................... 1

v

*Darling, et al. v. Douglas, et al.*, C-09-03798 SBA; Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Notice of Motion and Motion for Preliminary Injunction

# I.  FACTUAL UPDATE

Three significant events have taken place since Plaintiffs' opening brief was filed.  First, on July 1, 2011, CMS approved the State's request for a State Plan Amendment (SPA) to eliminate ADHC as an optional Medi-Cal benefit, with an effective date of September 1, 2011.  Supplemental Decl. of Lydia Missaelides ("Missaelides Supp. Decl.") Ex. A.  It is now clear that, without an injunction, ADHC will be eliminated as an optional Medi-Cal benefit within 35 days of the hearing on this motion.  CMS was careful to state in its approval letter that: "This action does not in any way address the State's independent obligations under the Americans with Disabilities Act or the Supreme Court's *Olmstead* decision."  *Id.*

Second, on June 15, 2011, the Legislature passed AB 96 which would require DHCS to submit, on or before September 1, 2011, an application to CMS to implement the "Keeping Adults Free from Institutions" ("KAFI") program. Assem. Bill No. 96 (2011-2012 Reg. Sess.); Missaelides Supp. Decl. Ex. E.  AB 96 would require the KAFI program to utilize licensed adult day health centers to provide a well-defined scope of specified services for Medi-Cal beneficiaries who have been assessed to be at significant risk of institutionalization.  *Id.*  At the request of the Governor's office, AB 96 has not been presented to the Governor for signature.  Missaelides Supp. Decl. ¶ 7.  Thus, Defendants have not applied to CMS to implement the KAFI program.

Third, on June 30, 2011, the Governor signed California's 2011-2012 budget. Sen. Bill No. 87 (2011-2012 Reg. Sess.) Missaelides Supp. Decl. Ex. D.  SB 87 appropriates an augmentation of $60 million, in addition to the Governor's previously budgeted $25 million contained in his May, 2011 revision to the budget, "to transition current beneficiaries of the Adult Day Health Care program to other appropriate services."  *Id.*  The Governor authorized a total of $85 million but he deleted Provision 13, which was the Legislature's prior budget language authorizing and directing the Administration to create a new KAFI waiver program.  *See*, [ECF No. 245-7] Missaelides Decl. Ex. G at PL00886.  In his veto message, the Governor specified the following uses for the $85 million:  (1) to transition current ADHC beneficiaries to other appropriate services, and (2) "to work with the Legislature to assess the needs of the population to determine to what extent additional services are needed during and after the transition," including "seeking federal waiver services and developing alternative funding arrangements to preserve services at ADHC centers." Missaelides Supp. Decl. Ex. D.

1

1   II.   **DEFENDANTS' FAIL TO REFUTE PLAINTIFFS' EVIDENCE**

2       A.   **Defendants' Transition Planning is A "Bridge to Nowhere"**

3       Defendants' belabored attempts to justify their transition planning efforts and identification of

4   alternative services for the 35,000-37,000 ADHC recipients who will need them in a matter of weeks fail

5   to provide any assurances that would counter Plaintiffs' claims of inadequacy. *See, e.g.,* [ECF No. 274]

6   Ogle Decl. ¶¶ 6-23. Defendants' planning efforts are "embryonic," according to Plaintiffs' expert, Dr.

7   Leslie Hendrickson, who has 25 years of experience administering and consulting on Medicaid

8   programs. In his opinion, Defendants have proffered "little documentation … to show they have an

9   understanding of how many persons need what services and where and how the services can be obtained

10  by September 1." Declaration of Leslie Hendrickson, Ph.D. ("Hendrickson Decl.") ¶ 32.

11      According to Dr. Hendrickson, Defendants:

12      should conduct the necessary planning and analysis…that would enable them to: (1) identify
        recipients who need alternative, replacement services and where these individuals reside;
13      (2) evaluate the availability of services, including the location and capacity of providers and
        whether such services fit recipients' needs; and (3) identify and plan for gaps in services in
14      order to avoid worsening physical and mental conditions and unnecessary use of hospitals,
        other health care providers, and nursing homes.
15      *Id.* ¶ 13.

16      Defendants' purported assessment process — which thus far ignores more than 75% of the

17  ADHC population-- is a mere first step. Defendants' Opposition ("Opp.") 3:16-19. The logic of

18  reviewing the IPCs of only the 4 and 5 day per week recipients is unclear and supported by no evidence

19  that individuals who attend ADHC for fewer days have the same or lesser needs. In any case,

20  Defendants' response to the needs they identify in recipients' IPCs — a laundry list of categories of

21  programs that "might" offer some case management or services — is wholly inadequate to ensure the

22  real, not "theoretical" availability of those services to meet the needs of ADHC recipients. *See,*

23  Supplemental Decl. of Kathleen Wilber ("Wilber Supp. Decl.") ¶¶ 6-9. For example:

24      Managed Care and TCM: Defendants now cite managed care case management or Targeted Case

25  Management (TCM) as a "key available resource." Opp. 4:4. However, case management, even if

26  available, does not provide services; rather it is intended to link individuals to needed resources.

27  Hendrickson Decl. ¶¶ 26-28; Decl. of Marty Lynch ("Lynch Decl.") ¶¶ 12, 19. Without services to be

28  linked to, case management is little value. *Id.* Moreover, TCM is simply a potential funding source,

1   not a service provider.  Hendrickson Decl. ¶¶ 26-27.

