1  Elissa Gershon, State Bar No. 169741
   elissa.gershon@disabilityrightsca.org
2  Elizabeth Zirker, State Bar No. 233487
   elizabeth.zirker@disabilityrightsca.org
3  Kim Swain, State Bar No. 100340
   kim.swain@disabilityrightsca.org
4  DISABILITY RIGHTS CALIFORNIA
   1330 Broadway, Suite 500
5  Oakland, CA  94612
   Telephone:  510.267.1200
6  Facsimile:   510.267.1201

7

8              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 ESTHER DARLING; RONALD BELL by his        )  Case No.:  C-09-03798 SBA
   guardian ad litem Rozene Dilworth; GILDA   )
11 GARCIA; WENDY HELFRICH by her guardian    )  CLASS ACTION
   ad litem Dennis Arnett; JESSIE JONES; RAIF )
12 NASYROV by his guardian ad litem Sofiya    )  PLAINTIFFS' SUPPLEMENTAL BRIEF
   Nasyrova; ALLIE JO WOODARD, by her        )  IN SUPPORT OF MOTION FOR
13 guardian ad litem Linda Gaspard-Berry;     )  PRELIMINARY INJUNCTION
   individually and on behalf of all others similarly )
14 situated,                                  )  Hearing Date:  November 8, 2011
                                              )  Time:          1:00 p.m.
15              Plaintiffs,                    )  Judge:         Hon. Saundra Armstrong
                                              )  Address:       1301 Clay Street
16         v.                                 )                 Oakland, CA 94102
                                              )  Courtroom:     1, 4th Floor
17 TOBY DOUGLAS, Director of the Department of )
   Health Care Services, State of California,  )
18 DEPARTMENT OF HEALTH CARE               )
   SERVICES,                                  )
19                                            )
                Defendants.                   )
20                                            )

21

22

23

24

25

26

27

28

i

Kenneth A. Kuwayti, State Bar No. 145384
kkuwayti@mofo.com
Benjamin A. Petersen, State Bar No. 267120
bpetersen@mofo.com
Morrison & Foerster LLP
755 Page Mill Road
Palo Alto, California  94304-1018
Telephone:     650.813.5600
Facsimile:     650.494.0792

Eric Carlson, State Bar No. 141538
Ecarlson@nsclc.org
NATIONAL SENIOR CITIZENS LAW CENTER
3435 Wilshire Boulevard, Suite 2860
Los Angeles, CA  90010
Telephone:     213.674.2813
Facsimile:     213.639.0934

Kenneth W. Zeller, *Pro Hac Vice*
kzeller@aarp.org
Kelly Bagby, *Pro Hac Vice*
kbagby@aarp.org
AARP FOUNDATION LITIGATION
601 E Street N.W.
Washington, D.C.  20049
Telephone:     202.434.2060
Facsimile:     202.434.6424

Anna Rich, State Bar No. 230195
arich@nsclc.org
Kevin Prindiville, State Bar No. 235835
kprindiville@nsclc.org
NATIONAL SENIOR CITIZENS LAW CENTER
1330 Broadway, Suite 525
Oakland, California  94612
Telephone:     510.663.1055
Facsimile:     510.663.1051

Barbara Jones, State Bar No. 88448
bjones@aarp.org
AARP FOUNDATION LITIGATION
200 So. Los Robles, Suite 400
Pasadena, California  91101
Telephone:     626.585.2628
Facsimile:     626.583.8538

Sarah Somers, State Bar No. 170118
somers@healthlaw.org
Martha Jane Perkins, State Bar No. 104784
perkins@healthlaw.org
NATIONAL HEALTH LAW PROGRAM
101 East Weaver Street, Suite G-7
Carrboro, North Carolina  27510
Telephone:     919.968.6308
Facsimile:     919.968.8855

ii

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   THE PURPORTED REPLACEMENT SERVICES ARE ILLUSORY ................................ 1

