1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ESTHER DARLING, et al.,

          Plaintiffs,

      v.

TOBY DOUGLAS, Director of the
Department of Health Care Services,
State of California, DEPARTMENT OF
HEALTH CARE SERVICES,

          Defendants.

Case No.: C-09-03798 SBA (JSC)

**REPORT AND
RECOMMENDATION RE
PLAINTIFFS' MOTION FOR
ENFORCEMENT OF STIPULATED
JUDGMENT AND FOR
APPOINTMENT OF SPECIAL
MASTER**

      Presently before the Court is a Motion for Enforcement of Stipulated Judgment and for

Appointment of Special Master ("Motion") brought by Plaintiffs Esther Darling, Ronald Bell by his

*Guardian ad Litem*, Rozene Dilworth, Gilda Garcia, Wendy Helfrich by her *Guardian ad Litem*,

Dennis Arnett, Jessie Jones, Raif Nasyrov by his *Guardian ad Litem*, Sofiya Nasyrova, and Allie Jo

Woodard by her *Guardian ad Litem*, Linda Gaspard-Berry (collectively, "Plaintiffs") against

Defendants Toby Douglas and the Department of Health Care Services ("DHCS") (collectively,

1  "Defendants").[1] (Dkt. No. 522.) After carefully considering the pleadings submitted by the parties,

2  including the parties' supplemental submissions (Dkt. Nos. 579-582), and with the benefit of oral

3  argument on November 8, 2012, the Court RECOMMENDS that the Motion be DENIED.

### BACKGROUND

5          On August 18, 2009, Plaintiffs, who are elderly persons and adults with disabilities, brought

6  a class action suit against Defendants to enjoin changes being made to Adult Day Health Care

7  ("ADHC"), asserting that the changes to the program, as enacted by the California Legislature,

8  would place them at risk of unnecessary institutionalization. (Dkt. No. 438, Ex. A.) Plaintiffs also

9  alleged that their due process rights were violated and that restrictive new eligibility criteria violated

10  Medicaid requirements. *Id.* Ultimately, the parties settled the case, with the Court entering a

11  Stipulated Judgment on January 25, 2012. (Dkt. No. 444.) The Court retained jurisdiction over the

12  action until 30 months after the Effective Date of settlement. *Id.*

13          At issue in the parties' current dispute are two portions of their Settlement Agreement

14  ("Agreement"). First, the Agreement sets forth the procedures and requirements for the elimination

15  of ADHC and the implementation of a new Medi-Cal benefit program called Community Based

16  Adult Services ("CBAS").[2] Forty thousand Class Members potentially could be eligible for CBAS.

17  (Dkt. No. 532, 1.) A defining feature of CBAS is that the program is administered through "managed

18  care plans," rather than the previous "fee-for-service" model used under ADHC. Managed care

19  provides Medi-Cal services through contracts between DHCS and managed care organizations or

20  health plans; fee-for-service is a payment model for Medi-Cal benefits where health care providers

21  receive a fee from DHCS for each service provided to a beneficiary. (Dkt. No. 438, Ex. A, Sec.

22  VI.13 & 15.) The Agreement provides that "[n]o sooner than July 1, 2012, for all CBAS-eligible

23  Class Members who reside in counties where Medi-Cal managed care is available and are eligible

24  for Medi-Cal managed care enrollment, CBAS will be available only as a Medi-Cal managed care

---

26          [1]  The presiding judge in this matter, the Honorable Sandra Brown Armstrong, referred all
motions filed pertaining to the parties' settlement to the undersigned for preparation of a report and
recommendation. (Dkt. No. 460.)

28          [2]  CBAS "refers to an outpatient, facility based service program that delivers skilled nursing
care, social services, therapies, personal care, family/caregiver training and support, meals and
transportation to eligible Medi-Cal beneficiaries." (Dkt. No. 438, Ex. A, Sec. VI.6.)

benefit." (*Id.* at Sec. XII.D.3.) The Agreement further states that Defendants shall "passively enroll" all CBAS-eligible Class Members receiving CBAS services under the fee-for-service model into the new managed care plans no sooner than 30 days prior to the date CBAS replaces ADHC. (*Id.* at Sec. XII.F.2.a.) Those Class Members would receive notice of this passive enrollment and be given an opportunity to opt-out of the new managed care plan. (*Id.* at Sec. XII.F.2.b.) If a Class Member opted-out, however, that Class Member would lose access to CBAS services. (*Id.* at Sec. XII.F.2.c.i.) The Agreement notes that "[e]nrollment into [managed care] shall not impede Class Members' access to Medicare providers and services." (*Id.* at Sec. XII.F.2.k.)

The second area of dispute is the assessment process for CBAS eligibility. In addition to setting out the criteria for CBAS eligibility, the Agreement describes the process by which Class Members will be deemed eligible or ineligible for CBAS. To begin, the Agreement contemplates three categories in which Class Members will be assigned based on an initial DHCS review: categorically eligible for CBAS; presumptively eligible for CBAS; and non-presumptively eligible for CBAS. (*Id.* at Sec. XI.A & B.) Categorically eligible Class Members would transition from ADHC to CBAS automatically.[3] (*Id.* at Sec. XI.B.1.)