2          Defendants' portrayal of managed care as a panacea is equally inaccurate.  Lynch Decl. ¶¶ 12-

3   19; Hendrickson Decl. ¶ 28; Missaelides Supp. Decl. ¶ 21.  For instance, with respect to Plaintiff

4   Darling, Defendants foist the responsibility for her care onto her managed care plan and her physician,

5   despite the fact that her ADHC provider confirmed that her managed care plan would be inadequate to

6   meet either her direct service or case management needs.  Supplemental Decl. of Dawn Myers Purkey

7   ("Myers Purkey Supp. Decl.") ¶¶ 15-16.  Half of California's counties do not have a Medi-Cal managed

8   care option at all, and in those that do, significant long term care and disability care services (such as

9   IHSS, ADHC, MSSP, HCBS Waiver services, and, for most plans, nursing facilities) are "carved out,"

10  which means that managed care plans do not offer or fund them, and, they generally lack expertise to

11  provide case management of these long term care and disability services.  Lynch Decl. ¶¶ 13, 17-18.

12         IHSS:  Defendants also continue to refer to IHSS, completely ignoring Plaintiffs' ample evidence

13  that IHSS is not a substitute for the skilled care at ADHC.  Mot. 7:27-8:26; Hendrickson Decl. ¶ 53.

14  Defendants fail to identify an IHSS substitute for ADHC recipients who already receive the statutory

15  maximum.  For example, while Defendants acknowledge that Plaintiff Helfrich is not eligible to receive

16  more IHSS (Opp. 5:10-12), they fail to reveal that the only other program that offers IHSS-type

17  attendant care is the Nursing Facility Waiver, which has a waitlist of approximately 700 people and an

18  estimated wait time of 19 months.  Wilber Supp. Decl. ¶ 7.

19         IHSS recipients already received a 3.6% cut in February, 2011, and the current budget contains a

20  "trigger" that could impose an additional 20% cut in January, 2012.  [ECF No. 269] Carroll Decl. ¶ 4;

21  CAL. WELF. AND INST. CODE § 12301.07(a)(1).  Moreover, 60% of ADHC recipients receive IHSS

22  services from a family member, 70% of whom say they cannot provide any additional care.  Missaelides

23  Supp. Decl. ¶ 15.  In Napa County, preliminary assessments by the IHSS program show that 50% of the

24  ADHC recipients will not be eligible for any increased IHSS upon the termination of ADHC.  The

25  average increase for the remaining 50% is 2.5 hours per month.  Supplemental Decl. of Celine Regalia

26  ("Regalia Supp. Decl.") ¶ 9.  Defendants do not explain how this meager increase can substitute for the

27  comprehensive services provided at ADHC.

28         Medication Management:  Defendants repeatedly mischaracterize the availability and criticality

3

1  of "medication management," which they blithely claim can "unquestionably" be provided through

2  IHSS.  Opp. 5:12-17; Carroll Decl. ¶ 4; [ECF No. 270] Ferreria Decl. ¶ 8; *see* Pl. Obj. to Def. Evid.

3  IHSS can only provide assistance with self-administration of medication and "paramedical services"

4  under limited circumstances (CAL. MAN. OF POL. & PROC. §§ 30-780 (7), (9)) but cannot substitute for

5  the skilled medication management provided at ADHC, which includes monitoring medications for side

6  effects, assessing the effectiveness of types and dosages of medications, coordinating with physicians,

7  and instructing participants and family members on proper medication administration.  *See*, [ECF No.

8  244] McCloud Decl. ¶¶ 46-49; [ECF No. 233] Dick-Muehlke Decl. ¶¶ 14-19, 22, 29-31; [ECF No. 254]

9  Steinke Decl. ¶¶ 14, 21; [ECF No.251] Puckett Decl. ¶ 47; [ECF No. 252] Regalia Decl. ¶ 25;

10 Hendrickson Decl. ¶ 49.  Defendants completely ignore the skilled services, such as monitoring and

11 medication management that ADHC uniquely provides to Plaintiffs Darling and Garcia, which are

12 critical to their ability to remain living independently.  "If [Ms. Garcia] loses her daily monitoring and

13 interventions at the ADHC center, she loses her independence, her friends, her medical monitoring and

14 will inevitably experience a downward spiral."  Steinke Decl. ¶ 27; ¶ 28 (Re: Darling).

15      <u>Lack of Services</u>:  Many of the categories of programs identified by Defendants are simply

16 irrelevant to the ADHC population, such as the children's waiver or the closed IHO waiver.  [ECF No.

17 276] Owen Decl. ¶¶ 7, 10.  Defendants also cite to services which have significant barriers to their

18 availability to ADHC recipients by the September 1, 2011 deadline, such as programs under

19 development (*Id.* ¶ 11); or those with waitlists, like the Nursing Facility Waiver (Wilber Supp. Decl.

20 ¶ 7); or those with enrollment caps and/or geographic limitations, such as MSSP, the Assisted Living

21 Waiver, and PACE (Owen Decl. ¶¶ 8, 9, 12).  *See*, Wilber Supp. Decl. ¶¶ 6-8.

22      <u>Inadequate Transition Process</u>:  While other programs may "potentially be appropriate as

23 replacement services…Defendants have not indicated that they have taken any of the steps necessary to

24 transition ADHC participants to actual alternative services by September 1, 2011."  Wilber Supp.