    A.   Defendants Cannot Assure the Availability of Replacement Services on December 1 .......... 1

    B.   Managed Care Will Not Replace ADHC ................................................................ 2

    C.   APS Will Not Provide ADHC or ADHC Equivalent Services ................................. 4

    D.   IHO WAIVER ................................................................................................. 5

    E.   PACE ............................................................................................................ 6

    F.   Available Services Cannot Prevent Risk of Institutionalization ............................. 6

III.  IMPLEMENTATION OF DEFENDANTS' PLAN HAS BEEN DISASTROUS ................... 8

# TABLE OF AUTHORITIES

**Cases**

*Brantley v. Maxwell-Jolly*
    656 F. Supp.2d 1161 (N.D. Cal 2009) ................................................................... 2, 8

*Disability Advocates, Inc. v. Paterson*
    653 F. Supp. 2d 184 (E.D. N.Y. 2009) ..................................................................... 2

*Frederick L. v. Dep't of Pub. Welfare*
    422 F.3d 151 (3d Cir. 2005)...................................................................................... 2

1    **I.      INTRODUCTION**

2           Based on Defendants' request for additional time "to further develop the transition program to

3    ensure that there is a seamless transition of ADHC beneficiaries to alternative services," this Court

4    continued the present Motion to November 8, 2011.  ECF Nos. 302, 306.  Defendants have failed to fulfill

5    that promise.

6           Defendants' plan continues to be not only a "bridge to nowhere," but a broken bridge.  The

7    transition plan unveiled on August 5, 2011 — a radical departure from the prior plans presented to the

8    public and to this Court just weeks before — purports to shift the vast majority of the 35,000-38,000

9    current ADHC recipients into managed health care and a smattering of other programs which cannot and

10   will not replace ADHC by December 1, 2011. *ADHC Transition Strategy*, Zirker Decl. Ex. R. Defendants

11   admit that their plans are incomplete, in process, and uncertain, even as the plan rapidly unfolds; many

12   elements are not even scheduled to occur until after December 1, 2011. An injunction must be issued to

13   prevent irreparable harm to Plaintiffs and Class Members.

14   **II.     THE PURPORTED REPLACEMENT SERVICES ARE ILLUSORY**

15          **A.      Defendants Cannot Assure the Availability of Replacement Services on December 1**

16          Defendants concede that Plaintiffs and Class Members may not have adequate replacement

17   services in place when ADHC is eliminated on December 1, 2011, or at all. Director Douglas has testified

18   at legislative hearings that "it will not be the same level" of services.  9-2-11 Sen. Budget Subcomm. 3,

19   Pt. 1, 14:21, Zirker Decl., Ex. O; *see also*, 8-24-11 Douglas Confirmation Hrg., Pt. 1, 4:4-5; 4:24-28; 7:5-

20   12, Zirker Decl., Ex. M.[1] Plaintiffs' expert Dr. Leslie Hendrickson concludes that, "Defendants' transition

21   plan contains no reasonable prospect that when ADHC services are discontinued on December 1, 2011,

22   appropriate replacement services will in fact be in place for all persons losing their ADHC services."

23   Hendrickson Supp. Decl. ¶ 5. Dr. Hendrickson further cautions "that ADHC services cannot be

24   terminated unless the Defendants assure and monitor whether individuals are in fact receiving the

25   replacement services specified in their care plans − before their ADHC services are terminated − not in

---

26
27   [1] *See also*, Health and Human Services Agency Secretary Diana Dooley testimony, 9-2-11 Sen. Budget Subcomm. 3 Hrg. 5:19-21 ("we're going to do less with less…"); 5:18-19 ("…it will not be as comprehensive, or as convenient, or as helpful to these families as the [ADHC] centers  have been"); 7:4-5 ("I think it is too early to say whether we can meet our ambitious goals for
28   December 1, 2011." Zirker Decl., Ex. O.

1   the anticipation that individuals "might" receive them." *Id.* ¶ 7.