For the remaining Class Members, the Agreement requires a more involved process. First, ADHC centers, using a "screening tool," conduct their own in-house determination of whether Class Members meet the CBAS eligibility criteria contained in the Agreement, and send their recommendations to DHCS. (*Id.* at Sec. XI.A.2.a.) Second, the Agreement requires a "face-to-face" assessment for all Class Members who ADHC centers recommend as CBAS eligible, or as needing a face-to-face assessment in order to determine initial eligibility.[4] (*Id.* at Sec. XI.A.3.b.) The parties are required to agree upon a tool and protocol for conducting these face-to-face assessments. (*Id.* at Sec. XI.A.3.c.) Next, the Agreement requires "second-level reviews" of eligibility determinations "[i]n all cases in which the outcome of the face-to-face assessment is that a Class Member is not

---

[3] Presumptively eligible class members would transition to CBAS and remain there "at least until a face-to-face assessment by DHCS." (*Id.* at Sec. XI.B.2.a.)

[4] Face-to-face assessments are also required upon request by the Class Member if the ADHC center does not recommend him or her as CBAS eligible, and when the ADHC center does not complete a CBAS screening tool and the individual has not been determined to be categorically or presumptively eligible. (*Id.* at Sec. XI.A.3.b.)

eligible for CBAS."[5] (*Id.* at Sec. XI.A.4.a.) Finally, Class members who receive a final determination of ineligibility can appeal the decision and receive an administrative hearing. (*Id.* at Sec. XIV.B.1.)

Plaintiffs allege that Defendants have violated the Agreement on the following four grounds: 1) Defendants have failed to take necessary steps to prevent managed care opt-outs; 2) some Class Members have had long-delayed hearing decisions; 3) Defendants have subjected Class Members to illegal Quality Assurance reviews in determining CBAS eligibility; and 4) Defendants have not acted to support access to CBAS and prevent loss of CBAS services due to center closures.[6] (Dkt. Nos. 522 & 555.) Plaintiffs also seek specific relief for each of the above alleged violations, as well as an appointment of a Special Master to assist the parties in reaching resolution of the ongoing disputes. (*Id.*)

## ANALYSIS

**A.    Legal Standard**

"A consent decree, which has attributes of a contract and a judicial act, is construed with reference to ordinary contract principles." *City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985); *see also United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005) ( "[C]ourts treat consent decrees as contracts for enforcement purposes."). "A consent decree, like a contract, must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree." *Asarco*, 430 F.3d at 980; *see also United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."). Therefore, the consent decree is construed as it is written, "not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *Armour*, 402 U.S. at 681.

---

[5]    However, if the Class Member was identified by the ADHC center as not meeting CBAS eligibility criteria, a second-level review is required only upon the request of the Class Member or the Class Member's family. (*Id.* at Sec. XI.A.4.a.)

[6]    Plaintiffs' Motion also includes two additional issues—the parties' failure to reach an agreement on a post-transition assessment tool, and Defendants' alleged failure to provide adequate notices to Class Members—that Plaintiffs have informed the Court are "deferred" and thus should not be considered at this time. (Dkt. No. 529.)

**B.**    **Whether Defendants' Alleged Failure to Respond to the Opt-Out Issue Violates the Agreement**

Plaintiffs contend that Defendants have not adequately responded to the high number of Class Members who have opted-out of managed care plans. This issue has arisen because, as noted above, the Agreement requires Class Members to forgo fee-for-service Medi-Cal in favor of managed care in order to receive CBAS. This is a change for Class Members who are dually eligible for Medi-Cal and Medicare. (Dkt. No. 522, 7.) In the past, these so-called "dual eligibles" have generally been exempted from requirements to enroll in managed care plans, which may require members to seek treatment from Medi-Cal providers within the plan's network, as opposed to the fee-for-service's network. (*Id.*) But now, with the conversion to managed care looming, up to 5,000 Class Members have exercised their right to opt-out and remain in fee-for-service Medi-Cal, with some number of these Class Members doing so out of a fear of losing their Medicare doctor. (*Id.*) This fear exists despite reassurances from Defendants that managed care participants can keep their Medicare doctor. Plaintiffs blame this "mass confusion and concern" on misleading information from a variety of sources.[7] (Dkt. No. 522, 7.) Plaintiffs acknowledge Defendants' attempts to remedy the opt-out problem, but contend the efforts are "too little, too late." (*Id.*) Specifically, Plaintiffs assert that Defendants should have begun to properly educate providers and beneficiaries in June 2012, rather than in August 2012. (Dkt. No. 555, 5.) They argue that Defendants' inadequate response violates the Agreement, "which requires that Defendants monitor and address barriers to access to CBAS, enable managed care plans to be responsible for provisions of CBAS, and which

---

[7]    Much of this confusion seems to be coming from discussions Class Members are having with their doctors or Medicare providers. As explained by the parties at the hearing on this Motion, while some doctors and providers may be misinformed and advising Class Members that they cannot accept managed care coverage, other doctors and providers may be aware they can accept such coverage and are simply refusing to accept Class Members as a matter of choice. Generally, a dual eligible's medical bill is divided between Medicare and Medi-Cal. Under the fee-for-service model, the state would pay the Medi-Cal portion; but under managed care, the managed care plans now pay that cost. Some doctors and providers, for reasons unknown to the Court, may not want to rely on payments from managed care plans and are thus advising patients that they will be dropped if they transition to managed care.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  prohibits impediments to 'access to Medicare providers or services' due to enrollment in Medi-Cal

2  managed care." (Dkt. No.555, 2.)