25 Decl.¶ 9.  An ADHC provider in Los Angeles contacted the resources in the Community Services

26 Resource Guide supplied by Defendants "in anticipation of the transition".  Supplemental Decl. of Nina

27 Nolcox ("Nolcox Supp. Decl.") ¶¶ 10- 16.  She found that most programs were not appropriate or

28 available; her staff were placed on lengthy holds, left messages that were not returned, and were referred

4

*DARLING, ET AL. V. DOUGLAS, ET AL.,* C-09-03798 SBA; PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS'
NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1  back to ADHC to serve their clients.  *Id*.  "If this Resource Guide constitutes the transition plan for the

2  L.A. area, then discharge from ADHC truly is a bridge to nowhere…." Nolcox Supp. Decl. ¶ 16.

3       Defendants have failed to rebut Plaintiffs' evidence that replacement services are not available

4  and that Plaintiffs remain at risk of institutionalization without ADHC.  *See*, Plaintiffs' Motion for

5  Preliminary Injunction ("Mot.") Sections II.D, E and G.  Moreover, Defendants' portrayal of the

6  Plaintiffs is inaccurate and misleading and their suggestion that Plaintiffs do not really need ADHC or

7  the services they receive there is insulting.  Defendants' declarant admits that she did not personally

8  review Plaintiffs' records, thereby relying on hearsay in her declaration; the records reviewed were

9  incomplete; and the declarant apparently did not review any of the declarations submitted by Plaintiffs,

10  or speak with ADHC providers or family members.  Ferreria Decl. ¶ 13.  The numerous inaccurate and

11  irrelevant statements about Plaintiffs are more fully addressed in the supplemental declarations of Celine

12  Regalia, Dawn Myers Purkey, Nina Nolcox, Tracy McCloud, and Peter Behr.

13      **B.    Eliminating ADHC will Result in Nursing Facility Placements and Cost the State**
14             **More Money than it Saves**

15       Defendants do not rebut the claim that elimination of ADHC as a Medicaid optional benefit will

16  cost the State more than it saves.[1]  They offer only one factually unsupported declaration which states

17  that by zeroing out the ADHC line item in the State budget, California will save $170 million in

18  estimated ADHC costs in 2011-2012.[2]  [ECF No. 278] Watkins Decl. ¶ 13; *See also* Pl. Obj. to Evid.

19       Plaintiffs' expert, Dr. Hendrickson, who recently prepared for the State a 300-page analysis of

20  long-term care services and financing in California, concludes that Mr. Watkins' statement is simply

21  wrong.  Dr. Hendrickson has conducted an analysis showing that if just 6,800 ADHC recipients are

22  placed in nursing facilities, and others receive no services, any savings from the elimination of ADHC

---

[1] While Defendants attack the Lewin Report as biased and unreliable (Opp. 8:20-9:9), Plaintiffs' experts vouch for the Lewin Group's objectivity, and Dr. Hendrickson states that "Lewin is correct in basing its analysis on costs that were actually paid rather than making speculative assumptions that some costs should not have been paid."  Hendrickson Decl. ¶¶ 37-39; Wilber Supp. Decl. ¶ 5.

[2] Defendants' attempts to characterize the ADHC program as fraudulent simply distract from the legal, personal, and fiscal issues in this case.  Opp. 8:20-9:9.  Defendants' fraud allegations rely on a study which uses an undersized sample and subjective determinations of fraud and error.  Missaelides Supp. Decl. ¶ 18.  Most egregiously, the study failed to account for the way that ADHC services are delivered compared to physician or pharmacy services.  *Id.*  "For instance, if a participant was found not to meet medical necessity, each day of attendance was counted as a separate error.  Consequently, the same error was compounded by multiple numbers of days of service." *Id.*  Thus, Defendants' fraud, error, and cost figures must be given little weight given their study's grossly flawed methodology.

1    will evaporate.  Hendrickson Decl. ¶¶ 41-56.  Moreover, since the State has budgeted only $85 million

2    for transition and provision of alternative services, if only 2,728 ADHC recipients require nursing

3    facility placement, the State will exceed its budgeted amount to serve this population.  *Id.* ¶¶ 57-59.

4            Defendants cite just one article from 1994 to justify their contention that ADHC recipients will

5    not be institutionalized.  [ECF No. 273] Muchmore Decl. ¶ 5.  However, "[t]here are now numerous

6    articles and research emphasizing and supporting the importance of ADHC as a community-care service

7    that helps keep people out of institutions, reduces caregiver stress and burden, and has a positive effect

8    on reducing mortality.  There are also a number of articles that support the cost effectiveness of ADHC

9    and other community-based services."  Wilber Supp. Decl. ¶ 4.  ADHC providers estimate that upon

10   ADHC elimination, 11% of recipients will be discharged to a nursing facility immediately, an additional

11   12.3% within the first 30 days and another 10.9% within two months.  Missaelides Supp. Decl. Ex. G.