2       Defendants' transition plan fails to meet this Court's standard for compliance with the Americans

3   with Disabilities Act (ADA) that replacement services must be more than "theoretically available" upon

4   the elimination of ADHC. *Brantley v. Maxwell-Jolly,* 656 F.Supp.2d 1161, 1174 (N.D. Cal 2009),

5   consistent with other circuits in which Courts have found that "'[g]eneral assurances' and expressions of

6   'good faith intentions' are not enough." *Disability Advocates, Inc. v. Paterson,* 653 F. Supp. 2d 184, 301

7   (E.D. N.Y. 2009), citing *Frederick L. v. Dep't of Pub. Welfare*, 422 F.3d 151, 158 (3d Cir. 2005).  Rather,

8   the ADA requires a "'reasonably specific and measurable commitment to deinstitutionalization' for which

9   the State 'may be held accountable.'"  *Id.* at 305, quoting *Frederick L.*, 422 F.3d at 157.

10      **B.      Managed Care Will Not Replace ADHC**

11      Defendants' August 5, 2011 transition plan proposed the unprecedented, wholesale transfer of the

12   vast majority of ADHC recipients into managed health care Plans by October 1, 2011, as a purported

13   replacement for ADHC.  Managed care Plans are only obligated to provide primary and acute health care

14   services, not long-term care services like ADHC.  Foster Decl. ¶¶ 6-7, 28-29; Hendrickson Supp. Decl.

15   ¶¶ 39-40.[2] Plaintiffs' expert Russell Foster, who has over 25 years of experience directing and consulting

16   for managed care health Plans, concludes that, "after the elimination of ADHC as a Medi-Cal benefit,

17   Medical managed care Plans are not likely to be able to provide the level and type of services needed to

18   prevent the institutionalization of many current ADHC recipients."  Foster Decl. ¶ 4.

19      As currently contracted with the State, most Medi-Cal managed care Plans cover only primary and

20   acute health care services that do not include ADHC or its equivalent. Medi-Cal managed care Plans are

21   only obligated to pay for "covered services." *Id*. ¶¶ 6, 28.  Explicitly excluded from coverage are home

22   and community based services, including In-Home Supportive Services (IHSS), the Multipurpose Senior

23

24   [2] Unlike traditional "fee-for-service" Medi-Cal (in which Medi-Cal pays providers directly for actual services provided) in "managed care," Medi-Cal pays managed care organizations a per member per month "capitation" amount to provide a set of contractually defined services. Foster Decl. ¶¶ 20-23. Over 80% of ADHC participants are eligible for both Medicare and

25   Medi-Cal, known as "dual eligibles." Research has shown that this population is among the sickest, neediest, and highest cost to public health care systems. Hendrickson Supp. Decl. ¶ 8. They also have a significantly higher rate of institutionalization

26   than the general population. *Id.* Under the DHCS Transition Plan, approximately 24,000 ADHC dual eligibles were "voluntarily" enrolled in managed care plans; meaning that they were sent notices and given a brief period of time in which to

27   select a managed care plan. Those who did not select a plan were defaulted into one on October 1. Only 500 people affirmatively chose a managed care plan; 14,000 "opted out" and remain in fee-for-service Medi-Cal; 10,000 were defaulted

28   into a plan because they did not make a selection. Ogle Dep. 20:10- 21:14, 23:10-22.

2

Service Program (MSSP), and ADHC. *Id.* ¶ 7. Rather, these services are "carved out" such that managed care enrollees who need them get them separately through fee-for-service Medi-Cal; managed care Plans do not pay for, nor do they have an obligation to provide, these services. *Id.* ¶¶ 6-7, 29, 32.

Moreover, many of ADHC's component services are "categorically beyond the scope of the primary and acute medical services Plans are currently obligated to provide," including specialty mental health services, protective supervision and maintenance therapies (such as ongoing physical, occupational, and speech therapy). *Id.* ¶¶ 30-31. Those ADHC-component services that are nominally available through managed care–such as medical services, assessment, care coordination and management, and some therapies–are far "more limited" in the managed care setting (Ogle Dep. 60:14-19) and "rarely resemble" the comprehensive, robust versions offered by ADHC. Foster Decl. ¶¶ 33-38. Beyond not being obligated to provide ADHC or equivalent services, most managed care Plans are only required to pay for nursing facility placement for 30-62 days, after which time the beneficiary is disenrolled from the Plan.[3] *Id.* ¶ 42. Thus, managed care Plans have little or no financial incentive to voluntarily provide home and community based services that will help enrollees avoid institutionalization. *Id.* ¶¶ 41-46.