3        Plaintiffs ask the Court to resolve the issue by ordering Defendants to allow those Class

4  Members who have opted-out of managed care to remain in fee-for-service CBAS until the

5  implementation of a larger program administered by the state to transfer Medi-Cal recipients from

6  fee-for-service to managed care.[8] (Dkt. No. 555, 6.) Alternatively, Plaintiffs suggest that opt-out

7  Class Members be reinstated to CBAS "until such time as Defendants have completed an effective

8  transition process that meets specified bench marks." (*Id.* at 7.) Finally, Plaintiffs note that opt-out

9  Class Members could be given Medical Exemption Requests, which ensures continuity of care and is

10  contemplated by the Agreement. (*Id.*)

11        In order for the Court to grant Plaintiffs' requested relief, Plaintiffs must first establish that

12  Defendants' actions or inactions related to the opt-out issue violate a specific provision of the

13  Agreement. Plaintiffs have failed to make such a showing. They cite to three provisions in the

14  Agreement—Sections XII.F.1, XII.F.2.k, and XII.B.5—that they believe Defendants have violated.

15  The first, Section XII.F.1 provides, "<u>Managed Care Coverage of CBAS</u>: Medi-Cal managed care

16  plans shall be responsible for the provision of CBAS services to CBAS-eligible Class Members

17  subject to the limitations set forth in Section XII.D. of this Agreement." (Dkt. No. 438, Ex. A.) The

18  Court does not see how this provision is even relevant to the opt-out dispute; there is no dispute over

19  whether Medi-Cal managed care plans are providing CBAS services to CBAS-eligible Class

20  Members who choose not to opt-out of the program.[9]

21        The second, Section XII.F.2.k states,

22  
23        Enrollment into Medi-Cal managed care plans and care management activities
    conducted by the plans shall not impede Class Members' access to Medicare providers
24  or services. Class Members accessing Medicare services through another plan or through
    Fee-for-Service Medicare maintain the right to see any Medicare provider that will
25  accept them as a patient and to choose their own primary care physician.

26       [8] This larger program administered by Defendants is called Coordinated Care Initiative

27  ("CCI") and is slated to begin in June 2013, transitioning some 560,000 Californians into managed
    care. (Dkt. No. 555, 3, 6.)

28       [9] The limitations in Section XII.D relate to the details of the CBAS transition from fee-for-
    service to managed care and do not concern the opt-out issue.

United States District Court
Northern District of California

1  (*Id.*) Plaintiffs appear to argue that enrollment into the managed care plans is impeding Class

2  Members' access to Medicare providers or services because some Class Members' physicians are

3  telling their patients that they will drop them if they do not opt-out. Defendants, however, do not

4  violate the Agreement if some physicians choose not to accept Class Members as patients or to

5  terminate their relationship with Class Members. The Agreement contemplates as much by

6  providing that Class Members "maintain the right to see any Medicare provider *that will accept them*

7  *as a patient*." (*Id.* (emphasis added).) The Agreement does not guarantee that Class Members are

8  able to keep their preferred provider. That some Medicare providers may discriminate based on

9  whether a patient is in a managed care Medi-Cal plan or a fee-for-service Medi-Cal plan, or that

10  some Class Members mistakenly believe that they will, is outside the scope of this provision of the

11  Agreement. It is not disputed that Class Members "maintain the right to see any Medicare provider

12  that will accept them as a patient and to choose their own primary care physician," in compliance

13  with the Agreement.

14        Finally, the Court is also not persuaded that Defendants' actions have violated Section XII.B.

15  Section XII.B addresses access and capacity, in relevant part, as follows:

16        The Department shall take all necessary and timely steps to ensure adequate provider
17        capacity including:
          . . .
18

19        4.    Using due diligence to: provide for sufficient CBAS capacity in geographic
              areas where ADHC services exist at the time of the execution of this Settlement
20            Agreement, including an adequate number of providers so that Class Members
              can transition seamlessly from ADHC to CBAS without interruption in services
21            due to waitlists; language and cultural competence to meet the needs of the
              CBAS eligible population; and program specialization to meet the specific
22            health needs of the CBAS eligible population. In the event that there is no
              sufficient CBAS provider capacity, Class Members shall receive unbundled
23            CBAS component services based on assessed need.

24
25        5.    The Department shall monitor CBAS provider capacity to ensure sufficient
              access in geographic areas where ADHC is provided at the time of execution of
26            this Agreement and use diligence to address access issues. This shall include
              consulting with CBAS providers and Plaintiffs' counsel regarding access
27            barriers and possible solutions.

28

7

United States District Court
Northern District of California

1   (*Id.* at Sec. XII.B.) Plaintiffs assert, through declarations from administrators or other employees at

2   CBAS provider centers in Los Angeles, that the financial strain put upon CBAS centers from some

3   Class Members' decisions to opt-out will inevitably lead to center closures and a resulting lack of

4   CBAS capacity. (Dkt. No. 500, Eychis Decl., ¶ 15; Dkt. No. 509, Liberman Decl., ¶ 4; Dkt. No. 520,

5   Toth Decl. ¶ 44.)

6       Even if these centers' financial situation is as dire as they claim, however, the record is

7   insufficient to support a finding that Defendants have breached this section. First, according to

8   Defendants, statewide CBAS capacity is only at 65%. (Dkt. No. 532, 8.) In other words, the Court

9   cannot find insufficient CBAS access or even that insufficient CBAS access is imminent. On this

10  record such insufficiency is only speculative.