12   Defendants concede that an 18% nursing facility placement rate is a valid estimate (Muchmore Decl.

13   ¶ 7), and the experience of one ADHC center that closed shows a likely 25% nursing facility placement

14   rate.  Hendrickson Decl. ¶ 51; [ECF No. 241] Houghton Decl. ¶¶ 13-15, 24.  Even if ADHC recipients

15   are not immediately placed in nursing homes, they "will suffer avoidable health consequences from the

16   lack of consistent and appropriate skilled care and monitoring" leading to eventual hospitalization and

17   nursing facility placement.  Steinke Decl. ¶ 31, 21-23; [ECF No. 238] Gardner Decl. ¶ 31 (Without

18   ADHC, there is a "serious risk that these adults no longer will be able to live in their own homes or with

19   their families and will instead require a more restrictive setting at a higher and [more] costly level of

20   care and, in some cases, require expensive psychiatric hospitalization.")

21           Significantly, while declarant Jim Watkins lists the many cuts to Medi-Cal services contained in

22   AB 97, including a 10% rate cut to nursing facilities (Watkins Decl. ¶ 8), Defendants fail to disclose that

23   in the final budget enacted on June 30, 2011 the 10% rate cut to nursing facilities will be restored next

24   year, costing the State $155 million.  Hendrickson Decl. ¶ 45.  In addition, in contrast to community-

25   based Medi-Cal services, nursing facilities will receive a rate increase.  *Id.*  Thus, the State's argument

26   that enjoining elimination of ADHC will "require painful reductions to other essential programs" (Opp.

27   17:15), is disingenuous.  If nursing facilities were to receive the same rate and service cuts that

28   community-based Medi-Cal services have endured, the additional savings could be used to fund the

1     ADHC program or adequate and appropriate alternatives.

2     **III.   PLAINTIFFS' CLAIMS ARE RIPE**

3           Defendants mistakenly characterize the gravamen of Plaintiffs' claims as an issue of "timing"

4     and argue that because their transition plan has not yet been implemented, Plaintiffs' claims are

5     premature.  Opp. 10:5.  Plaintiffs' experts, ADHC providers, and Defendants' own witnesses show,

6     however, that the services identified by Defendants are largely unavailable and inadequate, and that

7     Defendants have no means by which Plaintiffs and Class Members will be able to access replacement

8     services by September 1.  *See supra* Section II.A.

9           There is a timing issue as well.  Defendants have no ability to ensure that in a matter of weeks,

10     they can implement an effective transition plan that will prevent harm to thousands of ADHC recipients

11     who will precipitously lose the services they rely on to remain safe and healthy, and in their homes.

12     Harm to ADHC recipients is already occurring, as ADHC centers close.  *See*  Missaelides Supp. Decl.

13     ¶ 8.  "What is conspicuously absent in the Defendants' declarations is any discussion of groups of

14     current ADHC recipients who have in fact been successfully transitioned to alternative community

15     services identified by defendants."  Hendrickson Decl. ¶ 34; Houghton Decl. ¶¶ 12, 13-20.

16     **IV.   DEFENDANTS' ACTIONS PLACE PLAINTIFFS AND CLASS MEMBERS AT RISK**
17               **OF INSTITUTIONALIZATION IN VIOLATION OF THE ADA**

18         **A.   Defendants' Actions Constitute Discrimination Under the ADA**

19           Despite their decision to discontinue Medi-Cal funding for ADHC, Defendants remain obligated

20     under the ADA to take adequate steps to prevent unnecessary institutionalization when they eliminate

21     funding for a program expressly intended for that purpose.  *See* CAL. HEALTH & SAFETY CODE § 1570.2.

22     Defendants' "failure to prevent unnecessary gaps in service … improperly discriminate[s] against

23     persons with disabilities by limiting their ability to maintain their social and economic independence and

24     depriving them of a real choice between home and institutional care."  *Ball v. Rodgers*, No. 00-CV-67,

25     2009 WL 1395423, at *5 (D. Ariz. April 24, 2009).[3]

26

27     [3] "[L]imitations on the availability of [Medicaid] funds may be relevant to the fundamental alteration defense, but those
limitations are not pertinent to the question whether plaintiffs have met their burden of demonstrating a prima facie violation

28     of the integration regulation."  *Townsend v. Quasim,* 328 F.3d 511, 518, fn. 1 (9th Cir.2003).

In a recently-issued technical assistance guide from the United States Department of Justice (DOJ), the DOJ stated that in making budget cuts:

> …public entities have a duty to take all reasonable steps to avoid placing individuals at risk of institutionalization.  For example, public entities may be required to make exceptions to the service reductions or to provide alternative services to individuals who would be forced into institutions as a result of the cuts.  If providing alternative services, public entities must ensure that those services are actually available and that individuals can actually secure them to avoid institutionalization.

DOJ ADA/*Olmstead* Technical Assistance Guide, Gershon Decl., Ex. B Question 9.

Defendants mischaracterize Plaintiffs' prayers for relief as an unreasonable demand to maintain "the exact same level of benefits" (Opp. 12:3), citing to a footnote in the Supreme Court's *Olmstead* decision for the proposition that the ADA does not impose a specific standard of care or certain level of benefits to individuals with disabilities.  Opp. 12:10-16.  Defendants miss the point.  In the *Olmstead* footnote, the majority merely responds to the dissent's complaint that its holding will interfere with states' discretion in their administration of public services and clarifies that  "[s]tates must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide."  *Olmstead v. L.C.*, 527 U.S. 581, 603, fn. 14, 119 S.Ct. 2176 (1999).