While Defendants' transition plan initially implied that managed care Plan obligations and incentives to provide ADHC or ADHC equivalent services would change, it is now clear that they will not. *Id.* ¶¶ 48-51. Although Defendants assert that Plan contracts will eventually be amended, it appears that they will be changed only to alter the assessment timeline and require that the assessments, care coordination and case management covered under current contracts be extended to all ADHC recipients,[4] and provide for some enhanced monthly payment (reported to be $60) for transitioning enrollees. Ogle Dep. 71:2-72:21. Plans will not be required to provide ADHC or any other services not required by current contracts. *Id.* 71:2-18. Plans will receive a still undefined increase in the amount of money each month for serving current ADHC recipients, but this will not be enough to cover the provision of new services. Foster Decl. ¶¶ 50-51. Furthermore, Defendants have not established rewards and penalties to incentivize the provision of services that would prevent institutionalization. Ogle Dep. 93:22-94:8.

---

3 In County Operated Health Systems' managed care plans, in which all Medi-Cal recipients are already mandatorily enrolled, individuals stay enrolled in the plan after admission to the nursing facility, but the monthly rate the plan receives from the state increases to cover the full increased costs incurred by the plan. Foster Decl. ¶ 42.

[4] Currently, plans are not required to provide these services to dual eligibles enrolled in their plans. Ogle Dep. 71:2-15.

1    The managed care Plans themselves raised fundamental questions about their ability to serve this

2    high acuity population and made clear that the array of services they will offer is very limited and will not

3    compare to the comprehensive services that individuals receive through ADHC.  Cal. Assoc. of Health

4    Plans Letter, 8/19/11, Ogle Dep. Ex. 8 at ADHC00093-95; Foster Decl. ¶¶ 39-46; *see*, Regalia 2d Supp.

5    Decl. ¶¶ 11-14; Toth 2d Supp. Decl. ¶¶ 24-25; Jan Decl. ¶ 17; Davis Supp. Decl. ¶¶7-10; Myers Purkey

6    2d Supp. Decl. ¶¶ 20-32; Hinton Decl. ¶¶ 8-9; Bunch Decl. ¶¶ 13-14.

7       **C.      APS Will Not Provide ADHC or ADHC Equivalent Services**

8    Defendants' transition plan calls for ADHC clients not enrolled in managed care at the time of the

9    ADHC elimination to receive assessments, care plans and ongoing service coordination through APS

10   Healthcare, Inc., a private company based in New York with whom Defendants have contracted. Since

11   Defendants' rushed and confusing effort to get ADHC recipients enrolled into Medi-Cal managed care

12   was not very successful, most ADHC recipients opted to remain enrolled in fee-for-service Medi-Cal and

13   will rely on APS, which will provide only limited services that are unlikely to prevent unnecessary

14   hospitalizations or institutionalizations.  Foster Decl. ¶¶ 22, 37.

15   APS is charged with completing approximately 15,000 assessments and care plans for people who

16   opted out of, or who are not eligible for, managed care statewide. [5] Ogle Dep. 115:21-116:1. Assessments

17   must be completed by November 22, 2011, but as of October 5, 2011, had not been started. Then, APS

18   must develop care plans and arrange for services before December 1, 2011.  Hendrickson Supp. Decl.

19   ¶ 29; Jan Decl. ¶ 18. Moreover, given the lack of required credentials and training of assessors (Ogle Dep.

20   117:14-21), the failure of DHCS to require assessments and care planning to be done face-to-face and

21   include the participant and family, the lack of standards for the care plans, and deficiencies in the

22   assessment instrument itself, "the accuracy and quality of [the] assessments and care plans are highly

23   questionable." Hendrickson Supp. Decl. ¶¶ 24- 36; *see also*, Nolcox 2d Supp. Decl. ¶¶ 11-21; Puckett

24   Supp. Decl. ¶¶ 12-13.

---

[5] APS has also been contracted to provide assessments and care plans for all managed care enrollees in Los Angeles County as well as for beneficiaries enrolled in HealthNet plans. Ogle Dep. 51:1-18. Completed care plans will be shared with health plans that will then be responsible for ensuring services are in place and for providing ongoing care coordination and case management.