11      Second, the Agreement requires Defendants to "use due diligence" and to "monitor CBAS

12  provider capacity to ensure sufficient access." The record does not support a finding that Defendants

13  have failed to do either. It is undisputed that Defendants voluntarily pushed back the transition to

14  managed care by three months—from July 1, 2012 to October 1, 2012—to address questions about

15  what managed care would entail. (Dkt. No. 532, 1, 4.) In mid-August 2012, Defendants began to

16  receive data of an atypically high number of opt-outs (approximately 5,000). (*Id.* at 4.) Defendants

17  again attempted to resolve the problem by delaying the transition an additional month, to November

18  1, 2012, to "further educate providers, participants, and managed care plans about the opt-outs, why

19  it was occurring, and to confirm whether the choice to opt-out was in fact a deliberate and informed

20  one." (*Id.*) Defendants have specifically identified that some physicians are inaccurately informing

21  some Class Members that they will be unable to accept them as patients if they transition to managed

22  care. (*Id.* at 5.) To ensure that all the relevant stakeholders have accurate information, Defendants

23  have undertaken the following measures: contact with individual physicians and medical centers;

24  contact with California Medical Association; communications with CBAS centers; visits to CBAS

25  centers; communications with managed care organizations; communications with CBAS provider

26  organizations; meeting with the Health Insurance Counseling & Advocacy Program. (*Id.*)

27  Additionally, starting on October 19, 2012, Defendants initiated the "Easy Way Back" program,

28

United States District Court
Northern District of California

1    which allows opt-out Class Members until the end of the year to immediately re-enroll in managed

2    care CBAS without having to undergo an eligibility assessment. (*Id.*)

3       Further, nothing in the Agreement necessarily prevents center closures; rather, the

4    Agreement provides Defendants flexibility in assuring eligible Class Members receive CBAS. In

5    their Opposition to the Motion, Defendants detail the procedures involved and outcome obtained in

6    transitioning CBAS members from a closing center. Southwest Adult Day Services, the only CBAS

7    center for Sonoma County, decided to cease operations and close as a CBAS center in mid-August

8    2012. (Dkt. No. 532, 6.) Working with the center's staff, Defendants state that they accomplished the

9    transition of the 25 members as follows:

10   
11     • Nine members were able to receive services at another CBAS center, where the plan arranged for the transportation to this other center.

12   
13     • Thirteen members receive a variety of unbundled services, as specifically permitted by the settlement agreement, through the plan. The various unbundled services include home physical therapy, occupational therapy, respite therapy, and services through the Plans Home Visiting Program.

14   
15   
16     • One member was disenrolled from the CBAS center even before closure due to her worsening medical condition. The decision to disenroll from the center was a mutual one among the family, the center, and the plan. The member was then provided complex case management services and was found to not be at risk for a skilled nursing facility at that time.

17   
18   
19     • One member was provided necessary services through a Regional Center.

20     • At the time of the closure, one member's precise arrangements were still being arranged by the plan, in consultation with family members.

21   
22   (*Id.* at 7.) Plaintiffs do not disagree with this account, but simply state that it "only confirms the need

23   for careful planning and sufficient lead time to protect the health and safety of displaced Class

24   Members." (Dkt. No. 555, 14.) Defendants are not in breach, however, merely because more Class

25   Members have opted-out than the parties expected and therefore CBAS centers may be experiencing

26   anxiety about their financial viability. The parties could have structured the Agreement such that if

27   more than a certain number of Class Members opted-out, Defendants would keep them enrolled in

28   fee-for-service Medi-Cal; however, that was not part of the bargain. Instead, the parties agreed that

United States District Court
Northern District of California

1  Defendants would use due diligence to ensure sufficient access and monitor the capacity situation.

2  They have done so.

3  Accordingly, the undersigned recommends that the Court find that Defendants' response to

4  the opt-out issue has not violated the Agreement.

5  **C.     Whether the Delay in Hearings Violates the Agreement**

6  Plaintiffs next assert that of the approximately 2,000 Class Members who requested a fair

7  hearing following a determination of ineligibility (the majority of the requests being made in

8  February and March 2012), 1,000 Class Members have not yet received their hearing or Defendants'

9  decision regarding their appeal.[10] (Dkt. No. 555, 8.) Plaintiffs contend that this delay violates state

10  and federal law, which require a hearing decision within 90 days of a request for a hearing. (*Id.*; Dkt.

11  No. 522, 22). These delays create anxiety and health risks for Class Members, and place financial

12  strain on CBAS providers, which, in some cases, are continuing to provide uncompensated services

13  to Class Members awaiting a determination. (*Id.* at 10.) As a remedy, Plaintiffs request that the Court

14

15        [10]  At the hearing, the Court requested that Defendants provide the Court with updated

16  figures reflecting the number of Class Members awaiting a hearing and the number of written
decisions still pending. Defendants submitted the Supplemental Declaration of Jane Ogle, dated

17  November 13, 2012, which lists several data points collected by Defendants. (*See* Dkt. No. 580.)
From what the Court can best gather, it appears that there have been 2,552 fair hearing requests as

18  of November 9, 2012, 269 of which were not ripe for review. (*Id.* at ¶ 4.) Of the remaining 2,283,
1,237 hearings have been conducted, 698 hearing requests were withdrawn, and 81 applicants did

19  not appear at the hearing. (*Id.*) This leaves 267 hearings waiting to be scheduled and/or conducted.
Defendants state that they are "on track to have all of the fair hearing requests received as of early

20  September heard by December 1, 2012, assuming that there is not a large number of requests for

21  postponements." (*Id.* at ¶ 5.)