Here, Defendants take pains to prove that they "in fact provide" services that ADHC recipients may receive to replace ADHC; thus, their actions are subject to scrutiny under the ADA.  Opp. 3:23-4:17.  Moreover, Defendants have not eliminated ADHC entirely as a program.  Even as they have chosen to eliminate Medi-Cal funding for ADHC, ADHC programs could continue to be licensed and operational.  In addition, the underlying services which make up the ADHC program are services which the state continues to offer, both in the community and in nursing facilities.  The issue at hand is thus whether or not Plaintiffs and Class Members will have adequate access to those services in the community versus in institutions.[4]  As in *Townsend*, "the precise issue is not whether the state must provide the long term care services sought by Mr. Townsend and the class members — the state is already providing these services — but in what location these services will be provided."  *Townsend,*

---

[4] Defendants' reliance on *Rodriguez v. City of New York* and *Alexander v. Choate* to support their argument is misplaced for the same reason.  *Rodriguez* involved the Second Circuit's refusal to order New York to provide safety monitoring, a service it did not offer to anyone.  *Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999).  The *Townsend* Court distinguished *Rodriguez* stating, "[W]here the issue is the *location* of services, not whether services will be provided, *Olmstead* controls." *Townsend* at 328 F. 3d 517.  *Choate* is not an ADA case and did not involve termination of services intended to prevent institutionalization.  *Alexander v. Choate*, 469 U.S. 287 (1985).

1   328 F.3d at 517.  Plaintiffs have demonstrated that Defendants' actions will increase the likelihood that

2   they will enter institutions to receive those services.  *See* Mot. Sections II.G and III.B.; *see also*

3   Hendrickson Decl. ¶ 49; Steinke Decl. ¶¶ 31, 21-23; Gardner Decl. ¶ 31.

4          Thus, the issue here is not whether Defendants must maintain a certain standard of care, but

5   rather, whether Defendants have met their burden of ensuring more than a "theoretical" availability" of

6   alternative services when defunding ADHC services.  *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161,

7   1175 (N.D. Cal. 2009).  They have not done so and are thus culpable under the ADA.

8          **B.     Defendants Cannot Support their Fundamental Alteration Defense.**

9          Defendants' defense is premised on the State's fiscal situation and the bald assertion that a

10   challenge to their discontinuation of funding for ADHC "necessarily would constitute a fundamental

11   alteration of the State's Medi-Cal program."  Opp. 17:12-13.  Defendants claim that the requested relief

12   would result in cutbacks to other Medicaid programs, and that they would be forced to operate ADHC as

13   a state-only benefit without federal matching funds.  Opp. 13:6-10.  Neither assertion is true.

14          The fact that a state has a "fiscal problem, by itself, does not lead to the automatic conclusion

15   that [a proposed modification] will result in a fundamental alteration."  *Fisher v.Oklahoma Health Care*

16   *Authority*, 335 F. 3d 1175, 1182-83 (10th Cir. 2003).  That Defendants have spared nursing facilities

17   from the 10%  rate cut imposed on many other Medi-Cal providers — at a State cost of $155 million--

18   and bestowed on them a rate increase in the face of massive cutbacks to community-based Medi-Cal

19   services belies their argument that elimination of ADHC is necessary for their fisc.  *See supra* Section

20   II.B.  This Court has already rejected Defendants' argument that "they have no obligation to maintain

21   the same level of services as before, and are thus entitled to cut services at will to accommodate the

22   State's budgetary constraints."  *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 994-995 (N.D. Cal. 2010).

23          Defendants' actions will in fact cost more than they will save, according to Dr. Hendrickson,

24   who concludes that the $85 million allocated by the State is insufficient to pay for alternative services

25   that will be used by ADHC recipients.  Hendrickson Decl. ¶ 62.  If just 2,700 individuals go to nursing

26   facilities, the State will use up the entire $85 million.  *Id.* ¶¶ 58-59.  He also finds that if just 6,800

27   ADHC recipients go into nursing homes then Defendants will spend more than the $211 million of State

28   dollars that it would have cost to continue ADHC, without funding any services for the remaining

9

*Darling, et al. v. Douglas, et al.*, C-09-03798 SBA; Plaintiffs' Reply to Defendants' Opposition to Plaintiffs'
Notice of Motion and Motion for Preliminary Injunction

individuals.  *Id.* ¶ 61.  Dr. Hendrickson's findings are entirely consistent with the Lewin Report, which projected a net cost to the State of $51.6 million in the first year of elimination, and significantly higher costs in subsequent years.  [ECF No. 228-2] Auerbach Decl., Ex. B at 3.

Budgetary shortages alone do not create a fundamental alteration defense according to the DOJ:

> Budgetary shortages are not, in and of themselves, evidence that…relief [to Plaintiffs] would constitute a fundamental alteration.  Even in times of budgetary constraints, public entities can often reasonably modify their programs by re-allocating funding from expensive segregated settings to cost-effective integrated settings.  Whether the public entity has sought additional federal resources available to support the provision of services in integrated settings for the particular group or individual requesting the modification – such as Medicaid– is also relevant to a budgetary defense.  DOJ ADA/*Olmstead* Technical Assistance Guide, Gershon Decl. Ex. B Question 14.