4

Finally, APS will provide ongoing "service coordination support services" to ADHC clients not enrolled in managed care. "Service coordination support services" consists exclusively of making referrals to services and supports available in the community, such as IHSS. Nolcox 2d Supp. Decl. ¶ 22-25; Ogle Dep. 133:10-136:24; Puckett Supp. Decl. ¶¶ 10-11, 14. It does not include the direct provision of any medical or social services.  Nolcox 2d Supp. Decl. ¶ 23. These service coordination support services will be provided telephonically and only in response to a phone call from an ADHC client seeking assistance; there will be no affirmative steps taken by APS to coordinate care. Ogle Dep. 133:10-136:24.

### D.     IHO WAIVER

Defendants have proposed amending an existing Home and Community-Based Services (HCBS) Waiver – the In Home Operations (IHO) Waiver -- to provide ADHC services which they have renamed "Community-Based Adult Services" (CBAS). Hendrickson Supp. Decl. ¶¶ 45-46. Defendants' proposals are sufficiently uncertain and problematic such that CBAS is currently an empty paper option. *Id.* ¶¶ 46-52.  Defendants have allotted only 1,000 slots for the expansion of the IHO Waiver, an absurdly low number with no basis in actual need for the service. Owen Dep. 50:25-51:1-13; Zirker Decl. Ex. H. Unlike other HCBS programs which establish eligibility at the Nursing Facility-A level of care, an alternative which would provide services to over 50% of current recipients in some programs who are at risk for institutionalization, Defendants have chosen the more stringent NF-B level of care.[6] Nolcox 2d Supp. Decl. ¶¶ 35-36; Jan Decl. ¶¶ 20-21. The NF/AH Waiver, which provides services at the NF-A and B levels, has an 18-month waitlist and the applications of 400 current ADHC recipients are "sitting on the desk" of the IHO Chief with a fate "unknown." Owen Dep. 58:1-11.

With regard to the IHO Waiver, Defendants have yet to complete the federal application process or finalize major provisions, including the configuration of services and provider qualifications. Owen Dep. 50:25-51:1-13. Interested providers are unable to apply due to delays by Defendants. Regalia 2d Supp. Decl. ¶ 23; Puckett Supp. Decl. ¶ 26; Toth 2d Supp. Decl. ¶ 11; Myers Purkey 2d Supp. Decl. ¶¶ 42-44.  The application process for participants utilizes overly restrictive eligibility criteria and is confusing and cumbersome, resulting in only two applications being submitted to date. Owen Dep. 28:21–

---

[6] Eligibility criteria for MSSP, PACE, and SCAN is Nursing Facility-A level of care or above.

1    29:5; Regalia 2d Supp. Decl. ¶¶ 25-26; Puckett Supp. Decl. ¶¶ 21-22, 24-25; Davis Supp. Decl. ¶¶ 15-20;

2    Nolcox 2d Supp. Decl. ¶¶ 29-31; Myers Purkey 2d Supp. Decl. ¶ 34-41.

3          Moreover, Defendants' proposal is not a viable means to ensure that ADHC recipients have access

4    to a CBAS provider. Defendants expect to enroll providers through June, 2012, long after ADHC is

5    eliminated and ADHC providers have shut down. *ADHC Transition Schedule*, Zirker Decl., Ex. E.

6    Defendants have done no planning to match eligible individuals with CBAS providers in their geographic

7    area. As a practical matter, if Defendants are only offering 1,000 slots on the Waiver statewide, it is

8    unlikely ADHC/CBAS providers will remain open without enough participants to sustain their program.