22        Regarding outstanding hearing decisions, Defendants represent that of the 1,237 hearings
conducted, 517 written decisions have been issued. (*Id.* at ¶ 4.) Subtracting the 81 applicants who

23  did not attend their hearing, 639 decisions remain to be issued. Defendants state that "DHCS
anticipates being able to issue Final Decisions for all cases heard by December 1st, 2012, for

24  publication by DSS within the first two weeks of December, 2012." (*Id.* at ¶ 6.) Although Plaintiffs
are skeptical that Defendants can accomplish their stated goals, Plaintiffs provide no salient reason

25  why Defendants are not up to the task. In fact, Plaintiffs note in their supplemental briefing that the
most recent figures show that as of November 15, 550 written decisions have been issued. (*See* Dkt.

26  No. 582, 2.) That likely means Defendants issued 33 written decisions in the span of two days.
Especially given that written decisions will not likely need to be issued in every remaining case—

27  because applicants do not appear or because they withdraw their request—the Court does not find
that Defendants are incapable of meeting their stated goals.

28

United States District Court
Northern District of California

1  order CBAS for all Class Members with decisions pending over 90 days "until the time of final

2  determination." (*Id.*)

3          While the delays no doubt cause hardships, Plaintiffs have not shown how Defendants'

4  actions have violated any provision of the Agreement. Plaintiffs' Motion cites to Section XV.A of

5  the Agreement, but that section merely concerns the "Notice Plan" devised by the parties and says

6  nothing about the timing of hearings. In their Notice of Motion to Enforce Stipulated Judgment and

7  in their supplemental briefing filed after the hearing, Plaintiffs additionally cite to Section XIV,

8  entitled "Due Process/Appeals," which provides in relevant part, "Class members shall receive those

9  notices of adverse actions and opportunity for hearings and to file appeals and grievances they are

10 entitled to under federal and state law." (Dkt. No. 438, Ex. A, Sec. XIV.A.) However, nothing in

11 Section XIV provides for a violation of the settlement if the 90-day requirement is violated.

12         While federal and state law may require this 90-day timeframe, this Court's jurisdiction does

13 not extend beyond enforcing the Agreement. Indeed, Section XXI specifically provides that non-

14 class based remedies exist for, *inter alia*, "*due process grievance* and hearing procedures, available

15 to individual plaintiffs and Class Members for resolution of their individual disputes regarding

16 eligibility and/for [sic] appropriateness of services and benefits based on need." (Dkt. No. 438, Ex.

17 A, Sec. XXI.B (emphasis added).) Just as Class Members must appeal adverse eligibility

18 determinations through the appeals process and not the Court, Class Members must present

19 individual due process issues, such as alleged violations of the 90-day rule, through the

20 administrative and judicial review procedures already established under state and federal law.

21         In any event, it is undisputed that, at the direction of the Chief Administrative Law Judge at

22 DHCS, the parties *agreed* in late-April 2012 to schedule 125 attorney-represented "test cases" that

23 were designed to iron out legal issues that were expected to recur throughout the hearing process.

24 (Dkt. No. 532, 8; Dkt. No. 555, 9.) The test cases began at the end of May 2012 and lasted until the

25 end of August 2012, though some non-test cases may have been heard prior to the completion of all

26 the test cases. (*Id.*) As noted above, Defendants have indicated that all of the hearing requests

27 received as of early September will be heard by the beginning of December, assuming that there is

28 not a large number of postponements. (Dkt. No. 580, Ogle Suppl. Decl. ¶ 5.)

1    While the parties spend considerable effort in their briefs attempting to assign blame for

2 delays at various stages in this hearing process, it appears futile to attempt to parse out which side is

3 responsible for the delay of each of the hundreds of hearings. Delays are not a welcome part of the

4 process—particularly for Class Members—but the parties' submissions to the Court show that both

5 sides have worked, and continue to work, diligently and in good faith in creating and executing a

6 system for hearings that is efficient and fair.

7    The undersigned therefore recommends that the Court find that the alleged delays in hearings

8 do not constitute a violation of the Agreement.

9 **D.     Whether Defendants Violated the Settlement by Administering Quality Assurance
          Reviews**

10

11    Plaintiffs next contend that Defendants' process of reviewing all eligibility determinations

12 made by DHCS assessors conducting face-to-face assessments, a process known as Quality

13 Assurance ("QA") review, violates the Agreement. (Dkt. No. 522, 18-20.) Their argument rests on

14 their belief that the Agreement allows for administrative review only of determinations of

15 ineligibility by the face-to-face assessor—not determinations of eligibility. Rather, "[f]or Class

16 Members found eligible at a face-to-face assessment, the Settlement provided that they were to

17 transition to CBAS without interruption and at their current level of service." (Dkt. No. 522, 18

18 (citing Dkt. No. 438, Ex. A, XI.B.3).) Plaintiffs represent that the QA review process has affected

19 500-600 Class Members, and request that this Court immediately restore those Class Members'

20 CBAS benefits. (*Id.*; Dkt. No. 555, 13.)

21    Defendants do not address whether the Agreement forbids administrative review of initial

22 eligibility determinations;[11] instead, Defendants contend that they made it clear during the

23 development of the CBAS Eligibility Assessment Tool (CEDT) that there would be "multiple levels

24 of review" to verify "that its nursing staff had followed the correct procedures and had accurately

25

26    [11]  Although Defendants' Opposition is silent on their interpretation of the Agreement, the
parties note that in administrative hearings challenging a denial of CBAS, DHCS has taken the

27 position that the Agreement does not prevent review of an assessor's opinion following a face-to-
face assessment—even when the assessor concludes the participant is eligible. (*See* Dkt. No. 522,

28 19; Dkt. No. 532, 16.)