Defendants have chosen to eliminate ADHC as an optional Medi-Cal service, a decision with fiscal and human consequences.  Defendants' failure to make different choices, however, cannot be used to justify their fundamental alteration defense.  As the Centers for Medicare and Medicaid Services (CMS) has made clear:

> If other laws (*e.g.* ADA) require the state to serve more people, the State may do so using non-Medicaid funds or may request an increase in the number of people permitted under the HCBS waiver.  Whether the State chooses to avail itself of possible Federal funding is a matter of the State's discretion.  Failure to seek or secure Federal Medicaid funding does not generally relieve the State of an obligation that might be derived from other legislative sources (beyond Medicaid, such as the ADA.)  CMS *Olmstead* Update No: 4, Gershon Decl., Ex. A at 4.

Here, for example, Defendants could request that CMS extend the date for elimination of ADHC to allow for an orderly transition to a new KAFI program and/or other appropriate long-term care services.  In fact, CMS has indicated that it would consider such an extension, which would enable the State to continue receiving federal funds in the interim.  Gershon Decl. Ex. D.  This appears to be contemplated by the Governor's veto message, in which he allocated $85 million for transition and assessment, including seeking federal waiver approval and development of alternative funding arrangements to avoid shutdown of ADHC centers.  Hendrickson Decl. Ex. H.  The State has many options in delivering services to people with disabilities and has discretion to choose among these, without fundamentally altering the nature of its program.  *Fisher,* 335 F.3d at 1183.  It does not have the discretion to choose an option that violates the ADA.

**C.**   **Plaintiffs' Demonstrated Risk of Institutionalization is Sufficient to State an *Olmstead* Claim**

10

Defendants attempt to create a new standard for stating an *Olmstead* claim—one that has already been rejected by this Court and is inconsistent with the only appellate court to rule on this issue, numerous district courts, and the DOJ.  This Court has already rejected Defendants' assertion that to establish an *Olmstead* claim, Plaintiffs would have to show that they had "no choice" but to receive services in an institutional setting, holding that a risk of institutionalization is sufficient.  *Brantley*, 656 F. Supp. 2d at 1170.  This Court's holding is consistent with the Tenth Circuit, which held that "*Olmstead* does not imply that disabled persons who, by reason of a change in state policy, stand imperiled with segregation, may not bring a challenge to that state policy under the ADA's integration regulation without first submitting to institutionalization." *Fisher*, 335 F.3d at 1182.[5]

Significantly, the DOJ has affirmed that "persons at serious risk of institutionalization or segregation" are covered by the ADA's integration mandate and *Olmstead*.  DOJ ADA/*Olmstead* Technical Assistance Guide, Gershon Decl. Ex. B Question 6.  The DOJ explains:

> [A] plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services *or its cut to such services* will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution. *Id.*

Plaintiffs and Class Members have provided an abundance of evidence, unrefuted by Defendants, that without ADHC or adequate and appropriate services in place when they lose ADHC on September 1, 2011, they are at serious risk of imminent or eventual institutional placement.  *See*, Mot. Section II.E and G; *see also, supra*, Section II.B.

## V.  DEFENDANTS ARE IN VIOLATION OF FEDERAL STATUTORY AND CONSTITUTIONAL DUE PROCESS REQUIREMENTS

Defendants assert that the elimination of the ADHC benefit as an optional Medi-Cal benefit does not afford due process rights to ADHC participants.  However, Defendants mischaracterize the holdings

---

[5] Numerous district courts have held that a similar standard applies.  *See, V.L.* v. *Wagner*, 669 F. Supp. 2d 1106, 1109 (N.D. Cal. 2009) ("serious risk" sufficient to state an *Olmstead* claim); *Makin ex rel. Russell v. Hawaii*, 114 F. Supp. 2d 1017, 1034-35 (D. Haw. 1999) (denying summary judgment to defendant because statute "could potentially force Plaintiffs into institutions"); *Ball* v. *Rodgers*, 2009 WL 1395423, at *5 (Defendants' "failure to provide Plaintiffs with the necessary services threatened Plaintiffs with institutionalization."); *Marlo M. ex rel. Parris v. Cansler*, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010) (entering preliminary injunction based on "substantial risk of institutionalization"); *G. v. Hawaii*, 676 F. Supp. 2d 1046, 1057 (D. Haw. 2009) (reduction in services may violate *Olmstead* when it "will likely force beneficiaries from an integrated environment into institutional care"); *Mental Disability Law Clinic v. Hogan*, Civ. No. CV 06-6320, 2008 WL 4104460, at *15 (E.D.N.Y. Aug. 28, 2008) ("[E]ven the risk of unjustified segregation may be sufficient under *Olmstead*"); *Nelson v. Milwaukee Cty*, No. 04 C 0193, 2006 WL 290510, at *7 (E.D. Wis. Feb. 7, 2006) (plaintiffs stated cognizable integration claim by alleging that inadequate compensation of providers "substantially increase[s] the probability" that older residents will end up in "less integrated settings").