9    Toth 2d Supp. Decl. ¶¶ 10-11; Davis Supp. Decl. ¶ 20; Puckett Supp. Decl. ¶ 27.

10         **E.      PACE**

11         Defendants cite PACE, or the Program of All-Inclusive Care for the Elderly, as another option for

12   ADHC recipients.  PACE is the only fully integrated managed care program and serves individuals over

13   55 who meet at least the NF-A level of care. It relies heavily on ADHC services as the hub for the long-

14   term and primary health care it provides. Hendrickson Supp. Decl. ¶ 54. Five PACE programs serve

15   approximately 2,800 people in five specific areas of the state. Shen Dep. 10:25-11:14.  Defendants' intent

16   to enroll 1,000 additional beneficiaries is overshadowed by reality. To date, no ADHC participant has

17   voluntarily enrolled in PACE.  *Id.* 24:25-25:7. As of October 10, only the Los Angeles program had made

18   a firm commitment to expand (at 250-260 ADHC members). *Id.* 13:8-20; 14:13-15:19. Two other centers

19   have expressed some interest, but no firm commitments have been made to date. Jan Decl. ¶ 22; Shen

20   Dep. 14:1-12; 15:20-16:4; 16:19-24.[7] Further, individuals interested in enrolling will have to apply and be

21   assessed and approved by the State.  *Id.* 22:14-25.

22         **F.      Available Services Cannot Prevent Risk of Institutionalization**

23         Plaintiffs have previously described the inadequacies in the current service system, which are not

24   cured by Defendants' specious representations. Pltfs' Mot. for Prelim. Inj. 7:27-10:9, ECF No. 225.

25   Defendants have even abandoned a number of purported replacement options since the transition plan was

---

[7] Another program identified by Defendants to serve ADHC recipients is SCAN in Los Angeles County.  SCAN is a managed
care plan for people over age 65, which operates in the Los Angeles area. For enrollees who meet NF level of care (A or B),
SCAN provides long-term care as well as primary health care. Shen Dep. 36:3-23. Defendants do not know how many people
will go from ADHC to SCAN. No ADHC participants have enrolled in SCAN as of October 10. *Id.* 33:15-17; 37:7-9.

*DARLING, ET AL. V. DOUGLAS, ET AL.*, CASE NO. C09-03798 SBA:  PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

unveiled.  *See*, Hendrickson Supp. Decl. ¶¶ 19-20; *see also*, Toth 2d Supp. Decl. ¶¶ 13-17; Nolcox 2d Supp. Decl. ¶¶ 35-37.  For Plaintiffs and Class Members, the outlook is grim and many will be at risk of institutionalization when ADHC is eliminated. *See, e.g.*, Bunch Decl. ¶¶ 15-16; Canterbury Decl. ¶¶ 9-11; Davis Supp. Decl. § 23; Nolcox 2d Supp. Decl. ¶ 43; Heyn Decl. ¶¶ 15-17; Puckett Supp. Decl. ¶¶ 30-35; Toth 2d Supp. Decl. ¶ 28; Behr 2d Supp. Decl. ¶ 22; Missaelides 3d Supp. Decl. ¶¶ 12-13.

Plaintiff Ronald Bell is not eligible for many senior services because of his age.  Nolcox 2d Supp. Decl. ¶¶ 40-43. He elected to remain in fee-for-service Medi-Cal which means that he will receive only minimal service coordination from APS.  *Id.*  He has applied for the IHO Waiver, but as described above, there is no certainty that he will receive a slot or that there will be a provider to serve him. *Id.*  Plaintiff Wendy Helfrich is already mandatorily enrolled in managed care, and her health plan is unable to offer her more than occasional home nurse visits and limited physical or occupational therapy. Regalia 2d Supp. Decl. ¶ 19. Plaintiff Raif Nasyrov enrolled in managed care because his daughter was not clear that he had a choice to opt out. Toth 2d Supp. Decl. ¶ 31. His options through managed care are unclear. *Id.* ¶ 32. His daughter will be forced to leave him alone at home while she works, and she is frightened about the likely deterioration in his physical and mental health without ADHC.  *Id.* ¶¶ 29-30.