United States District Court
Northern District of California

1   assessed each participant for CBAS eligibility."  (Dkt. No. 532, 14 (citing King-Broomfield Decl., ¶

2   6).) Defendants also contend that they sent the final version of the CEDT—which includes separate

3   signature lines for the Assessor, QA Reviewer, and the 2nd Level Reviewer—to Plaintiffs' counsel

4   on December 15, 2011, before face-to-face assessments commenced, and Plaintiffs' counsel did not

5   object to the CEDT in any way. (*Id.* at 14-15.) Defendants also assert that earlier versions of the

6   CEDT included a signature line not just for the assessor, but also for "NE III/QA Reviewer." (*Id.* at

7   15 n.3 (citing Puckett Decl., Exs. A & B).)

8        Nothing in the Agreement necessarily prohibits Defendants from engaging in quality

9   assurance oversight of an assessor's initial favorable eligibility determination. Plaintiffs' argument to

10  the contrary—that Class Members "found eligible at a face-to-face assessment" automatically

11  transition uninterrupted into CBAS—is not supported by the Agreement. The relevant Agreement

12  provisions do not require the assessor to make an eligibility determination "at" the face-to-face

13  assessment, let alone require Defendants to abide by the assessor's judgment. The Agreement simply

14  states that "[a]fter a face-to-face assessment, presumptively eligible Class Members who are found

15  eligible for CBAS shall [continue receiving CBAS]," and, regarding non-presumptively eligible

16  Class Members, "[i]f, after a face-to-face assessment, a Class Member is determined to be eligible

17  for CBAS, the Class Member will transition from ADHC to CBAS . . . without interruption." (Dkt.

18  No. 438, Ex. A, Sec. XI.B.2.b & 3.a.) The Agreement does not make binding a single assessor's

19  opinion regarding an eligibility determination.

20       The existence of the QA process appears to derive from Section XVI.B of the Agreement,

21  titled "Quality Assurance." That provision states:

22       It is the responsibility of Defendants to provide quality assurance monitoring and oversight to
23       all Class Members. In carrying out this obligation, the following general standards shall
         apply:
24
25       1.   Quality assurance activities performed by Defendants shall include:
              *monitoring the quality and accuracy of the screening and assessment of*
26            *Class Members for CBAS services* and actual provision of services to
              Class Members by providers, managed care plans and APS, and shall
27            include reviews of data, random sampling of files and in person reviews
              with individuals whose files are examined.
28

13

2.      Quality assurance activities shall be focused on measuring whether services are provided to Class Members' [sic] in accordance with this Agreement.

(Dkt. No. 438, Ex. A, Sec. XVI.B (emphasis added).) This section does not exempt an assessor's initial determination of eligibility from quality assurance review; rather, it requires Defendants to actively monitor the quality and accuracy of the assessment process.

Such oversight was explicitly discussed during the development of the CEDT tool. As Plaintiffs' own declarant, Diane Puckett, states:

> We were told by DHCS that assessment teams would be headed by a DHCS nurse supervisor, which they (DHCS) felt to be a critical element of ensuring quality and consistency. Since DHCS planned to have over 200 nurses participating in CBAS assessments at ADHC centers, including both contract nurses and others from various divisions of DHCS, the nurse supervisor's role was to make sure that the procedures we developed were followed.

> The nurse supervisor's job with respect to reviewing findings made by the assessors included ensuring that all qualifying factors for CBAS were considered. This point was discussed at length at several meetings, including the need to provide training to assist assessors with some of the specialized CBAS criteria, such as the two dementia-related criteria, since many nurses do not have a background in distinguishing levels of dementia.

> . . .

> The QA Review was different from the second level reviews, as DHCS explained, and was included because not every assessment team would be able to have a nurse supervisor with them in the field; therefore an additional step was needed wherein the supervisor in the DHCS office would ensure that the eligibility standards had been correctly applied and that participants had the benefit of a sufficient and comprehensive assessment to determine whether they are eligible for CBAS. In other words, we had every reason to believe that this process would comport with the Settlement, given that the Settlement requires Quality Assurance activities and contains specific requirements for such activities.

(Dkt. No. 516, Puckett Decl. ¶¶ 8-9, 13.) Ms. Puckett goes on to explain that she believed implicit in this agreement of quality assurance oversight was the expectation that favorable eligibility determinations made by nurses on site could not be overturned. (*Id.* at ¶¶ 13, 16.) The Court, however, sees no basis for this assumption in the language of the Agreement. It appears incongruous to acknowledge the need for close supervision of face-to-face assessors but at the same time insist

14

United States District Court
Northern District of California

1   such supervision is forbidden if the assessor makes a determination, however inaccurate, in favor of

2   a Class Member.

3          What seems obvious from the parties' dispute over the QA review issue is that the parties did

4   not finalize the QA review process and understand exactly what it would entail. That Plaintiffs now

5   disagree with aspects of Defendants' QA review does not empower the Court to opine on the merits

6   of Defendants' oversight procedures.[12] The Agreement specifically provides that the parties are

7   required to agree upon a tool and protocol for conducting these face-to-face assessments. (Dkt. No.

8   438, Ex. A, Sec. XI.A.3.c.) Thus the details of QA reviews of face-to-face assessments are left to the

9   parties to develop, not the Court. For this reason, the Court declines Plaintiffs' invitation to examine

10  the QA review process and determine whether it comports with generally accepted practices for such

11  reviews or undermines the purpose of a face-to-face assessment.[13] (Dkt. No. 522, 21.) The Court is

12  not in a position to instruct Defendants on what is a proper QA review.

13         Accordingly, the undersigned recommends that the Court find that Defendants' QA review

14  process does not violate the Agreement.

15

16  _____

17  [12] Among other things, Plaintiffs argue that the QA review process is inappropriate because
    in some instances the signature on the QA Reviewer line appears to match the signature on the 2nd
    Level Reviewer line on the CEDT form. At the hearing, however, Defendants' counsel represented

18  that Defendants' assessment policy does not allow the person who conducts the QA review to also
    conduct the second-level review for the same applicant. Further, no second-level review is

19  conducted if the Class Member is found eligible.

20  [13] The Court notes that, while it is not clear why the QA reviewer overturned the decision
    of the nurse assessor in each instance, it appears many QA reviews disagreed with the assessor's

21  evaluation of the eligibility criteria; specifically, QA reviewers have disagreed with an assessor's
    determination on the grounds that there was an "insufficient showing of nursing interventions."

22  (Dkt. No. 516, Puckett Decl. ¶ 17.) In other words, at the time of those QA reviews, Defendants
    took the position that such intervention was required to satisfy the Agreement's eligibility

23  requirements for CBAS. However, following fair hearings on this issue, Defendants have since
    published a "Decision of the Director" making clear that the "substantial nursing intervention"

24  standard is not required for eligibility under the Agreement. (Dkt. No. 508, Leiner Decl., Ex. B, 16-
    17.) Notwithstanding this apparently erroneous earlier interpretation of the eligibility requirements,

25  nothing in the Agreement authorizes this Court to intervene in the eligibility determination process
    if Defendants' determinations, made in good faith, prove incorrect. Rather, the procedure

26  envisioned by the Agreement is exactly what is occurring now—fair hearings challenging
    individual eligibility determinations. While the Court understands why Plaintiffs are not satisfied

27  with the process, the Agreement does not allow for Court intervention under these circumstances.

28

United States District Court
Northern District of California

1    **E.      Remaining Access and Capacity Issues**

2          Plaintiffs also allege that a combination of factors are placing increasing financial strain on

3    CBAS centers state-wide, leading to the threat of center closures and lack of access and capacity for

4    Class Members. (Dkt. No. 522, 12; Dkt. No. 555, 13-14.) While Plaintiffs' concerns about access

5    and capacity relate to some of the issues discussed above, including delays in eligibility

6    determinations, their criticisms also address high ineligibility rates and delays in payments to

7    providers. (*Id.*)

8          Plaintiffs' allegations regarding lack of access and capacity do not constitute a violation of

9    the Agreement. As noted above, to the extent there is disagreement about an eligibility

10   determination, the Agreement provides a process by which a Class Member may challenge that

11   determination. Regarding the alleged delay in Treatment Authorization Requests ("TARs"), which

12   are required to receive payment for the provision of CBAS services, Plaintiffs appear to base their

13   argument on a state law requirement that the TARs be processed within 30 days. (Dkt. No. 522, 12)

14   Plaintiffs, however, do not point to a provision in the Agreement requiring Defendants to process

15   TARs timely. As discussed above, the Court did not retain jurisdiction to litigate claims of

16   Defendants' failure to follow California law.

17         Section XII.B, quoted above, does require Defendants to act diligently to ensure sufficient

18   CBAS access and capacity for Class Members. The Court, however, is unpersuaded that Defendants

19   have failed to meet the requirements of Section XII.B. When Plaintiffs brought their concerns

20   regarding the TARs to Defendants in late July, Defendants sent Plaintiffs' counsel a letter informing

21   them that the vast majority of TARS were being processed in a timely manner. (Dkt. No. 539, Press

22   Decl., Ex. B.) Specifically, Defendants' data showed "that nearly 97% of the approximately 7000

23   TARs currently in our system are aged at 60 or fewer days. And 83.4% are aged at 30 or fewer

24   days." (*Id.*) Defendants' letter goes on to ask Plaintiffs' counsel to provide them information on

25   specific TARs or specific centers that are having delay issues. (*Id.*) While the transition to a new

26   process of administering TARs has proved difficult for at least some CBAS providers, one of

27   Plaintiffs' own declarants, an administrator at a CBAS center in Sacramento, states that she spoke

28   with Debra Ferreira from DHCS on September 7, 2012 and was assured "that they would get all

1  TARs 30 days old and older [] processed within the next week." (Dkt. No. 497, Canterbury Decl. ¶

2  20.) Given this undisputed information and evidence of Defendants' diligent efforts to process

3  TARs, the Court does not see how Defendants' actions can be construed as violating Section XII.B,

4  or any other provision of the Agreement.

5      The undersigned therefore recommends that the Court find that Defendants have not violated

6  the Agreement by allegedly failing to address access and capacity issues.

7  **F.      Whether Defendants Have Violated the Purpose of the Agreement**

8      At the hearing, and through their supplemental briefing after the hearing, Plaintiffs

9  presented an overarching argument that even if Defendants have not violated a particular provision

10 of the Agreement, Defendants' actions and inactions have violated the purpose of the Agreement.

11 (*See* Dkt. No. 579.) To identify the supposed purpose of the Agreement, Plaintiffs point to the two

12 preliminary injunctions issued against Defendants prior to the settlement, as well as Section IV of

13 the Agreement, which states in part:

14      WHEREAS, the Parties enter into this Settlement Agreement ("Agreement") in
15  mutual recognition and support of Class Members' rights to live in the most integrated
    setting appropriate and be free of unnecessary institutionalization;
16
17      WHEREAS, it is the Parties' intent to provide a seamless transition to Settlement
    Class Members from current ADHC services to other services for eligible individuals,
18  including the new Community Based Adult Services (CBAS) program, and to provide case
    management and other services based on assessed need;
19

20 (Dkt. No. 438, Ex. A.) Plaintiffs further contend that the "circumstances surrounding the formation

21 of the consent order" may be taken in account when determining the Agreement's purpose and

22 whether that purpose has been thwarted. (Dkt. No. 579, 2 (quoting *United States v. ITT Cont'l*

23 *Baking Co.*, 420 U.S. 223, 238 (1975).)

24      The Supreme Court has held that "because consent decrees are normally compromises in

25 which the parties give up something they might have won in litigation and waive their rights to

26 litigation, it is inappropriate to search for the 'purpose' of a consent decree and construe it on that

27 basis." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 235 (1975) (examining, *inter alia*,

28 *Armour*, 402 U.S. 673). Accordingly, the Court declines to order certain remedies based on alleged

United States District Court
Northern District of California

1   violations of the Agreement's supposed purpose. Even if the recitals in Section IV could be seen as

2   an agreement to the purpose of the settlement, the undisputed facts show that Defendants have

3   operated in good faith and executed their duties to the extent required by the Agreement.

4   Additionally, as discussed above, the Court has not identified any ambiguity in the Agreement's

5   provisions that could be aided by reference to the recitals in Section IV or to the circumstances

6   surrounding the Agreement's formation.[14]

7        Although Plaintiffs cite to several lower court cases in their supplemental briefing, none is

8   helpful to Plaintiffs. In *Equal Employment Opportunity Commission v. Local Union No. 3*, the

9   district court did not rule out its ability to issue orders based on the alleged failure of one party to

10  comply with the supposed purpose of the consent decree where the decree included a provision

11  granting the court jurisdiction to "order any further relief which may be necessary or appropriate."

12  416 F. Supp. 728, 731-32 (N.D. Cal. 1975). The court, however, specifically distinguished *Armour*

13  on the basis that a provision allowing the court to grant "further relief" was not present in *Armour*.

14  *Id.* at 732. As in *Armour*, such a provision is not present here, and thus *Local Union* does not apply.

15       In *Massachusetts Association for Retarded Citizens, Inc. v. King*, the First Circuit cites *ITT*

16  *Cont'l Baking* when noting that interpretation of a consent decree "depends in part upon language,

17  in part upon the circumstances surrounding their formation, and in part upon the basic purposes of

18  the decree." 668 F. 2d 602, 607 (1st Cir. 1981) (citing *ITT Cont'l Baking*, 420 U.S. 223). This stray

19  sentence, however, does not mean that this Court can order the sought-after remedies even if it finds

20  no violation based on the language of the Agreement. The Supreme Court in *ITT Cont'l Baking*,

21  while holding that the agreement's purpose could be used to assign penalties *after* a violation of the

22  agreement was found, affirmed the rule in *Armour*, forbidding use of the agreement's supposed

23  purpose to determine whether the agreement was violated. 420 U.S. at 237. Finally, in *N.Y. State*

---

24      [14] To the extent Plaintiffs imply that the Court should use the "circumstance" of the two

25  injunctions issued against Defendants in enforcing and interpreting the Agreement, the Court
    disagrees. Reliance on such information would presumably be based on the notion that the Court

26  should take into account which side was apparently winning the litigation prior to settlement.
    However, as the Supreme Court has noted, settlement agreements represent compromises and the

27  parties have given up their right to proceed on the claims and determine their final merits. (*See*

28  *Armour*, 402 U.S. at 681.) It is thus improper to treat the Agreement as Defendants' surrender rather
    than as a neutral document representing the parties' bargain.

1   *Ass'n for Retarded Children v. Carey*, the Second Circuit broadly interpreted a provision in a

2   settlement agreement based on the circumstances surrounding formation of the agreement. 596 F.2d

3   27, 37-38 (2d Cir. 1979). But such a particularized interpretation is unhelpful here with a different

4   agreement and a different set of circumstances.[15]

5           The undersigned recommends that the Court find that Defendants have not violated the

6   Agreement by allegedly failing to act in accordance with the supposed purpose of the Agreement.[16]

7                                          **CONCLUSION**

8           For the reasons stated above, the undersigned RECOMMENDS that Plaintiffs' Motion be

9   DENIED. Any party may file objections to this report and recommendation with the district court

10  judge within ten days after being served with a copy. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P.

11  72(b); Civil L.R. 72–3. Failure to file objections within the specified time may waive the right to

12  appeal the district court's ultimate Order.

13

14  Dated: November 20, 2012

15                                          _____

16                                          JACQUELINE SCOTT CORLEY
                                            United States Magistrate Judge

17

18

19

20

21

22

23  [15]  To the extent Plaintiffs believe that changed conditions warrant relief from Defendants'
24  actions, the Court notes that Plaintiffs have not sought modification of the Agreement. On a motion
    to enforce a settlement agreement, the Court cannot construe the agreement such that the
25  construction modifies the agreement. *See Hughes v. United States*, 342 U.S. 353, 357-58 (1952)
    (holding that while modification could be had after a proper hearing proving the need for such
26  modification under applicable standards, such modification in the guise of construing a consent
    decree is inappropriate); *see also United States v. Atl. Ref. Co.*, 360 U.S. 19, 23 (1959) (same).
27       [16]  Because the undersigned does not find that Defendants are in violation of the Agreement,
28  the undersigned also recommends that the Court decline Plaintiffs' request to appoint a Special
    Master.