11

*DARLING, ET AL. V. DOUGLAS, ET AL.*, C-09-03798 SBA; PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1  in both cases they cite in support of this argument.  In *Rosen v. Goetz,* the court held that due process

2  was not violated where the Defendants "*will* grant hearings to affected beneficiaries so long as they raise

3  a valid factual dispute about their continued eligibility for coverage, as opposed to a mere challenge to

4  the change in law or policy."  410 F.3d 919, 926 (6th Cir. 2005).  In *M.R. v. Dreyfus*, the limitation on

5  the hearing requirement arose from the practical consideration that, *absent some factual dispute* about an

6  individual's right to benefits, a hearing would serve little, if any purpose. 767 F. Supp. 2d 1149, 1166

7  (W.D. Wash. Feb. 9, 2011), appeal docketed March 17, 2011, Case No. 11-35026.

8          In *Rosen*, the Plaintiffs argued that they were entitled to a hearing when the State proposed to

9  eliminate one Medicaid program and a beneficiary claimed continued eligibility under another program,

10  even if the beneficiary failed to allege a "valid factual dispute" about her eligibility for this other form of

11  Medicaid coverage.  *Rosen*, 410 F.3d at 927.  Unlike *Rosen*, here, there will be instances of valid factual

12  disputes, which will give rise to hearing rights, despite the fact that there has been a change in law.

13          For instance, Defendants acknowledge that there will be individual factual disputes over whether

14  services provided through Defendants' "short-term" program will be adequate, which could be

15  addressed at a hearing.  *See, e.g.*, Ogle Decl. ¶ 15 ("DHCS will request that the ADHC centers notify the

16  state if there are participants for whom they cannot secure access to services."); ¶ 22 ("If an ADHC

17  participant cannot be transitioned in a timely manner to another program or service, the participant may

18  receive services in the short-term transitional program authorized by AB 97.")

19          In addition to hearing rights to determine if transition services are adequate, Plaintiffs have due

20  process hearing rights regarding whether or not they continue to be entitled to the underlying skilled

21  nursing services, personal care services, and other Medi-Cal services for which they qualify, and which

22  they have received in a "bundled" fashion through the ADHC program.  Elimination of the ADHC

23  optional benefit summarily reduces access to these underlying services, which could be challenged at a

24  hearing.  *See, e.g.,* Ogle Decl. ¶ 21 ("beneficiary currently receiving physical therapy at an ADHC center

25  will be able to receive physical therapy from another Medi-Cal provider, so long as the beneficiary

26  meets the medical necessity criteria for receiving that benefit.")

27          Defendants admit that they will not issue legally adequate notice. Ogle Decl. ¶ 9.  Sending

28  participants notice of the elimination, which will contain a phone number to call with questions, does not

1    meet Constitutional or statutory requirements.

2    **VI.    DEFENDANTS CONFLATE ARTICLE III STANDING REQUIREMENTS WITH
3            PLAINTIFFS'** *OLMSTEAD* **CLAIM**

4            There can be no question that ADHC recipients whose current benefits are slated to be

5    eliminated in less than two months' time have standing under Article III of the Constitution to claim

6    injury as a result of that elimination.  *See*, *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050,

7    1065 (9th Cir. 2008), *cert. granted in part on other grounds sub nom, Maxwell-Jolly v. Indep. Living

8    Ctr. of S. Cal.,* 131 S.Ct. 992 (U.S. Jan. 18, 2011) (Medi-Cal beneficiaries have Article III standing to

9    challenge cuts to medical services); *Harris v. Bd. of Supervisors, Los Angeles County*, 366 F.3d 754,

10   761-62 (9th Cir. 2004) (likelihood of harm to indigent plaintiffs due to threatened closure and reduction

11   of county hospitals was not too speculative.)[6]

12          Defendants argue that because DHCS' transition plans are not final and other case management

13   services are allegedly available (Opp. 20:22-21:5), Plaintiffs cannot show a causal connection between

14   the planned elimination of ADHC and impending harm.  Here, the chain of causation is clear, and

15   Defendants cite no authority that Plaintiffs fail to meet Article III's causality test.  The fact that some

16   alternative services "may" be available does not undermine Plaintiffs' standing to bring their claims.

17   *See, Harris*, 366 F.3d at 763 (plaintiffs challenging closure of public hospital met Article III causation

18   requirement despite existence of alternative, inadequate facilities.)

19          In contrast to *M.R. v. Dreyfus*, where a reassessment and exceptions process existed that would

20   have allowed the plaintiffs to recover lost services, yet they failed to contact their case managers to

21   attempt to correct gaps in care, here Plaintiffs' skilled ADHC providers are fully aware of the impending

22   cuts, are exploring feasible options, and yet Plaintiffs and others similarly situated remain at risk of

23   imminent harm.  *Cf.* 767 F. Supp. 2d at 1153, 1163-64.  Plaintiffs have standing under Article III.

24

25   _____

26   [6] To the extent that Defendants argue that Plaintiffs' allegations of physical or mental deterioration must be "so certain and
     precipitous that they would imminently have no alternative but to submit to, and become qualified for, institutional care"
     (Opp. 20:18-21), Defendants improperly conflate the constitutional requirements for standing (*see Lujan v. Defenders of
27   Wildlife*, 504 U.S. 555, 560 (2009) (must show an injury that is "actual or imminent")) with the merits questions of likelihood
     of institutionalization and irreparable harm (addressed in Section IV above, and Section VII.A below, respectively.)  *Cf.
     Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041-44 (9th Cir. 1999) *en banc* (finding Article III standing, but not
28   sufficient likelihood of irreparable harm, where traffic stop occurred once over ten years).

1

**VII.   PLAINTIFFS MEET THE ADDITIONAL *WINTER* STANDARDS FOR GRANTING OF A PRELIMINARY INJUNCTION**

2

**A.     Plaintiffs have Shown a Likelihood of Irreparable, Imminent Harm**

3

For the third time, Defendants argue that Plaintiffs' impending loss of ADHC services does not

4

entail sufficiently likely irreparable harm to support issuance of a preliminary injunction.  This position

5

is no more persuasive now that the state has chosen to eliminate Medi-Cal funding for the entire ADHC

6

program than it was in the face of prior planned reductions in ADHC services.  *See*, *Cota* 668 F. Supp.

7

2d 997; *Brantley*, 656 F. Supp. 2d at 1176-77.

8

A preliminary injunction is, of course, "unavailable absent a showing of irreparable injury."

9

*Hodgers-Durgin*, 199 F.3d at 1042.  Defendants do not acknowledge either this Court's prior holdings or

10

supporting Ninth Circuit precedent establishing that "the reduction or elimination of public medical

11

benefits is sufficient to establish irreparable harm to those likely to be affected by the program cuts."

12

*Cota* 668 F. Supp. 2d 997; *Brantley*, 656 F. Supp. 2d at 1176-77; *see also, e.g*., *Beno v. Shalala*, 30 F.3d

13

1057, 1063-64, n.10 (9th Cir. 1994).  As the Court explained in *Brantley***Error! Bookmark not defined.**,

14

"[g]iven the tenuousness and complexities of [Plaintiffs'] conditions, an interruption in their care, even

15

if temporary, will have serious consequences for Plaintiffs."  654 F. Supp. 2d at 1176-77.

16

In essence, Defendants characterize any threatened injury to Plaintiffs as "speculative" until

17

physical or mental deterioration, hospitalization or other institutionalization actually occurred,

18

effectively foreclosing the option of preliminary injunctive relief altogether.  With this motion scheduled

19

to be heard just over 30 days before implementation of AB 97, with ADHC providers increasingly

20

closing in the face cuts, and without an adequate transition plan, Plaintiffs have more than sufficiently

21

shown that they are likely to suffer irreparable harm in the absence of an injunction.

22

**B.     The Balance of Equities and the Public Interest Support a Preliminary Injunction**

23

Defendants' recitation of theoretically available replacement services is "illusory."  Wilber Supp.

24

Decl. ¶ 8.  Moreover, although "the State has declared its intention to assist plaintiffs in locating"

25

alternative services (Opp. 23:7), their inadequate efforts virtually ensure that Plaintiffs and Class

26

Members will lose needed medical services in a matter of weeks.  Hendrickson Decl. ¶ 32; Wilber Supp.

27

Decl. ¶ 9.  Plaintiffs' analysis of the balance of equities and public interest is sound.  *See*, Mot. 25:1-9.

28

In addition, as discussed *supra* Section IV, Defendants have not shown that enjoining

14

1  elimination of ADHC would compel cutbacks to "other essential Medicaid programs."  Opp. 23:18.  As

2  elimination will actually cost more than it saves, an injunction would protect the State's fisc, as well as

3  prevent harm to thousands of Californians.  Plaintiffs agree with Defendants that it is in the public

4  interest "to make necessary health care services available to a vulnerable population and to efficiently

5  and responsibly manage public funds."  Opp. 24:6-8.  An injunction would meet both of these aims.

6  **VIII.   PLAINTIFFS' REQUESTED INJUNCTION IS PROPER**

7          Contrary to Defendants' claims, the claims of Plaintiffs mirror those of the putative class as a

8  whole.  All Plaintiffs and Class Members have:  been determined by Defendants to meet medical

9  necessity criteria for ADHC; are Medicaid recipients; have been determined by Defendants to face the

10 risk of institutionalization, hospitalization, and/or mental or physical deterioration without ADHC

11 services; and will be subjected to the termination of ADHC services as a result of the same statutory

12 changes, and Defendants' implementation of these changes.  The Court can issue classwide relief despite

13 the fact that plans for Plaintiffs and Class Members necessarily must be specific to individual needs.

14 *See,* Hendrickson Decl. ¶¶ 13-23; [ECF No. 257] Wilber Decl. ¶¶ 21-22.

15         Defendants argue that the proposed order gives the Court an "unprecedented level of judicial

16 oversight over the DHCS' transition assistance efforts."  Opp. 25:16.  However, this Court has already

17 enjoined Defendants from making cuts to ADHC services until they can ensure that appropriate

18 alternative Medi-Cal services are provided.  *Brantley*, 656 F. Supp. 2d 1161, 1178.  The claim that the

19 proposed injunction is impermissibly vague is baseless; consistent with the Governor's veto message,

20 there are many ways Defendants can implement the injunction, and they have the ability to do so.

21 **IX.     CONCLUSION**

22         Plaintiffs respectfully request that this Court issue a preliminary injunction ordering Defendants

23 not to cease providing ADHC unless and until they ensure that adequate, appropriate, and uninterrupted

24 replacement services are in place to prevent unnecessary institutionalization.

25 Date:   July 12, 2011                              Respectfully submitted,

26                                                    DISABILITY RIGHTS CALIFORNIA

27                                            By:  _/s/_____
                                                   Elissa Gershon
28                                                 Attorneys for Plaintiffs

15