Plaintiff Jessie Jones is enrolled in managed care through Kaiser and she is unlikely to receive any additional services even with the loss of ADHC. Behr 2d Supp. Decl. ¶ 17. She was referred for the IHO Waiver, but it is unknown whether she will qualify or have an available provider. *Id.* ¶ 22. Plaintiff Allie Jo Woodard's daughter opted not to enroll in managed care, apparently mistakenly believing that she would forfeit her longtime primary care physician. Davis Supp. Decl. ¶ 23. She has 11 service needs identified in her ADHC discharge plan, nine of which will be unmet when ADHC is eliminated. *Id.* ¶ 22. Her ADHC provider expects that she will need to be placed in a nursing facility within one month of ADHC termination. *Id.* 23. Plaintiff Esther Darling is already enrolled in managed care, but does not appear to have any additional services available to her when ADHC is eliminated. Myers Purkey 2d Supp. Decl. ¶¶ 45-52. Five of her six service needs will be unmet; MSSP might be available for case management assistance, but there is a four-month waitlist. *Id.* ¶¶ 47-49. Due to the confusion about the IHO Waiver, she has not yet been referred. *Id.* ¶ 52.

CAADS conducted a survey of the needs of participants who attend ADHC 4-5 days per week. Based on the survey results, "[t]he overall prognosis for outcome after discharge was scored as "fair" for 20.84% of the patients and "poor" for 79.17% indicating a high risk of institutionalization of these individuals.  Missaelides 3d Supp. Decl. ¶¶ 16-21.

## III.    IMPLEMENTATION OF DEFENDANTS' PLAN HAS BEEN DISASTROUS

In addition to the structural inadequacies of Defendants' transition plan, its hasty and reckless implementation has demonstrated that Defendants cannot proceed without causing untold harm to affected ADHC recipients.  Defendants began sending notices regarding managed care enrollment a mere 12 days after their latest plan was announced, without any guidance to ADHC providers as to how to advise their clients and families. Missaelides 3d Supp. Decl. ¶ 7; Toth 2d Supp. Decl. ¶¶ 33-35. Many people never received enrollment packets, non-English speakers received enrollment materials only in English, and Defendants' 800 number was of little or no assistance. Jan Decl. ¶¶ 9-15; Missaelides 3d Supp. Decl. ¶¶ 6-11. Toth 2d Supp. Decl. ¶¶ 33-34. Since the October 1, 2011 enrollment date, reports are beginning to emerge of serious problems with access to necessary health care. *See*, *e.g.,* Nolcox 2d Supp. Decl. ¶ 10 (loss of previously covered services necessitating emergency disenrollment from L. A. Care); Toth 2d Supp. Decl. ¶¶ 36-37 (enrollment in managed care means choosing between preferred doctor and Russian language ADHC program); Missaelides 3d Supp. Decl. ¶ 11 (people mistakenly enrolled in managed care must pay out-of-pocket for doctor visits until disenrollment is effective in 15-45 days).

Moreover, Defendants' plan to monitor the effects of their scheme relies entirely on retrospective reporting of outcomes such as nursing facility placement and hospital admissions. Defendants will not even begin collecting this information until after December, 2011, after ADHC is eliminated. Hendrickson Supp. Decl. ¶ 10; *Transition Monitoring Plan*, Ex. B to Zirker Decl. At that point, it will be too late to correct the harms that could have been avoided. *Id.* Given the impossible timelines set by Defendants, the critical flaws in the enrollment and assessment process, and Defendants' "track record of unreliable assurances" (Hendrickson Supp. Decl. ¶¶ 22-23), Defendants' failure to set, monitor, and analyze clear goals and outcomes is irresponsible and dangerous.  *Id.* ¶¶ 7-23. Such a lack of accountability to Plaintiffs and Class Members to the consequences of their actions is the same "arguably cavalier" approach enjoined by this Court twice before.  *Brantley,* 656 F. Supp. 2d 1161, 1174.

8

1    Date:   October 14, 2011             Respectfully submitted,

2                              DISABILITY RIGHTS CALIFORNIA

3                  By:   /s/ _____

4

5                              Elissa Gershon
                                Attorneys for Plaintiffs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*DARLING, ET AL. V. DOUGLAS, ET AL.*, CASE NO. C09-03798 SBA:  PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION